FILED

2022 Mar-25  PM 01:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **MICHAEL WAYNE REYNOLDS,** } | |
| } | |
| **Petitioner,** } | |
| } | |
| **v.** } | **Case No.: 4:18-CV-00236-RDP** |
| } | |
| **JEFFERSON S. DUNN, Commissioner,** } | |
| **Alabama Department of Corrections,** } | |
| } | |
| **Respondent.** } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Michael Wayne Reynolds's Petition for Writ of Habeas Corpus by Prisoner in State Custody Under Death Sentence Pursuant to 28 U.S.C. § 2254 and his Motion to Permit Discovery and for an Evidentiary Hearing. (Docs. # 1, 32).[1] Reynolds was convicted of five counts of capital murder for the killing of Charles ("Chuck") James Martin III, Melinda Martin, and their 8-year-old daughter Savannah Martin. In his petition, Reynolds seeks habeas relief from both his conviction and death sentence.

Through his timely-filed federal habeas petition, Reynolds presents numerous claims for consideration by the court, including ten "Substantive Claims"; six "Ineffective Assistance of Counsel Claims"; and one "Cumulative-Effect Claim." (*See generally* Docs. # 1, 31). Reynolds highlights four of these claims: (1) violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); (2) violation of *Doyle v. Ohio*, 426 U.S. 610 (1976); (3)

---

[1] Reference to a document number ("Doc. _____"), refers to the docket number assigned to each document as filed in the court's record and citations to the page numbers in such documents refer to page number assigned to the document within the court's electronic filing system. Unless otherwise indicated, citations to the state-court records reflect the volume and PDF page number.

ineffective assistance of counsel; and (4) a violation of Reynolds's right to confront and adequately cross-examine witnesses at trial. (Doc. # 31 at 8).

The Petition is fully briefed and ripe for the court's review. (*See* Docs. # 1, 20, 21, 31, 32). After careful consideration of Reynolds's claims in light of the state record and for the reasons stated below, Reynolds has not met the requirements for habeas relief under 28 U.S.C. § 2254. Thus, Reynolds's Petition for Writ of Habeas Corpus (Doc. # 1) and his Motion to Permit Discovery and for an Evidentiary Hearing (Doc. # 32) are due to be denied.

## <u>TABLE OF CONTENTS</u>

I.    **BACKGROUND** ........................................................................................**10**

    A.  **The Offense Conduct** .................................................................**10**

    B.  **Third-Party Conduct** ................................................................**19**

    C.  **The Sentencing Order** ...............................................................**25**

    D.  **Procedural History** ...................................................................**30**

II.   **FEDERAL HABEAS REVIEW STANDARDS** ........................**34**

    A.  **Exhaustion, Procedural Default, and the "Cause and Prejudice Standard"** ........**36**

    B.  **The Procedural Default Doctrine** ............................................**38**

        1.  **General Principles** ...............................................................**38**

        2.  **Overcoming Procedural Default** ...........................................**41**

            a.  **"Cause and Prejudice" Standard** ...................................**42**

                (1) **"Cause"** ....................................................................**43**

                (2) **"Prejudice"** ..............................................................**44**

            b.  **"Fundamental Miscarriage of Justice" Standard** ........**44**

    C.  **The Antiterrorism and Effective Death Penalty Act of 1996 & Habeas Review** ....**45**

        1.  **28 U.S.C. § 2254(e)(1)** ......................................................**46**

        2.  **28 U.S.C. § 2254(d)** .........................................................**47**

            a.  **Section 2254(d)(1)'s "Contrary to" Clause** .................**48**

            b.  **Section 2254(d)(1)'s "Unreasonable Application" Clause** ............**49**

            c.  **Section 2254(d)(2)** ........................................................**50**

            d.  **Evaluating State Court Factual Determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)** ........**51**

    D.  **The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions** ........**52**

    E.  **Claims Dismissed Pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure** ........**54**

    F.  **Ineffective Assistance of Counsel Claims** ..............................**56**

        1.  **The Performance Prong** .......................................................**58**

        2.  **The Prejudice Prong** ...........................................................**60**

        3.  **Deference Afforded State Court's Decisions** .........................**61**

**III.  REQUEST FOR DISCOVERY AND EVIDENTIARY HEARING MOTION**............**63**

   **A.  Discovery Is Not Warranted on Reynolds's Rule 32 *Brady/Giglio* Claim**................**64**

   **B.  An Evidentiary Hearing Is Not Warranted on Reynolds's *Brady/Giglo* or *Strickland* Claims** ...............................................................................**67**

**IV.  SUBSTANTIVE CLAIMS** ........................................................................**68**

   **A.  *Brady/Giglio*** .....................................................................................**68**

      **1.  Alleged Failure to Disclose Deal with West and to Correct Her Testimony** .....**71**

         **a.  Procedural History** .......................................................................**72**

            **(1)  The Rule 32 Court's Initial Dismissal and the Reversal by ACCA**.......**72**

            **(2)  Rule 32 Court's Decision on Remand** ........................................**73**

            **(3)  ACCA's Decision After Return from Remand** .......................................**75**

         **b.  Reynolds is Not Entitled Relief Under § 2254(d)(2)** ........................**77**

         **c.  Reynolds is Not Entitled to Relief Under § 2254(d)(1)** ...............**82**

      **2.  Alleged Suppression of Notes** ........................................................**84**

         **a.  ACCA's Decision** .........................................................................**86**

         **b.  28 U.S.C. § 2254(d)(1)** ................................................................**87**

            **(1)  Investigator Notes from Langley Interview**...............................**88**

            **(2)  Forensic Field Notes**...........................................................**92**

         **c.  Conclusion** .................................................................................**94**

      **3.  Cumulative-Effect** ........................................................................**94**

   **B.  Prosecutorial Misconduct** ....................................................................**95**

      **1.  Reynolds's *Doyle* Claim** ...............................................................**96**

         **a.  The ACCA's Decision** .................................................................**97**

         **b.  Section 2254(d)(2)** .....................................................................**110**

         **c.  Section 2254(d)(1)** .....................................................................**113**

            **(1)  *Doyle v. Ohio*** ...................................................................**115**

            **(2)  *Anderson v. Charles*** ..........................................................**118**

            **(3)  *Jenkins v. Anderson*** .........................................................**120**

         **d.  Alternatively, Reynolds Has Failed to Show that the ACCA Was Unreasonable in Concluding that Any *Doyle* Error Was Harmless**...........**122**

**2. Alleged Pervasive Prosecutorial Misconduct** ...................................................**124**

   **a. Alleged Prosecutorial Misconduct:  Encouraging Improper Evidence** ......**126**

      **(1) Background** ...................................................**127**

         **(a) Reynolds's Brief to the ACCA** ...................................................**127**

         **(b) The ACCA's Decision** ...................................................**127**

         **(c) Reynolds's Federal Habeas Petition and Reply** ...................................................**129**

         **(d) Comparison of Reynolds's State Court Brief & Federal Habeas Petition** ...................................................**129**

      **(2) Prior Inconsistent Statement** ...................................................**130**

         **(a) Reynolds Did Not Exhaust the Prosecutorial Misconduct Claim Based on the Prosecutor's Knowledge that Martin's Prior Inconsistent Statement Was Excluded From Trial** .......................**130**

         **(b) Alternatively, Even Assuming the Claim is Not Exhausted and Even Assuming the Prosecutor Acted Improperly, Any Presumed Error Was Harmless** ...................................................**132**

      **(3) Prior Consistent Statement** ...................................................**132**

      **(4) The ACCA's Decision Regarding the Prosecution's Line of Questioning That Directed Martin to Identify His Mother Was Not Based on an Unreasonable Determination of the Facts Nor Was it Contrary to Clearly Established Federal Law** ...................................................**133**

      **(5) Conclusion** ...................................................**133**

   **b. Alleged Prosecutorial Misconduct:  Bolstering Evidence** ...................................................**134**

      **(1) Alleged Vouching for West** ...................................................**134**

         **(a) ACCA's Decision** ...................................................**134**

         **(b) Section 2254(d)(2)** ...................................................**134**

         **(c) Section 2254(d)(1)** ...................................................**137**

         **(d) The Trial Court's Jury Instruction Further Demonstrates that the Prosecution's Comments Did Not Cause Constitutional Error** ....**139**

         **(e) Conclusion** ...................................................**139**

      **(2) Vouching for Capital Verdict** ...................................................**140**

         **(a) The ACCA's Decision** ...................................................**140**

         **(b) Analysis** ...................................................**141**

   **c. Alleged Prosecutorial Misconduct:  Inflaming Passions of Jury** ...............**142**

(1)  The ACCA's Decision ................................................................143

(2)  Reynolds's Argument that the ACCA Failed to Address the Prosecution's Opening Statements is Without Merit and Does Not Provide Reynolds With an Independent Cause for Habeas Relief.......144

(3)  Section 2254(d)(1) .................................................................145

    (a)  *Viereck v. United States*................................................145

    (b)  *Bruton v. United States* ...............................................147

    (c)  *Berger v. United States* ...............................................147

(4)  Conclusion ............................................................................149

d.  **Alleged Prosecutorial Misconduct:  Misstatement of Law to Jury**............150

(1)  Reasonable Doubt .................................................................151

(2)  Mitigating Circumstances ......................................................154

    (a)  The ACCA's Decision ..................................................155

    (b)  Reynolds Failed to Properly Raise This Claim for Federal Habeas Review.............................................................156

    (c)  Alternatively, the ACCA's Decision Was Not Contrary to, or an Unreasonable Application of, Clearly Established Federal Law....157

        (i)  *Bruton v. United States* .................................158

        (ii)  *Berger v. United States* ...............................159

    (d)  Conclusion ..................................................................160

(3)  Voluntary Intoxication as a Defense .........................................160

    (a)  The ACCA's Decision ..................................................160

    (b)  Analysis .......................................................................161

    (c)  Conclusion ..................................................................162

(4)  Improper Limitation of Mitigation Evidence ............................162

    (a)  The ACCA's Decision ..................................................163

    (b)  Section 2254(d)(1) ......................................................163

        (i)  *Smith v. Texas* .............................................164

        (ii)  *Lockett v. Ohio* ...........................................165

    (c)  Conclusion ..................................................................165

(5)  Cumulative Impact of Misstatements of Law............................165

e.  **Alleged Prosecutorial Misconduct:  Victim Impact Evidence** ...................166

(1)  ACCA's Decision ...................................................................167

(2)  Section 2254(d)(2) .............................................................169

(a)  *Donnelly v. DeChristoforo* ........................................169

(b)  *Darden v. Wainwright* ..............................................169

(c)  *Viereck v. United States* ...........................................170

(3)  Section 2254(d)(2) .............................................................171

(4)  Conclusion .........................................................................171

f.    Alleged Prosecutorial Misconduct:  Introduction of Hearsay .................172

(1)  Reynolds Failed to Exhaust This Claim ........................172

(2)  Section 2254(d)(2) .............................................................173

(3)  Section 2254(d)(1) .............................................................174

(4)  Conclusion .........................................................................174

g.    Alleged Prosecutorial Misconduct:  Evidence of Other Crime .................174

h.    Claim:  Cumulative-Impact of Alleged Prosecutorial Misconduct ...........176

C.  *Crawford* .........................................................................................176

1.  The ACCA's Decision ...................................................................177

2.  Section 2254(d)(1) ........................................................................178

D.  Double-Counting .....................................................................................181

E.  Advisory Opinion ....................................................................................184

F.  Jury Instructions .....................................................................................186

1.  The Instruction of Reasonable Doubt During the Guilt Phase of Reynolds's Trial ...............................................................................................187

2.  Instruction on Mitigating Circumstances During the Penalty Phase .............191

3.  Instruction Regarding Mercy During the Penalty Phase of Reynolds's Trial 195

G.  *Batson* ...............................................................................................198

1.  Reynolds Waived His *Batson* Claim .................................................200

2.  In Any Event, Reynolds Cannot Succeed on His *Batson* Claim .....................201

H.  *Ring* .................................................................................................202

I.  Alabama's Capital Sentencing Process ...............................................204

J.  Alabama's Method of Execution ........................................................208

V.    INEFFECTIVE ASSISTANCE OF COUNSEL ...........................................211

**A. Guilt Phase Claims of Ineffective Assistance**..................................**212**

    **1. Meaningful Participation in His Own Defense**..................**213**

    **2. Investigation of the State's Case**..................................**217**

    **3. Investigation of Decomposition Evidence**......................**221**

    **4. No Motion for Change in Venue**..................................**224**

    **5. Failure to Adequately Conduct *Voir Dire***....................**230**

    **6. Failure to Make a *Batson* Objection**..........................**234**

    **7. Failure to Introduce Report of Chad Martin's Confession**...........**236**

    **8. Failure to Object to "Prejudicial" Bolstering**...............**240**

    **9. Failure to Cross-Examine a "Key Witness" at Trial**........**242**

    **10. Failure to Object to Courtroom Security Measures**..........**243**

**B. Penalty Phase Claims of Ineffective Assistance**..................**249**

    **1. Failure to Conduct a Reasonable Mitigation Investigation**............**250**

        **a. Reynolds Did Not Properly Plead This Claim**...........**251**

        **b. Section 2254(d)(1)**......................................**252**

            **(1) *Ake v. Oklahoma*, 470 U.S. 68 (1985); *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017)**...............**252**

            **(2) *Williams v. Taylor*, 529 U.S. 362 (2000)**..............**253**

            **(3) *Wiggins v. Smith*, 539 U.S. 510 (2003)**...............**255**

            **(4) *Rompilla v. Beard*, 545 U.S. 374 (2005)**.............**257**

            **(5) *Porter v. McCollum*, 558 U.S. 30 (2009)**............**258**

            **(6) *Sears v. Upton*, 661 U.S. 945 (2010)**...............**261**

        **c. Section 2254(d)(2)**......................................**263**

    **2. Counsel's Omission of "Powerful," "Readily-Available," and "Compelling" Mitigation Evidence**..................................**264**

        **a. The ACCA's Decision**..................................**264**

        **b. Section 2254(d)(1)-(2)**..................................**266**

    **3. Counsels' Failure to Prepare the Penalty Phase Witnesses to Testify**...........**267**

    **4. Counsels' Failure to Introduce a Confession to Create Residual Doubt**.........**269**

**C. Sentencing Hearing**..................................**272**

**D. Motion for a New Trial**..................................**275**

**E.  "Actual Conflict of Interest" Claim** ...................................................................**277**

**F.  Reynolds's Cumulative-Effect *Strickland* Claim**.......................................**284**

**VI.  REYNOLDS'S CUMULATIVE-EFFECT "OF ALL ERRORS" CLAIM**.................**286**

**VII.  CONCLUSION** ............................................................................................................**288**

## I.  BACKGROUND

On direct appeal, the Alabama Court of Criminal Appeals ("ACCA") noted the following

regarding the charges against Reynolds and his trial on those charges:

> In March 2005, an Etowah Grand Jury returned an indictment against . . . Michael
> Wayne Reynolds, charging him with five counts of capital murder in connection
> with the deaths of Charles James Martin III, Melinda Martin, and the Martins'
> eight-year-old daughter, Savannah Martin. The murders were made capital
> because: (1) two or more persons were killed by one act or pursuant to one scheme
> or course of conduct, *see* § 13A-5-40(a)(10), Code of Alabama 1975 (count I of the
> indictment); (2) the murder of Charles Martin III was committed during the course
> of a first-degree robbery, *see* § 13A-5-40(a)(2), Code of Alabama 1975 (count II of
> the indictment); (3) the murder of Melinda Martin was committed during the course
> of a first-degree robbery, *see* § 13A-5-40(a)(2), Code of Alabama 1975 (count III
> of the indictment); (4) Savannah Martin was less than 14 years of age when she was
> murdered, *see* § 13A-5-40(a)(15), Code of Alabama 1975 (count IV of the
> indictment); and (5) the murder of Savannah Martin was committed during the
> course of a first-degree robbery, *see* § 13A-5-40(a)(2), Code of Alabama 1975
> (count V of the indictment). Following a trial by jury, Reynolds was convicted of
> all five counts of capital murder, as charged in the indictment. The jury
> recommended, by a vote of 12-0, that Reynolds be sentenced to death. The circuit
> court accepted the jury's recommendation and sentenced Reynolds to death for the
> five capital-murder convictions.

*Reynolds v. State*, 114 So. 3d 61, 73 (Ala. Crim. App. 2010) ("*Reynolds I*").

### A.  The Offense Conduct

The ACCA observed the following factual basis for the charges against Reynolds:

The State presented evidence that in the early morning hours of Sunday, May 25,
2003, Charles Martin, III, his wife, Melinda, and their 8-year-old daughter,
Savannah, were stabbed to death in their house. Their bodies were doused with
gasoline and set on fire. The crimes were discovered later that morning by
Melinda's father, Jerry Veal. Melinda Martin's purse and a cordless telephone were
missing from the house.

Adrian Marcella "Marcie" West, ["West"] who was Michael Reynolds's girlfriend
at the time of the murders, testified at trial. She and Reynolds lived with Reynolds's
father, Harold Reynolds, at the time of the crimes. West testified that on Saturday,
May 24, 2003, Michael Reynolds installed a car stereo for Donald Harvey, who
was also known as "Dino," in exchange for some cocaine. West and Reynolds used
the cocaine; they also used crack cocaine several more times throughout that day
and night.

West testified that later that night or early on Sunday morning, she drove Michael Reynolds to the Martins' house in a vehicle that was owned by Harold Reynolds's girlfriend, Sandra Roberts ["Roberts"]. West said that Michael Reynolds and Charles Martin were good friends. Reynolds told West that they were going to the Martins' house "to get some money," and she assumed he meant that he was going to rob Charles Martin.

When they arrived at the Martin residence, West parked the vehicle in the driveway, and Michael Reynolds got out. Reynolds told West to wait in the car. West said that Reynolds was not wearing any shoes, and that he was carrying a scabbard containing a dagger-style knife. She had seen the knife before at Harold Reynolds's residence. West testified that she was not alarmed that Reynolds had the knife with him because, she said, Reynolds sometimes traded various items for drugs or money.

Reynolds went to the carport door and knocked. Charles Martin opened the door and waved at West, and then Martin and Reynolds went into the house.

While West was waiting in the car, she heard Melinda Martin scream. West got out of the car and ran into the house. She saw Charles Martin lying on the kitchen floor and she heard Melinda Martin screaming in the back of the house. West went to the bedroom, where she saw Melinda Martin bent over next to the bed as Michael Reynolds stabbed her. Savannah Martin was on the bed.

West testified that she got between Reynolds and Melinda and tried to stop him from stabbing her. Reynolds accidentally stabbed West through the arm when she tried to intervene. West testified that Reynolds yelled at her and asked her what she was doing there. He told West to get the telephone and Melinda Martin's purse and to go wait in the car. Reynolds handed her two knives—the knife that he had taken into the house, and a steak knife that West had not seen before.

West grabbed the telephone and Melinda Martin's purse and took the knives and left the bedroom. When she left the room, Melinda Martin was "slouched over" at the end of the bed, and Savannah Martin was standing on the bed. West testified that she felt faint, so she leaned up against the wall in the hallway. She again felt faint when she crossed over Charles Martin's body in the kitchen, so she leaned against the kitchen counter. West left the house and went to the car.

West opened the front passenger door and placed the items in the floorboard . . . and then crawled to the driver's side of the vehicle – the driver's door was damaged and did not open.

West testified that Reynolds came to the car and told West not to leave, and then he grabbed the larger knife and went back into the house. Reynolds apparently returned to the car a second time and again told West not to leave. West testified

that she was afraid, so she did not leave or call for help. At that time, West did not realize that she had been stabbed.

West testified that when Reynolds returned to the car for the third time, he got in the vehicle and told her that she had been stabbed and that he should drive. West said that she did not allow Reynolds to drive because she feared that he was going to take her somewhere and kill her. West could see the orange glow of a fire in the house.

She drove back to Harold Reynolds's residence. When they arrived at Reynolds's house, Michael Reynolds told West to give her clothes to him and to take a shower. West stated that she saw Reynolds looking through Melinda Martin's purse. While West was taking a shower, Reynolds took a cloth and cleaned Sandra Roberts's car. After West showered, Reynolds bandaged her arm, using a first-aid kit they had in their bedroom. Reynolds told West [that] there was no blood in the car.

Sandra Roberts testified that she was asleep in Harold Reynolds's bed when West and Michael Reynolds arrived back at the house. She testified that around 3:00 or 4:00 a.m. she was awakened when Reynolds placed her car keys on the nightstand beside the bed. West and Reynolds then went to their bedroom. Roberts noticed that West was walking with her arms folded.

Roberts got out of the bed and went into the kitchen and sat down at the kitchen table. A short time later, Michael Reynolds entered the kitchen and gave Roberts some money and told her to go buy some drugs. Roberts left and purchased some crack cocaine. West said that while Roberts was gone, Michael Reynolds took a shower and that is when she noticed blood on Reynolds's legs.

When Roberts returned to the house, she and Michael [Reynolds] divided the crack cocaine. Roberts used her portion of the drugs while she was seated at the kitchen table, but Michael Reynolds took his and West's share of the crack to his bedroom.

Roberts testified that a short time later, Michael Reynolds reentered the kitchen and propositioned her for sex, but she refused. Roberts said that Michael Reynolds wanted more drugs but, according to him, he could not get West to give him more money. Reynolds asked Roberts to talk to West. Roberts agreed.

When Roberts entered the bedroom, West was in [the] bed with the covers pulled up to her neck, staring at the ceiling. Roberts testified that West was acting strangely and that she was unable to engage West in any conversation. Roberts decided to leave and go to her house. As she was driving, she noticed a cordless telephone without the base on the backseat of her car. Roberts had never seen that telephone before.

West and Michael Reynolds woke around 9:00 or 9:30 on that morning. West noticed that the eyeglasses Michael Reynolds had been wearing the night before

were broken. When she pointed this out to Reynolds, he told her that the missing eyeglass piece would melt in the fire. West testified that Reynolds told her that the knives were under the truck and [that] their clothes and Melinda Martin's purse were in a white bag.

Around 10:00 am on Sunday, May 25, Jerry Veal, Melinda Martin's father, drove by Charles and Melinda Martin's residence located on Tidmore Bend Road in Etowah County. Veal became concerned when he saw Melinda's vehicle parked in the driveway because Melinda regularly attended church services on Sunday mornings. Veal telephoned Melinda on his cell phone, but no one answered.

Veal drove back to the Martin residence and parked his vehicle in the driveway. He got out and went to the carport door and knocked. When no one came to the door, Veal opened the carport door and found the kitchen in disarray—furniture had been moved around, the window treatments were partially torn down, and there was blood everywhere. Veal saw his son-in-law lying on the kitchen floor in a pool of blood.

Veal returned to his car and told his wife, and she telephoned 911. While Jerry Veal was talking on the cell phone with the 911 dispatcher, he saw James Mulkey, a retired Gadsden police officer, drive by the house. Veal was acquainted with Mulkey, so he stopped Mulkey and told him what he had seen.

Mulkey instructed Veal to remain outside, and Mulkey went to the carport door. When Mulkey opened the carport door, he saw Charles Martin, who appeared to be dead, lying on the kitchen floor. Mulkey did not enter the residence at that time because he could detect the strong odor of gasoline and gunpowder.

When the paramedics arrived, Mulkey and the paramedics entered the residence; they determined that Charles Martin was dead. Mulkey and the paramedics proceeded down the hallway to determine if anyone was in need of medical assistance. They discovered the bodies of Melinda Martin and Savannah Martin in a bedroom. The bedroom was in disarray and there was blood everywhere.

The smell of gasoline was overpowering, so Mulkey opened the back door to the residence, and then he and the paramedics left through the back door of the house, being careful not to disturb the scene.

Investigators arrived and processed the scene. During the investigation, a bloody partial footprint and a blood drop were discovered on the steps outside the carport door. Charles Martin was found lying on the floor in a pool of blood with a cigarette by his mouth. There were bloody shoe prints on the kitchen floor. The kitchen chairs were knocked over, the kitchen blinds had been ripped or slashed, and there was blood spattered everywhere. A gasoline can was sitting on the floor beside Charles Martin's body and exploded bottle rockets were scattered throughout the house[, the] kitchen[,] and into the living room.

A utensil drawer in the kitchen was open, and there were blood droplets under the drawer. There were two sandwiches on a Styrofoam plate on the kitchen counter by the stove, and one of the burners of the kitchen stove was lit. Investigators observed a spoon with gray material in it and a syringe located on the counter beside the stove. A basket of prescription drugs was also on the counter.

Blood droplets were found on the hallway wall opposite the door to the bedroom where the bodies of Melinda and Savannah were discovered.

Melinda Martin was found lying on the floor on the right side of the foot of the bed. She had slits in her clothing that were consistent with stab wounds. She was also wearing a back brace. A walking cane was found near her body. A telephone cord extended from the wall by the headboard of the bed to Melinda Martin's body, but no telephone was attached to the cord.

Savannah Martin was lying on her back on the bed. She had been stabbed multiple times and had a prominent stab wound through her neck. A bloody handprint was discovered near Savannah's body on the fitted sheet; however, due to the soft surface, there was no ridge detail to the print.

An investigator collected the wet, bloody comforter and bed linens and put them in a large paper bag in order to transport the bedding to the forensic laboratory for further testing. When the bedding was unpackaged and put up to dry later that day, a television remote and a temple piece to a pair of eyeglasses fell out of the bedding. Law-enforcement personnel were informed about the eyeglass piece.

An autopsy of the victims confirmed that Melinda died as a result of 24 stab wounds to her body. Charles Martin died as a result of 11 stab wounds to his body. Savannah Martin died as a result of 5 stab wounds to her body. All the victims had chemical burns to their bodies, and Charles Martin also had thermal burns on his body. None of the stab wounds to the victims was immediately fatal.

West testified that as she and Reynolds were walking to a nearby convenience store later that same Sunday morning, Reynolds asked West if he had made the headlines, and he inquired whether West had seen Charles Martin's face. Later that day, the police arrested Michael Reynolds on an unrelated matter.

That same afternoon, West saw Donald Harvey drive into the alley behind Reynolds's residence. West got into Harvey's car, and he asked her if Reynolds had anything to do with what happened to Charles Martin. West nodded in the affirmative. Although the evidence was conflicting regarding whose idea it was, West and Harvey agreed that they should get rid of the evidence from the crime scene.

14

Harvey and West went to a gasoline service station and purchased some gasoline and drove to an area near Tuscaloosa Avenue. West threw the telephone base into the woods, and then Harvey doused the bag containing their clothes and the purse with gasoline and set the items on fire. West and Harvey threw the knives into the Coosa River from a pier at a boat launch located at Gadsden State Junior College.

On the day the murders were discovered and in the days that followed, the police questioned several persons regarding their potential involvement in the murders and robbery, including Charles Martin's nephew, Chad Martin, and John Langley, who lived in the same neighborhood as the Martin family. The police ultimately ruled these individuals out as suspects.

A few days after the discovery of the crimes, West talked with her former employer, who was an attorney, and told him what had happened. The attorney contacted the district attorney's office, and as a result, West subsequently gave the police a statement regarding the crimes.

Based on the information provided by West, the Gadsden police located and photographed the burn pile where West said the clothes and purse had been burned, and the police also recovered the telephone base in the woods a short distance from the burn pile. The phone base, the cordless phone found in Roberts's car, and the telephone cord lying across the floor in the room where the bodies of Melinda and Savannah Martin were found were all Uniden brand products.

Gadsden police conducted a search of Harold Reynolds's residence. In the bedroom shared by Michael Reynolds and West, the police discovered a pair of prescription tinted eyeglasses. The glasses were broken—the temple piece was missing, and one of the lenses was lying beside the glasses. The glasses were consistent with the prescription lenses and frames sold to Reynolds by a professional optician. The temple piece recovered from the bedding at the Martin house matched the temple piece still attached to the frame found at the Reynolds residence. A first-aid kit was also discovered in the bedroom.

A scuba diver with the Etowah County Rescue Squad recovered an oriental-style scabbard from the Coosa River in the area where the knives had been discarded by West and Harvey. Sandra Roberts testified that the scabbard['s decorative sheath] appeared to be the same [sheath] she had previously seen at Reynolds's residence. West also testified that the scabbard was the one that she and Harvey had disposed of in the Coosa River.

Photographs of Michael Reynolds's hands taken by [the] Gadsden police after his arrest showed bruising and flaking skin. West testified the bruising and flaking was not present at the time of the murders.

A forensic examination of the interior of Roberts's car did not indicate the presence of any blood. Forensic testing of the DNA extracted from the swab of the blood

drop from the outside steps and the hallway at the Martin residence matched the DNA obtained from Adrian West. There was a mixture of DNA on the blood swabbed from the handle of the gasoline can. The primary contributor of DNA was determined to be Savannah Martin, but neither Michael Reynolds nor Melinda Martin could be excluded as a contributor of the DNA. There was also a mixture of DNA from a swab of blood obtained from the lens of Michael Reynolds's glasses—Melinda Martin's DNA was the primary component of that DNA mixture. The bloody footprint on the outside doorstep matched a known ink print of Michael Reynolds's footprint.

The shoe prints in the kitchen did not match any of the known samples submitted for comparison purposes, and a blood swab from the outside door frame did not match any of the known DNA samples.

Michael Reynolds testified in his defense. He testified that he met Charles Martin in May 2002 and that he and Charles became good friends. Reynolds testified that Martin was one of the people authorized to take Reynolds's son home from school. Reynolds and his son even lived with Charles Martin for several months, at Martin's mother's residence.

Reynolds said that he saw Martin several times a week up until the time Reynolds was arrested for a different offense. Reynolds testified that he had seen Melinda Martin a couple of times, but that he had never seen Savannah Martin. He testified that the last time he saw Martin alive was two or three weeks before the Martins were killed.

Reynolds testified that at the time of the incident, he and Adrian West were living with his father at his father's residence. Reynolds said that on the morning of . . . May 24, 2003, his "boss" came by the residence and paid his father and him for a painting job they had completed the day before. Later that morning, Donald Harvey came to the Reynolds residence and asked Michael Reynolds to install a car radio for him. Reynolds said that he installed the radio, and Harvey gave him a gram of cocaine in return.

Reynolds said that between 9:00 and 10:00 p.m., Sandra Roberts came to the residence. Reynolds and West shared the last of their drugs with Roberts. Reynolds testified that he gave Roberts some money to get some more drugs. Reynolds explained that he had money to purchase the drugs because in addition to the money that he had received that morning for completing the painting job, West also had $500 that Reynolds's father[, Harold Reynolds,] had given her to hold in case Reynolds needed to post bond – he testified that there was an outstanding warrant for his arrest at that time.

Reynolds testified that Sandra Roberts left and went to buy more drugs. When she returned with the drugs, Reynolds, Roberts, and West used all of those drugs. Reynolds testified that sometime later, Adrian West and Sandra Roberts left

together in Sandra's car to go get more drugs. Reynolds testified that he instructed West to go with Roberts because he thought Roberts had cheated them out of drugs on the previous transaction.

Reynolds testified that after Roberts and West had been gone for a couple of hours, he changed into a pair of shorts and a T-shirt, went to bed, and fell asleep. His father was passed out; he was intoxicated.

Reynolds said that sometime later, Adrian West woke him and told him that she was hurt. Reynolds got out of bed to attend to West. When Reynolds asked her how she was hurt, she told him that she had been stabbed. Reynolds then asked West how she had been stabbed, and she responded that "Chuck was dead and she ... got stabbed trying to stop them from stabbing Chuck's wife." Reynolds testified that West did not tell him who she was with at the time of the stabbings.

Reynolds stated that he was concerned about her arm, so he bandaged it using a first-aid kit he had in the bedroom. He said that the wound was not bleeding very much but that it looked bad. After bandaging her arm, Reynolds instructed West to accompany him outside the house so that he could talk to her without fear of his father overhearing.

Reynolds testified that when they got outside, he continued to question her about what happened, but West did not want to talk about it. Reynolds said that West was very worried, so he told her to get Sandra Roberts's car keys and she did.

Reynolds said that they left in Roberts's car, and that West drove because Reynolds's license had been revoked. Reynolds was still dressed in the clothes he had on when he went to sleep, and, although he put on his glasses, he did not put on any shoes.

They went to the Martin residence. He said that when they got to the residence, West slowed down in order to pull into the driveway; however, Reynolds said that because the lights were on in the house, he instructed her to keep driving. West drove to a nearby gas station, turned around, and then drove back to the Martin residence.

When they got to the Martin residence, West asked Reynolds what he wanted her to do. He testified that he again instructed her to "just drive." West began to drive back to Reynolds's residence. Reynolds testified that as they were traveling, West told him that she was scared, and she asked him what they were going to do. Reynolds said that as they neared his father's residence, he "just knew [he] had to do something," so he instructed West to again drive to the Martin residence.

Reynolds testified that when they arrived at the Martin residence at that time, West drove the car into the driveway. The carport light was on. Reynolds got out of the car and told West to remain in the car. As Reynolds approached the carport door,

he saw that the door was cracked open. Reynolds pushed the door open and saw Charles Martin lying on the floor. Reynolds said there was blood all around Martin so, he said, he knew at that point that West had told him the truth.

He testified that he did not telephone the police; instead, he went inside, stepped over Charles Martin's body, and went to the Martin's bedroom. He explained that he went to that bedroom because West told him she had been hurt "trying to stop them from stabbing Chuck's wife." Reynolds said that although the television was on in the bedroom, the bedroom lights were not on, so he did not see Melinda Martin's body when he first went into the room. Reynolds said that he tripped over Melinda Martin, who was lying in the floor between the bed and the doorway. When he tripped, his glasses fell off onto the bed, and he caught himself on the bed. Reynolds testified that he grabbed his glasses from the bed and stood up and that is when he saw Melinda Martin, who appeared to be dead. Reynolds testified that he never saw Savannah Martin.

Reynolds said that he went back through the house and outside, stepping back over Charles Martin in the process. He gave West his glasses and told her to hold them. Reynolds then asked West to tell him everything that she had touched so that he could wipe it off, but West could not recall everything she had touched. Reynolds testified that he went back into the house, intent on wiping the surfaces off. Reynolds said that everything in the house was such a mess that he did not know where to start. He said that at that point, he looked and saw that one of the burners on the stove was lit, so he decided to burn the house down. Reynolds testified that he got the gasoline can that was located beside the porch steps and doused the rooms with gasoline.

Reynolds said that when he got back to the kitchen, he got a napkin and lit it from the burner, and threw it on the gasoline trail. Reynolds then left the house and got in the car and told West to leave. As West drove back toward Harold Reynolds's residence, she asked Reynolds what was going to happen and he told her "[N]othing, I caught the place on fire."

Reynolds testified that when they got back to Harold Reynolds's residence, they parked Sandra's car and went into the house. As they walked by his father's bedroom, Sandra Roberts asked them if they had "anything," meaning drugs. Reynolds told her they did not, and then he and West went to the bedroom they shared. Reynolds testified [that] at that point, he told West to give him some money and West gave him $20. He gave that money to Sandra Roberts and told her to go get some more drugs. He testified that he wanted to get Roberts out of the house. Reynolds said that he and West went into the bathroom, and he cleaned and rewrapped the injury on West's arm. In a few minutes, Roberts returned with more drugs.

When Roberts returned with the drugs, Reynolds went into the kitchen and he and Roberts took some of the drugs. Reynolds prepared a syringe of the drugs for West

and took it into their bedroom; however, West refused the drugs, saying she just wanted to go to sleep. Reynolds offered the drugs to Roberts, and when she declined to take the drugs, Reynolds used them. He then went back to sleep.

Reynolds testified that later that morning while he and West were walking home from the convenience store, he again tried to question West about what had happened the night before. Reynolds said that West was acting strangely and she told him that she did not want to think about it. He testified that at that point, he did not want to think about it either.

Reynolds said that shortly after they arrived back at his father's residence, the police arrived and arrested him and that he had been incarcerated since that time.

*Reynolds I*, 114 So. 3d at 74-81 (internal citations omitted).

### B.    Third-Party Conduct

The ACCA discussed certain findings made regarding Chad Martin and Langley's initial status as persons of interest and their testimony at Reynolds's trial as witnesses for the prosecution. *See id.* at 92-98. Specifically, "[o]n May 25, 2003, during the hours following the discovery of the crimes, the police interviewed several people of interest – including Charles Martin's 25-year old nephew, Chad Martin, and Chad Martin's friend, . . . Langley." *Id.* at 92. Upon further investigation, Chad Martin and Langley were ruled out as suspects in the Martins' murders. *Id.* The State called Chad Martin and Langley to testify, and both adamantly denied having anything to do with the Martins' murders. *Id.* Langley's testimony corroborated Chad Martin's alibi. *Id.*

The ACCA noted that the record on appeal indicated that Chad Martin was questioned by police on May 25, 2003 (the day the Martins's bodies were discovered). *Id.* During the interview, Chad Martin told investigators "two conflicting versions of his whereabouts at the time of the murders." *Id.* Chad Martin's first statement denied "any involvement in the crime," while his second statement included a "purport[ed] confess[ion] to the [murders]." *Id.* The ACCA explained that "[a]fter investigation, the police excluded Chad Martin as a suspect," and the court noted that

"[s]everal days later, [by which time Reynolds had become the primary suspect,] Chad Martin recanted his confession in a third oral narrative to the police." *Id.*

The ACCA acknowledged that "Chad Martin's first narrative account to the police," in which he denied any involvement in the crimes, "was reduced to a written statement . . . and signed by [Chad] Martin." *Id.* However, the ACCA determined that Chad Martin's second statement, in which he purportedly confessed, "was not reduced to an official statement, but [instead] documented in two [distinct] police reports," signed by different individuals and presumably rendered on different days. *Id.*

Regarding the second statement, the ACCA described the first police report dated May 25, 2003, as being "prepared and signed by [Sergeant] Dale Fincher," but the report was not "introduced as evidence at Reynolds's trial" because "Fincher had moved out of state and did not testify at trial." *Id.*; *see also id.* at 92 n.8 ("Before trial, the prosecutor offered to assist in Fincher's presence at trial; however, the defense indicated that Fincher was not a critical witness to its case."). The ACCA observed that the second police report dated May 29, 2003 "purportedly document[ed] Chad Martin's confession was . . . signed by Captain Roy Harbin." *Id.* at 92 However, due to certain circumstances at trial and "after a hearing [on the matter,] the circuit court ruled that the May 29 police report signed by Capt. Harbin could not be used to impeach Chad Martin's trial testimony." *Id.*; *see, e.g.*, *id.* at 93-97.

The ACCA also recognized that before trial the "the State filed a . . . motion in limine to prevent the defense from mentioning any 'alleged statements' made by Chad Martin regarding the events surrounding the deaths of the victims." *Id.* The State argued that these "'statements' were hearsay and were unreliable." *Id.* The trial court addressed this motion "[a]t the beginning of

[Reynolds's] trial" and "considered arguments" in favor and against. *Id*. The ACCA provided that during this hearing, "one of Reynolds's defense counsel stated:"

> I would also anticipate – we have the one – we do have one statement signed by Chad Martin. We also have some statements signed by some investigating officers. Two of those three officers are available. And I would anticipate talking about those statements; maybe possibly asking Mr. Martin about them through those officers. They signed them, and he supposedly made these verbal statements to them. They are very pertinent to the crime.

*Id*. at 93. The ACCA continued:

> [t]he [trial] court ruled that until Chad Martin testified at trial, neither party could refer to Martin's previous oral or written statements[,] [but] . . . indicated that it would be willing to consider arguments from counsel regarding the admissibility of the statements for impeachment purposes [at the appropriate time][,] [and that] [b]oth parties indicated . . . satisf[action] with [this] ruling.

*Id*. (internal citations omitted).

Further, the ACCA acknowledged that during Reynolds's trial Chad Martin testified on "direct examination . . . that he was very close to his uncle, Charles Martin, and . . . considered [Charles Martin] to be like a brother[,] and "that he also had a good relationship with [Charles] Martin's wife and daughter." *Id*. (citing Vol. 9 at 86-87). The ACCA then reiterated that "Martin testified that he had nothing to do with the murders and robbery of the Martin family." *Id*.

Regarding Chad Martin's testimony, the ACCA noted:

> Chad Martin testified that he spent Saturday afternoon through the following Sunday morning [on which] the murders [occurred] doing construction work at John Langley's house, which was located in the same neighborhood as the Martin [family's] house.[9] [Chad] Martin testified that he and Langley took drugs during their time together and that at one point they left Langley's house to get more drugs . . . [,] [and] said that at various times, other people were also at Langley's house.

> > John Langley's testimony corroborated Chad Martin's testimony with regard to what transpired while Chad Martin was at his residence.

> [Chad] Martin [also] testified that the only time that he was out of Langley's sight was when he went to Langley's garage to work on Langley's lawnmower[,] [and]

[that] . . . [Langley's] back door to [the] house was open . . . , and Langley knew where [Chad Martin] was.

[Chad Martin also testified that] Langley drove [him] home sometime early Sunday morning because [he] thought he [would need] to go to work . . . . [but explained] that his employer telephoned him around 6:00 a.m. and told him that he did not have to work that day because it was going to rain. [Chad] Martin [then testified he] took a shower, went to a friend's house, and . . . returned to . . . Langley's house.

[Chad] Martin testified that on the way to Langley's house, he saw a fire truck and police vehicles at the Martin residence. [Once at] Langley's house, he told Langley what he had seen . . . and expressed his concern about Charles Martin, [who was suffering from depression], . . . [because he thought] [Charles] Martin might have committed suicide.

Chad Martin [testified that he then] drove back to the Martin['s] residence and parked the car he was driving behind the fence in the Martins' backyard[,] [when] . . . police officer approached him and told him that he could not be there and that he could not be with the family. Recogniz[ing] [Sergeant] James Mulkey standing nearby[,] . . . [Chad Martin] engaged him in a conversation.

[Chad] Martin testified that Sgt. Mulkey told him that Charles Martin was dead and that Mulkey also told him where Charles Martin's body was found. [Sergeant] Mulkey then asked Chad Martin for the names of [Charles] Martin's wife and daughter. Chad Martin testified that when [Sergeant] Mulkey asked him for [his] niece's name, [Savannah,] he became so upset that he collapsed.

Although not clear from his testimony, it appear[ed] [to the ACCA] that Chad Martin left the scene for a short time, and during that time he ingested substantial amounts of crystal methamphetamine, Prozac, and cocaine. [Chad] Martin claimed that he was . . . trying to kill himself because he was so distraught over the Martins' deaths.

Chad Martin testified that when he returned to the scene, some of the other family members where there and that is when he heard police officers talking about the details of the crimes. [Chad] Martin instigated a conversation with [Lieutenant] Faye Gary while he was on the scene[,] [and] . . . although [Chad Martin] did not recall the details of his conversation with [Lieutenant] Gary, he did not tell [the Lieutenant] that he had overheard the other police officers discussing the details of the crimes. Chad Martin was [then] taken to the police station for questioning.

[Chad] Martin testified that while he was at the police station, he was under the influence of the drugs[,] . . . suffering from sleep deprivation because of his drug abuse[,] [and that] . . . [he] was questioned for many hours by the police. Around 8:40 p.m., Chad Martin signed a written statement that had been prepared by one of the officers in which Martin apparently denied any participation in the crimes.[10]

[10] The statement, which was referred to as both State's Exhibit 63 and Defendant's Exhibit 2, was not introduced into evidence by either party.

[Chad] Martin [also] testified that the police . . . continued to interrogate him [even after his first signed statement], and after 18 or 19 hours of questioning, he decided that he would "tell them anything just to get out of there." [Chad] Martin testified that he did not remember what he told the investigators at that point; however, *the inference from the record is that at that time [Chad] Martin apparently confessed to being involved in the crimes.*

*Although Martin purportedly confessed to the crimes, after further investigation, the police ultimately excluded Chad Martin as a suspect.*[11]

[11] The police determined that Chad Martin knew details of the crime because of what he had overheard while at the scene of the crimes.

[Chad] Martin testified that several days later, he contacted a lawyer who accompanied him to the police station, and he gave another narrative in which he recanted his confession[,] and [w]hen [doing so], he apparently told the police the same version of events he gave in his first statement, and to which he testified at trial.

*Reynolds I*, 114 So. 3d at 93-95 (internal citations omitted) (emphasis added).

The ACCA also reviewed the record concerning defense counsel's cross-examination of Chad Martin, in which Chad Martin was asked if he "made a statement to [Lieutenant] Faye Gary." *Id.* Chad Martin stated "that he had but that he did not recall what [was] said," so defense counsel began "question[ing] [Chad] Martin about *specific incriminating statements* that [Chad Martin] [purportedly] made to [the Lieutenant] by asking a series of questions."[2] *Id.*

"Did you tell Ms. Gary that 'You knew this sounded crazy but it was like you were seeing this through Chuck's eyes?'" and "Did you tell Ms. Gary that ... 'I could see Savannah's eyes and I could hear her screaming for help?'" [Chad] Martin could not recall what he told Gary because, he was under the influence of drugs at the time he made the incriminating statement[,] and further clarified that the only

[2] The ACCA also observed that upon the completion of the prosecution's questions for Chad Martin on direct examination, the prosecution "intimated that he might later offer Chad Martin's exculpatory statements into evidence[,]" and that defense counsel affirmatively "responded that counsel had no objection to the admission of Chad Martin's exculpatory statement, provided the court also admit Martin's inculpatory version of events that he told to the investigators during the questioning[,]" while recognizing that the circuit court "indicated that the discussion was premature at that point in the trial. *See Reynolds I*, 114 So. 3d at 95 (citing Vol. 9 at 109).

reason he remembered what he said in his first statement – the exculpatory statement that he signed – was because he had read the statement before trial.

Defense counsel then asked Martin whether he remembered making a statement to [Captain] Roy Harbin[,] . . . [to which Chad] Martin responded that, although he recalled making a statement, he could not recall to whom he made the statement[;] [prompting] the prosecutor [to] request[] a sidebar conference.

Outside the hearing of the jury, the prosecutor asserted that defense counsel should not be allowed to "back-door" the contents of the May 29 report signed by [Captain] Harbin by asking Martin line-by-line questions from the report like counsel had done when questioning Martin about his statements to [Lieutenant] Gary. Defense counsel responded that because the confession was an oral statement made by Martin to the investigators, counsel needed to introduce the contents of statement through Martin's testimony. [To which,] [t]he prosecutor replied: "[I]f Chad testifies he doesn't remember giving the statement to Roy Harbin and doesn't remember anything in it, the proper method is for him to call Roy Harbin and say 'Did he do it and what did he say?'" The Court agreed and instructed defense counsel that if Martin did not remember what he told the investigator, defense counsel could not elicit the contents of the report by questioning Martin line-by-line regarding the details of the report.

When defense counsel resumed cross-examination, Martin reiterated that he did not remember to whom he had made the inculpatory oral statement, so defense counsel ended its cross-examination of Martin.

Later in the trial, after the State rested and before the defense's presentation of its case, the prosecutor informed the Court that he had learned that defense counsel intended to introduce the May 29 police report . . . signed by Capt[ain] . . . Harbin, which supposedly documented Martin's confession. The State moved the Court for an order in limine prohibiting the introduction or mention of the May 29 police report. A[nother] hearing was conducted outside the presence of the jury.

During [this] hearing, the State elicited testimony from Capt[ain] . . . Harbin that in May 2003, he was the head of the detective division and that he supervised several investigators who were involved in the investigation of the Martin murders and robbery. When the prosecutor showed Harbin the May 29, 2003, police report, which was labeled Defendant's Exhibit 10, Capt[ain] Harbin admitted that although he had signed the report, he did not prepare or type the report – that was done by [Sergeant] Fincher – and he had not even read a completed version of the report until a few days before trial. Capt[ain] Harbin testified that he was not present during the entire interview with Chad Martin because he was also monitoring interviews with other suspects. Capt[ain] Harbin stated that the May 29 police report did not contain an accurate version of what he had heard during the interview with Chad Martin.

> Defense counsel cross-examined Capt[ain] Harbin at length regarding why he would sign a report purporting to be his rendition of Martin's confession when he had not read the report, when he was not present for the entire interview with Chad Martin, and when he could not recall what Martin had said during the interview. In response to questions propounded by defense counsel, [Captain] Harbin conceded, "Detective Fincher put the paper on my desk ... [and] I signed it."

*Reynolds I*, 114 So. 3d at 95-96 (internal citations omitted). The ACCA concluded its factual discussion of the testimony and events surrounding Chad Martin's status as a person of interest determining that "[d]uring the State's redirect examination, Capt. Harbin confirmed that at the time he signed the May 29 report, Reynolds was the primary suspect in the crimes and was already in custody." *Id*. at 96. The ACCA also observed that the circuit court was particularly careful in "clarify[ing] its ruling," and expressly noted that, although the "document itself [was] not in," counsel was free to call "[Captain] Harbin and . . . ask him anything that [he thought was] appropriate in regard to this case. [The trial court did] not in any way limit [the] questioning of that particular witness." The circuit court also reiterated that defense counsel could "ask [Captain Harbin] whatever you think is appropriate, any inconsistencies, just not the document." *See id.* at 97. Further, "toward the end of the defense's case-in-chief" the ACCA recognized that defense counsel decided not to call Captain Harbin and explained to the trial court that to call him "doesn't help me at this point." *Id.* Further, even when challenged by the trial court as to whether this was his true belief in light of the wide latitude the trial court would offer him in questioning Captain Harbin, defense counsel again declined and noted that there was not anyone else that the defense could get from the witness. *See id.*

### C.    The Sentencing Order

The trial court's sentencing order made the following findings and set forth the following rationale:

From the evidence presented at trial the Court finds that the defendant Michael [Reynolds] did as outlined in count one intentionally kill Charles James Martin, III, Melinda Martin and Savannah Martin by one act or pursuant to one scheme or course of conduct in violation of 13A-5-40(A)(10) of the Code of Alabama 1975, as amended.

Pursuant to counts two, three, and five, that the defendant did intentionally kill Charles Martin, III, Melinda Martin and Savannah Martin in the course of first degree robbery in violation of Title 13A-5-40(A)(2) of the Code of Alabama 1975, as amended.

And as to count four, did intentionally kill Savannah Martin, a child under the age of 14 years, in violation of Title 13A-5-40(A)(15) of the Code of Alabama 1975, as amended.

As to the Court's finding concerning the existence or nonexistence of aggravating – or nonexistence of aggravating circumstances,[3] the Court finds that three statutory aggravating circumstances are applicable in the case at bar, having been proven beyond a reasonable doubt and are due to be considered in the determination of the appropriate sentence in this case. The applicable statutory circumstances are as follows: A, that the intentional murder was committed while the defendant was engaged in[,] or was an accomplice in the commission of[,] or an attempt to commit[,] or flight after committing[,] or attempting to commit robbery in accordance with Section 13A-5-49[(4)] of the Code of Alabama 1975.

The second aggravating offense: The capital offense was established that it was heinous, atrocious or cruel compared to other capital offenses in accordance with

---

[3] Section 13A-5-49 of the Alabama Code (1975) enumerates the statutory aggravating circumstances as follows:

(1)  The capital offense was committed by a person under sentence of imprisonment;
(2)  The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person;
(3)  The defendant knowingly created a great risk of death to many persons;
(4)  The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping;
(5)  The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
(6)  The capital offense was committed for pecuniary gain;
(7)  The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or enforcement of the laws;
(8)  The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses;
(9)  The defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct; or
(10)  The capital offense was one of a series of intentional killings committed by the defendant.

Ala. Code § 13A-5-49 (1975).

Section 13A-5-49[(8)] of the Code of Alabama 1975; and C, that the defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct in accordance with Section 13A-5-49[(9)] of the Code of Alabama 1975.

The jury in this case by its verdict of guilt found beyond a reasonable doubt at least two of the three statutory aggravating circumstances set out above existed in this case.

The Court has independently reviewed the evidence in this case and concurs that the evidence is sufficient to establish beyond a reasonable doubt that this defendant committed the murders in this case in connection with the theft of the purse and the telephone from the Martins' residence and under circumstances that support the conclusion that these facts constitute robbery in the first degree under Alabama law.

The Court also concurs that the evidence clearly establishes beyond a reasonable doubt, as the jury concluded, that the murders in this case constituted the intentional killing of two or more persons by one act or pursuant to one scheme or course of conduct.

The Court also finds that the evidence in this case was clearly sufficient to establish beyond a reasonable doubt that the intentional killing of Chuck, Melinda and Savannah Martin were as committed especially heinous, atrocious or cruel compared to other capital offenses.

Each victim in this case died from multiple stab wounds. Chuck Martin was stabbed eleven times. His wife Melinda was stabbed twenty-four times. And young Savannah was stabbed five times.

The number of wounds inflicted and the fact that for all of these victims[,] death was not instantaneous[,] are certainly cruel and heinous enough to satisfy the requirements of the law when considered with all of the facts of this case.

When we consider the killing of the eight-year-old Savannah, however, whose death was an apparent afterthought, a brutal execution to prevent her from identifying her parents' killer, there is absolutely no doubt that the murders in this case satisfy the requirement of the law.

The three aggravating circumstances set out above were established beyond a reasonable doubt and must be weighed against the mitigating circumstances in this case.

As to the existence or nonexistence of the mitigating circumstances, the Court in determining, considering and weighing mitigating circumstances in this case

reviewed all statutory mitigating circumstances[4] and also considered all of the mitigating factors as charged to the jury in the penalty phase of this trial and the additional mitigating circumstances re-offered today – or offered to the defendant or by the defendant on October 22nd, 2007, and on today's date and those offered at trial.

The Court also considered the contents of the defendant's motion for the Court to consider the attached exhibits as additional mitigating evidence at the sentencing docket of December the 6th, which is today, and all exhibits attached thereto as substantive submissions in support of the mitigating circumstances presented by the defendant.

The Court finds no evidence that the defendant was acting under influence of extreme mental or emotional disturbance or that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
The Court further finds no evidence that that the victims participated in the defendant's conduct or consented to it.

The Court further finds no evidence that the defendant acted under duress or under the substantial domination of another person.

More particularly, the Court finds and considers as mitigating circumstances in the defendant's behalf evidence presented of the defendant's environmental, educational, life, background, family, school history, the love of the defendant's family for the defendant, the love of the defendant's friends for the defendant and the defendant's love for his family and friends.

This Court also finds and considers as a mitigating circumstance that the defendant experienced neglect and abuse as a child and had a history of drug abuse and addiction.

---

[4] Section 13A-5-51 of the Code of Alabama defines statutory mitigating circumstances as follows:

Mitigating circumstances shall include, but not be limited to, the following:

(1)  The defendant has no significant history of prior criminal activity;
(2)  The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;
(3)  The victim was a participant in the defendant's course of conduct or consented to it;
(4)  The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;
(5)  The defendant acted under extreme duress or under the substantial domination of another person;
(6)  The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and
(7)  The age of the defendant at the time of the crime.

Ala. Code § 13A-5-51 (1975).

The Court has considered as a mitigating circumstance the poverty experienced by the defendant as a child, the fact that his father was at times a brutal, abusive alcoholic. The fact that the defendant's mother was not maternal, apparently did not bond with or nurture her children and had health problems, the fact that the defendant was reared in a filthy home with hygiene and health issues, the fact that the defendant was homeless for a significant period of time during his childhood and has essentially been on his own since he was the age of thirteen, the fact that the defendant was physically abused by his father as a small child and had little if any structure in his home, the fact that the defendant dropped out of the school when he was in the seventh grade and has received little if any formal education since that time, the fact that the defendant apparently witnessed his father physically abusing his mother and possibly other family members when he was a child as well as the fact that the defendant allegedly being [exposed to] – [and/]or abusing drugs or alcohol at age thirteen and later developed a serious drug dependency to crystal methamphetamine and cocaine and that these addictions led to the loss of custody of his child, the loss of jobs and eventually emotional issues that resulted from drug addictions and the consequences of drug addiction.

The Court has also seriously considered as a mitigating factor the fact that the defendant does have a child and family members who love him, that he has been described as the glue that holds his disjoin[t]ed family together and that the imposition of the death penalty in this case would have a devastating effect on many members of his family.

The Court also considered the fact that the defendant was a good father and stepfather at points in his life.

The Court specifically finds and considers as a mitigating circumstance the fact that the defendant has no significant history of prior criminal activity as provided in Section 13[A]-5-51[(1)] of the Code of Alabama 1975.
In essence, the Court considered all mitigating circumstances presented by the evidence and weighed each of them. Each fact and circumstance offered in mitigation was accepted and considered by this Court as valid and accorded due weight in the sentence of this case.

. . . The Court finds from the consideration of the evidence presented at the trial of this case and the sentencing hearing, the aggravating and mitigating circumstances applicable to this case and the recommendation of the jury contained in its advisory verdict that the aggravating circumstances set out in the Code of Alabama, that being again 13A-5-49[(4)], that the intentional murder was committed while the defendant was engaged in or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit robbery in accordance with Section 13A-5-49[(4)] of the Code of Alabama 1975; under 13A-5-49[(8)], that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses in accordance with Section 13[A]-5-49[(8)] of the Code of

Alabama 1975; and under 13[A]-5-49[(9)], that the defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct in accordance with Section 13A-5-49[(9)], that these existed in this case and are sufficient to support the sentence of death.

It is the opinion of this Court that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstance. The Court theretofore finds that the punishment of the defendant should be fixed by the Court as death for the capital murders of Charles Martin, III, Melinda Martin and Savannah Martin.

It is therefore ordered and adjudged by this Court and it is the judgment of this Court that the defendant be and is hereby sentenced to death, said sentence to be carried out in the manner and at such time and place as may be prescribed by law.

(Vol. 14 at 11-22).

### D.    Procedural History

In March 2005, Reynolds was indicted in the Etowah County Circuit Court on five counts of capital murder for the stabbing deaths of Charles, Melinda, and their eight-year old daughter, Savannah, committed during the course of a robbery. (*See* Vol. 1 at 38-39, 80, 90). On August 29, 2006, due to Circuit Judge William M. Cardwell's retirement, Reynolds's case was reassigned to Presiding Circuit Judge W. Allen Millican. (Vol. 1 at 108). At trial, Charles C. Hart, David McWhorter, and Paul R. Roberts represented Reynolds.[5] (Vol. 5 at 200). On October 19, 2007, following the guilt phase of the trial, Reynolds was found guilty of capital murder. A penalty phase of the trial followed, and the jury -- by a unanimous vote of 12-0 -- recommended that Reynolds be sentenced to death. (*See* Vol. 13 at 153-54). As required under Alabama Code § 13A-5-47, a formal sentencing hearing was conducted on December 6, 2007. (*See generally* Vols. 13 at 195-

---

[5] Patricia Granger initially served as Reynolds's co-counsel with Charles Hart until April 26, 2007, when, due to a conflict of interest, the court granted Ms. Granger's request to withdraw from representation. (*See* Vol. 1 at 154). On that same day, the court appointed David McWhorter. (*Id.* at 155). And thereafter, on June 6, 2007, the court appointed Paul Roberts to serve as additional counsel for Reynolds. (*Id.* at 157).

202; 14 at 1-24). The trial court accepted the jury's recommendation and sentenced Reynolds to death. (Vol. 2 at 67-101).

Reynolds appealed his conviction and sentence to the ACCA. (*See* Vol. 19). On October 1, 2010, the ACCA entered a published opinion affirming Reynolds's conviction and death sentence. *Reynolds I*, 114 So. 3d 61. On December 10, 2010, the ACCA denied Reynolds's request for rehearing. (Vol. 22 at 215). The Alabama Supreme Court followed by denying Reynolds's petition for certiorari on December 14, 2012. On October 7, 2013, the United States Supreme Court denied Reynolds's petition for writ of certiorari and denied his request for rehearing on December 2, 2013. *Reynolds v. Alabama*, 134 S. Ct. 97 (U.S. Oct. 7, 2013), *reh'g denied* (Dec. 2, 2013).

On December 10, 2013, Reynolds filed a petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. (*See* Vol. 24 at 10-139). On March 24, 2014, with permission from the Rule 32 court, Reynolds filed his amended Rule 32 petition. (*See* Vols. 24 at 140-201; 25 at 3-24). On August 20, 2014, the Circuit Court of Etowah County issued an order summarily dismissing Reynolds's amended Rule 32 petition. (*See* Vols. 25 at 162-202; 26 at 3-22). Reynolds filed a post-judgment motion challenging the Rule 32 court's summary dismissal order, which was denied. (*See* Vol. 26 at 23-46).

On September 18, 2015, after pretermitting the discussion of Reynolds's other claims raised in his Rule 32 amended petition, the ACCA remanded to the Circuit Court with instructions to conduct further proceedings on Reynolds's *Brady/Giglio* claim. *See Reynolds v. State*, 236 So. 3d 189 (Ala. Crim. App. 2015) (*Reynolds II*). The ACCA's remand instructions provided that:

> [t]he circuit court may order any discovery relating to this claim that it deems necessary to allow the parties to litigate Reynolds's claim. It must, however, provide Reynolds an opportunity to disprove the procedural bars asserted by the State and to prove his *Brady/Giglio* claim, and it must provide the State an opportunity to present evidence in rebuttal. The circuit court may comply with this Court's remand instructions by conducting an evidentiary hearing or by taking

31

evidence in the form of evidentiary submissions. Rule 32.9, Ala. R. Crim. P. Further, the circuit court shall make specific findings of fact regarding its disposal of Reynolds's claim.

Further, the circuit court is instructed to take all necessary action to see that the circuit clerk makes due return to this Court *at the earliest time possible and within 56 days* of the release of this opinion.

*Reynolds II*, 236 So. 3d at 202 (emphasis added).

On September 23, 2015, the Circuit Court of Etowah County issued a scheduling order in accordance with the ACCA's instructions regarding the presentation of evidence pertaining to Reynolds's *Brady/Giglio* claim. (Vol. 28 at 43-44). In the Rule 32 court's scheduling order issued on remand, Reynolds was afforded twenty (20) days to present evidentiary submissions on the remanded issues; the State had twenty (20) days to file any rebuttal evidence in accordance with the relevant provisions of Rule 32.9, and the Rule 32 court reserved the remaining ten or eleven days of the fifty-six days provided to make return to the ACCA. (Vol. 28 at 43). During the respective time frames, the court indicated that it would review the parties' submissions, issue findings, and, if necessary, hold an expedited evidentiary hearing or, alternatively, request further evidence to review. (*Id.*).

On September 25, 2015, Reynolds filed his initial discovery motion. (*Id.* at 45-58). The State responded, arguing that Reynolds had failed to establish good cause for his "overly broad" discovery requests. (*Id.* at 59-70). The Rule 32 court agreed with the State's response, and, on September 29, 2015, issued an order denying Reynolds's initial discovery motion. (*Id.* at 71-72) (explaining that "[t]he Defendant has requested every conceivable item, record, file, statement, communication, and/or information not only from the State's file but from individuals who have since retired or are now deceased").

On October 5, 2015, Reynolds filed a motion requesting a thirty-day extension to prepare and present evidence to the Rule 32 court. (*Id.* at 73-77). On October 6, Reynolds then filed his motion requesting the court to reconsider its order denying his previous discovery motion and attached an exhibit containing his Interrogatories to the State. (*Id.* at 78-97). The next day, the Rule 32 court denied Reynolds's request for a thirty-day extension, but it granted in part Reynolds's motion to reconsider his discovery requests. (*Id.* at 98-99). Specifically, the court's order instructed:

> The State shall immediately, as of the date of this Order, make available to Counsel for the Defendant any and all files held by the Etowah County District Attorney's Office pertaining to the prosecution of Adrian Marcella West for hindering prosecution, unlawful distribution of a controlled substance, possession of a controlled substance and/or drug paraphernalia. . . . Said file to be reviewed and inspected by Counsel for the Defendant in the presence of and under the supervision of the Etowah County District Attorney and/or his staff.

(*Id.* at 99). In a separate order, issued October 8, 2015, the court granted Reynolds's request to file his Rule 32 Evidentiary Submissions by email or facsimile, recognizing the added constraint a holiday would have on Reynolds's approaching deadline. (*Id.* at 103).

Reynolds filed evidentiary submissions in support of his *Brady* claim, to which the State replied and offered evidentiary submissions in rebuttal. (*See generally id.* at 104-201; Vol. 29 at 3-189). After receiving these evidentiary submissions, the Rule 32 court issued a written order denying relief on Reynolds's *Brady/Giglio* claim. (Vol. 29 at 190-94). On November 12, 2015, the court issued its opinion on remand, deciding:

> Reynolds'[s] claims are not true and further that the prosecution did not suppress evidence that was favorable to the Defendant. Further, this Court finds the Defendant did not prove his *Brady/Giglio* claim . . . by a preponderance of the evidence . . . ; likewise, the Defendant could have raised this issue on direct appeal and failed to do so and is therefore procedurally barred, in accordance with the provisions of Rule 32.2(a)(5), [Ala. R. Cr. P.].

(*Id.* at 193). The court concluded:

Based upon all of the foregoing, and upon due consideration of the same, it is hereby ORDERED, ADJUDGED, DECREED AND DETERMINED BY THIS COURT as follows:

1. That, though provided an opportunity to disprove the procedural bars asserted by the State, the Defendant has utterly and completely failed to do so, by a preponderance of the evidence or any other legal standard.

2. That, as to the *Brady/Giglio* issue dealing with an alleged agreement with Witness Marcie West for her testimony, the Defendant has further failed to meet his burden as to proof of the same; and, indeed, this Court finds as a matter of fact and law that no such agreement ever existed.

(*Id.* at 194). The Rule 32 court directed the clerk to return the order to the ACCA as instructed. (*Id.*).

On return from remand, the ACCA affirmed the Rule 32 court's decision on April 22, 2016. (Vol. 33 at 100-75). After addressing Reynolds's claims individually, the ACCA found that Reynolds's non-*Brady/Giglio* claims were properly dismissed by the Rule 32 court "because the claims were insufficiently pleaded under Rules 32.3 and 32.6(b) [] were without merit, or were procedurally barred." (*Id.* at 175) (internal citations omitted). The ACCA also noted that Reynolds's *Brady/Giglio* claims were properly raised on remand but were correctly denied below. (*Id.*). On January 27, 2017, the ACCA denied Reynolds's request for rehearing. (*Id.* at 176). And, on April 27, 2017, the Alabama Supreme Court denied certiorari review. (Vol. 34 at 207).

Less than one year later, on February 9, 2018, Reynolds filed this Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence in this court. (Doc. # 1). On May 30, 2018, Respondent filed his response and brief in support. (Docs. # 20, 21). Reynolds replied on September 27, 2018. (Doc. # 31).

## II.    FEDERAL HABEAS REVIEW STANDARDS

The claims in Reynolds's petition are governed by the deferential standard of review mandated by Congress in 28 U.S.C. § 2254(d). AEDPA governs this court's review of Morris's

34

habeas claims. *See Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011) (explaining that AEDPA applies to habeas petitions filed after April 24, 1996). When a petitioner has obtained a state-court adjudication of a constitutional claim on the merits, § 2254(d) places significant restrictions on a federal court's authority to award habeas relief. "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks omitted), quoting *Renico v. Lett*, 559 U.S. 776, 773 (2010). Under this standard, a federal court may grant habeas corpus relief to a state prisoner for claims adjudicated on the merits by a state court only if the petitioner shows that the state court proceedings resulted in a decision that was:

> (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)(2). The Supreme Court has explained how the statutory language operates:

> As amended by AEDPA, 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.
>
> The reasons for this approach are familiar. Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights. It disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal authority.

> Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.

*Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal citations and quotations omitted).

The petitioner bears the burden of showing that an adjudicated issue falls within § 2254(d)(1) or (d)(2). *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam); *see also id.* at 24-25 (explaining that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a constitutional holding] incorrectly"). Additionally, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. __, 138 S. Ct. 1188, 1192 (2018) (holding that habeas courts reviewing adjudicated claims under AEDPA should "'look through' [an] unexplained decision to the last [developed] state-court decision . . . . [and] then presume that the unexplained decision adopted the same [merits-based] reasoning").

This court's review of Reynolds's claims under § 2254(d)(1) is limited to the record that was before the state courts that adjudicated those claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Similarly, the state courts' decisions must be "measured against [the Supreme] Court's precedents as of the time" the state court rendered its decisions. *Id.* at 182 (internal quotation marks omitted).

### A.    Exhaustion, Procedural Default, and the "Cause and Prejudice Standard"

In keeping with well-established principles of comity and federalism, a petitioner is required to present his federal claims to the state court by exhausting the state's available procedures. *Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (holding that a petitioner "can seek

federal habeas relief *only on claims* that have been *exhausted* in state court") (emphasis added).

That requirement ensures that state courts are afforded the first opportunity to address federal

questions affecting the validity of state court convictions and, if necessary, correct violations of a

state prisoner's federal constitutional rights. As the Eleventh Circuit has explained:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who
> has not exhausted his available state remedies. 28 U.S.C. ' 2254(b)(1)(A) ("An
> application for a writ of habeas corpus on behalf of a person in custody pursuant to
> the judgment of a State court shall not be granted unless it appears that . . . the
> applicant has exhausted the remedies available in the courts of the State. . . ."").
> "When the process of direct review . . . comes to an end, a presumption of finality
> and legality attaches to the conviction. . . . The role of federal habeas proceedings,
> while important in assuring that constitutional rights are observed, is secondary and
> limited. Federal courts are not forums in which to relitigate state trials." *Smith v.
> Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989), quoting *Barefoot v. Estelle*, 463
> U.S. 880, 887 (1983).

> Exhaustion of state remedies requires that the state prisoner "fairly presen[t][6]
> federal claims to the state courts in order to give the State the opportunity to pass
> upon and correct alleged violations of its prisoners= federal rights." *Duncan v.
> Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76
> (1971) (internal quotation marks omitted). The Supreme Court has written these
> words:

>> [T]hat the federal claim must be fairly presented to the state courts .
>> . . . it is not sufficient merely that the federal habeas applicant has
>> been through the state courts. . . . Only if the state courts have had
>> the first opportunity to hear the claim sought to be vindicated in a
>> federal habeas proceeding does it make sense to speak of the
>> exhaustion of state remedies.

> *Picard*, 404 U.S. at 275, 92 S. Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S.
> Ct. at 888 ("Respondent did not apprise the state court of his claim that the
> evidentiary ruling of which he complained was not only a violation of state law, but
> denied him the due process of law guaranteed by the Fourteenth Amendment.").

> Thus, to exhaust state remedies fully the petitioner must make the state court aware
> that the claims asserted present federal constitutional issues. "It is not enough that

---

[6] The phrases "fairly presented" and "properly exhausted" are synonymous. *O'Sullivan v. Boerckel,* 526 U.S.
838, 848 (1999) (observing that the question is "not only whether a prisoner has exhausted his state remedies, but also
whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts")
(emphasis in original).

all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

## B.     The Procedural Default Doctrine

It is well established that if a habeas petitioner fails to raise his federal claim in the state court system at the time and in the manner dictated by the state's procedural rules, the state court may decide the claim is not entitled to a review on the merits. In other words, if such a failure occurs "the petitioner will have *procedurally defaulted* on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009) (emphasis added).

### 1.     General Principles

The procedural default doctrine was explained by the Supreme Court in *Woodford v. Ngo*, 548 U.S. 81 (2006):

> In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7 (1992). *See also Coleman v. Thompson*, 501 U.S. 722, 731-32, 111 S. Ct. 2546 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. See *Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid.*, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744-51, 111 S. Ct. 2546.

*Woodford*, 548 U.S. at 92-93.

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules and that procedural

bar provides an adequate and independent state ground for denying relief, then federal review of the claim is also precluded. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.").

When a petitioner fails to comply with state procedural rules, federal habeas review is strictly limited.

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. *Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar*, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), *and that bar provides an adequate and independent state ground for denying relief. See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (emphasis added).

When the last state court rendering judgment affirms without an explanation, "the federal court should 'look through' that 'unexplained' decision to the last related state-court decision that does provide a relevant rationale," and "should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The state can "rebut the presumption by showing that the unexplained affirmance [actually] relied or most likely [relied] on different grounds than the lower state court's decision, such as alternative grounds for

affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*

Federal deference to a state court's clear finding of procedural default under its own rules is strong:

> [A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. *Harris*, 489 U.S. at 264 n.10, 109 S. Ct. 1038 (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegation was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (alterations and emphasis in original).

The Supreme Court defines an "adequate and independent" state court decision as one that "rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375 (2002), quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (emphasis in *Lee*). The questions of whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "is itself a federal question." *Id.*, quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001), quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990). An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the

determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). Stated differently, if "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is *not* independent of federal law. *Id.*

To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "firmly established and regularly followed." *Lee v. Kemna,* 534 U.S. at 375, quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984). In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as adequate. *James*, 466 U.S. at 346. That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so renders the rule inadequate. "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed' – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 52, 60-61 (2009). Rather, the adequacy requirement means only that the procedural rule "must not be applied in *an arbitrary or unprecedented fashion*." *Judd*, 250 F.3d at 1313 (emphasis added).

Thus, in summary, if the procedural rule is not firmly established or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, then it will not be considered adequate, and the state court decision based upon such a rule may be reviewed by a federal court. *Card*, 911 F.2d at 1517. Conversely, if the rule is deemed adequate, the decision will not be reviewed by this court.

### 2. **Overcoming Procedural Default**

Generally, there are three circumstances in which an otherwise valid state-law ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where a petitioner demonstrates that he had good "cause" for not

following the state procedural rule *and* that he was actually "prejudiced" by the alleged constitutional violation; *or* (2) where a state procedural rule was not "firmly established and regularly followed"; *or* (3) where a failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see, e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'"), quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995), in turn quoting *Murray*, 477 U.S. at 496).

The court has already addressed the law related to whether a state procedural rule is firmly established and regularly followed. Below, the court reviews the legal principles surrounding the other two circumstances.

### a.    "Cause and Prejudice" Standard

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright*

*v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis added). This "cause and prejudice" standard is clearly framed in the conjunctive; therefore, a petitioner must prove both elements.

### (1)    "Cause"

To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in the state courts. *Carrier*, 477 U.S. at 488; *see also Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988). As explained by the Supreme Court:

> Objective factors that constitute cause include "interference by officials" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "[i]neffective assistance of counsel . . . [on direct review] is cause." Attorney error short of ineffective assistance of counsel [on direct review], however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (internal citations omitted).

While "[a]ttorney error [on direct review] that constitutes ineffective assistance of counsel" has long been accepted as "cause" to overcome a procedural default, the constitutional ineffectiveness of post-conviction counsel on collateral review generally will not support a finding of cause and prejudice to overcome a procedural default. *Coleman*, 501 U.S. at 754. This is so because "[t]here is no right to counsel in state post-conviction proceedings." *Id.* at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)).

Nevertheless, the Supreme Court has extended its prior decision in *Coleman* by deciding that, as a matter of equity, and, under specific, limited circumstances, errors by counsel on post-conviction collateral review could establish the necessary "cause" to overcome a procedurally defaulted claim. In *Maples v. Thomas*, 565 U.S. 266 (2012), the Supreme Court found that post-conviction counsel's gross professional misconduct (*e.g.*, abandonment of the petitioner) severed the agency relationship between counsel and the petitioner and, thus, established the necessary

"cause" to overcome a procedural default. *Maples*, 565 U.S. at 281. And, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome the procedural default of that type of claim when the state prohibits it from being raised during the direct review process. *Martinez*, 566 U.S. at 11-12.

### (2)   "Prejudice"

In addition to proving the existence of "cause" for a procedural default, a habeas petitioner must also show that he was actually "prejudiced" by the alleged constitutional violation. He must establish "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his *actual* and *substantial* disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis added); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992). If the "cause" is of the type described in *Martinez v. Ryan*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 12-15 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

### b.   "Fundamental Miscarriage of Justice" Standard

In a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the default. But there are only two circumstances where that door may be opened: (a) a petitioner demonstrates that there has been a fundamental miscarriage of justice, which "has probably resulted in the conviction of one who is actually innocent," *Smith*, 477 U.S. at 537-38, quoting *Carrier*, 477 U.S. at 496); *or* (b) the petitioner shows "by *clear and convincing* evidence that[,] but for a constitutional error, no

reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323-27 & n.44, quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (emphasis in *Schlup*); *see also, e.g.*, *Smith*, 477 U.S. at 537-38.

C.      **The Antiterrorism and Effective Death Penalty Act of 1996 & Habeas Review**

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). And, this description is especially apt when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254.

Direct review is and remains the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Id.*, quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). "Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963).

"Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634. That is due to the fact that, under the federal system of governments created by the United States Constitution, the States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights. *Engle v. Isaac*, 456 U.S. 107, 128 (1982). "The reason most

frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992); *McCleskey*, 499 U.S. at 491; *Wainwright*, 433 U.S. at 90).

Congress legislated these principles in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended preexisting habeas law. Indeed, several provisions of AEDPA require federal courts to give even greater deference to state court determinations of federal constitutional claims than before. As the present petition was filed after April 24, 1996, AEDPA applies. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).

### 1.    28 U.S.C. § 2254(e)(1)

Section 2254(e)(1) requires district courts to presume that a state court's factual determinations are correct unless the habeas petitioner rebuts the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also, e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides "a highly deferential standard of review for factual determinations made by a state court"). Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).

The deference that attends state court findings of fact pursuant to § 2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, a presumption of correctness must be afforded to a state court's factual findings, even when the habeas claim is being examined *de novo*. *See Mansfield v. Secretary, Department of Corrections*, 679 F.3d 1301, 1313 (11th Cir.

46

2012). The presumption of correctness also applies to habeas claims that were adjudicated on the merits by the state court and, therefore, those claims are subject to the standards of review set out in 28 U.S.C. § 2254(d)(1) or (d)(2) discussed in the following section.

### 2.   28 U.S.C. § 2254(d)

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). It does not matter whether the state court decision contains a lengthy analysis of the claim or a summary ruling "unaccompanied by explanation." *Id.*

Further, the "backward-looking language" of the statute requires an examination of the state court decision on the date it was made. *Cullen v. Pinholster*, 563 U.S. 170 (2011). That is, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id.* at 182, quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003). Finally, "review under § 2254(d)(1) [and (d)(2)] is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181. Therefore, a federal habeas court conducting § 2254(d) review should not consider new evidence "in the first instance effectively *de novo*." *Id.* at 182.

A closer look at §§ 2254(d)(1) and (d)(2) reveals that when a state court has made a decision on a petitioner's constitutional claim, habeas relief cannot be granted unless it is determined that the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Title 28 U.S.C. § 2254(d). Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the Supreme Court of the United States" has been interpreted by the Supreme Court as referencing only "the *holdings*, as opposed to the *dicta*, of [the Supreme Court=s] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (O'Connor, J., majority opinion) (emphasis added); *see also, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006).

The "contrary to" and "unreasonable application" clauses of § 2254(d) have been interpreted as "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams,* 529 U.S. at 405-07). When considering a state court's adjudication of a petitioner's claim, therefore, the habeas court must not conflate the two modes of analysis.

### a.       Section 2254(d)(1)'s "Contrary to" Clause

A state court determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405. *See also, e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001).  As the Eleventh Circuit has noted, the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above.[7] Instead, the statutory

---

[7] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

language "simply implies that 'the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'" *Alderman*, 468 F.3d at 791, quoting *Williams*, 529 U.S. at 405.

> ### b.    Section 2254(d)(1)'s "Unreasonable Application" Clause

A state court's determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407; s*ee also, e.g.*, *Putman*, 268 F.3d at 1240-41 (same). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*. Rather, that application must also be unreasonable." *Id*. at 411 (emphasis added). In other words, the question to be asked when deciding

---

The word "contrary" denotes incompatibility or logical inconsistency. Two propositions are incompatible with one another if both cannot be true or correct. Thus, a state court decision is contrary to federal law if that decision and the applicable federal law cannot both be true or correct. Given this premise, there appear to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:

- the state court applies the correct federal standard and arrives at a correct outcome;
- the state court applies an incorrect federal standard and arrives at an incorrect outcome;
- the state court applies an incorrect federal standard [but] arrives at a correct outcome; and,
- the state court applies the correct federal standard [but] arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

the federal constitutional issue is not whether the state court "correctly" applied Supreme Court precedent but whether the state court's determination was objectively unreasonable. *Id.* at 409; *see also, e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable."); *Harrington v. Richter*, 562 U.S. 86, 100-03 (2011).

To demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. Stated another way, if the state court's resolution of a claim is debatable among fair-minded jurists, it is not objectively unreasonable.

Also, "[b]y its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has "unreasonably" applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted). Mixed questions of constitutional law and fact are those decisions "which require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963).

### c.   Section 2254(d)(2)

Title 28 U.S.C. § 2254(d)(2) "imposes a 'daunting standard – one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, 565 U.S. 1138, 132 S. Ct. 611, 612 (2012) (Sotomayor, J., respecting denial of certiorari), quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010). As the Supreme Court has noted:

> in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define."
> *Williams v. Taylor,* 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).
> It suffices to say, however, that a state-court factual determination is not
> unreasonable merely because the federal habeas court would have reached a
> different conclusion in the first instance. *Cf. Id.,* at 411, 120 S. Ct. 1495.

*Wood v. Allen,* 558 U.S. 290, 301 (2010). Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.*, quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006) (alteration in original). Conversely, "when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Correctional Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013), quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc) (alterations in original).

### d.    Evaluating State Court Factual Determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)

As explained above, § 2254(d)(2) regulates federal court review of state court findings of fact. That provision limits the availability of federal habeas relief on any claims by a state prisoner that are grounded in a state court's factual findings, unless the state court's findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, 28 U.S.C. § 2254(e)(1) provides that factual determinations made by a state court are "presumed to be correct," and that the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010). ("Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than

a preponderance of the evidence but less than proof beyond a reasonable doubt.") (internal quotation marks omitted).

Nevertheless, the manner in which §§ 2254(d)(2) and (e)(1) relate to one another remains an open question. *See Rice v. Collins*, 546 U.S. 333, 339 (2006); *Wood v. Allen*, 558 U.S. 290 (2010); *Raheem v. GDCP Warden*, 995 F.3d 895, 908 n.4 (11th Cir. 2021); *Cave v. Secretary for Department of Corrections*, 638 F.3d 739, 744-45 (11th Cir. 2011) ("[N]o court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard," quoting *Gore v. Secretary for Department of Corrections*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)). Even so, the Eleventh Circuit's earlier opinion in *Ward v. Hall* concluded that federal habeas courts "must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Id.* at 1177 (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)). That same opinion observed that § 2254(e)(1) "commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155 (alteration in original).

### D.   The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Federal habeas "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *see also* 28 U.S.C. § 2254(a). Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Two consequences flow from those fundamental propositions.

First, the habeas petitioner bears the burden of (1) overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and (2) establishing a factual basis demonstrating that federal post-conviction relief should be granted. *See, e.g.*, 28 U.S.C. §§ 2254(d), (e)(1); *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always on the petitioner.") (citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)).

Second, the habeas petitioner must meet "heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *Borden v Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (holding that § 2254 requires "fact pleading," and not merely "notice pleading"). The mere assertion of a ground for relief, without sufficient factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1) or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts* (which requires a state prisoner to "specify all the grounds for relief available to the petitioner" and "the facts supporting each ground"). Rule 2(c)(1)-(2), *Rules Governing Section 2254 Cases in the United States District Courts*; *see also* 28 U.S.C. § 2242 (stating that an application for writ of habeas corpus "shall allege the facts concerning the applicant's commitment or detention").

In short, a habeas petitioner must include in his statement of each claim sufficient supporting facts to justify a decision for the petitioner if the alleged facts are proven true. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that a habeas petition must "state facts that point to a 'real possibility of constitutional error,'" quoting Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts*). *Cf. Hill v. Lockart*, 474 U.S. 52, 60 (1986) ("Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty

and insisted on going to trial. He alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty."); *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (holding in a case premised upon 28 U.S.C. § 2255 that, despite the liberal construction due a *pro se* petitioner's allegations, dismissal was appropriate because the movant did not allege "facts that, if proven, would entitle him to relief"). In addition, "[c]itation of the controlling constitutional, statutory, or other bases for relief for each claim also should be stated." 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005). As another district court has stated it:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners. Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

### E.     Claims Dismissed Pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure

Rule 32.3 of the Alabama Rules of Criminal Procedure requires:

> The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

Ala. R. Crim. P. 32.3. Further, Rule 32.6(b) of the Alabama Rules of Criminal Procedure mandates:

> Each claim in the [Rule 32] petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

Ala. R. Crim. P. 32.6(b). Lastly, Rule 32.7(d) of the Alabama Rules of Criminal Procedure

allows summary disposition of a state habeas petition if:

> the court determines that he petition is not sufficiently specific, or is precluded, or
> fails to state a claim, or that no material issue of fact or law exists which would
> entitle the petitioner to relief under this rule and that no purpose would be served
> by any further proceedings, the court may either dismiss the petition or grant leave
> to file an amended petition. Leave to amend shall be freely granted. Otherwise, the
> court shall direct that the proceedings continue and set a date for hearing.

Ala. R. Crim. P. 32.7(d).

The Eleventh Circuit has observed that "[a] ruling by an Alabama court under Rule 32.6(b)

is also a ruling on the merits." *Borden v. Allen*, 646 F.3d 785, 812 (11th Cir. 2011). Under AEDPA

principles, when a claim has been dismissed by the state courts pursuant to Rule 32.6(b), the

reviewing federal habeas court may only "examine the reasonableness of the ACCA's adjudication

of [a petitioner's] claims based upon the allegations contained in his [Rule 32] Petition." *Id.* at

816-17 (citing *Cullen*, 563 U.S. at 181) ("We now hold that review under § 2254(d)(1) is limited

to the record that was before the state court that adjudicated the claim on the merits."). The *Borden*

court explained that the court's task was "to evaluate whether the [ACCA's] determination that

[the petitioner's] relevant ineffective assistance of counsel claims were due to be dismissed for

failure to state a claim with sufficient specificity under Rule 32.6(b) was 'contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States.'" *Id.* at 818-19 (citing 28 U.S.C. § 2254(d)(1)).

Of note, the Eleventh Circuit has recognized that Rule 32.6(b) possesses a "heightened

pleading requirement—fact pleading." *Id.* at 810. Further, it is well settled in state courts that under

Alabama procedural law, "[t]he burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy

one." *Hyde v. State*, 950 So. 2d 344, 356 (Ala. Crim. App. 2006). Specifically, Alabama courts hold:

> Rule 32.6(b) requires that the *petition* itself disclose the *facts* relied upon in seeking relief. In other words, it is not the pleading of a *conclusion* which, if true, entitles the petitioner to relief. It is the allegation of *facts* in pleading which, if true, entitles a petitioner to relief. After *facts* are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those *alleged* facts.

*Boyd v. State*, 913 So. 2d 1113, 1125 (Ala. Crim. App. 2003) (emphasis in original) (internal citations and quotations omitted). Alabama courts have consistently observed the following legal principle:

> Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The *full* factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). *See Bracknell v. State*, 883 So. 2d 724 (Ala. Crim. App. 2003). To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must "identify the [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," *Strickland v. Washington*, 466 U.S. 668, 690 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [*Strickland*,] 466 U.S. at 694. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.

*Hyde*, 950 So. 2d at 356 (emphasis in original) (parallel citations omitted).

### F.     Ineffective Assistance of Counsel Claims

Federal ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represented a state prisoner at trial or on direct appeal from the conviction. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). *See also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no

constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.").

The Supreme Court's "benchmark" standard for determining ineffective assistance is well established. The question is whether a trial or appellate attorney provided representational assistance to a state prisoner that was so professionally incompetent as to create issues of federal constitutional proportions. In other words, the court asks "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). If an objective answer to that question is yes, then counsel was constitutionally ineffective.

*Strickland* requires that the issue be approached in two steps:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First, the defendant must show that counsel's performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis added); *see also, e.g.*, *Williams*, 529 U.S. at 390; *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001). Both parts of the *Strickland* standard must be satisfied: that is, a habeas petitioner bears the burden of proving, by "a preponderance of competent evidence," that (1) the performance of his trial or appellate attorney was *deficient*; *and* (2) that such deficient performance *prejudiced his defense*. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). Thus, a federal court is not required to address both parts of the *Strickland* standard when the habeas petitioner makes an insufficient showing on one of the prongs. *See, e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be

satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

### 1.    The Performance Prong

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong of the *Strickland* test, a petitioner must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.

The standard set forth by *Strickland* for gauging attorney performance is "reasonableness under prevailing professional norms." *Id.* at 688; *see Williams*, 529 U.S. at 390-91: *Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Chandler*, 218 F.3d at 1313. "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313). "Furthermore, [the reviewing court] must recognize that omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." *Id.*, quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (internal quotation marks omitted). No guarantee is made by the Sixth Amendment that a defendant is to be provided the very best counsel, or the most skilled attorney; rather, the Sixth Amendment provides only for counsel that performs within a reasonable range of professional norms. *See Grayson*, 257 F.3d at 1196.  That is, the court "ask[s] only whether some reasonable lawyer at trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error and in light of all the circumstances. *See, e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (providing attorneys with "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1286 (11th Cir. 1988) (explaining that *Strickland* performance review is a "deferential review of all the circumstances from the perspective of counsel at the time of the alleged errors"). Under the *Strickland* standard of review:

> [T]here are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence – which is also constitutionally protected – and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. It follows that, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotations and citation omitted); *see also Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Moreover, the fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel. *See Chandler*, 218 F.3d at 1314. "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" *Id.*, quoting *Darden*, 106 S. Ct. at 2474. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693.

But upon this strong presumption of competent assistance, it follows that "to show that counsel's performance was unreasonable, the petition must establish that *no competent counsel would have taken the action that his counsel did take*." *Grayson*, 257 F.3d at 1216 (emphasis in original). *See, e.g.*, *Stewart*, 476 F.3d at 1209; *Chandler*, 218 F.3d at 1315; *c.f. Rogers*, 13 F.3d at 386 ("Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."). Particularly relevant with respect to this court's review, although "[a]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence . . . [t]his duty does not necessarily require counsel to investigate every evidentiary lead." *Williams v. Allen*, 542 F.3d 1396, 1337 (11th Cir. 2008) (citations omitted).

### 2.    The Prejudice Prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). "It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693; *see also Harrington*, 562 U.S. at 112. Instead to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see Williams*, 529 U.S. at 391. Critically, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In the context of the death sentence itself, "'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and

mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209, quoting *Strickland*, 466 U.S. at 695.

Further, to satisfy this high standard, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001), quoting *Strickland*, 466 U.S. at 687. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson*, 256 F.3d at 1177, quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996), quoting in turn *Kimmelman v Morrison*, 477 U.S. 365, 374 (1986) (internal quotation marks omitted).

### 3.    Deference Afforded State Court's Decisions

When the state court has adjudicated a petitioner's ineffectiveness claims on the merits, the findings of historical facts made in the course of evaluating the claim are subject to a presumption of correctness under §§ 2254(d)(2), (e)(1). *see Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome the state court's findings of fact, the petitioner must show that those findings were unreasonable in light of the evidence before the state court and carry his burden of proving the facts by clear and convincing evidence. *See id.*

Deference to a state court's resolution of a claim of ineffective assistance of counsel involves a double layer of reasonableness. Under the AEDPA, the federal habeas court may grant relief on such a claim only if the state court determination involved an "unreasonable application" of *Strickland* to the facts of the case. *See Harrington*, 562 U.S. at 100-01. As previously noted, *Strickland* requires an assessment of whether counsel's conduct was professionally unreasonable and whether such conduct resulted in actual prejudice. The assessment of the reasonableness of the state court's determination and the assessment of the alleged attorney error cannot be conflated

into one inquiry. *See id.* at 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim decided on the merits by the state court only if the habeas court determines that it was "objectively unreasonable" for the state court to find that counsel's conduct was not "professionally unreasonable" or did not result in actual prejudice.

As the Supreme Court put it in *Harrington*:

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). An ineffective-assistance [of counsel] claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process of the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689; *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.

Establishing that a state court's application of *Strickland* was unreasonable under [Section] 2254(d) is all the more difficult. The standards created by *Strickland* and [Section] 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S. [111, 123] [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. [*Knowles*,] 556 U.S. at 123. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under [Section] 2254(d). When [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105 (internal citations omitted); *see also Premo v. Moore*, 562 U.S. 115, 123 (2011).

Here, the Rule 32 court adjudicated Reynolds's ineffectiveness claims on the merits. It appears he has since significantly altered the factual basis he relies upon to present in this court

his ineffectiveness claims (at least as compared to what he originally presented to the Rule 32 court) to the point that he is essentially asserting new claims. Accordingly, as explained in more detail below, these new claims (or these new aspects of his claims), which were not presented to the state courts, are subject to dismissal for non-exhaustion, and thus are procedurally defaulted on that basis. *See Kelley v. Sec'y, Dept. of Corr.*, 377 F.3d 1317, 1345 ("The habeas petitioner can escape the exhaustion requirement only by showing cause for the default and actual prejudice resulting therefrom. . . . Absent the applicability of [this] exception [ ], nonexhausted claims cannot be raised in federal habeas corpus petitions.") (citations omitted).

As a general matter, though, to the extent Reynolds petitioned the Alabama Supreme Court for a writ of certiorari, both on direct appeal and following his post-conviction proceedings (*see* Vols. 22, 34), he has generally "invok[ed] one complete round of [Alabama's] established appellate review process," and has theoretically exhausted his state court remedies as required by 28 U.S.C. § 2254(b)(1). *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see Smith v. Jones*, 256 F.3d 1135, 1141 (11th Cir. 2001); *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003). As a result, with exceptions noted below, there are no overarching exhaustion or procedural default issues under § 2254 raised by Reynolds's federal habeas petition. However, to the extent exhaustion or procedural default issues may apply within individual claims and subclaims the court will address them as they are presented.

## III.   REQUEST FOR DISCOVERY AND EVIDENTIARY HEARING MOTION

On September 27, 2018, Reynolds filed a Motion for Discovery of Records and Files and for an Evidentiary Hearing. (Doc. # 32). In the motion, Reynolds requested the court's permission to conduct discovery on his claim that the prosecution suppressed evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny

(the "Rule 32 *Brady/Giglio*" claim). (*Id.* at 19-41). Reynolds also requested an evidentiary hearing on his Rule 32 *Brady/Giglio* claim and on his ineffective assistance of counsel claim. (*Id.* at 42-55).

> On April 1, 2019, the court denied Reynolds's Motion without prejudice, explaining:

> A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rather, a habeas petitioner's ability to conduct discovery is governed by the interplay between 28 U.S.C. § 2254(e)(2) and Rules 6 (Discovery) and 8 (Evidentiary Hearing) of the Rules Governing § 2254 Cases in the United States District Courts. …

> [Thus,] the court can only determine whether discovery and an evidentiary hearing is warranted under Rules 6 and 8 of the Rules Governing § 2254 Cases in the context of the court's substantive review of the habeas petition itself. Accordingly, the court will consider Petitioner's entitlement to discovery and an evidentiary hearing during its substantive review of the petition. If the court finds that either discovery and/or a hearing is warranted, it will grant Petitioner's request at that time.

(Doc. # 36 at 1-2).  The court will now address whether (1) discovery and/or (2) an evidentiary hearing is warranted in this case.

### A.    Discovery Is Not Warranted on Reynolds's Rule 32 *Brady/Giglio* Claim

As previously mentioned, "[a] habeas petitioner, unlike the usual civil litigant in federal court is not entitled to discovery as a matter of ordinary course." *Bracy*, 520 U.S. at 904. Furthermore, the "broad discovery provisions" of the Federal Rules of Civil Procedure do not apply in habeas proceedings. *Harris v. Nelson*, 394 U.S. 286, 295 (1969). The *Harris* Court also held that the All Writs Act provides federal courts the power to "fashion appropriate modes of procedure." *Id.* at 299; *see* 28 U.S.C. § 1651.

Rule 6 of the Rules Governing § 2254 Cases permits a petitioner "to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion *and for good cause shown* grants leave to do so, but not

otherwise." *See* Rule 6 of the Rules Governing § 2254 Cases in the U.S. Dist. Courts (emphasis added). The rule embodies the principle that a court must permit discovery in a proceeding only "where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09, quoting *Harris*, 394 U.S. at 300; *see also Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). In keeping with the well-settled principle that habeas petitioners are not entitled to go on fishing expeditions in search of supporting evidence, the "good cause" standard requires a petitioner to identify what he expects to uncover through his discovery requests. *See Williams*, 380 F.3d at 976.

Reynolds complains that he should have been provided an adequate opportunity to engage in discovery but he was not. The court disagrees. As explained below, Reynolds has not established "good cause" for permitting additional discovery on his Rule 32 *Brady/Giglio* claim.

During the post-conviction appeal that followed the Rule 32 court's summary dismissal for insufficient pleading, the ACCA concluded that Reynolds pleaded specific facts, that if true, would establish a *Brady/Giglio* violation. *See Reynolds II*, 236 So. 3d at 202. Thus, the ACCA remanded the case to the Rule 32 court with instructions "to conduct further proceedings on Reynolds's *Brady/Giglio* claim." *Id.* The ACCA further explained that "[t]he circuit court may comply with this Court's remand instructions by conducting an evidentiary hearing or by taking evidence in the form of evidentiary submissions." *Id.* (citing Ala. R. Crim P. 32.9). On remand, the Rule 32 court permitted Reynolds to engage in discovery relevant to his *Brady/Giglio* claim and to submit his arguments. Ultimately, the Rule 32 court denied relief. *Reynolds II*, 236 So. 3d at 202.

On Reynolds's subsequent appeal, the ACCA rejected Reynolds's argument that the Rule 32 court "denied him access to basic discovery," "[prevented] him from having a full and fair

opportunity to present evidence of his *Brady/Giglio* claim," and hindered his ability to fairly present his claims. (Vol. 33 at 166-71). The ACCA discussed the relevant timeline of events and legal standards before deciding that "[t]he circuit's court's granting of limited discovery was reasonable." (*Id.*). For example, the ACCA specifically noted that "[p]ost-conviction discovery does not provide a petitioner with a right to 'fish' through official files and . . . 'it is not a device for investigating possible claims, but a means of vindicating actual claims.'" (*Id.* at 170, quoting *Jackson v. State*, 910 So. 2d 797, 801 (Ala. Crim. App. 2005) (citations omitted)).

The ACCA agreed with the Rule 32 court that "Reynolds's initial motion for discovery was overly broad . . . [and] sought information far beyond the scope of remand." (*Id.*). The ACCA also concluded that Reynolds did not satisfy the "good cause" standard for post-conviction discovery on the overly broad matters and that "the circuit court did not abuse its discretion in denying his initial motion for discovery." (*Id.*). Finally, the ACCA held that "[t]he circuit court's decision to accept evidentiary submissions in lieu of an evidentiary hearing was consistent with [the ACCA's] remand." (*Id.* at 171).

At this federal habeas stage, Reynolds still has failed to articulate what it is he would have been able to find if, on remand in the Rule 32 court, he had been entitled to conduct more comprehensive discovery. Based on the record, Reynolds has not shown good cause, even though on remand he was granted the ability to conduct reasonable, limited discovery in the Rule 32 court. (*See id.* at 170). Additionally, to the extent Reynolds objects to the Alabama Rules of Criminal Procedure's allowance of a court's acceptance of evidentiary submissions in lieu of an evidentiary hearing, that contention rests on state procedural law that is outside this court's jurisdiction. *See Landers v. Warden, Atty. Gen. of Ala.*, 776 F.3d 1288, 1296 (11th Cir. 2015) ("If the Alabama state

habeas court violated Alabama state law [Rule 32.9 of the Alabama Rules of Criminal Procedure], that is for the Alabama appellate courts to determine. . . .")

The state court provided Reynolds a full and fair opportunity either to engage in the discovery he now requests or argue good cause on why he was entitled to that discovery. This court agrees with the ACCA's conclusion that Reynolds has failed to show good cause for further post-conviction discovery. Reynolds is not entitled to discovery under Rule 6 of the Rules Governing § 2254 Cases. Accordingly, Reynolds's Motion (Doc. # 32) to conduct discovery regarding his *Brady/Giglio* claim is due to be denied.

**B.     An Evidentiary Hearing Is Not Warranted on Reynolds's *Brady/Giglio* or *Strickland* Claims**

"[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court [and he must do so] based solely on the state court record." *Landers*, 776 F.3d at 1295. "Once a petitioner has demonstrated such an error or unreasonable determination, 'the decision to grant [an evidentiary] hearing rests in the discretion of the district court.'" *Id.* (citing *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007)).

For the reasons provided below, the court concludes that Reynolds has not pleaded sufficient facts to demonstrate a *Brady/Giglio* claim after being afforded an opportunity to develop his state record. *See* Part IV(A)(2), *infra*. Also, Reynolds has not sufficiently pleaded his Rule 32 *Strickland* claims. *See* Part V, *infra*. Therefore, Reynolds is not entitled to a federal evidentiary hearing on either claim.

Alternatively, Reynolds failed to develop the factual basis of these claims in his state court proceedings, and he has failed to establish that either exception in § 2254(e)(2) applies: (1) the

claims do not rely on a new, retroactive rule of constitutional law; and (2) there is no factual predicate that could not have been previously discovered through the exercise of due diligence. Reynolds also fails to show that the facts underlying either claim "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Therefore, § 2254(e)(2) precludes the district court from granting an evidentiary hearing. *Holland v. Jackson*, 542 U.S. 649, 653 (2004); *accord Bradshaw v. Richey*, 546 U.S. 74, 79 (2005).

Furthermore, even if Reynolds satisfied § 2254(e)(2)'s standard, "the decision to grant such a hearing rests in the discretion of the district court." *Schriro*, 550 U.S. at 468. And, in this case, the court concludes that an evidentiary hearing is not warranted.

In sum, and as explained in detail below, this court concludes that Reynolds has not shown he is entitled to relief under § 2254(d). The court further concludes that Reynolds failed to factually develop these claims in the state court and, therefore, he is precluded from obtaining an evidentiary hearing in this court.

## IV.   SUBSTANTIVE CLAIMS

### A.   *Brady/Giglio*

Reynolds contends that the State violated the principles of *Brady/Giglio* and, thus, deprived him of his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Docs. # 1 at 4, 17-42; 31 at 11-34). Reynolds divides his *Brady/Giglio* argument into three contentions: (1) the prosecution failed to disclose the existence of a deal between it and West (Docs. # 1 at 2, 19-42; 31 at 11-28); (2) the prosecution suppressed the forensic investigator's field notes indicating that no blood was found on the interior of Sandra Roberts's car, and that another vehicle was investigated, and handwritten notes taken by the police

while interviewing several of the prosecution's witnesses (Docs. # 1 at 7, 19-20, 42-48; 31 at 11, 29-34); and (3) the cumulative effect of each of these alleged violations was error. (Doc. # 31 at 34). The court has considered each of Reynolds's arguments and meticulously reviewed the state court record. For the reasons provided below, the court concludes that Reynolds's *Brady/Giglio* claims are without merit and, thus, are due to be denied.

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently;" and, [3] the suppressed evidence must be material to the issues at trial. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Evidence is 'material' … when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017), quoting *Cone v. Bell*, 556 U.S. 449, 469 (2009), citing in turn *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see*, *e.g.*, *Strickler*, 527 U.S. at 280. "A 'reasonable probability' of a different result is one in which the suppressed evidence 'undermines confidence in the outcome of a trial.'" *Turner*, 137 S. Ct. at 1893 (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), quoting in turn *Bagley*, 473 U.S. at 678). Notably, a petitioner is entitled to a new trial only if he "establishe[s] the prejudice necessary to satisfy the 'materiality' inquiry." *See Strickler*, 527 U.S. at 282.

This issue tends to be "legally simple but factually complex. [A court] must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' and determine

in light of that examination whether 'there is reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Turner*, 137 S. Ct. at 1893, quoting *Cone*, 556 U.S. at 470, citing in turn *Bagley*, 473 U.S. at 682. The latter "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *see Bagley*, 473 U.S. at 678.

Stated differently, "favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone*, 556 U.S. at 470, quoting *Kyles*, 514 U.S. at 435, citing *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004); *Strickler*, 527 U.S. at 290. In fact, "undisclosed evidence can require a new trial even if it is more likely than not that a jury seeing the new evidence would still convict." *Hays v. Alabama*, 85 F.3d 1492, 1498 (11th Cir. 1996). Nonetheless, withheld evidence is not material if -- when considered in the context of the entire record -- it "is too little, too weak, or too distant from the main evidentiary points of the case." *See Turner*, 137 S. Ct. at 1894.

The court recognizes that the prosecution is firmly obligated under *Brady* to disclose evidence favorable to the defendant. *See Berger v. United States*, 295 U.S. 78, 88 (1935). And to be sure, when fulfilling this obligation, the State should err on the side of cautionary disclosure. *See id.* In other words, *Brady* requires the prosecution to turn over "material evidence," which includes evidence that, if it had been disclosed to the jury, would undermine confidence in the outcome of the trial or sentence as a whole. *Agurs*, 427 U.S. at 97-98; *see, e.g., Cone v. Bell*, 556 U.S. 449, 469-70; *Kyles*, 514 U.S. at 434. But, there is no constitutional violation if the evidence merely "might have helped the defense" or is not particularly probative. *Agurs*, 427 U.S. at 109-

10. Put differently, *Brady* does not give a defendant a right to "complete discovery" of the prosecution's files. *Agurs*, 427 U.S. at 109.

Indeed, the Supreme Court has recognized the impropriety of applying the broadest possible interpretation to decide *Brady* disclosure violations and warned against the application of a backward-looking standard, as that may result in the unintended and undesirable consequence of requiring the State to effectively turn over its entire file including potential work product. *Agurs*, 427 U.S. at 108-09 ("If everything that might influence a jury must be discovered, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice."). And, the *Agurs* Court has also cautioned that such expansive disclosure requirements would undermine the interest of the judiciary to maintain public confidence in and the reliability of judicial sentencing through the stripping of the State's right to develop and protect its own theory of the case without undue uncertainty. *Id.* at 109-10 (recognizing that there is "no constitutional requirement to make a complete and detailed accounting to the defense of all police investigatory work on a case. The mere possibility that an item of undisclosed information *might have helped* the defense, or *might have affected* the outcome of trial, does not establish 'materiality' in the constitutional sense"), quoting *Moore v. Illinois*, 408 U.S. 786, 795 (1972) (emphasis added).

## 1. Alleged Failure to Disclose Deal with West and to Correct Her Testimony

This portion of Reynolds's *Brady/Giglio* argument is further divided into three subclaims. First, Reynolds alleges that the "overwhelming evidence [he] present[ed] to the Rule 32 trial court and the ACCA shows by clear and convincing evidence" that there was an agreement between West and the State under which the prosecution would reduce West's sentence on outstanding criminal charges in exchange for her testimony against Reynolds, but that the purported agreement

was not disclosed. (*See generally* Docs. # 1 at 26-42; 31 at 11-28). Second, Reynolds contends that the prosecution knowingly failed to correct West's testimony when she expressly denied the existence of such a deal. (Doc. # 1 at 26-27). Third, Reynolds argues that the Rule 32 court did not provide him with a sufficient opportunity to conduct discovery and present evidence on these issues. (*Id.* at 34). Reynolds claims that the ACCA's decision (1) was an unreasonable determination of the facts in light of the evidence presented in the State court proceeding; and (2) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. (*Id.* at 42). For the reasons explained below, the court concludes that Reynolds is not entitled to relief on this *Brady/Giglio* subclaim under either of § 2254(d)'s provisions.

### a.   Procedural History

To properly evaluate Reynolds's *Brady/Giglio* claims, it is important to carefully review the state court record regarding his assertion of those claims.

### (1)   The Rule 32 Court's Initial Dismissal and the Reversal by ACCA

Reynolds presented this *Brady/Giglio* subclaim in his state habeas appeal. (Vol. 31 at 101-08). On its first review, the Rule 32 court dismissed the claim as procedurally barred under Rules 32.2(a)(3) and 32.2(a)(5) of the Alabama Rules of Criminal Procedure. (Vol. 26 at 21). The Rule 32 court also decided that, under Rules 32.6(b) and 32.7(d), Reynolds insufficiently pleaded his *Brady/Giglio* claims. (*Id.*). However, on appeal, the ACCA remanded, holding that "Reynolds pleaded facts, that if true, would establish that the State violated both *Brady* and *Giglio*." *Reynolds II*, 236 So. 3d at 202, 202 n.1. On the pleadings, the ACCA reasoned that Reynolds was "entitled to an opportunity . . . to prove [this] claim" under Rule 32.9. *Id.* at 202; *see also id.* at 200-01, quoting *Boyd v. State*, 913 So. 3d 113, 1125 (Ala. Crim. App. 2003).

The ACCA also noted that the State "pleaded that [this] claim [was] procedurally barred because it could have been but was not raised at trial or on [direct] appeal." *Id.* at 202 (citing Ala. R. Crim. P. 32.2(a)(3), (a)(5)). As a result, the ACCA instructed that, on remand, Reynolds "must present evidence both disproving [the procedural bar] and proving his *Brady/Giglio* claim by a preponderance of the evidence." *Id.* at 200-02 (citing Ala. R. Crim. P. 32.2-32.3). Accordingly, the ACCA remanded Reynolds's case with the following instructions:

> The circuit court may order any discovery relating to this claim that it deems necessary to allow the parties to litigate Reynolds's claim. It must, however, provide Reynolds an opportunity to disprove the procedural bars asserted by the State and to prove his *Brady/Giglio* claim, and . . . provide the State an opportunity to present evidence in rebuttal. The circuit court may comply with this Court's remand instructions by conducting an evidentiary hearing or taking evidence in the form of evidentiary submissions. Rule 32.9, Ala. R. Crim. P. Further, the court shall make specific findings of fact regarding its disposal of Reynolds's claim.
>
> [T]he circuit court is instructed to take all necessary action to see that the circuit clerk makes due return to this Court at the earliest time possible and within 56 days of the release of this opinion. The return to remand shall include the circuit court's written findings along with a transcript of the evidentiary hearing, if any, and all evidence taken by the court.

*Reynolds II*, 236 So. 3d at 202 (emphasis added).

### (2)   Rule 32 Court's Decision on Remand

The Rule 32 court compiled a list of the evidence it considered on remand, which included certain factual findings. (Vol. 29 at 190-94; Vol. 33 at 171-73). First, "the [trial c]ourt on May 12, 2005, required prosecution to make known any incentives or agreements made with witnesses who will testify in the case." (Vol. 29 at 191). Second, the trial court granted Reynolds's "motion for discovery of prosecution files, records and information necessary to a fair trial … [to] the extent provided by Rule 16 of the Alabama Rules of Criminal Procedure and *Ex parte Monk* [, 557 So. 2d 832 (Ala. 1989)]." (*Id.*). Third, "[i]n the twelve (12) months preceding the trial of this case [the trial c]ourt held eight (8) different hearings dealing with discovery issues." (*Id.*). Fourth, "[t]o

ensure that [Reynolds] was given all exculpatory evidence [the trial c]ourt performed an in camera inspection of the prosecution's file. Those portions of the prosecution's file that were not provided to the Defendant were placed under seal with the Clerk and by Order of [the Circuit Court] were filed as a supplement of the record on appeal." (*Id.*). Fifth, after Reynolds raised his *Brady/Giglio* concerns, the trial court ordered the State to produce records concerning West. (*Id.* at 192). Sixth, Reynolds "first sought to exclude" West's testimony "by asserting a common law marriage and privilege"; however, after holding a hearing, the trial court found there was no common law marriage. (*Id.*). During his examination of West, Reynolds's trial counsel "specifically asked" if she "made any deals with the District Attorney's Office for [her] testimony" and West responded, "[n]o Sir." (*Id.*, quoting Vol. 8 at 158). Seventh, "[w]hen asked by the prosecution" if she had "made any kind of agreement with [the prosecutor's] office for [her] testimony," over the objection of defense counsel, West again responded, "[n]o, sir." (*Id.*, quoting Vol. 8 at 166).

The Rule 32 court found "nothing in the record that indicate[d] there was an agreement between the prosecution and West." (Vol. 33 at 172; Vol. 29 at 192-93). Instead, the court held:

> on at least two (2) occasions, once by the defense and once by the prosecution, West denied any agreement. West's affidavit in the State's opposition to [Reynolds]'s claims denied any agreement. West's attorney, Jeff Montgomery, denied any knowledge of any agreement for West's testimony. Chief Deputy District Attorney Marcus Reid denied any agreement with West for her testimony.

(Vol. 33 at 172, quoting Vol. 29 at 192). The Rule 32 court found further support for its finding that there was no such deal in "Judge David Kimberley's plea colloquy at West's guilty plea hearing[,] [which] indicate[d] West's plea was a blind plea." (*Id.*, quoting Vol. 29 at 192). Also, after noting the differences between West's and another defendant's sentences, the Rule 32 court found that West's sentence was "consistent with other sentences of similar character … depending on the judge assigned the case." (*Id.*, quoting Vol. 29 at 193).

The Rule 32 court concluded that Reynolds's *Brady/Giglio* claims were based solely on speculation and conjecture. (Vol. 29 at 193). Reynolds's assertion that West received preferential treatment in her sentencing did not come close to outweighing clear, documented evidence to the contrary: (1) the affidavits from Chief Deputy District Attorney Marcus Reid, Jeff Montgomery (West's attorney), and West; (2) West's testimony at trial; the colloquy with Judge Kimberly; and (3) other testimony and representations in the trial transcript. (*Id.* at 73-74, quoting Vol. 29 at 193). All of that evidence indicated there was no agreement between West and the prosecution in exchange for West's testimony at Reynolds's trial.

The Rule 32 court restated its holding as follows:

1.      That, [when] provided an opportunity to disprove the procedural bars asserted by the State, [Reynolds] has utterly and completely failed to do so, by a preponderance of the evidence or any other legal standard.

2.      That, as to the *Brady Giglio* issue dealing with an alleged agreement with Witness Marcie West for her testimony, [Reynolds] has further failed to meet his burden as to proof of the same: and, indeed, this Court finds as a matter of fact and law that no such agreement ever existed.

(Vol. 29 at 194).

### (3)    ACCA's Decision After Return from Remand

After the Rule 32 court's decision on remand, Reynolds again appealed to the ACCA. (*See generally* Vol. 33 at 166-74). As Reynolds acknowledges in his federal habeas petition, he argued to the ACCA that the Rule 32 court deprived him of a full and fair opportunity to present evidence in support of his *Brady/Giglio* claim. Reynolds also argued that the circuit court erroneously concluded he had not proven his *Brady/Giglio* claims by a preponderance of the evidence. (*See id.* at 166). The ACCA addressed these arguments in turn and held that each was without merit. (*Id.*). Accordingly, the ACCA affirmed the Rule 32 court's determination and underlying factual findings. (*See id.* at 166-73).

The ACCA noted that the remand instructions had directed the Rule 32 court "to take all necessary action to see that the circuit clerk makes due return to this Court at the *earliest time possible and within 56 days of the release of this opinion*." (*Id.*, quoting *Reynolds II*, 236 So. 3d at 202) (emphasis added). Consistent with that deadline, the Rule 32 court entered a schedule that provided "Reynolds 20 days to present the circuit court with any legal, competent, and relevant evidence supporting his claim. The State was [also] afforded 20 days from the filing of Reynolds's evidence to present the circuit court with any rebuttal evidence." (*Id.* at 166). Reynolds then sought a thirty-day extension of time, which the circuit court denied. (*Id.*).

The ACCA held that the Rule 32 court did not abuse its discretion (and in fact noted that the lower court had granted Reynolds access to any and all of the State's files pertaining to the prosecution of West). The ACCA also noted that Reynolds did not point to any specific evidence that he would have been able to obtain if not for the limits on discovery or the Rule 32 court's denial of his motion for an enlargement of time. (*Id.* at 168). The ACCA concluded that the Rule 32 court reasonably limited discovery and rejected the use of interrogatories under state law. (*Id.* at 170). The ACCA also determined that the Rule 32 court did not abuse its discretion when it allowed evidentiary submissions in lieu of an evidentiary hearing. (*Id.* at 171).

The ACCA further observed that under Alabama law, "where there are disputed facts in a postconviction proceeding and the [Rule 32] court resolves those disputed facts, '[t]he standard of review on appeal . . . is whether the trial judge abused his discretion.'" (*Id.* at 171, quoting *Boyd v. State*, 913 So. 3d 1113, 1112 (Ala. Crim. App. 2003), quoting in turn *Elliott v. State*, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992)). Ultimately, the ACCA rejected Reynolds's *Brady/Giglio* claim, holding that "the circuit court did not err in denying this claim" because "[t]he findings of

the circuit court are supported by the record." (*Id.* at 173) (citing *Hunt v. State*, 940 So. 2d 1041, 1055 (Ala. Crim. App. 2005)); (*see, e.g.*, *id.* at 172-73).

### b.        Reynolds is Not Entitled to Relief Under § 2254(d)(2)

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller–El,* 537 U.S. at 340. This court must give proper deference to the state court's findings of fact and in particular the finding that the State did not enter into an agreement with West for her testimony at Reynolds's trial. As explained by the Eleventh Circuit, § 2254(d)(2) "requires that we accord the state trial court substantial deference." *Raheem v. GDCP Warden*, 995 F.3d 895, 907 (11th Cir. 2021) (citing *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)). "If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.'" *Id.* (citing *Brumfield v. Cain*, 576 U.S. 305, 314 (2015), quoting in turn *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "In addition, on AEDPA review, 'a determination of a factual issue made by a State court shall be presumed to be correct' -- a presumption the petitioner has the burden of rebutting 'by clear and convincing evidence.'" *Id*. at 907-08 (citing 28 U.S.C. § 2254(e)(1)). The Supreme Court has not defined the "precise relationship between 2254(d)(2) and 2254(e)(1), and as our circuit court has stated several times before, "we need not do so here." *Id.* at 908 n. 4, quoting *Tharpe v. Warden*, 834 F.3d 1323, 1337 (11th Cir. 2016), citing in turn *Burt v. Titlow*, 571 U.S. 12, 18 (2013).

Here, Reynolds's petition contains nothing more than speculation and conclusory assertions that there was a deal between West and the State in exchange for West's testimony

against Reynolds. Reynolds claims that the State delaying West's criminal charges until after his conviction in conjunction with the fact that West incriminated herself at Reynolds's trial is sufficient evidence to prove that the State entered into a deal with West. (*See* Doc. # 1 at 36-37). That argument is far off the mark. Reynolds also points to a memorandum that references an agreement between West and the D.A.; however, nothing in the memorandum links the agreement (if any existed) to West testifying against Reynolds. (*See id.* at 38-39). The court explains its reasons for rejecting Reynolds's arguments below.

First, as discussed by the ACCA, a Rule 32 proceeding is governed by the provisions of Alabama's Rules of Criminal Procedure. (Vol. 33 at 171). Here, the ACCA reasonably recognized that the Rule 32 court's receipt of evidentiary submissions, in lieu of an evidentiary hearing, satisfied its remand order and Rule 32.9. (*Id.*). Additionally, Reynolds has not shown that the timeline adhered to by the Rule 32 court resulted in any unreasonable determination of fact. To the extent that the decision rested on state law grounds, the court declines to opine further on this issue. However, the court notes that the Eleventh Circuit has recognized that an evidentiary hearing is not a requirement for § 2254(d)(2) deference. *Landers v. Warden, Atty. Gen. of Ala.*, 776 F.3d 1288, 1297 (11th Cir. 2015) (citing *Schriro v. Landrigan*, 550 U.S. 465, 471, 476 (2007)).

The sworn affidavits of Reid, West, and West's counsel (Montgomery) specifically and categorically deny the existence of a deal made between the State and West for the purpose of inducing her testimony and cooperation at Reynolds's trial. For example, Reid attested that "[t]here was no deal in any form or at any time between the Etowah County District Attorney's Office and . . . West for her testimony during . . . Reynolds's trial" and that "[n]o promises or inducements concerning . . . West's pending charges, or any other matter, were made to . . . West in exchange for her testimony at Reynolds's trial." (Vol. 29 at 176). Similarly, in Montgomery's affidavit, he

attested that "[a]t no time was there a deal or agreement of any kind with the Etowah County District Attorney's Office in exchange for [his client West]'s testimony during the Reynolds trial. No promises were made of any kind concerning [her] pending charges." (*Id.* at 182).

Moreover, consistent with her prior trial testimony, West again confirmed through affidavit that there was no deal between her and the State in exchange for her testimony. In her affidavit, West swore that she "did not make any deals or agreements of any kind with the Etowah County District Attorney's Office" for her testimony at Reynolds's trial and that she wanted to testify at Reynolds's trial "because [she] knew [she] needed to tell the truth and tell what happened." (*Id.* at 186). West has also attested that "[n]o one ever promised [her] anything for [her] testimony[,]" "suggested that [her] charges might be lessened by testifying[,]" or "promised [her] anything at all about [her] charges." (*Id.*). West concluded her affidavit by swearing that "[a]t the time of Reynolds [*sic*] trial, [she] had no idea what would happen in [her] [pending] cases." (*Id.*).

These sworn statements are consistent with the record, including West's testimony. As recognized by the state courts, the nature of West's "blind plea" was plain from Judge David Kimberly's colloquy of her at the plea hearing. (*See* Vol. 33 at 172; Vol. 29 at 193). These facts are sufficient to establish the reasonableness of the ACCA's decision, which rejected Reynolds's claim that a *Brady/Giglio* violation occurred. *See Baxter v. Thomas*, 45 F.3d 1501, 1507 (11th Cir. 1995) (denying federal habeas relief on a claim that a witness testified pursuant to a deal with the State where the Assistant District Attorney, the witness, and a law enforcement officer provided sworn testimony that no such deal was made, and finding that "there is nothing to suggest that a deal had been made and, consequently, no *Brady* violation.").

As recognized by the state courts, West's affidavit was consistent with her testimony at Reynolds's trial, when she was tested in the "crucible of cross examination." (*See* Doc. # 31 at 15)

(citing *Jones v. Campbell*, 436 F.3d 1285, 1259 (11th Cir. 2006)). Moreover, the Rule 32 court, as the factfinder, is entitled to receive deference with respect to its credibility determinations. *Thompson v. Keohane,* 516 U.S. 99, 111 (1995).

Reynolds has not come close to articulating why it was unreasonable for the Rule 32 court to find West's affidavit credible and reliable. After all, West's declaration is consistent with her trial testimony during cross examination and her sworn testimony on re-direct. (Vol. 8 at 158, 166; Vol. 29 at 176-80, 182-84; Vol. 29 at 202; Vol. 30 at 3-10). And, it was confirmed by the substance of her blind plea. (*Id*.). Reynolds has failed to meet his AEDPA burden of showing that the ACCA's findings are objectively unreasonable.

To the extent Reynolds now relies on a January 13, 2009 memorandum composed by Mr. Montgomery, his assertions are simply insufficient to meet AEDPA's exacting standards. The memorandum referenced by Reynolds, *at most*, suggests that if "any agreement . . . existed regarding any portion of Ms. West's plea and/or sentence[,]" that agreement was entered into *after* Reynolds's conviction and sentence and did not relate "in [any] way to Ms. West's testimony during the Reynolds's trial." (Vol. 29 at 178). *See Burgess v. Terry*, 478 F. App'x 597, 600 (11th Cir. 2012) (holding that under *Brady*, "there can be no suppression of evidence that does not exist at the time of trial or sentencing"). While it is true that the State has an ongoing duty of disclosure, Reynolds cannot possibly prove he was prejudiced at trial or sentencing based upon purported evidence of an agreement between West and the prosecutor that did not even exist – at the time of trial or later. *See Landers*, 776 F.3d at 1297-98 (holding that the state court did not err in crediting an attorney's testimony over petitioner's version of facts where the "state court had plausible reasons" for reliability findings.)

80

Furthermore, Montgomery, who dictated the memorandum on the day of West's change of plea, explained in his affidavit that, "[a]lthough the memo indicates an 'Agreement with the D.A.'[,] I do not recall having any formal agreement in place at that time; only general discussions concerning the type of sentence I would request from the Court and any objections the District Attorney may have had, if any." (Vol. 29 at 178). Reynolds has not provided *any* evidence at all to demonstrate that the ACCA and the Rule 32 court were objectively unreasonable in finding that no *quid pro quo* agreement existed between West and the State. Rather, he relies on nothing more than rank speculation. Accordingly, Reynolds has not established that a *quid pro quo* agreement was orchestrated between West and the State "only days" after Reynolds's arrest. (*See* Doc. # 1 at 37). Nor has Reynolds demonstrated that the state courts' factual findings were objectively unreasonable. *See* 28 U.S.C. § 2254(d)(2).

Similarly unavailing is Reynolds's comparison of the sentence that was received and served by West (who testified for the State) to the sentence received and served by Harvey (who testified for the defense). Both West and Harvey were charged with (1) hindering the prosecution and (2) distribution of a controlled substance. And they each received "virtually the same sentence" -- three-year split sentences -- despite the fact that they each entered blind pleas before different judges. (*See* Vol. 31 at 36, 36 n.13, Vol. 29 at 11-31, 49-56, 61-36, 202; Vol. 30 at 3-8).

Reynolds wholly ignores this point and instead focuses on West's later admission into a treatment program. However, Reynolds has not presented any evidence rebutting the Rule 32 court's finding that West qualified for the program because she was a first-time offender, in contrast with Harvey, who was a habitual offender. (Vol. 29 at 193; Vol. 33 at 172; *see, e.g.*, Vol. 29 at 61-62). And, the record shows that Harvey and his status were personally known to the Rule 32 court. (*Id.*). Given these key differences, Reynolds has failed to demonstrate that West's entry

into the program was pursuant to a plea deal[8] (*see id.*; Vol. 29 at 49, 178-79, 193), and Reynolds's attempt to compare Harvey's case to that of West is unavailing. The two were similarly situated (except as it relates to their criminal history) and their sentences were not in any manner disproportionate to their prior records.

Reynolds has fallen far short of meeting his burden under AEDPA. He has not shown that no reasonable jurist could agree with the state court's determination of the facts. On return from remand, the ACCA determined that the record evidence supported the Rule 32 court's conclusion that no deal between the State and West existed. (Vol. 33 at 173). The Rule 32 court found that the affidavits from the Chief Deputy District Attorney, West's attorney, and West herself unequivocally denied the existence of any alleged deal made between the State and West. (*See* Vol. 33 at 172). And, as the ACCA recognized, the Rule 32 court's finding is supported by Reynolds's trial record showing that West twice denied the existence of such a deal while on the stand and when questioned by both Reynolds's trial counsel and the prosecution. (*See id.*; *see also* Vol. 8 at 158, 166). Reynolds has failed to demonstrate how the ACCA's affirmance of the Rule 32 court's factual findings on remand was based on an unreasonable determination of the facts. Accordingly, Reynolds is not entitled to relief under § 2254(d)(2).

### c.    Reynolds is Not Entitled to Relief Under § 2254(d)(1)

Reynolds argues that the ACCA's rejection of this *Brady/Giglio* subclaim was contrary to, or an unreasonable application of, clearly established federal law. (*See* Doc. # 1 at 42). As discussed above, the Rule 32 court reasonably found there was no *quid pro quo* deal made by the

---

[8] Moreover, in support of West's credibility, the court notes that at the time West's affidavit was given, on October 29, 2015 (*see* Vol. 29 at 187), it appears from the record that her supervised probationary period of five years had ended without incident. West was released from custody upon completion of a six-month SAP program on November 24, 2009, with her remaining sentence suspended. She was placed on five years of supervised probation, which would have concluded November 24, 2014. (*See* Vol. 28 at 132-33; Vol. 29 at 179).

State promising leniency to West in exchange for her testimony. The point is as tautological as it is true: there can be no *Brady* claim for "failing to disclose" something that did not exist. And for the same reasons explained above, Reynolds cannot succeed on a *Giglio* claim based on the prosecution's alleged failure to correct truthful testimony that such a deal did not exist.

A *Brady/Giglio* claim is predicated on the suppression of evidence. So here, to succeed on such a claim, Reynolds must show there was an agreement between West and the State that was withheld. *Wearry v. Cain*, 577 U.S. 385, 393-94 (2016) (citing *Napue v. People of the State of Illinois*, 360 U.S. 264 (1959) (holding that the State violated *Brady* when it failed to disclose that a witness had sought a deal and may have been motivated by the possibility of a reduced sentence, rather than his relationship with the victim as the prosecutor insisted at trial). Here, there is no evidence of an agreement between West and the State.

Reynolds also contends that, under Eleventh Circuit precedent, mere advice by a prosecutor must be disclosed because it could constitute an informal understanding which could affect the jury's determination of credibility. (Doc. # 1 at 24-25 (citing *Haber v. Wainright*, 756 F.2d 1520, 1524 (11th Cir. 1985))). First, the court notes that, under § 2254(d)(1), Reynolds's burden is to prove that the ACCA's decision is contrary to clearly established law as determined by the *Supreme Court of the United States*. Second, the ACCA's decision is not contrary even to the Eleventh Circuit case he cites, *Haber*, because there is no evidence of an informal understanding between West and the State. Therefore, Reynolds has not shown that the ACCA's decision is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, Reynolds's *Brady/Giglio* claim is without merit and is due to be denied.

### 2.      Alleged Suppression of Notes

Reynolds also alleges that the State violated *Brady* and *Giglio* by suppressing field notes of forensic testing performed on Roberts's car and hand-written notes from the preliminary investigation interview of Langley, the State's witness.[9] (*See* Docs. # 1 at 7, 19-20, 42-48; 31 at 11, 29-34). According to Reynolds, these notes were favorable to his theory of the case because they contained impeachment and exculpatory evidence that could have been used against the State's "key witnesses" to undermine the State's theory of events and exculpate Reynolds. (Doc. # 1 at 45, 47).

Reynolds specifically points to two notations in the undisclosed police interview notes (presumably written during Langley's interview with investigators). (*See* Doc. # 1 at 47). These notations report that Langley indicated Chad Martin was working in his garage around 2:30 to 3:30 a.m. on the morning that the murders occurred, that Chad Martin visited the garage during that time, and that, at some unspecified time, Chad Martin showed Langley a black, pocketknife with a serrated blade. (Doc. # 1 at 47) (citing Vol. 15 at 171).

Reynolds compares Langley's testimony at Reynolds's trial with the police interview notes to assert a temporal discrepancy. (*Id.*, quoting Vol. 15 at 170). And, Reynolds contends this

---

[9] The court notes that Reynolds also contends that the prosecution suppressed police interview notes of state-witness West and defense-witness Harvey. (Doc. # 1 at 20, 40, 46). Reynolds asserts that the interview notes from West and Harvey "contain facts that the defense could have used to cross-examine these and other key witnesses at trial." (*Id.* at 46). However, Reynolds's arguments are conclusory. He has not provided any argument in support of this allegation and he has failed to point to any specific facts within either West's or Harvey's police interview notes that could be favorable to the defense. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) ("We will not address this perfunctory and underdeveloped argument"); *see also Flanigan's Enters. Inc. v. Fulton Coty, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument). As such, Reynolds is due no relief on this portion of his claim and has abandoned and/or waived it.

Alternatively, Reynolds has not carried his burden of showing that the ACCA's adjudications of these unaddressed claims were contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or that the decisions were based on unreasonable factual findings. (*See* Doc. # 1 at 46-48). Accordingly, no federal habeas relief is warranted on this portion of Reynolds's *Brady/Giglio* claim.

discrepancy directly conflicts with Langley's testimony at Reynolds's trial indicating that Chad Martin was in his garage working around 5:30 or 6:00 a.m., which he argues "is significant because . . . Langley provided an alibi for Chad Martin on the night of the crime." (*Id.*) (citing Vol. 9 at 57-59). At trial, both Langley and Chad Martin unequivocally denied having any involvement in the murders. Reynolds emphasizes that neither Langley nor Chad Martin mentioned the pocketknife in their testimony. (*Id.*). According to Reynolds, this was prejudicial, because his trial "counsel could have used the undisclosed notes of interviews of [these] witnesses to place a knife in the hands of Chad Martin and discredit his alibi." (*Id.*).

Additionally, Reynolds points to the forensic investigator's field notes that revealed that no blood was detected in Roberts's vehicle. He asserts these notes "were crucial to rebut the State's theory of the crime" that "West suffered a serious stab wound when she tried to intervene in the crime[,]" and that under Reynolds's instruction, West placed the knives from the murder scene "on the floorboards" of "Roberts's Car." (*Id.* at 46). Reynolds maintains that the negative-blood-test results from Roberts's car demonstrates that the State's version of events could not have occurred and that these results also corroborated Reynolds's testimony "that he drove to the Martins' house" after their murders "to help cover up West's involvement." (*Id.*). Reynolds concedes that this information was revealed to the jury during his counsel's cross-examination of the forensic investigator. But, he nevertheless contends that the failure to disclose these forensic field notes prejudiced his defense because he could not incorporate "these facts into his trial strategy." (*Id.*). Reynolds claims disclosure of the field notes would have permitted him to utilize the negative results in his opening argument, to impeach "key State witnesses," and to confront the forensic investigators about the "full scope of their investigation." (*Id.*).

###### a.      ACCA's Decision

Reynolds presented these same arguments on direct appeal. *See Reynolds I*, 114 So. 3d at

111-15. The ACCA rejected Reynolds's contention that the State allegedly suppressed police

interview notes of a defense witness, Harvey, and two of the State's witnesses, West and Langley.

*Id.* at 111-13. The ACCA clarified the difference between a statement and interview notes to

explain that Reynolds's argument focused on "the investigators' interview notes with West,

Langley, and Harvey" rather than statements by them as those notes "purportedly contain[ed]

impeachment evidence." *Id.* at 112. The ACCA criticized Reynolds's failure to "specify [in his

brief] how the notes in question were exculpatory or what portion of the notes were inconsistent

with the witnesses' trial testimony." *Id.* at 113. Nevertheless, the ACCA analyzed this

*Brady/Giglio* claim by reviewing the "notes from the interviews conducted with West, Langley,

and Harvey" contained in the appellate record. *Id.* (citing Vol. 15 at 157-65, 168-74, 179). The

ACCA determined that it was "not clear how these additional notes could have been used to

impeach the three witnesses' trial testimony." *Id.* Further, while recognizing that the police

interview notes "may [have] contain[ed] more or less detail than the witnesses' trial statements,"

the ACCA denied Reynolds's request for relief, concluding that the police interview notes did not

"appear to contain either any conflicting information," any information that was "useful for

impeachment purposes [,] or any exculpatory information" sufficient to establish a *Brady*

violation. *Id.*

Similarly, the ACCA rejected Reynolds's assertion that the "State withheld notes prepared

by . . . Hopwood, a forensic scientist," who assisted with the investigation of the murders. *Id.* at

113-14. The ACCA explained that "during defense counsel's cross-examination of Hopwood,

Hopwood testified that he had performed a chemical-screening test for the presence of blood in

various places of the interior of the automobile that Reynolds and West used on the night of the murders but that the test did not detect the presence of blood." *Id.* at 114. The ACCA found that the record established that Hopwood "did not reduce his field notes regarding the testing of this vehicle to an official report," that "Reynolds was not necessarily entitled to Hopwood's field/investigative notes," and that Reynolds failed to show that "the State suppressed the evidence." *Id.* Further, the ACCA held that, even assuming Reynolds was entitled to Hopwood's forensic field notes, no *Brady* violation occurred because Reynolds had not demonstrated prejudice, as West testified to the same fact (*i.e.*, that no blood was visible in the vehicle). *Id.*, quoting *Giles v. State*, 906 So. 2d 963, 973 (Ala. Crim. App. 2004), *overruled on other grounds*, *Ex parte Jenkins*, 972 So. 2d 159 (Ala. 2005).

Reynolds now contends that the ACCA's determination was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. (Doc. # 1 at 44). For the reasons explained below, the court disagrees.[10]

### b.    28 U.S.C. § 2254(d)(1)

As an initial matter, Reynolds has utterly failed to develop any argument in support of his position that the ACCA's rejection of his *Brady* claim was "contrary to . . . clearly established

---

[10] The court notes that Reynolds has not pleaded or argued that the ACCA's determination rejecting his two *Brady/Giglio* claims presented on direct appeal resulted from the ACCA's unreasonable finding of fact. (*See* Doc. # 1 at 44) ("The [ACCA]'s decision was contrary to and an unreasonable application of, clearly established Supreme Court precedent."). (*See, e.g.*, *id.* at 41-48); 28 U.S.C. § 2254(d)(2).

It is well-established that "[a] party abandons all issues on appeal that he or she does not 'plainly and prominently' raise in his or her initial brief." *United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012), quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). "Nor may "[p]arties ... raise new issues in reply briefs." *Krasnow*, 484 F. App'x at 429 (citing *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008)). "The[se] same principles apply at the district court level." *Al-Amin v. Shartle*, No. 1:12-CV-1688-AT-GGB, 2016 WL 10718765, at *17 (N.D. Ga. Mar. 24, 2016), *report and recommendation adopted in part, rejected in part on other grounds*, No. 1:12-CV-1688-AT-GGB, 2017 WL 6596602 (N.D. Ga. Sept. 29, 2017), *aff'd sub nom. Al-Amin v. Warden Georgia Dep't of Corr.*, 932 F.3d 1291 (11th Cir. 2019), *cert. denied*, 2020 WL 1668291, at *1 (U.S. Apr. 6, 2020). Accordingly, Reynolds has waived and/or abandoned any such argument under § 2254(d)(2) with respect to this claim.

Supreme Court precedent." (Doc. # 1 at 44). "[M]ere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments-hence litigate-on a petitioner's behalf. Federal judges cannot litigate on behalf of the parties before them, and it is for this reason that any claims in [Reynolds's] petition that were not argued in his brief are abandoned." *Blankenship v. Terry*, 2007 WL 4404972 at *40 (S.D. Ga.), *aff'd* 542 F.3d 1253 (11th Cir. 2008) (citing *United States v. Burkhalter*, 966 F. Supp. 1223, 1225 n.4 (S.D. Ga. 1997); *GJR Inv., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998)). Accordingly, Reynolds has abandoned any intended argument under the contrary to prong of § 2254(d)(1).

In the alternative, the court concludes that Reynolds has not met his burden under AEDPA to show that the ACCA's decision was contrary to Supreme Court precedent. Reynolds has not pointed to any Supreme Court decision that indicates a different result than that reached by the ACCA. That is, there is not a Supreme Court case involving a similar set of facts that comes to a different conclusion. *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); 28 U.S.C. § 2254(d)(1). Nor has Reynolds demonstrated that the ACCA's rejection of this claim involved an unreasonable application of *Brady* and its progeny. Thus, federal habeas relief under the contrary to prong of § 2254(d)(1) is not warranted.

### (1)   Investigator Notes from Langley Interview

The ACCA correctly concluded that, while containing "more or less detail" than Langley's signed, handwritten statement provided to defense counsel, the investigator's notes from Langley's *interview did not conflict with the* "trial statement" prepared and signed by Langley. *Reynolds I*, 114 So. 2d at 113. Reynolds has simply not provided any evidence at all to the contrary. (*See* Doc. # 1 at 46-47). And, he has not attempted to compare the allegedly impeaching and exculpatory

information found in the police interview notes to Langley's official statement that was undisputedly disclosed to trial counsel. (*Id.*).

Despite this material failure, the court has reviewed the record before the ACCA and readily concludes that the ACCA's decision was not objectively unreasonable. The undisclosed police interview notes do not conflict with Langley's statement provided to the defense. And any impeachment of Langley's testimony as to the exact time when Chad Martin was working in his garage would have been cumulative. Langley's testimony surrounding Chad Martin's alibi was impeached with his prior statement, which (as the ACCA recognized) is not contradictory to the police interview notes at issue here. *See Banks v. Dretke.* 540 U.S. at 672-73; *see, e.g.*, *Turner v. United States*, 137 S. Ct. 1885, 1894-95 (2017) (finding that the record reflected that undisclosed "impeachment evidence" was immaterial "in the context of this trial, the cumulative effect of the withheld evidence is insufficient to "'undermine confidence'" in the jury's verdict, when considering the effect of the "largely cumulative . . . impeachment evidence . . . [that was] already . . . used at trial"), quoting in part *Smith v. Cain*, 565 U.S. 73, 75-76 (2012), quoting in turn *Kyles*, 514 U.S. at 434. *Cf. Wearry v. Cain*, 577 U.S. 385 (2016) (holding that the State's failure to disclose material evidence, including inmates' *statements* casting doubt on the credibility *of the State's star witness*, violated defendant's due process, despite this witness's prior impeachment with other evidence, where, "the State's trial evidence resembles a house of cards, built on the jury crediting [a key State witness's] account rather than [a petitioner's] alibi") (citing *Agurs*, 427 U.S. at 113) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance *might* be sufficient to create a reasonable doubt.") (emphasis added). Moreover, Langley was not a "crucial" witness for the State to the extent Reynolds asserts. *See Banks*, 540 U.S. at 672-73; *Kyles*, 514, U.S. at 433-34, 4367.

89

The court also rejects Reynolds's contention that a single, isolated reference from the police investigator's notes of Langley's interview -- documenting Langley's purported recollection, that Chad Martin once showed him a black, serrated pocketknife -- amounts to impeachment or exculpatory evidence that could have been used by defense counsel to undermine the State's theory of the case and "place[] a knife in the hands" of Chad Martin on "the night of the crime." (Doc. # 1 at 47). As determined by the ACCA, this evidence did not constitute impeachment or exculpatory evidence as contemplated by *Brady*. Reynolds disagrees, but he has fallen far short of meeting his burden of demonstrating that this conclusion was "objectively unreasonable" under AEDPA.

For example, although Reynolds suggests that this evidence could have been used as impeachment evidence, he has not pointed to any inconsistencies between Martin's and Langley's trial statements (or even their trial testimony regarding the possession or ownership of a knife). (*See id.* at 47). This is significant, particularly in light of Reynolds's concession that at trial neither Chad Martin nor Langley made any mention of a knife in their testimony. (*Id.*). Instead, they repeatedly and adamantly denied having anything to do with the murders. It is unclear how Reynolds's defense counsel would have used this isolated reference to impeach the truthfulness of either Chad Martin or Langley's testimony. Moreover, under Rule 613(b) of the Alabama Rules of Evidence, extrinsic evidence of a prior inconsistent statement, which was not made under oath, may *only* be introduced for the purposes of impeaching the witness's *credibility*, not for the purpose of introducing substantive evidence. *See* Ala. R. Evid. 603(b); *Reynolds I*, 114 So. 3d at 113. So, Reynolds would not have been able to circumvent rules of evidence to introduce this notation as substantive evidence of the truth of the matter asserted.[11] Thus, Reynolds has failed to

---

[11] Thus, Reynolds's "revised" position that he would have used the police-interview note to impeach Langley's already impeached testimony is also off the mark. Reynolds would have been barred from doing so because

show that the ACCA's decision that the police interview notes did not amount to impeachment evidence subject to disclosure under *Brady* was objectively unreasonable.

Moreover, Reynolds does not even argue that this information was "exculpatory." And yet, even if he did, he has failed to make the required showing under AEDPA (*See* Doc. # 1 at 46-48). That is, Reynolds has not explained why the ACCA's decision was objectively unreasonable. The police interview notes suggest that Chad Martin showed Langley a pocketknife at one unidentified time, but this indication does not constitute exculpatory evidence as defined by *Brady* and its progeny. Moreover, this information (even if disclosed to the jury) would not undermine the direct evidence of Reynolds's involvement in the murders. Nor does it call into question the evidence about the ornamental scabbard sheath (which Roberts identified as the ornamental cover to Reynolds's six to eight inch scabbard). It does not answer or impeach the fact that such a sheath was recovered by a diver in the exact location where West testified that Reynolds threw it into the water. Similarly, it does not call into question the autopsy evidence and other testimony indicating that the wounds sustained by the Martins were consistent with wounds that would have been caused by the unrecovered scabbard. (*See* Vol. 9 at 4-5, 8-9, 45-48; Vol. 15 at 173-74; *see, e.g.,*

---

in such an instance his intention was not to impeach Langley's credibility but to introduce inadmissible evidence as substantive proof of the matters contained therein to undermine Chad Martin's alibi. (Doc. # 1 at 47) ("Thus, counsel could have used the undisclosed notes of interview of [Langley] to place a knife in the hands of Chad Martin and discredit his alibi."). Consequently, the ACCA's determination that such evidence is not impeachment evidence is not objectively unreasonable.

Additionally, a review of the record on appeal demonstrates that the notes do not indicate that Chad Martin was in actual possession of this knife on or around the time of the murders. In fact, no other evidence regarding the pocketknife exists in the record. (*See* Vol. 15 at 171). Further, the police investigator who took the notes did not testify at trial. Engaging in total speculation about what context she could provide -- even assuming the notes would be admissible for *impeachment* purposes -- is beyond the scope of this court's AEDPA *Brady* review. *See McWhorter v. Dunn*, 4:13-cv-02150-RDP, 2019 WL 277385 at *59 (N.D. Ala. Jan. 22, 2019); *aff'd sub nom. McWhorter v. Comm'r, Ala. Dep't of Corr.*, 824 F. App'x 773 (11th Cir. 2020) (finding that where an individual did not testify at the respective trial the court cannot know whether that individual would have offered testimony inconsistent "with his alleged prior statement" that would've permitted the use of extrinsic evidence and qualification of another as an impeachment witness) (citing *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999)); *cf. Spaziano v. Singletary*, 36 F.3d 1028, 1044 (11th Cir. 1994).

Vol. 15 at 164). Thus, Reynolds has not shown that (1) the ACCA unreasonably applied *Brady* or its progeny or (2) that its decision is contrary to clearly established federal law.

**(2)      Forensic Field Notes**

To the extent Reynolds argues that the ACCA unreasonably applied clearly established Federal law in rejecting his claim that the State violated *Brady* for failing to disclose forensic investigator's field notes, Reynolds fails to cite to any specific portion of the record in support of his argument. (*See* Doc. # 1 at 45-46). Nonetheless, the court has reviewed the relevant portions of the record considered by the ACCA on direct appeal and, as explained below, concludes that the ACCA's rejection of this claim was not objectively unreasonable.

As the ACCA noted, West testified that Reynolds cleaned the interior of the car after he returned to his father's home. *See Reynolds I*, 114 So. 3d at 115. (*See also* Vol. 8 at 144-45). On cross examination, Hopwood explained that several days later he also "looked at a Nissan Maxima," which belonged to Roberts, as well as a "beige Oldsmobile Toronado" (Vol. 10 at 76; *see, e.g.*, Vol. 11 at 113). When asked by defense counsel if he had taken any samples from the passenger floorboard, Hopwood answered that he had not because there was nothing "obviously visible." (Vol. 10 at 76). Hopwood did, however, take swabbed samples to detect if any blood was present from the seats, the gearshift, the steering wheel, and the headliner which had a visible stain. (*Id.* at 76-77). To the extent Reynolds argues the lack of any indication of blood on the floorboards of Roberts car (which is where West testified the knives were placed) that argument lacks merit. Hopwood's testimony regarding the forensic examination of Roberts's car specifically stated that no swabs were taken from, or tests performed on the floorboards, where West testified she placed the knives. (*See* Vol. 8 at 144; Vol. 10 at 76-77).

92

Moreover, Hopwood's response to defense counsel's cross-examination question regarding the type of blood detection tests that were used on Roberts's car lends additional support to the ACCA's finding. West had already testified to the fact that she had not seen any blood on the floorboards, and that any blood in the car was cleaned by Reynolds. (*See* Vol. 8 at 144-45; Vol. 10 at 76-77). *See also Reynolds I*, 114 So. 3d at 115. More specifically, Hopwood testified that he employed tetra-methyl-benzoline ("TMB") as a "chemical screening test" to confirm the presence of blood when it is visible "to the naked eye." (Vol. 10 at 76-77). Hopwood explained that the reason he used TMB, despite its obvious shortcomings, was to prevent the frequent false-positives of its widely-known alternative, Luminol (which reacts to oxidizers like Febreze). (*See id.* at 77). Reynolds has not pointed to anything in the record that demonstrates that, if he had been provided information about the lack of blood evidence in the car, there is a reasonable probability that the outcome of his trial would have been different.

Finally, Reynolds argues that if he had been provided with these field notes the state's theory of the case would be untenable because no blood was found to be present (despite West's stab wound). Reynolds's argument is without merit. Reynolds himself testified that West and Roberts went together to buy drugs and, while awaiting their return, he fell asleep, (Vol. 11 at 112-15, 136). Reynolds's story is that he remained asleep until West woke him, saying that she was injured. (*See id.*). Reynolds testified that, at first, West was not bleeding badly at the time she woke him up, despite what Reynolds described as a gross-looking stab wound to her arm. He contends that it was then that he went to the Martins's home to destroy evidence that could implicate West. And, according to his version of events, it was later that morning, when he returned from the Martins's home (after Reynolds attempted to burn the Martins's home down), West's arm began bleeding. (*Id.* at 115, 124). So, even Reynolds's version of events places a bleeding West in

Roberts's car — whether she was with Reynolds or Roberts. It follows that the absence of visible blood does nothing to corroborate his testimony (nor does it undermine the State's case). Also, and again, West testified that she did not see blood on the floorboards and that, in any event, Reynolds had cleaned the car. (*See* Vol. 9 at 144-45). Therefore, Reynolds fails to prove prejudice under *Brady* (as the ACCA decided) even if the State were required to disclose Hopwood's field notes.

### c.    Conclusion

For all these reasons, Reynolds is not due federal habeas relief on his claims that the State withheld police interview and forensic field notes. Reynolds has simply not shown prejudice under *Brady*. This claim is therefore due to be denied.

### 3.    Cumulative-Effect

Reynolds next argues that the *Brady/Giglio* violations considered cumulatively entitle him to federal habeas relief under § 2254(d). Reynolds contends that he "has shown a reasonable probability of a different outcome of his trial had the jury been provided this suppressed evidence." (Doc. # 31 at 34). The court disagrees.

First, there is no evidence that a deal existed between West and the prosecution in exchange for her testimony against Reynolds. It follows that the prosecution was not under any obligation to disclose something that did not exist.

Second, the police interview notes purportedly containing information that conflicts with Langley's testimony are not material for the purposes of *Brady*. Langley was not a key witness at Reynolds's trial. And, as Langley's testimony had already been impeached, the jurors were fully able to assess his credibility. Moreover, the evidence implicating Reynolds (unrelated to any aspect of the matter related to Langley) was so strong and overwhelming that any temporal disparity in Langley's testimony was simply not prejudicial under *Brady*.

Third, to the extent Langley's police interview notes made any reference to Chad Martin's ownership of a pocketknife, that is wholly insufficient to undercut the corroborated testimony of West and Harvey as to where they disposed of Reynolds's ornamental sheathed dagger and the steak knife taken from the murder scene. In fact, the ornate leather sheath was found exactly where West had indicated it would be.

Fourth, Reynolds cannot demonstrate that the lack of blood evidence in Roberts's car was in any way prejudicial to his defense. West testified that Reynolds cleaned the car at his father's home after returning from the murder scene.

Therefore, even considering these claims cumulatively, the ACCA's decision was not contrary to, or an unreasonable application of, clearly established federal law. Nor has Reynolds met his burden to show that the ACCA's decision was based on an unreasonable determination of fact. Thus, Reynolds's *Brady/Giglio* claims are due to be denied.

### B.    Prosecutorial Misconduct

In his federal habeas petition, Reynolds argues that the prosecution's improper behavior deprived him of a fair trial, due process, and a reliable jury verdict in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Doc. # 1 at 48). Reynolds presents three prosecutorial-misconduct claims: (1) the prosecution improperly used Reynolds's post-arrest silence for impeachment purposes during his cross examination of Reynolds (*see* Docs. # 1 at 49-58; 31 at 35-50); (2) the prosecution engaged in "a pattern of improper behavior" during the guilt and penalty phases of Reynolds's trial (*see* Docs. # 1 at 58-67; 31 at 50-72); and (3) the cumulative effect of the alleged prosecutorial errors resulted in an unreliable conviction and sentence. (*See* Docs. # 1 at 48, 66-67; 31 at 35). The court addresses these arguments, in turn.

### 1.   Reynolds's *Doyle* Claim

Reynolds claims that the prosecution violated his Fifth Amendment right against self-incrimination as articulated in *Doyle* by repeatedly using his post-*Miranda* silence for impeachment purposes during cross-examination and closing arguments. (*See* Docs. # 1 at 48-57; 31 at 35-50). And, he contends that the ACCA erroneously upheld the prosecution's commentary on direct appeal. (*Id.*). For the reasons discussed below, the court disagrees.

According to Reynolds, the prosecutor made numerous disparaging comments regarding Reynolds's "post-arrest silence" during cross-examination and closing arguments. (Doc. # 1 at 50, 57) (citing Vol. 11 at 134-39, 142-44, 147, 154, 156; Vol. 12 at 21). He argues that the prosecution improperly suggested that he should have voluntarily offered his personal knowledge of the Martins' murders to investigators even after invoking his right to remain silent. (Doc. # 1 at 51-53). Reynolds also argues that the prosecution violated *Doyle* when the prosecutor offered his theory that Reynolds waited to hear the State's evidence before fabricating and presenting his exculpatory explanation. (*Id.*) (citing Vol. 11 at 138).[12]

Reynolds maintains that these "repeated references" to his purported "post-arrest silence" were not made for the purpose of impeaching his testimony with prior inconsistent statements, but rather were designed to encourage the jury to infer guilt from Reynolds's "silence." (*Id.* at 50, 57). After defense counsel objected on the grounds that the prosecutor's line of questioning invaded Reynolds's rights to silence and counsel, Reynolds alleges that the prosecutor's illicit purpose is evinced from his response that "[h]e doesn't have a right to remain silent . . . [because h]e is on the stand." (*Id.*, quoting Vol. 11 at 139). Reynolds also alleges the prosecutor returned to the "same

---

[12] Reynolds also complains that the prosecutor repeatedly criticized Reynolds's decision to remain silent prior to trial despite his invocation of *Miranda*. (*See id.* at 50-51, 55) (citing Vol. 11 at 137, 143; Vol. 15 at 156). However, Reynolds does not dispute that after being informed of his *Miranda* rights, he answered a "few" of the investigating officers' questions before he invoked his right to remain silent and his right to counsel.

line of questioning" despite the trial court's instruction to ask his next question. (*Id.*) (citing Vol. 11 at 139).

Reynolds contends that this alleged error was not harmless. He argues that the record is devoid of overwhelming evidence of his guilt, and therefore the prosecution's actions adversely affected the jury's decision-making abilities. (*Id.* at 53). In particular, Reynolds points to the jury's question about whether Reynolds had provided the police with a statement, and the trial court's answer to that question. (*Id.*) (citing Vol. 12 at 153, 155).

Reynolds argues that he is due federal habeas relief because (1) the ACCA's decision was contrary to, and an unreasonable determination of, *Doyle* and its progeny, (2) and the decision resulted from an unreasonable determination of the facts of record before the ACCA. (*See id.* at 57) (citing *Doyle*, 426 U.S. at 619; 28 U.S.C. § 2254(d)). The court disagrees.

### a.   The ACCA's Decision

The ACCA addressed these same arguments and held that there was "no basis for reversal in either the prosecutor's cross-examination questions or [the prosecutor's] comments during closing arguments" when considering "the particular facts of this case, together with Reynolds's [testimony] admi[tting] that he regretted not coming forward much earlier with [his] exculpatory version of the facts." *Reynolds I*, 114 So. 3d at 140.  Before reaching this conclusion, the ACCA extensively reviewed and examined relevant and controlling legal authorities and provided a thorough evaluation of the challenged cross-examination and closing argument. *See id.* at 126-40.

The ACCA summarized its factual findings after reviewing the disputed portion of the record in its proper context. *See generally id.* at 126-33, 139; *see also id.* at 126 ("The prosecutor's questions and comments cannot be considered in the abstract but must be considered in the context in which they occurred"), quoting *Brown v. State*, 11 So. 3d 866, 909 (Ala. Crim. App. 2007),

*aff'd*, 11 So. 3d 933 (Ala. 2008), *cert. denied*, 557 U.S. 938 (2009). In doing so, the ACCA looked to the State's case, finding on cross-examination that defense counsel asked Gadsden Police Investigator Lumpkin if he was the arresting officer who "picked up Mr. Reynolds [on] . . . [the day the murders were discovered]" and "whether [Lumpkin] talk[ed] to him [that day]" *Id.* Lumpkin affirmed that Reynolds was "picked up" the day of the murders but testified that he was not the arresting officer and did not speak with Reynolds the day of his arrest. *Id.* Apart from this exchange, the ACCA found that "[t]here was no other testimony in the State's case regarding the circumstances of Reynolds's arrest." *Id.*

The ACCA then reviewed Reynolds's direct testimony. *See id.* at 126-27. Reynolds testified "that he was not present when the crimes occurred and that he had nothing to do with the crimes[,] and only "went to the scene . . . to protect his girlfriend who, he claimed, although present, did not participate in the crimes." *Id.* at 139; *see also id.* at 126, 130. The ACCA also found that Reynolds "testified on direct [examination] that [instead of] calling the police after discovering that the Martins had been murdered, he tried to burn the bodies and the house in order to cover crimes that some other undisclosed persons supposedly committed." *Id.* at 139-40; *see also id.* at 126-27 (observing that Reynolds's counsel "asked [him] whether he contacted the police after [finding] his friend Charles Martin lying in a pool of blood" to which "Reynolds admitted that he did not call the police") (citing Vol. 11 at 119).

The ACCA then turned to the prosecution's cross-examination of Reynolds. The ACCA found that Reynolds admitted that after his arrest he told the police that he had no knowledge of the crimes but that he wished that he had told the truth when he first talked to the police. *Reynolds I*, 114 So. 3d at 140; *see id.* at 127-28, quoting Vol. 11 at 136-39. Moreover, the ACCA noted that "Reynolds expressed confusion as to why he was being prosecuted for the crimes instead of the

people who supposedly committed the crimes[,]" while "intimat[ing] that he even knew who committed the robbery and murders, but . . . declined to reveal their identity when asked to do so by the prosecutor on cross-examination." *Reynolds I*, 114 So. 3d at 140; *see also id.* at 129, quoting Vol. 11 at 144-45. The ACCA also observed that "Reynolds testified he had been incarcerated for over four years before trial and that during that time he regretted not telling his version of what had happened." *Reynolds I*, 114 So. 3d at 140.; *see id.* at 129-30, quoting Vol. 11 at 150; *see also id.* at 130, quoting Vol. 11 at 152-56.

The prosecution's questioning during cross-examination highlighted Reynolds's intimate knowledge of the State's witnesses and their activities surrounding the murders. *See id.* at 127. The ACCA observed that the prosecutor's questions challenged Reynolds's prior testimony, in which Reynolds admitted his alleged attempt to destroy evidence by burning the Martin's home after testifying that some unknown individuals killed the Martins. *Id.* at 127, quoting Vol. 11 at 128-56. The ACCA also quoted several portions of Reynolds's cross-examination to support its conclusion that the prosecutor directed his questions to showcase the logical inconsistencies embedded within Reynolds's testimony. *See Reynolds I*, 114 So. 3d at 127-29, quoting Vol. 11 at 136-39, 142-44.

Based on its analysis of the State's case-in-chief, the direct examination of Reynolds, and the prosecution's cross-examination of Reynolds, the ACCA concluded that the prosecutor's purpose was to elicit testimony in support of the State's theory that Reynolds's story was created with the benefit of hindsight. *See Reynolds I*, 114 So. 3d at 126-29, quoting Vol. 11 at 136-39, 142-44 (providing "the prosecutor continued to cross-examine Reynolds as to how his version of what happened dovetailed with the State's evidence").

The ACCA then reviewed the closing arguments. *See id.* at 130-32. The ACCA found that defense counsel's closing argument highlighted the credibility conflict that existed between Adrian West and Reynolds. *Id.* at 130. (*See generally* Vol. 12 at 12). The ACCA noted that the defense changed its strategy from elaborating on West's "self-serving" interests when testifying against Reynolds to attacking the prosecution's sufficiency of evidence. *See Reynolds I*, 114 So. 3d at 130-31. (*See* Vol. 12 at 12). Against this contrasting backdrop, the ACCA evaluated the allegedly offensive portion of the prosecution's closing rebuttal argument.[13] *Reynolds I*, 114 So. 3d at 131, quoting Vol. 12 at 21.

The ACCA also observed that during its deliberation the jury submitted a question to the court asking whether "Michael Reynolds [made] a statement to the police after being questioned," and, if so, "was [this statement] submitted as evidence and available" for the jury's review. *Id.*, quoting Vol. 12 at 153 (internal quotations omitted). The judge said he "ha[d] no idea" and the prosecutor opined, "he made a statement, and I questioned him about it, and he responded that he made a statement." *Id.* (emphasis removed), quoting Vol. 12 at 153-54. The court answered the jury's question as follows: "No written statement made by the defendant was offered into evidence; you have to remember the testimony." *Id.*, quoting Vol. 12 at 154-59.

---

[13] The ACCA provided the contested portion of the prosecution's closing argument:

"[Adrian West] told you what happened out there. And what that man did: He sat over there in jail. He came up with a story that you and I heard for the first time Tuesday.

"The evidence dribbles in as it always does in an investigation like this. You know you have got a killing. He is questioned for the first time about these killings. *He didn't know nothing about it. He is questioned a second time. Didn't know nothing about it.* Well of course, he is not questioned again. He is charged. But all they would have had to do was somebody had to call [Investigator] Roger Dale there or call us up, '[H]ey, listen, we have got all the facts. We can tell you exactly what happened. Just like [Adrian West] did. A couple of days after the killing she came in and told us what happened.' *We didn't hear from this man except for him to say ['N]o, I wasn't there[;] I don't know nothing about it.*'"

*Reynolds I*, 114 So. 3d at 131, quoting Vol. 12 at 21 (emphasis in *Reynolds I*).

Of note, the ACCA found that the reference to a "statement" made by Reynolds to police was a generalization made by both parties, as the statement was actually a "set of handwritten interview notes made by investigators during their questioning of Reynolds." *Reynolds I*, 114 So. 3d at 131. The ACCA summarized Reynolds's statement as:

> The first notes are dated May 26, 2003[,] and indicate that Reynolds was advised of his rights. During that interview, Reynolds apparently told investigators that he was not at the Martin's residence on the night of the crimes and that he did not kill the Martins or know who did. Reynolds said that he did not know where the Uniden brand telephone found in Sandra Roberts's car came from. He also said that Chad Martin stole drugs from Charles Martin on previous occasions and that Charles Martin knew about it. Reynolds told the investigators that when Charles Martin used drugs, he was slow and could be "taken." In this same conversation, Reynolds described the black bag where Charles Martin kept his prescription drugs, and Reynolds described in some detail how Charles Martin "cooked" his drugs on the stove. In other interview notes, Reynolds admitted that he had used drugs with Charles Martin, and he again denied committing the crimes or being at the Martin residence on the night of the crimes.

*Reynolds I*, 114 So. 3d at 131-32 (citing Vol. 15 at 156, 175-77, 180) (internal citations omitted).

With this factual predicate, the ACCA began its analysis of the legal precedent that Reynolds cited to support his claim that "on twenty-one different occasions during cross-examination and closing arguments, the prosecutor ... commented on [his] post-*Miranda* silence by drawing attention to the fact that [he] did not disclose his subsequent exculpatory [trial] explanation to the State before trial," in violation of *Doyle v. Ohio,* 426 U.S. 610 (1976), and its progeny." *Reynolds I*, 114 So. 3d at 132 (internal quotations and citations omitted). The ACCA stated, however, that while Reynolds alleged twenty-one separate violations, defense counsel objected only "once on this particular ground during the purportedly improper line of questioning." *Id*. The court explained that the absence of continuing objections would "not preclude [the ACCA] from reviewing the issue," but acknowledged that the absence of these objections would "weigh

against any claim of prejudice . . . on appeal." *Id.* (citing *Dill v. State*, 600 So. 2d 343 (Ala. Crim. App. 1991), *aff'd*, 600 So. 2d 372 (Ala. 1992)).

The ACCA noted that the Supreme Court in *Doyle* granted certiorari to address whether "a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings *at the time of his arrest*." *Reynolds I,* 114 So. 3d at 132, quoting *Doyle*, 426 U.S. at 611. The ACCA recognized that the *Doyle* Court held "'the use for impeachment purposes of petitioners' *silence, at the time of arrest and after receiving Miranda warnings*, violated the Due Process Clause of the Fourteenth Amendment.'" *Id.*, quoting *Doyle*, 426 U.S. at 619-20. While recognizing that the use of post-*Miranda* silence for the purpose of impeaching a defendant was a due process violation, the ACCA also observed that the *Doyle* Court contemplated and expressly "acknowledged the importance of impeachment cross-examination to the prosecution." *Id.* (citing *Doyle* 426 U.S. at 619, 620, n.7 and n.11). The ACCA provided in support:

> We recognize of course, that unless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defense insulated from effective challenge. . . . It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of the events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. *Cf. United States v. Fairchild*, 505 F.2d 1378, 1383 (C.A.5 1975).

*Reynolds I*, 114 So. 3d at 132, quoting *Doyle*, 426 U.S. at 619, 620, n.7 & n.11 (citations omitted).

The ACCA also recognized that the Supreme Court "specifically declined to address the constitutionality of the prosecutor's inquiry as to why neither defendant had told his exculpatory story at any time before trial." *Reynolds I*, 114 So. 3d at 135 (citing *Doyle,* 426 U.S. at 616 n.6).

Thus, the ACCA found "no error in the prosecutor's line of questions regarding why Reynolds did not come forward with his exculpatory story at any time before trial." *Id.*

The ACCA then turned to *Anderson v. Charles*, 447 U.S. 404 (1980). *See Reynolds I*, 114 So. 3d at 132-33. The ACCA explained that, like Reynolds, the defendant in *Anderson* testified in his own defense at trial. *Id.* at 132. The ACCA also recognized that, like Reynolds's testimony, the defendant's testimony in *Anderson* differed from the explanation he gave to an interviewing officer shortly after being arrested and informed of his *Miranda* rights. *Id.* at 132-33. Continuing its analysis, the ACCA explained that, in *Anderson*, "[d]uring cross-examination the prosecutor asked [the defendant] a series of questions challenging [his] credibility based on his failure to tell the detective the same story that he told at trial." *Id.* at 133. The ACCA observed that the Supreme Court distinguished *Anderson* from its predecessor *Doyle*:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. *But Doyle does not apply to cross-examination that merely inquiries into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.*
>
> In this case, the Court of Appeals recognized that the respondent could be questioned about prior statements inconsistent with his testimony. The court therefore approved the 'latter portion of the above quoted cross-examination. . . .' But the Court of Appeals found that 'the earlier portion of this exchange' concerned the 'separate issu[e]' of the respondent's failure to tell arresting officers the same story he told the jury.' *Ibid.* In the court's view, these questions were unconstitutional inquiries about post arrest silence. Thus, the Court of Appeals divided the cross-examination into two parts. It then applied *Doyle* to bar questions that concerned the respondent's failure to tell the police the story he recounted at trial.
>
> *We do not believe that the cross-examination in this case can be bifurcated so neatly.* The quoted colloquy, taken as a whole, does 'not refe[r] to the [respondent's] exercise of his right to remain silent; rather [it asks the] [respondent] why, if [his trial testimony] were true he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street.' Any ambiguity in the prosecutor's initial questioning was quickly

resolved by explicit reference to Detective LeVanseler's testimony, which the jury heard only a few hours before. *The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement*.

We conclude that *Doyle* does not apply to the facts of this case. Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence' and we find no reason to adopt such a view in this case.

*Reynolds I*, 114 So. 3d at 133, quoting *Anderson*, 447 U.S. at 408-409 (emphasis added). After assessing *Anderson*, the ACCA turned to the prosecution's cross-examination of Reynolds and found the record clearly supported a finding "that the prosecutor's intent was to impeach the credibility of Reynolds's trial testimony by contrasting his testimony with his prior inconsistent statements to the investigators" when "question[ing] Reynolds [about] what [he] told the police after his arrest[.]" *Id.* at 133-34.

The ACCA disagreed with Reynolds's argument that "because [Reynolds] admitted to making only 'a few statements,' and that because [the content of] those statements are not in the [trial] record, the prosecutor's questions were akin to commenting on his post-*Miranda* silence and thus do not fall under *Anderson*." *Id.* at 134. Instead, Reynolds's arguments erroneously distinguished *Anderson* and improperly relied on *Doyle* and *Edwards v. State*, 502 So. 2d. 846 (Ala. Crim. App. 1986). *See id.*

As the ACCA explained, in *Doyle* one defendant remained silent after arrest while Doyle asked, "What's this all about?" *Id.*, quoting *Doyle,* 426 U.S. at 623-24. When told why he was being arrested, Doyle exclaimed, "[Y]ou got to be crazy" or "I don't know what you are talking about." *Id.*, quoting *Doyle*, 426 U.S. at 623-24. The ACCA recognized that the Supreme Court construed Doyle's response as silence, and the ACCA further noted that Doyle's explanation did not contradict his trial testimony. *Id.* (citing *Anderson*, 447 U.S. at 406 n.2).

The ACCA then turned to *Edwards* and observed that in that case, after evidence was introduced that the defendant invoked his right to silence following his arrest, the prosecutor cross-examined the defendant regarding a statement to the authorities that defendant denied making. *Id*.; *see also Edwards*, 502 So. 2d. at 849-51. The ACCA recognized that the scenario presented in *Edwards* "constituted reversible error." *Reynolds I*, 114 So. 3d at 134; *see Edwards*, 502 So. 2d at 852. But, the ACCA distinguished *Edwards* from Reynolds's appeal by turning to the Supreme Court of the United States' analysis:

> [T]here is an indication in the record that the prosecutor may have been attempting to use a prior inconsistent statement made by the appellant to the arresting officer after he had claimed his right to remain silent; those facts would have brought this case under the holding of *Anderson v. Charles*, 447 U.S. 404 (1980).
>
> Any indication ... that the prosecutor intended to impeach the appellant by the introduction of a prior inconsistent statement, is not upheld by the record. Such a statement was never introduced into evidence, *nor was there any testimony regarding such a statement by Sergeant Boone, the appellant, or any other witness.* Thus, the *Anderson* holding is inapplicable to this case.

*Reynolds I*, 114 So. 3d at 134, quoting *Edwards*, 502 So. 2d at 851-52 (citations omitted).

As the ACCA explained, unlike the facts of *Edwards* and *Doyle*, in Reynolds's trial "there was *direct evidence from Reynolds* that he made two statements and that those [statements] were inconsistent with Reynolds's trial testimony." *Id.* As a result, the ACCA concluded there was no error even though "the statements themselves were not admitted into evidence" at Reynolds's trial. *Id*.

Further, the ACCA found that no harm resulted from the failure to introduce into evidence the written statements. As the ACCA noted, "Alabama Rules of Evidence do not require the admission into evidence of written prior inconsistent statements," and do not require that "the statement . . . be shown []or its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel" presumably for the purposes of

rehabilitating the witness on redirect. *Id.* at 134-35, quoting *McElory's Alabama Evidence* § 157.01(a), quoting in turn *Ala. R. Evid.* § 613(a).[14] "Most significantly," the ACCA determined that "the introduction into evidence of the actual statements to investigators in which Reynolds denied any knowledge of the crimes would have only solidified for the jury the disparity between Reynolds's trial testimony and his previous statements." *Id.* at 135.

The ACCA added that the "prosecution's questions do not constitute a *Doyle* violation because '[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.'" *Reynolds I*, 114 So. 3d at 135, quoting *Anderson,* 447 U.S. at 408; citing *Gobble v. State*, 104 So. 2d 920, 945 (Ala. Crim. App. 2010). As a result, the ACCA found no error in the prosecution's use of Reynolds's prior inconsistent statements to impeach Reynolds's trial testimony. *Id*.

The ACCA also examined the Supreme Court's opinion in *Jenkins v. Anderson*, 447 U.S. 231 (1980). The *Jenkins* Court held that a prosecutor's use of a defendant's pre-arrest silence to impeach the defendant's trial testimony was not a violation of the Fifth or Fourteenth Amendments to the Constitution. *Reynolds I*, 114 So. 3d at 135 (citing *Jenkins*, 447 U.S. at 240). The ACCA found the Supreme Court's reasoning in *Jenkins* to be "particularly relevant to the facts of [Reynolds's] case."[15] *Id.*

---

[14] The ACCA also found that Reynolds's counsel never requested to be shown the prior statements and never objected to the testimony "that Reynolds was arrested the day the murders were discovered, that upon his arrest he answered questions propounded by investigators, and those answers were inconsistent with his exculpatory trial testimony." *Id.* at 135.

[15] The ACCA specifically pointed to the line of questioning at issue in *Jenkins* – with the understanding that the exchange involved pre-arrest statements (or absence of statements):

Q. [PROSECUTOR]: And I suppose you waited for the Police to tell them what happened?
A. [JENKINS]: No, I didn't.
Q. [PROSECUTOR]: You didn't?

The ACCA recognized that although "[i]t can be argued that a person facing arrest will not remain silent if his failure to speak later can be used to impeach him. . . . [T]he Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.'" *Id.* at 136, quoting *Jenkins*, 447 U.S. at 236, quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 30 (1973). The ACCA explained that "the rule that [an accused who] testified . . . must testify fully, [does not] add[] in any substantial manner to the inescapable embarrassment which the accused must experience in determining whether he shall

---

A. [JENKINS]: No.
Q. [PROSECUTOR]: I see . . . . [a]nd how long was it after this day that you were arrested, or that you were taken into custody?

After some discussion of the date on which [Jenkins] surrendered, the prosecutor continued:

Q. [PROSECUTOR]: When was the first time that you reported the things you have told us in Court today to anybody?
A. [JENKINS]: Two days after it happened.
Q. [PROSECUTOR]: And who did you report it to?
A. [JENKINS]: To my probation officer.
Q. [PROSECUTOR]: Well, apart from him?
A. [JENKINS]: No one.
Q. [PROSECUTOR]: Who?
A. [JENKINS]: No one but my –
Q. [PROSECUTOR]: (Interposing) Did you ever go to a Police Officer or to anyone else?
A. [JENKINS]: No, I didn't.
Q. [PROSECUTOR]: As a matter of fact, it was two weeks later, wasn't it?
A. [JENKINS]: Yes.

In closing argument to the jury, the prosecutor again referred to the [Jenkins's] prearrest silence. The prosecutor noted that [Jenkins] had waited two weeks, according to the testimony—at least two weeks before he did anything about surrendering himself or reporting [the stabbing] to anybody. The prosecutor contended that [Jenkins] had committed murder in retaliation for the robbery the night before.

. . .

At trial the prosecutor attempted to impeach [Jenkins's] credibility by suggesting that [Jenkins] would have spoken out if he had killed in self-defense. . . . *In this case, of course, [Jenkins] did not remain silent throughout the criminal proceedings. Instead, he voluntarily took the witness stand in his own defense.*

*Reynolds I*, 114 So. 3d at 135-36, quoting *Jenkins*, 447 U.S. at 233-234 (internal citations omitted).

testify or not." *Id.*, quoting *Jenkins*, 447 U.S. at 237, quoting *Raffel*, 271 U.S. at 499 (internal quotations omitted).

As the ACCA explained, in *Raffel v. United States*, 271 U.S. 494 (1926), the Supreme Court recognized that the Fifth Amendment "is not violated when a defendant who testifies in his own defense is impeached with his prior silence." *Reynolds I*, 114 So. 3d at 136, quoting *Jenkins*, 447 U.S. at 235. The defendant in *Raffel* was tried twice. "[A]t the first trial, [a witness for the prosecution] testified that Raffel . . . had made a [prior] inculpatory statement[,] but [Raffel] did not testify." *Id.*, quoting *Jenkins*, 447 U.S. at 235. When the first trial ended in a mistrial, the same witness testified at the second trial, and Raffel "took the stand to deny making such a statement[;]" however, "cross-examination revealed that [Raffel] did not testify at the first trial. *Id.*, quoting *Jenkins*, 447 U.S. at 235 (alterations added). The ACCA recognized that "[t]he [*Raffel*] Court held that inquiry into prior silence was proper because [t]he immunity from giving testimony is one which a defendant may waive by offering himself as a witness . . . [w]hen he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined . . . ." *Id.*, quoting *Jenkins*, 447 U.S. at 235-36 (internal quotations omitted).

The ACCA also acknowledged the Supreme Court's holding "that a statement taken in violation of *Miranda* . . . may be used to impeach a [testifying] defendant's credibility [and] reject[ed] the contention that such impeachment violated the Fifth Amendment." *Reynolds I*, 114 So. 3d at 137, quoting *Jenkins* 447 U.S. at 237, quoting in turn *Harris v. New York*, 401 U.S. 222, 225 (1971). The *Harris* Court reasoned:

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury, . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.

*Reynolds I*, 114 So. 3d at 137, quoting *Jenkins* 447 U.S. at 237-38, quoting in turn *Harris*, 401 U.S. at 225, citing *Oregon v. Hass*, 420 U.S. 714, 721-23 (1975); *Walder v. United States*, 347 U.S. 62, 65 (1954).[16] Therefore, the ACCA concluded "*impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial.*" *Reynolds I*, 114 So. 3d at 137, quoting *Jenkins*, 447 U.S. at 238 (emphasis added).

The ACCA also supported its decision with precedent that has concluded that "the use of pre-arrest silence to impeach a defendant's credibility does not violate the Constitution." *Id.* at 138, quoting *Jenkins*, 447 U.S. at 240-41 (internal citations omitted). Of course, each state "remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial." The Alabama Rules, as referenced by the ACCA, provide "[t]he right to cross-examine a witness extends to any matter relevant to any issue and to matter affecting the credibility of the witnesses . . ." Ala. R. Evid. 611(b). Rule 611(b) generally does not limit the scope of cross-examination with respect to matters brought out on a witness's direct examination. *See Reynolds I*, 114 So. 3d at 138, quoting *McElroy's Alabama Evidence* § 136.01(1). The ACCA also recognized that "adverse parties in . . . criminal cases are entitled to conduct a thorough and sifting cross-examination" with "wide latitude for testing a witness'[s] credibility[,]" and though "not absolute . . . the latitude and extent of such cross-examination rests largely within the sound discretion of the trial court . . . reversible only [for] abuse[]." *See id.* at 138-39, quoting *McElroy's Alabama Evidence* § 136.01(2).

---

[16] The ACCA also referenced judicial considerations that provide "[o]nce a defendant decides to testify, the interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Reynolds I,* 114 So. 3d at 137, quoting *Jenkins,* 447 U.S. at 238, quoting in turn *Brown v. United States*, 356 U.S. 148, 156 (1958).

In further support of its conclusion, the ACCA explained that both federal and Alabama precedent respects the jury's "paramount right to consider a witness's motivation, and any evidence testing his interest, bias, or prejudice so as to illustrate or impeach the accuracy of his testimony is a competent, material, and relevant subjection of cross examination." *Id.* at 139, quoting *Gobble*, 104 So. 3d at 953, quoting in turn *Ex parte Brooks*, 393 So. 2d 486, 487-88 (Ala. 1980) (internal quotations omitted); *see Davis v. Alaska*, 415 U.S. 308, 316 (1974). The ACCA reasoned, "when the accused takes the stand to testify in his own behalf, he does so in a dual capacity – (1) as the accused and (2) as a witness[;] [thus] as a witness his credibility [is subject to] impeach[ment]" just as "any other witnesses may be impeached." *Id.*, quoting *Gobble*, 104 So. 3d at 953, quoting in turn *Fisher v. State*, 328 So. 2d 311, 317 (Ala. Crim. App. 1976); *Chambers v. State*, 84 So. 2d 342, 343-44 (Ala. 1955). And, the state court noted that "[a] defendant, who testifies for himself as a witness, may be impeached in the same manner as other witnesses, by showing that he has made contradictory statements"). *See id.*, quoting *Gobble*, 104 So. 3d at 953, quoting in turn *Fisher*, 328 So. 2d at 317; *Chambers*, 84 So. 2d at 343-44) (internal quotations omitted).

For these reasons, the ACCA concluded that Reynolds's *Doyle* claim was without merit: "Given the particular facts of this case, together with Reynolds's admission that he regretted not coming forward much earlier with his exculpatory version of the facts, we find no basis for reversal in either the prosecutor's cross-examination questions or his comments during closing arguments." *Reynolds I*, 114 So. 3d at 140.

### b.    Section 2254(d)(2)

The court addresses Reynolds's prosecutorial misconduct claim and his argument that the ACCA's decision resulted from an unreasonable application of facts in light of the evidence before

the ACCA at the time of its decision. (*See* Doc. # 1 at 46, 55). For the following reasons, the court disagrees with his position.

Reynolds asserts that habeas relief is appropriate under § 2254(d)(2) because the ACCA's decision contains unreasonable factual determinations. But, that argument cuts no ice.

Reynolds acknowledges that a presumption of correctness attaches to state court factual findings under § 2254(e)(1). And, obviously he has the initial burden to point to those state court findings he claims are unreasonable. However, his references to the record simply fail to identify which specific factual findings he contends the ACCA unreasonably determined. Instead, Reynolds cites to the record pages (that were thoroughly evaluated in their proper context by the ACCA), and either rehashes his arguments presented to the state courts or relies on circular logic. (*See* Doc. # 31 at 35-37, 41). He simply has not identified which factual findings he contends were unreasonable.

But, even if Reynolds had adequately identified the factual findings he attacks, there is another flaw in his position. He has not explained the significance of any such finding in a non-conclusory manner; therefore, he has not established his *Doyle* claim as one that is a "highly probable" of succeeding. (*See* Doc. # 31 at 41); *Ward*, 592 F.3d at 1177; *see also Lee*, 987 F.3d at 1018 n.2 (explaining that unless a petitioner "can[] show that the state court's decision 'was based on' the challenged findings, they provide no basis for federal habeas relief whether or not those findings were unreasonable"). Reynolds's imprecise citations to the record coupled with his conclusory allegations are insufficient to overcome the heightened pleading requirement that the petition should state facts support each ground. *See* Rule 2(c) of the *Rules Governing Section 2254 Cases in the U.S. District Courts*. *See also* Advisory Committee Note to Rule 4 of the *Rules Governing 2254 Cases in the U.S. District Courts*, quoting *Aubut v. Maine,* 431 F.2d 688, 689 (1st

Cir. 1970) (internal quotation omitted). As a result, Reynolds did not establish that the ACCA or the Circuit Court unreasonably determined a fact of record relevant to the dismissal of his *Doyle* claim. Consequently, relief under § 2254(d)(2) is unavailable to Reynolds.[17]

In the alternative, the court concludes that Reynolds's argument that the ACCA's decision resulted from an unreasonable determination of the facts is without merit, ambiguous, and conclusory in nature. The court disagrees with Reynolds's contention that the "record is clear that the [prosecutor's] cross-examination questions were designed to suggest guilt from Reynolds's silence, not to impeach him by introducing evidence of a prior inconsistent statement." (Doc. # 31 at 41). Additionally, Reynolds does not address the ACCA's findings that, on multiple occasions, Reynolds admitted he answered "some" of the police's questions, *Reynolds I*, 114 So. 3d at 127, quoting Vol. 11 at 136; that he admitted that "the first time the police talked to [him] . . . [he] didn't know anything about it," *id.* at 128, quoting Vol. 11 at 142; that he stated later that "[h]e was trying to protect [West]," *id.* at 130, quoting Vol. 11 at 154; that he repeatedly admitted he "should have told [the investigators] at the beginning of this what happened," *id.* at 128, 130, quoting Vol. 11 at 139, 156; and, that the police interview notes that refer to Reynolds's inconsistent "statement" completely contradict his direct testimony, *see id.* at 131-32 (Vol. 15 at 156, 180).

Reynolds also asserts that the prosecutor's "intent was manifest by the frequency of the prosecutor's improper comments[.]" (Doc. # 31 at 41) (citing Vol. 11 at 137-39, 142-44, 147, 154, 156; Vol. 12 at 21). Contrary to this unsupported supposition, the prosecutor's comments did not indicate that the prosecution intended to comment on Reynolds's post-arrest silence. Rather, the prosecutor's remarks were directed at Reynolds's obligation to testify fully and truthfully.

---

[17] The court also notes that Reynolds has not sought to expand the habeas record nor attempted to meet § 2254(e)(1)'s clear and convincing standard on any state court factual determination applicable to his *Doyle* claim.

Reynolds also argues that the prosecutor's alleged failure to discontinue his line of questioning after the trial judge directed the prosecution to "ask [his] next question" amounts to evidence of his intent to comment on Reynolds's post-*Miranda* silence. But this argument is also without merit. (*See* Doc. # 1 at 51). As observed by the ACCA, and as demonstrated by the record, the prosecutor's next question -- "You could have solved this whole crime, couldn't you?" -- was not a repeated question. Instead, the question honed-in on the prosecution's theory that Reynolds tailor-made his exculpatory version of the events after listening to all of the inculpatory evidence in the State's possession. *See Reynolds I*, 114 So. 3d at 128, quoting Vol. 11at 139.

In conclusion, Reynolds has not pointed to any specific facts showing that the ACCA's decision was the result of an objectively unreasonable determination of the record. As such, Reynolds's argument that he is due federal habeas relief on this claim under 28 U.S.C. § 2254(d)(2) is due to be denied.

### c.      Section 2254(d)(1)

Nor has Reynolds met his burden of proof under § 2254(d)(1) of showing that the ACCA's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1).  The ACCA decided Reynolds's claim of improper use of "post-arrest silence" under *Doyle* and its progeny. Reynolds has wholly failed to identify a decision in which the Supreme Court reached a "different result" based on "materially indistinguishable facts. Thus, at a minimum, fair-minded jurists could debate the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *see Shinn v. Kayer*, ___ U.S. ___, 141 S. Ct. 517, 523 (2020) (precluding review of claims under § 2254(d)(1)'s contrary to standard because "the state court applied 'the correct governing legal principle . . . to

113

the facts of the prisoner's case'"), quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal quotations omitted). That is all that is required to uphold the ACCA's legal conclusion.

Here, Reynolds alleges that the state court unreasonably applied *Doyle* and its progeny in rejecting his claim that the prosecutor intentionally "made improper statements regarding [his] [*Miranda*] invocation" for the alleged purpose of encouraging the jury to infer guilt from his silence and invocation of counsel. Reynolds cites numerous cases, mostly in support of a singular proposition without any further analysis.[18] (*See generally* Doc. # 1 at 35-57). In reply, Reynolds cites to other cases for support,[19] but he often does so without any development or application to the facts of his case. (*See generally* Doc. # 31 at 35-50).

---

[18] In support of this claim, Reynolds cites to numerous federal and state court cases. (*See generally* Doc. # 1 at 35-57). But, these cases do not support Reynolds's arguments, particularly as related to his AEDPA burden under § 2254(d). Specifically, the cases cited to by Reynolds include: *Miranda*; *Doyle*; *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986); *Jenkins*; *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Anderson*; *United States v. Jenkins*, 499 F. Supp. 2d 1268, 1279 (M.D. Fla. 2007) (holding that prosecutor's repeated references to defendant's refusal to provide *written statement* to inspector, while having otherwise waived his *Miranda* rights, violated his right to due process, and that such error was not harmless due to the lack of inculpatory evidence and repeated objections by defense counsel); *U.S. v. Pennington*, 20 F.3d 593, 599 (5th Cir. 1999) (holding that prosecution did not improperly comment on defendant's post-*Miranda* silence); *U.S. v. Laury*, 985 F.2d 1293, 1303 (5th Cir. 1993) (finding prosecutor's statements were harmless error because of sufficient evidence of guilt in the record, where the prosecutor repeatedly commented on defendant's "partial" post *Miranda* silence and where "nothing [he] told the FBI agents was inconsistent with his trial testimony"); *United States v. Canterbury*, 985 F.2d 483 (10th Cir. 1993); *Ex parte Great Am. Surplus Lines Ins. Co.*, 540 So. 2d 1357 (Ala. 1989) (granting insurer's petition for writ of mandamus ordering trial court to vacate order compelling insurer to produce coverage opinion letter prepared by insurer's legal counsel, holding that the opinion letter fell within attorney client privilege, was not waived, and was within the work product doctrine's "zone of privacy"); *Arthur v. State*, 575 So. 2d 1165, 1175-76 (Ala. Crim. App. 1990) (holding that the trial court's admission of testimony of statement defendant made to police officer over two weeks after defendant invoked his right to remain silent was "plain" error and likely had prejudicial impact on jury, where there was no proof that such statement offered was made voluntarily or knowingly waiving Miranda invocation); *Wiley v. State*, 516 So. 2d 812 (Ala. Crim. App. 1986), *rev'd Ex parte Wiley*, 516 So. 2d 816 (Ala. 1987) (holding defendant could reclaim right to remain silent and that prosecution's questions to the arresting officer about the defendant's assertion of his right to remain silent and retain counsel was unconstitutional). (*See generally* Doc. # 1 at 35-57).

With respect to most of these cases, Reynolds completely fails to even offer a rudimentary explanation of why they support his AEDPA claim. Those failures present a strong case that Reynolds has abandoned or waived these arguments.

[19] *Davis v. Alaska*, 415 U.S. 308 (1974) (holding that a defendant was denied his right of confrontation with the court's refusal to allow defendant to cross-examine key prosecution witness); *Chapman v. California*, 386 U.S. 18 (1967) (holding that, where the court charged the jury that the defendant's failure to testify in combination with prosecutions repeated references to defendant's silence, that harmless error could not be presumed where State had not made showing beyond a reasonable doubt that those comments did not contribute to the convictions); *Fugate v. Head*, 261 F.3d 1206 (11th Cir. 2001) (denying petition for writ of habeas corpus, holding that counsel was not

The court has analyzed each of the cases on which Reynolds relies, but concludes that Reynolds's claim is due to be denied.

### (1)    *Doyle v. Ohio*

Reynolds's argument that the ACCA's decision is contrary to *Doyle* lacks merit. In *Doyle*, the court considered whether a prosecutor may impeach a suspect for failing to say something when that silence occurred soon after the police arrested the suspect and informed him of the right to remain silent. *See* 426 U.S. at 611-12. The court analyzed the issue as though both defendants had remained mute after receiving their *Miranda* rights, and described the case as one involving cross-examination of a person "who remain[s] silent" after police informed him of his Miranda warnings. *Id.* at 620 (Stevens, J., dissenting). Not until trial did the defendants in *Doyle* assert that they had been framed and, after they took that position, the prosecutor improperly impeached their

---

ineffective under *Strickland* during guilt or penalty phases); *United States v. Dodd*, 111 F.3d 867 (11th Cir. 1997) (holding that district court did not abuse discretion in finding prosecutor's comment during rebuttal was not remark on defendant's right to remain silent, as it referred to context of defendant's prior statement); *United States v. Tenorio*, 69 F.3d 1103, 1107 (11th Cir. 1995) (holding prosecution and witness violated defendant's right to remain silent when commenting that under the circumstances no reasonable person would remain silent, where no inconsistent statements were given by defendant prior to his testimony at trial); *United States v. Gabay*, 923 F.3d 1536, 1541 (11th Cir. 1991) (holding joinder of indictments was proper where defendant demonstrated no prejudice; transcript of prior testimony of deceased was admissible exception to hearsay rule; and that the continuation of deliberations with eleven jurors after one was dismissed for misconduct was not abuse of district court's discretion); *United States v. De Parais*, 805 F.2d 1447, 1455 (11th Cir. 1986) (finding the "prosecutor was not commenting on appellant's post arrest silence[,]" rather "was attempting to impeach [defendant's] testimony on the basis of his prior inconsistent statements.), *overruled on other grounds by United States v. Kaplan*, 171 F.3d 1351, 1357 (11th Cir. 1999); *United States v. Gates*, 351 F. App'x 362 (11th Cir. 2009) (holding there was sufficient evidence to support conviction for attempting to persuade minor to engage in sexual activity and that any error in governments closing argument shifting burden of proof was harmless); *Anderson v. State*, 571 So. 2d 1290, 1295 (Ala. Crim. App. 1990) (holding prosecutor's pervasive behavior, including asking defendant who, invoked his right to remain silent and had made no prior inconsistent statements to officers before testifying, what he had "to hide by exercising his right to remain silent" over multiple objections by the defense, amounted to reversible error); *Edwards v. State*, 502 So. 2d 846, 851-52 (Ala. Crim. App. 1986) (holding a prosecutor's repeated references on cross-examination to a defendant's repeated assurances he invoked his right to remain silent, response that when questioned by officers he remained silent, and where no inconsistent statement was introduced into evidence by defendant or anyone else, was a *Doyle* violation). (*See generally* Doc. # 31 at 35-50).

The court notes that Reynolds makes reference to most of these cases briefly in support of a generalized proposition that is, quite clearly, taken out of context. But even putting aside that flaw in his argument, Reynolds has not met his burden under AEDPA of demonstrating that the ACCA's decision is contrary to, or an unreasonable application of, clearly established Supreme Court precedent as related to his *Doyle* claim. Accordingly, these arguments are without merit and due to be dismissed.

exculpatory trial testimony by cross-examining the co-defendants as to why they had not told the same "frameup" story to the police at time of the arrest. *Id.* at 614-15.

In *Doyle*, the state court explained that the prosecution's use of defendant's post-*Miranda* silence "was not evidence offered by the state in its case in chief as a confession by silence or as substantive evidence of guilt but rather cross examination of a witness as to why he had not told the same story earlier at his first opportunity." *Id.* at 615-16; *see also id.* at 614 n.5. The Supreme Court rejected the state court's characterization of the cross-examination and held that this form of impeachment violated the defendant's due process rights. *Id.* at 620.

But, as the ACCA correctly recognized, the *Doyle* Court "specifically declined to address the constitutionality of the prosecutor's inquiry as to why neither defendant had told his exculpatory story at any time before trial." *Reynolds I*, 114 So. 3d at 135 (citing *Doyle*, 426 U.S. at 616 n.6). Indeed, as the Supreme Court elaborated, "unless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge." *Doyle*, 426 U.S. at 619 n.7 (citing *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)).

The facts presented in Reynolds's state court trial are materially distinguishable from those in *Doyle*. Unlike the defendants in *Doyle*, Reynolds waived his *Miranda* rights and admitted on cross-examination that he answered "some" of the questions posed by the officer. (*See* Vol. 11, Tab 19, TR. 1564). Reynolds also admitted that his statements to police were inconsistent with his direct testimony and that he "wished" he had told the truth earlier. *Reynolds I*, 114 So. 3d at 134, 140.

As the ACCA found, Reynolds's statements to police repeatedly denied committing the murders; denied knowing who was responsible for the murders (despite intimating otherwise on

cross-examination); and denied being at the Martin's home on the night of the murders (which contradicts his testimony on direct examination). *See Reynolds I*, 114 So. 3d at 131-32. Additionally, the prosecution provided several pieces of physical evidence that placed Reynolds at the Martin's home: Reynolds's DNA mixed with Melinda Martin's on a gas can handle, Reynolds's bloody footprint, Reynolds's prescription broken eyeglass piece found in the bed with Savannah Martin, and the broken frames found at his father's home (where he lived) with Mrs. Martin's blood on them.[20]

Moreover, the statement that Reynolds admitted to the police directly contradicted his exculpatory version of events provided in his direct testimony. But, in *Doyle*, the defendant's "silence" did not reflect a direct (or even indirect) contradiction to his exculpatory version of events.[21] Simply put, the prosecution's impeachment of Reynolds's post-*Miranda* statement offered to the investigators that were inconsistent with his testimony at trial make Reynolds's conviction distinguishable from the facts of *Doyle*.

The ACCA did not unreasonably apply *Doyle* when rejecting this claim. As discussed above in detail, the state court concluded that the facts presented in *Doyle* were patently distinguishable from those presented in Reynolds's case. Reynolds fails to demonstrate that no reasonable jurist could agree with the ACCA's application of *Doyle* to his case. And, to the extent

---

[20] Another distinguishing characteristic of this case compared to *Doyle* is that Reynolds's exculpatory explanation simply is not plausible. Reynolds testified that after sending West and Roberts off to purchase more drugs, he fell asleep after a day binging on crack cocaine only to wake up to see a stabbed girlfriend. To protect West, Reynolds purportedly went to the crime scene to erase all evidence of her presence. In doing so, Reynolds says he stepped over his friend's body without calling the authorities and later attempted to set fire to the home. As recognized by the ACCA, in *Doyle*, there was little direct, inculpatory evidence that pointed to the defendant, and it is simply implausible that the defendant was framed.

[21] The ACCA presumed that, because Doyle's response did not actually conflict with his trial testimony, the Supreme Court construed this response as silence for the purposes of analysis. *Id.* (citing *Anderson*, 447 U.S. at 406 n.2) (providing that with respect to the responses in *Doyle*, "[i]n any event, neither the inquiry nor the exclamation quoted above contradicted the defendant's later trial testimony").

Reynolds complains about the prosecution's inquiries into his failure to come forward at "any time," the *Doyle* Court specifically declined to address the constitutionality of any such reference. Rather, the *Doyle* Court recognized that its ruling, if taken to the extremes, could impermissibly allow a defendant to tailor his exculpatory story to the State's case against him -- which is what the prosecution in Reynolds argued when impeaching him on his prior inconsistent statements. *See Doyle*, 426 U.S. 619 n.7 (citing *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)). Thus, the ACCA's decision was not an unreasonable application of *Doyle*.

### (2)    *Anderson v. Charles*

Similarly, the ACCA did not unreasonably apply *Anderson v. Charles*, 447 U.S. 404 (1980). *See Reynolds I*, 114 So. 3d at 132-33. In *Anderson*, the defendant testified and offered an explanation at trial that conflicted with his post-*Miranda* statement to police. *Anderson*, 447 U.S. at 405-406. As the ACCA recognized, the issue in *Anderson* related to a series of questions "[d]uring [the prosecutor's] cross-examination [that] challeng[ed the defendant's] credibility based on [his] failure to tell the detective the same story that he told at trial." *Anderson*, 447 U.S. at 404-05.

The *Anderson* Court began by evaluating *Doyle*. The Court acknowledged that "*Doyle* . . . held that the Due Process Clause of the Fourteenth Amendment prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings." *Id.* at 406. The *Anderson* Court explained that the "two defendants [in *Doyle*] made no postarrest statements about their involvement in the crime" but the prosecutor "asked the defendants why they had not told the [exculpatory] story . . . upon arrest." *Id.* at 407. The Court reasoned that "such impeachment was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and

assure him, at least implicitly, that his silence will not be used against him." *Id.* at 407-08 (citing *Doyle* 426 U.S. at 618-19; *Jenkins*, 447 U.S. at 239-40).

The ACCA correctly recognized that the Supreme Court distinguished *Anderson* from *Doyle*. *Reynolds I*, 114 So. 3d at 133. In *Anderson*, the Court clarified *Doyle*'s application.

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquiries into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Anderson*, 447 U.S. at 408 (citing *United States v. Agee*, 597 F.2d 350, 354-56 (3d Cir) (en banc), *cert. denied*, 442 U.S. 944 (1979); *United States v. Mireles*, 570 F.2d 1287, 1291-93 (5th Cir. 1978); *United States v. Goldman*, 563 F.2d 501, 503-04 (1st Cir. 1977), *cert. denied*, 434 U.S. 1067 (1978)).

After setting the channel markers erected by *Doyle*, the *Anderson* Court reviewed the Sixth Circuit's decision.  While the court of appeals applied *Doyle* to "bar questions that concerned the . . . failure to tell the police the story . . . recounted at trial," the *Anderson* Court expressly rejected that rationale. *Id.* As the Supreme Court explained, the exchange, when "taken as a whole, does not refe[r] to the exercise of [the defendant's] right to remain silent; rather [it asks] . . . why, if [his trial testimony] were true he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street." *Id.* at 408-09. The Court reasoned that "any ambiguity in the prosecutor's . . . questioning was quickly resolved by explicit reference to . . . testimony, which the jury heard only a few hours before." *Id.* at 409. And, the Court concluded that the prosecutor's questions "were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* While explaining that "[the] two inconsistent descriptions of events may be said to involve 'silence' insofar as [they] omit[] facts

119

included in the other version[,]" the Supreme Court noted that *Doyle* simply does not mandate "such formalistic understanding of 'silence,'" and, therefore, declined to extend *Doyle* to the prosecutor's cross-examination in *Anderson. Anderson*, 447 U.S. at 409.

Consistent with the reasoning in *Anderson*, here, the ACCA did not "neatly bifurcate" its evaluation of the cross-examination. Rather, the ACCA assessed the contested cross-examination and closing arguments "as a whole." *See Reynolds I*, 114 So. 3d at 126-33, 139; *see also id.* at 126 (explaining that the prosecutor's questions and comments "cannot be considered in the abstract but [rather] . . . in the context in which they occurred"), quoting *Brown v. State*, 11 So. 3d 866, 9090 (Ala. Crim. App. 2007) (internal quotation omitted).

The ACCA's evaluation, like that in *Anderson*, concluded that the prosecutor was attempting to impeach Reynolds through his prior inconsistent statements to police. *See generally Reynolds I*, 114 So. 3d at 126-33, 139. The ACCA reasonably determined that "[t]he questions were not designed to draw meaning from silence but to elicit an explanation for a prior inconsistent statement." *See Anderson*, 447 U.S. at 409. As a result, Reynolds has not shown that the ACCA unreasonably applied *Anderson*.

### (3)    *Jenkins v. Anderson*

Reynolds next argues that the ACCA's reliance on *Jenkins v. Anderson*, 447 U.S. 231 (1980), "to find that the prosecutor's comments on . . . Reynolds's post-*Miranda* silence did not violate federal law . . . was unreasonable." (Doc. # 1 at 54). Reynolds alleges that *Jenkins* is inapplicable because the Supreme Court "noted that impeachment with post-*Miranda* silence would be unconstitutional." (*Id.*) (citing *Jenkins*, 447 U.S. at 240). In support, Reynolds contends that, unlike the comments and questions at issue in this matter, *Jenkins* involved a prosecutor's comments on a defendant's pre-arrest silence when no *Miranda* warnings were provided. (*Id.*).

Relying on this distinction, Reynolds (somewhat circularly) contends that the Supreme Court's "emphasis on the difference between pre- and post-*Miranda* silence, [indicates the ACCA]'s reliance on *Jenkins* . . . was unreasonable[,]" presumably because (again) Reynolds maintains his purported silence violated *Doyle*. (*Id.*).

But Reynolds's argument misconstrues the ACCA's analysis of *Jenkins*. There, the defendant testified at trial that he had killed the victim but claimed it was in self-defense. *See Jenkins*, 447 U.S. at 233. On cross-examination, the prosecutor questioned why the defendant did not go to the police or tell others that he acted in self-defense. *Jenkins*, 447 U.S. at 233-34. The court held that the prosecutor's use of the defendant's pre-arrest silence was not unconstitutional generally (nor a violation of *Doyle* specifically). *Id.* at 238, 240.

In doing so, the court placed significant emphasis on the "petitioner['s] [failure] . . . to remain silent throughout the criminal proceedings[,]" and pointed to the defendant "voluntarily [taking] the witness stand." *Id.* at 235. The *Jenkins* Court explained that "[i]t has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters *reasonably related to the subject matter of direct examination*." *Id.* at 236 n.3 (emphasis added). Further, the Supreme Court reasoned:

> Use of such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts. … Once a defendant decides to testify, "[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination."

*Id.* at 238, quoting *Brown v. United States*, 356 U.S. 148, 156 (1958).

Reynolds fails to demonstrate how the ACCA's application of *Jenkins* was objectively unreasonable. The ACCA recognized that *Jenkins* applied to pre-arrest cases but found that its reasoning was nonetheless relevant to the facts of Reynolds's case. More specifically, neither the

defendant in *Jenkins* nor Reynolds remained silent throughout the criminal proceedings; "instead, [they] voluntarily took the witness stand in [their] own defense." *See Reynolds I*, 114 So. 3d at 135-36. Reynolds was impeached based upon the differences between his pre-trial statements and his trial testimony. Jenkins was impeached based upon the difference in his testimony he acted in self-defense and his pre-*Miranda* failure to report the need to defend himself. Reynolds has not satisfied his burden under 28 U.S.C. § 2254(d)(1).[22]

> **d.    Alternatively, Reynolds Has Failed to Show that the ACCA Was Unreasonable in Concluding that Any *Doyle* Error Was Harmless**

Reynolds has not pointed to any Supreme Court decision that establishes the ACCA unreasonably determined Reynolds's *Doyle* claim. To the contrary, a reasonable jurist could find that the purpose of the prosecutor's comments and line of questioning was to impeach Reynolds's prior testimony with the inconsistent statements that Reynolds provided to police. Accordingly, Reynolds's federal habeas relief on this claim is due to be denied.

In the alternative, were the court to assume a *Doyle* violation, Reynolds has not demonstrated that the ACCA was unreasonable in rejecting his claim because any assumed error was harmless. Reynolds contends that where "evidence of guilt is not overwhelming" a *Doyle* violation could not be harmless beyond reasonable doubt. (Doc. # 31 at 46) (citing *United States v. Jenkins*, 499 F. Supp. 2d at 1279-80).

---

[22] The additional cases that Reynolds cites do not satisfy his burden under AEDPA. For example, in *United States v. Canterbury*, 985 F.2d 483 (10th Cir. 1993), the Tenth Circuit held that the defendant's "partial silence [did] not preclude him from claiming a violation of his due process rights under *Doyle*." *Canterbury*, 985 F.2d at 486. However, the decision in *Canterbury* turned on "whether the cross-examination was designed to impeach the defendant's trial testimony calling attention to prior inconsistent statements, or instead, was designed to suggest an inference of guilt from the defendant's post-arrest silence." *Id.* at 486. The *Canterbury* court found that the cross-examination in question violated *Doyle* where the prosecution's questions were not "designed to point out inconsistencies between Canterbury's trial testimony and his statements at the time of arrest[,]" because "[his] post-arrest statements [were] not inconsistent with his entrapment defense." *Id.* at 486. But, in Reynolds's case, his statement to police directly contradicted his trial testimony. Also, and in any event, even if *Canterbury* were not distinguishable, it is not controlling here. *See Carey v. Musladin*, 549 U.S. 70, 74 (2006).

However, the Eleventh Circuit has repeatedly held that a prosecutor's reference to a defendant's post-*Miranda* silence is harmless when such error occurs during a trial in which the State's evidence is otherwise overwhelming. *See United States v. Miller*, 255 F.3d 1282, 1285-86 (11th Cir. 2001) (citing *United States v. Gabay*, 923 F.2d 1536 1541 (11th Cir. 1991). (*See also* Doc. # 21 at 42). As determined by the Supreme Court, owing to the deferential review at this state, the standard for establishing harmlessness for purposes of habeas review is even less exacting than that required on direct review. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). For the purposes of habeas relief, error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.*

Reynolds's trial record confirms, as observed by the ACCA, that the State presented overwhelming evidence of Reynolds's guilt. The evidence includes: eyewitness testimony by West (Vol. 8 at 37-76); pieces from Reynolds's prescription eyeglasses (on which Melinda Martin's DNA was found) in the room where the bodies of Melinda and Savanah Martin were located, and the broken remains of the eyeglasses found during a consensual search of Reynolds's room at his father's home (*see* Vol. 9 at 32-34, 40-41); testimony identifying the murder weapons and placing them in Reynolds's hands (*see* Vol. 8 at 100-01, 115-16, 190); a DNA mixture of blood found on the handle of the gasoline can that forensic tests later confirmed was consistent with the blood of both Melinda Martin and Reynolds (*see* Vol. 10 at 175-76); and forensic testimony identifying Reynolds's bloody footprint at the scene of the murders (*see* Vol. 10 at 201-02). Coupled with the logical inconsistencies imbedded in Reynolds's testimony, this evidence was overwhelming and supports the conclusion that the ACCA's decision was not objectively unreasonable.

For the above stated reasons, Reynolds's *Doyle* claim is due to be denied.

### 2.      Alleged Pervasive Prosecutorial Misconduct

Reynolds next claims that prosecutorial misconduct deprived him of his constitutional rights to due process, a fair trial, a reliable verdict, and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Docs. # 1 at 48, 58-67; 31 at 50). Reynolds's "other prosecutorial misconduct" claim includes seven allegations. Reynolds claims that the prosecution: (1) encouraged the jury to rely on improper evidence (Docs. # 1 at 59; 31 at 64-66); (2) improperly bolstered the State's case against him (Docs. # 1 at 59-60; 31 at 62-64); (3) inflamed the passions of the jury (Docs. # 1 at 60-61; 31 at 55-58); (4) misstated the law to the jurors (Docs. # 1 at 61-63; 31 at 51-55); (5) introduced improper victim impact evidence during the guilt phase (Docs. # 1 at 63-64; 31 at 58-62); (6) improperly elicited hearsay testimony from key witnesses (Docs. # 1 at 64-65; 31 at 66-69); and, (7) improperly presented evidence of sexual assault and rape. (Docs. # 1 at 65-66; 31 69-72).

Reynolds alleges that "these tactics, individually and cumulatively, 'so infected [his] trial with unfairness as to make the resulting conviction a denial of due process.'"[23] (Doc. # 1 at 58, quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Reynolds seeks relief under § 2254, arguing that "the [ACCA's] rejection of [his] prosecutorial misconduct claim was contrary to, and an unreasonable application of, clearly established Supreme Court precedent." (Doc. # 1 at 58-59).

To the extent Reynolds presented the following arguments to the state court, the ACCA rejected each claim after applying the appropriate standard of review. *Reynolds I*, 114 So. 3d at 140-46. The ACCA explained the standard of review as follows:

---

[23] The court addresses each of Reynolds's arguments individually and cumulatively to determine the viability of each claim (and all the claims in the aggregate). *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 117, 1132 (11th Cir. 2012) (recognizing where individual claims of error or prejudice are without merit, a cumulative claim must fail because "we have nothing to accumulate").

"In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict."

"The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. … Prosecutorial misconduct is subject to a harmless error analysis."

…

"While this failure to object does not preclude review in a capital case, *it does weigh against any claim of prejudice*. . . . This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as a part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments to be particularly harmful. *Johnson v. Wainwright*, 778 F.2d 623, 629 n.6 (11th Cir. 1985), *cert. denied*, 484 U.S. 872 (1987)."

*Reynolds I*, 114 So. 3d at 140-41, quoting *Vanpelt v. State*, 74 So. 3d 32, 81 (Ala. Crim. App. 2009) (internal citations omitted).

On federal habeas review, courts must ascertain "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181, quoting *Donnelly*, 416 U.S. at 643. A prosecutor's comments do not rise to this level merely by being "offensive" or "improper"; indeed, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* at 180-81 (internal quotations omitted). The standard of review is the "narrow one of due process, and not the broad exercise of supervisory power." *Donnelly*, 416 U.S. at 642. When applying this standard, a court must look at the context surrounding the prosecutor's remarks. *See Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997). The Supreme Court gave us this explanation:

Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. . . . [T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other

words, the Court must consider the probable effect the prosecutor's response would
have on the jury's ability to judge the evidence fairly.

*United States v. Young*, 470 U.S. 1, 11-12 (1985). Moreover, when determining whether a
statement is sufficiently egregious to deprive a defendant of due process, the court considers
factors such as: "(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether
there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and
(4) the weight of aggravating and mitigating factors." *Land v. Allen*, 573 F.3d 1211, 1219-20 (11th
Cir. 2009) (citing *Romine*, 253 F.3d at 1369–70). Notably, "isolated or ambiguous or unintentional
remarks must be viewed with lenity." *Brooks v. Kemp*, 762 F.2d 1383, 1403 (11th Cir. 1985) (en
banc), *vacated on other grounds by* 478 U.S. 1016 (1986), *reinstated by* 809 F.2d 700 (11th Cir.
1987) (en banc) ("A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never
be unconstitutional."); *see Spivey v. Head*, 207 F.3d 1263, 1276 (11th Cir. 2000) ("Proper
arguments, regardless of their impact on the outcome of the case, do not render a trial unfair.")

For the reasons provided below, the court concludes that Reynolds's prosecutorial
misconduct claims are without merit, individually and cumulatively. Accordingly, those claims
are due to be denied.

### a.   Alleged Prosecutorial Misconduct: Encouraging Improper Evidence

Reynolds claims that the prosecution encouraged the jury to rely on improper evidence
through Chad Martin's testimony. (Doc. # 1 at 59). Reynolds alleges that the error occurred
because the prosecutor had knowledge that the trial court would not allow Martin's previous
purported confession into evidence. (*Id*. at 59).

For the reasons explained below, the court concludes that (1) Reynolds failed to exhaust
this particular prosecutorial misconduct claim (based on the prosecution's knowledge that Martin's

126

prior inconsistent statement would not be entered into evidence), (2) Reynolds abandoned the argument that the prosecution improperly bolstered Martin's credibility through prior consistent statements, and, in any event, (3) the ACCA's decision was not contrary to clearly established federal law or based on an unreasonable determination of the facts.

### (1)      Background

### (a)      Reynolds's Brief to the ACCA

On direct appeal, Reynolds's included three pertinent sections in his state court brief: (1) "The Trial Court Erred in Refusing to Allow Mr. Reynolds to Present Evidence That Chad Martin Confessed to the Crime," (2) "The State Improperly Bolstered the Credibility of Its Own Witnesses by Presenting Evidence of Prior Consistent Statements and Polygraph Tests," and (3) "The Prosecutor Encouraged the Jury to Rely on Improper Evidence in Considering Chad Martin's Testimony" (Vol. 19 at 38-63, 113-14). In the first section, Reynolds describes the purported facts surrounding Martin's confession to police and the legal arguments on how the trial court erred by not allowing the prior inconsistent statement. (Vol. 19 at 38-51). In the second section, Reynolds details the prosecution's alleged error in asking Martin questions that bolstered his testimony through prior consistent statements. And, in the third section, Reynolds claims it was improper for the prosecutor to have Martin identify his mother and testify to her because that testimony tended to bolster Martin's credibility and elicit a response from his mother. (Vol. 19 at 113-14). Reynolds did not make these arguments in the Rule 32 court; therefore, Reynolds's earlier brief on direct appeal to the ACCA contains the entirety of Reynolds's analysis on these claims in the state court.

### (b)      The ACCA's Decision

The ACCA addressed each issue as it was presented by Reynolds's in his state court brief. The ACCA explained at length why the trial court did not abuse its discretion when it declined to

admit Martin's purported confession and the accompanying police report for impeachment purposes. *Reynolds I*, 114 So.3d at 92-103. Additionally, the ACCA held that the trial court did not commit plain error when it denied admitting the same evidence for substantive purposes.[24] *Id.*

Regarding the claim that the prosecution improperly bolstered Martin's credibility with prior consistent statements, the ACCA concluded that the argument was without merit. *Id.* at 104. The ACCA explained that the prosecution "did not introduce into evidence *any* of the content of Chad Martin's oral or written statements—inculpatory or exculpatory." *Id.* (emphasis in original). The ACCA, citing *McElroy's Alabama Evidence*, also found no plain error existed in the prosecution's questions that elicited "the fact that [Martin] had been questioned at length by the police and subsequently excluded as [a] suspect[]" because it was "apparent from the record that the defense intended to elicit testimony that [Martin] was originally a suspect."[25] *Id.* at 105-06.

As to the last issue, the ACCA did not condone the prosecution's question asking Martin if he "[c]an [] sit right there in that witness stand and look [his mother] in the eye and tell her whether [he] had anything to do with killing [Charles Martin]?" *Id.* at 106-07. The ACCA suggested that the question was rhetorical and, at most, the question asked for a yes-or-no answer, rather than Martin's response "Momma, I didn't kill him." *Id.* Ultimately, the ACCA was not convinced that the prosecution attempted to encourage the jury to rely on matters not in evidence. And, in the context of the entire trial, it concluded Martin's response did not so infect the trial with

---

[24] Because Reynolds does not present this claim in his federal habeas petition, it is unnecessary for the court to detail the ACCA's rationale for rejecting it.

[25] The ACCA also detailed Reynolds's claim that the prosecution improperly bolstered the credibility of witness John Langley. But, as Langley's testimony is not addressed by Reynolds in his petition on this issue, the court need not address that issue and instead focuses on the portion of the ACCA's decision regarding Martin.

unfairness as to make the resulting conviction a denial of Reynolds's right to due process. Therefore, the ACCA found no plain error in the prosecutor's actions. *Id.* at 107.

### (c)    Reynolds's Federal Habeas Petition and Reply

In his petition to this court, Reynolds presented the argument that "the prosecutor encouraged the jury to rely on improper evidence in considering State witness Chad Martin's testimony." (Doc. # 1 at 59). Reynolds cited to the prosecution's questions directing Martin to identify his mother in the courtroom and being able to tell her that he did not commit the murders (as well as Martin's initial denial of the crimes and admitting to a drug problem). (*Id.*) In the same paragraph of his petition, Reynolds argued that it was improper for the prosecution to introduce this testimony in light of the prosecution's knowledge that the trial court would not admit evidence of Martin's prior confession. (*Id.*) Reynolds's reply brief provides more detail into the prosecution's alleged error and claims that the ACCA's decision was an unreasonable determination of the trial record as well as contrary to *Holmes v. South Carolina*, 547 U.S. 319, 324-31 (2006). (Doc. # 31 at 64-66). In short, Reynolds's argument in his petition is that the prosecution's line-of-questioning that directed Martin to deny committing the murders was improper because the prosecution knew about Martin's alleged confession and that it would not be admitted into evidence.

### (d)    Comparison of Reynolds's State Court Brief & Federal Habeas Petition

There are two key differences between Reynolds's state brief and his federal habeas petition. First, Reynolds's petition claims that it was improper for the prosecution to direct Martin to testify directly to his mother because the prosecution had knowledge that Martin's prior inconsistent statement was excluded from evidence. On the other hand, in his state brief, Reynolds made two distinct arguments (contained in two wholly separate sections): (1) regarding Martin's

alleged prior confession, Reynolds argued that it was improper for the *trial court* to exclude Martin's prior inconsistent statement; and (2) regarding Martin testifying directly to his mother, Reynolds claimed that the *prosecution* improperly bolstered Martin's credibility. Thus, Reynolds did not exhaust the claim that the prosecutor acted improperly based on the prosecution's knowledge that the trial court excluded Martin's prior inconsistent statement.

Second, in his federal habeas petition, although Reynolds asserted a general argument that "the prosecutor encouraged the jury to rely on improper evidence in considering State witness Chad Martin's testimony," Reynolds failed to cite any instance of the prosecution using Martin's prior consistent statements. As a result, Reynolds also abandoned this claim in his federal habeas petition.

### (2)     Prior Inconsistent Statement

#### (a)     Reynolds Did Not Exhaust the Prosecutorial Misconduct Claim Based on the Prosecutor's Knowledge that Martin's Prior Inconsistent Statement Was Excluded From Trial

To satisfy the exhaustion requirement, a petitioner must first provide the state court "a meaningful opportunity to consider [the] allegations of legal error." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986). Although a federal court should afford a petitioner some "flexibility in determining whether [the petitioner has] met [the exhaustion] requirement," *Cummings v. Dugger*, 862 F.2d 1504, 1507 (11th Cir. 1989), "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted); *see also Picard v. Connor*, 404 U.S. 270, 278 (1971). Ultimately, a petitioner satisfies the exhaustion requirement when "the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation to be

the same as it was presented in state court." *Kelley v. Sec. for Dept. of Corrections*, 377 F.3d 1317, 1344-45 (11th Cir. 2004).

The substance of Reynolds's claim presented to the ACCA is significantly different from his federal habeas claim. In his state court brief, Reynolds argued that the *trial court* erred by not admitting evidence of Martin's purported confession. However, Reynolds did not assert in the state courts a claim of *prosecutorial misconduct* based on the prosecutor's knowledge that Martin's purported confession would not be allowed into evidence. As a result, Reynolds did not afford the ACCA any opportunity to (1) analyze the factual basis of the prosecutor's knowledge at the time of questioning Martin or (2) decide the legal issue of prosecutorial misconduct based on such knowledge. The reasonable reader would not understand a claim accusing the trial court of error as being the same as accusing the prosecutor of misconduct. Therefore, Reynolds did not exhaust his claim that the prosecutor encouraged the jury to rely on improper evidence based on the prosecutor's knowledge that Martin's purported confession would not be admitted into evidence.[26]

Reynolds has not offered any evidence (nor any arguments) to overcome this procedural default by way of cause and prejudice or fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Frady*, 456 U.S. at 170 (finding that a habeas petitioner must show "not merely that the errors . . . created a possibility of prejudice, but that … [it] infect[ed] his entire trial with [constitutional] error"); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Accordingly, this claim is outside the scope of federal habeas review and, therefore, denied.

---

[26] The court notes that the record appears to lack proof of the prosecutor's knowledge that Martin's purported confession would not be admitted into evidence at the time that the prosecutor questioned Martin. As explained by the ACCA, at the beginning of the trial, the circuit court ruled "until [Martin] testified at trial, neither party could refer to Martin's previous oral or written statements." *Reynolds I*, 114 So. 3d at 93. But the trial court did not definitely exclude Martin's prior statements until after the prosecution's direct examination of Martin. *Id.* at 95-97.

**(b)** **Alternatively, Even Assuming the Claim is Not Exhausted and Even Assuming the Prosecutor Acted Improperly, Any Presumed Error Was Harmless**

"A prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. But here, Reynolds's trial record confirms that the State presented overwhelming evidence of Reynolds's guilt. The evidence included: eyewitness testimony by West (Vol. 8 at 37-76); pieces from Reynolds's prescription eyeglasses, on which Melinda Martin's DNA was found, in the room where the bodies of Melinda and Savanah Martin were located, and the broken remains of the eyeglasses found during a consensual search of Reynolds's room at his father's home (*See* Vol. 9 at 32-34, 40-41); testimony identifying the murder weapons and placing them in Reynolds's hands (*see* Vol. 8 at 100-01, 115-16, 190); a DNA mixture of blood found on the handle of the gasoline can that forensic tests later confirmed was consistent with the blood of both Melinda Martin and Reynolds (*see* Vol. 10 at 175-76); and, forensic testimony identifying Reynolds's bloody footprint at the scene of the murders (*see* Vol. 10 at 201-02). As a result, any presumed prosecutorial misconduct resulting from the prosecutor's knowledge of Martin's purported confession being excluded from trial was harmless. Accordingly, this claim is due to be denied.

**(3)** **Prior Consistent Statement**

It is well-established that "[a] party abandons all issues on appeal that he or she does not 'plainly and prominently' raise in his or her initial brief." *United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012), quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). Under this claim in his petition, Reynolds fails to assert (much less cite to any portion of the record to support such an assertion) that the prosecution bolstered Martin's credibility with

prior consistent statements. As a result, Reynolds abandoned this claim from his state court brief, and is not due relief under this theory.

### (4) The ACCA's Decision Regarding the Prosecution's Line of Questioning That Directed Martin to Identify His Mother Was Not Based on an Unreasonable Determination of the Facts Nor Was It Contrary to Clearly Established Federal Law

In his federal habeas reply, and for the first time, Reynolds cites *Holmes v. South Carolina* in support of his prosecutorial misconduct claim. Even if this argument were properly before the court (and it is not), it is not persuasive. In *Holmes*, the Supreme Court held that a state court's interpretation of an evidentiary rule violated a criminal defendant's right to a meaningful defense. *Holmes*, 547 U.S. at 319, 331. But this holding has no application to a prosecutorial misconduct claim. Instead, *Holmes* points to an error of the state court. As this is the only case that Reynolds has cited to support this claim, he has failed to meet his burden that the ACCA's decision is contrary to clearly established federal law.

Reynolds also has failed to prove that the ACCA's decision was based on an unreasonable determination of the facts. As noted by the ACCA, the prosecutor's line-of-questioning is not one to be condoned. However, in the context of the entire trial, the prosecutor's question did not "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." This court agrees with the ACCA's determination.

### (5) Conclusion

Reynolds failed to exhaust his claim that the prosecutor acted with impropriety based on the prosecution's supposed knowledge that the trial court would exclude Martin's alleged prior inconsistent statements. Reynolds abandoned his state court claim that the prosecutor improperly used prior consistent statements to bolster Martin's credibility. And, Reynolds failed to meet his

burden of proof under § 2254(d) to prove that the ACCA's decision was either based on an unreasonable determination of the facts or contrary to clearly established federal law. Accordingly, this claim is due to be denied.

### b.      Alleged Prosecutorial Misconduct: Bolstering Evidence

Reynolds next argues that the prosecutor in his case impermissibly bolstered the State's evidence (1) by vouching for West's testimony and (2) by vouching for the propriety of a capital verdict. (*See* Docs. # 1 at 58-60; 31 at 62-64). For the reasons provided below, the court disagrees.

### (1)      Alleged Vouching for West

Reynolds argued that during the prosecution's opening statement, the prosecutor improperly vouched for the character of its key witness, West. (*See* Doc. # 1 at 58-59 (citing Vol. 7 at 188-90). Reynolds contends that this "bolstering was impermissible and incredibly prejudicial" and directs the court's attention to *United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991). (*See* Doc. # 1 at 59).

### (a)      ACCA's Decision

Reynolds presented this same claim to the ACCA on direct appeal. *Reynolds I*, 114 So. 3d at 143. The ACCA rejected it.

> In a[n] allegation of improper vouching, Reynolds refers this Court to three pages of the prosecutor's opening argument. We have reviewed the alleged improper comments in the context of the opening argument, and we find no plain error. Contrary to Reynolds's interpretation, the prosecutor was not improperly vouching for the credibility of State's witness, Adrian West. Instead, the prosecutor was simply outlining what he expected the evidence to prove.

*Id.* (internal citations omitted).

### (b)      Section 2254(d)(2)

In support of his claim that the prosecutor improperly bolstered West's testimony, Reynolds offers only a few factual recitations alongside multiple conclusory and/or speculative

statements. Reynolds contends that the following segment of the prosecutor's opening statement

evinces the prosecutor's intent to create a battle of credibility between Reynolds and West:

> Marcie West is a young lady who had been involved with Michael for a while. She
> had come a ways [(sic)] in her life, gone through some changes, had been working
> for a lawyer, getting addicted to drugs, being involved with Reynolds. A former
> relationship was abusive. She got involved with Reynolds. She tried to make a life
> with him. But her addiction carried her to 706 Tidmore Bend in a car with Michael
> Reynolds the night of – or the early morning hours of May 25th.

(Doc. # 31 at 63) (citing Vol. 7 at 188-89). Reynolds claims that the prosecutor's opening statement

improperly bolstered West's credibility by distancing West "as far as possible" from her

involvement in the Martins' deaths. (*Id*.). Reynolds pointed to another segment of the prosecutor's

opening statement in support of his argument:

> Now, she will tell you they were a little different. She liked Friends, watching the
> Friends TV show. His favorite move was Gladiator. He watched it over and over.
> There is nothing wrong with the movie. That was his favorite one. He watched it
> over and over.
>
> . . .
>
> And we are not going to say that Marcie didn't make any mistakes that night. She
> did. She took the telephone when he told her to take it. He sent her out of that house
> with that knife. And I think she will always question and always blame herself –
> she will blame herself for the fact that that child was alive when she left that house.
> She feels like there was some kind of way maybe she could have – but when he told
> her to take that telephone she thought that was so the child could not call 911,
> so Savannah could not call 911.

(Doc. # 31 at 63-64) (citing Vol. 7 at 188-90). As explained below, the court concludes that

Reynolds's improper bolstering argument is unpersuasive.

Under § 2254, the burden of proof is on the petitioner "to establish his right to habeas

relief,'" and to do so "he must prove all facts necessary to show a constitutional violation."

*Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008). To carry this burden, "a petitioner must

state specific, particularized facts which entitle him or her to habeas corpus relief for each ground

specified. These facts must consist of sufficient detail to enable the court to determine, *from the face of the petition alone*, whether the petition merits further habeas corpus review." *Adams v. Armontrout*, 897 F.2d 332, 333-34 (8th Cir. 1990) (emphasis added) (providing "general reference to the transcripts, case records, and briefs on appeal patently fails to comply with Rule 2(c)"). Merely providing a few citations to the record, strung together with conclusory allegations and ambiguous references to case law, whether pleaded in prior briefs on appeal or not, is insufficient to overcome the heightened pleading requirement of Rule 2(c). *See* Rule 2(c) of the *Rules Governing Section 2254 Cases in the U.S. District Courts; see also* Advisory Committee Note to Rule 4 of the *Rules Governing 2254 Cases in the U.S. District Courts*.

In his petition, Reynolds makes no attempt to develop this argument beyond a citation to *Eyster*, which is followed by a short parenthetical. (Doc. # 1 at 59). In his reply, Reynolds claims that "[t]he State essentially vouched for the character and credibility of West over that of Reynolds" followed by another blanket assertion that "[t]he bolstering of witnesses is impermissible, *see Eyster*, 948 F.2d at 1206-07, and was highly prejudicial against Reynolds in a case where the State admittedly juxtaposed the credibility of West against that of Reynolds." (Doc. # 31 at 64). Simply put, Reynolds failed to meet his heightened pleading requirement, much less his burden of proof.

Alternatively (and even assuming Reynolds met the heightened pleading standard, which he did not), the claim would still fail because Reynolds did not meet his burden under § 2254(d)(2). The ACCA's decision was not based on an unreasonable determination of the facts. The ACCA determined that the comments in the prosecutor's opening statement were based on what the prosecution expected the evidence to show and, therefore, did not constitute improper argument.

"[T]he need to examine the entire context of the judicial proceeding" is of "primary importance." *Brooks v. Kemp*, 762 F.2d 1383, 1403 (11th Cir. 1985) (*en banc*), vacated on other grounds by 478 U.S. 1016 (1986), reinstated by 809 F.2d 700 (11th Cir. 1987) (*en banc*). "[I]t is not [the court's] duty to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair. In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity." *Id.* Moreover, "[a] permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional." *Id.*; *see also Romine*, 253 F.3d at 1366; *Spivey v. Head*, 207 F.3d 1263, 1276 (11th Cir. 2000).

There was nothing in the prosecution's opening statement that vouched for West's character or credibility. The only comparative statement he made about West and Reynolds related to their movie preferences. In fact, the prosecution addressed West's addiction and involvement in the crime. These statements were not "unfair" in any way to Reynolds. *See Brooks*, 762 F.2d at 1403. In other words, the state court record establishes that the comments did not "so infect the trial with an unfairness" as to deprive Reynolds of constitutional due process. When considered in light of the weight of the evidence, the arguments made by defense counsel, and the trial court's instructions to the jury, it is not in any way likely that the prosecutor's comments influenced the jury. *See Darden*, 477 U.S. at 182 (citing *United States v. Young*, 470 U.S. 1 (1985)). Therefore, Reynolds is not due relief under § 2254(d)(2).

### (c)   Section 2254(d)(1)

To the extent that Reynolds presents an argument under § 2254(d)(1) on this claim, it is unpersuasive. To begin, the only case that Reynolds cites in support of this claim is *United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991), which though decided by a panel in our circuit is not

controlling for the purposes of presenting "clearly established federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1).

However, even if *Eyster* were controlling, that decision is readily distinguishable from the circumstances of Reynolds's trial. In *Eyster*, the prosecutor (trying to rehabilitate a witness) fabricated a theory that suggested the witness's testimonial inconsistencies were easily explained due to a typographical error. *Eyster*, 948 F.2d at 1205-06. But the prosecutor's explanation was wholly unsupported by the record. *Id.* The court held that there was "a reasonable probability that but for the prosecutor's improper comments, the outcome of the proceeding would have been different." *Id.* at 1208. The court noted the lack of physical evidence tying the defendant to the crime, that the defendant was acquitted on every count except for the one that the contested witness testified at length about, and that "the government's reference to a typographical error was ultimately an outright falsehood designed to mitigate [the witness's] willful perjury, which the appellee conceded at oral argument." *Id.* This level of prosecutorial indiscretion (when combined with underwhelming evidence of guilt) distinguishes the *Eyster* trial from Reynolds's trial. But that is not the case here. As cataloged above, there was staggering evidence of Reynolds's guilt.

As a result, Reynolds failed to prove that the ACCA's decision was contrary to clearly established federal law, as determined by the Supreme Court. Relying on conclusory assertions and an undeveloped argument, Reynolds fails to show how the prosecutor's opening statement was "highly prejudicial" or "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181.

**(d)** **The Trial Court's Jury Instruction Further Demonstrates that the Prosecution's Comments Did Not Cause Constitutional Error**

Even assuming that the prosecutor made an improper statement (and, to be clear, he did not), the trial court clearly instructed the jurors that arguments made by the attorneys were not to be considered evidence and that the jury's decision was to be based on the evidence properly presented at trial. (*See* Vol. 12 at 85-86); *Johnson*, 256 F.3d at 1185 ("[I]mproper statements during argument can be cured by clear and accurate jury instructions."). Specifically, the trial court charged the jury that:

> statements of lawyers – the lawyers are permitted to argue the case. They are permit[ted] to draw reasonable inferences about the facts of the case. However, you are not governed by what the lawyers say. It is your responsibility to remember the evidence *as it came from the witness stand and base your verdict solely on the evidence.* Likewise, I've permitted the lawyers in large measure to say whatever they thought appropriate about the law. But if what the lawyers have said about the law differ in any respect to what I'm telling you about the law or what I have told you about the law, then you are to be governed by what I tell you about the law and not what the lawyers say.

(*Id.*) (emphasis added).

After a thorough evaluation of the record before the ACCA, this court easily concludes that the record establishes that the comments did not "so infect the trial with an unfairness" as to deprive Reynolds of constitutional due process. Furthermore, when considered with the weight of the evidence, the arguments made by defense counsel, Reynolds's testimony, and the trial court's instructions to the jury, it is not likely that the prosecutor's comments improperly influenced the jury's decision.

**(e)** **Conclusion**

The ACCA's decision regarding Reynolds's claim that the prosecutor bolstered the State's evidence was not contrary to, or an unreasonable application of, clearly established federal law.

139

*See* 28 U.S.C. § 2254(d)(1). And the ACCA's decision was not the result of an unreasonable determination of facts in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(2). Thus, Reynolds's claim is due to be denied.

**(2)    Vouching for Capital Verdict**

Reynolds also contends that the prosecution vouched for the propriety of a capital verdict.

In support of this claim, Reynolds cites three of the prosecutor's statements:

- "[W]e feel very strongly, and we feel that you all – we also conclude beyond a reasonable doubt that based on clear, undisputed – reasonably undisputed evidence in this case – this is clearly a case of capital murder and nothing else." (Vol. 12 at 17).

- "[B]ecause anybody with any kind of sense would know that you're not going to buy that cock and bull story the guy got on the witness stand and tried to sell to you." (Vol. 12 at 17-18).

- "The only appropriate verdict is guilty of capital murder. Not anything less. If you are not going to convict him of capital murder, just let him go." (Vol. 12 at 32).

(Doc. # 1 at 60). The court analyzes this claim below.

**(a)    The ACCA's Decision**

The ACCA rejected each of Reynolds's claims on plain-error review. *See Reynolds I*, 114 So. 3d at 141-43. Regarding the first statement, the ACCA reasoned:

"'[I]t is not improper for [the prosecuting attorney] to argue or to express his opinion that [the] accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence.' 23A C.J.S. Criminal Law § 1104, pp. 194-95 (1961). *Galloway v. State*, 484 So. 2d 1199, 1201 (Ala. Crim. App. 1986). 'In *Galloway*, a number of cases are cited in which the prosecuting attorney made comments stating his opinion that the appellant was guilty.'"

*Reynolds I*, 114 So. 3d at 141-42, quoting *Broadnax v. State*, 825 So. 2d 134, 183 (Ala. Crim. App. 2000).

Regarding the second comment, the ACCA analyzed the prosecutor's statement in context and explained "the prosecutor was merely replying to defense counsel's closing argument that the evidence established only that Reynolds was at the scene of the crimes to help cover up his girlfriend's presence at the scene of the triple-murder/robbery." *Id.* at 142. The ACCA determined that the prosecution was entitled to spotlight the defense's strategy and point to flaws in it; thus, the remarks at issue did not vouch for a capital verdict but "were part of the prosecutor's legitimate argument that the evidence did not support the defense's theory." *Id.*, quoting *Reeves v. State*, 807 So. 2d 18, 45-46 (Ala. Crim. App. 2000), *cert. denied*, 534 U.S. 1026 (2001) (internal quotations omitted).

And, regarding the third comment, the ACCA explained that "[t]he prosecutor's exhortation to the jury was based upon the evidence presented during the trial." *Id.* at 143. The ACCA recognized the principle that a prosecutor generally errs when "exhorting the jury to 'do what's right,' or to 'do its job,'" because that implies that, in doing so, a jury can only reach one verdict, "regardless of its duty to weigh the evidence and follow the court's instructions on the law." *Id.* at 142, quoting *McNair v. State*, 653 So. 2d 320, 339-40 (Ala. Crim. App. 1992), *aff'd*, 653 So. 2d 353 (Ala. 1994). However, as the ACCA emphasized, "it is not improper for a prosecutor to argue to the jury that a defendant is guilty or to urge the jury to find the defendant guilty of the crime charged so long as that argument is based on the evidence; in fact that is exactly what a prosecutor is supposed to do during closing argument." *Id.*, quoting *Morris v. State*, 60 So. 3d 326, 368 (Ala. Crim. App. 2010) (internal citations omitted).

#### (b)    Analysis

This court's "inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court, and the Supreme Court has never held that a prosecutor's closing arguments

were so unfair as to violate the right of a defendant to due process." *Reese*, *v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012) (internal citations omitted). "A prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012), quoting *Darden*, 477 U.S. at 181. Additionally, "[p]roper arguments, regardless of their impact on the outcome of a case, do not render a trial unfair." *Spivey*, 207 F.3d at 1276. *See e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 182-83 (1986) (reasoning that a prosecutor's closing argument did not render the defendant's trial fundamentally even though prosecutor said that the death sentence would be the only way to prevent a future similar act, the defendant was as an "animal," and the defendant should suffer a violent, graphic and grotesque death).

When the entire trial is put in context, Reynolds cannot show that the prosecutor's argument was improper nor that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." After reviewing the trial testimony and the ACCA's decision, the court concludes that the evidence supports both the prosecution's arguments and the ACCA's decision. In other words, Reynolds failed to demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law. In fact, Reynolds does not cite a single Supreme Court case in support of this issue in his petition. (*See* Doc. # 1 at 60). And, Reynolds failed to demonstrate that the ACCA's decision was based on an unreasonable determination of the facts considering the evidence presented in the state court proceeding. Accordingly, his claim is due to be denied.

### c. Alleged Prosecutorial Misconduct: Inflaming Passions of Jury

Reynolds argues that "the prosecutor attempted to inflame the passions of the jury." (Doc. # 1 at 60-61) (citing Vol. 7 at 177-80, 185; Vol. 11 at 166-67). Reynolds challenges six statements

made by the prosecution. During the prosecution's opening statement, Reynolds contends that the prosecutor "told the jury it would witness 'the results of a massacre,' 'one of the most grisly crime scenes that has ever been witnessed in this county,' and a 'butcher[ing]' by . . . Reynolds, who the prosecutor referred to as the 'evil' that came knocking." (Doc. # 1 at 60) (citing Vol. 7 at 177-78, 80, 185). With respect to the prosecution's closing arguments, Reynolds contends the "prosecutor then pleaded with the jury to end 'his reign of terror' over the community by declaring Mr. Reynolds guilty," while asking that the jurors also to "'tell this community that his murders, his terror, this sadness . . . can stop today.'" (*Id.* at 60-61, quoting Vol. 11 at 166-67). Reynolds claims that "the [ACCA's] decision denying Reynolds relief notwithstanding the State's efforts to inflame the passions of the jury was contrary to Supreme Court precedent" set forth in three decisions. *Viereck v. United States*, 318 U.S. 236 (1943), *Bruton v. United States*, 391 U.S. 123 (1968), and *Berger*. (Doc. # 31 at 58).

## (1)       The ACCA's Decision

Reynolds raised this claim on direct appeal to the ACCA. The ACCA rejected the claim under plain error review because Reynolds failed to object to the allegedly "inflammatory" comments made by the prosecution during the State's opening and closing statements at trial. *See Reynolds I*, 114 So. 3d at 143. In addressing this claim, the ACCA relied on the rationale in *Floyd*:

> "We have carefully reviewed the prosecutor's entire closing argument during the penalty phase of Floyd's trial, paying particular attention to the context of the prosecutor's remarks quoted in Floyd's brief. Based on that review, it is clear that the prosecutor's remarks at the penalty phase of Floyd's trial were made in the heat of debate, were proper comments on facts in evidence, were in reply to various remarks made during defense counsel's closing argument, and were not improperly designed to inflame the passions of the jury. Therefore, no basis for reversal exists."

*Reynolds I*, 114 So. 3d at 143, quoting *Floyd v. State*, 190 So. 3d 940 (Ala. Crim. App. 2007), *rev'd on other grounds* 190 So. 3d 972 (Ala. 2012).

### (2)   Reynolds's Argument that the ACCA Failed to Address the Prosecution's Opening Statements is Without Merit and Does Not Provide Reynolds With an Independent Cause for Habeas Relief

Reynolds argues that the ACCA failed to address the prosecution's opening statements because the ACCA's rationale included the justification that the prosecutor's comments were made "in reply to remarks made during the counsel's closing argument." (Doc. # 1 at 61). But Reynolds reads this quote completely out of context. The contested phrase was only a portion of a larger block quote from a case that the ACCA used in its analysis. *See Reynolds I*, 114 So. 3d at 143. In fact, the ACCA noted that "Reynolds cites several portions of the prosecutor's *opening* and closing arguments." *Id.* (emphasis added).

Furthermore, a state court need not provide every explanation and rationale in support of its findings, or even address every claim. *See Harrington*, 562 U.S. at 98 (determining "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief"); *Johnson*, 568 U.S. at 298 (providing that a state court's decision is an adjudication "on the merits" and entitled to AEDPA deference when it "addresses some but not all of a defendant's claims"); *see also Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1213 (11th Cir. 2013) (observing that Eleventh Circuit precedent "required that [the court] afford AEDPA deference even where the state court's decision is a summary adjudication or engages in only some evaluation because 'implicit findings' may be inferred from dispositive rulings" and collecting cases). In other words, Reynolds has the burden to prove that the ACCA's decision was contrary to, or an unreasonable application of, federal law: it is simply not enough for Reynolds to claim that the ACCA did not address an issue.

### (3)   Section 2254(d)(1)

Reynolds argues that "the [ACCA's] decision denying [him] relief notwithstanding the State's efforts to inflame the passions of the jury, was contrary to Supreme Court precedent set forth in *Viereck*, *Bruton*, and *Berger*, and was an unreasonable application of that law." (Doc. # 31 at 58). For the reasons provided below, the court concludes that the ACCA's decision was not contrary to, or an unreasonable application of, *Viereck*, *Bruton*, and *Berger*.[27]

### (a)   *Viereck v. United States*

Reynolds's reliance on *Viereck v. United States*, 318 U.S. 236 (1943) is misplaced because the portion of *Viereck* that he cites is not "controlling" for purposes of habeas review under § 2254(d)(1). Indeed, the language Reynolds cites in *Viereck* is dicta. (*See* Doc. # 31 at 56-57). To be sure, under § 2254(d)(1), "clearly established federal law" only applies to "holdings … of [Supreme] Court[] decisions." *Williams*, 529 U.S. at 412; *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006).

In *Viereck*, the Court criticized a prosecutor's closing argument, but only speculated as to whether the closing argument constituted error. In fact, the Court expressly stated that its holding was not based on the prosecutor's comments. *See Viereck*, 318 U.S. at 237 ("The question decisive of petitioner's challenge to the validity of his conviction is whether the statute or any authorized regulation of the Secretary required the statement which *petitioner* omitted to make.") (emphasis added). Simply put, that language was dicta, which does not satisfy the "clearly established federal law" requirement under § 2254(d)(1). As a result, the court concludes that *Viereck* does not support Reynolds's argument under 28 U.S.C. § 2254(d)(1).

---

[27] Reynolds has actually failed to provide any Supreme Court authority regarding inflammatory comments delivered during opening statements that amount to prosecutorial misconduct. Thus, with respect to Reynolds's claims involving the prosecution's opening statement, Reynolds has not shown that the ACCA's decision was objectively unreasonable.

Alternatively, even if the referenced portion of *Viereck* amounts to clearly established federal law for the purposes of federal habeas relief (and, it does not) the closing argument in *Viereck* is materially distinguishable from the prosecutor's statements at Reynolds's trial. Reynolds attempts to equate the prosecutor's comments that Reynolds's case involved "'one of the most grisly crime scenes that has ever been witnessed in the county' and [the prosecutor's pleas] to the emotions of the jury to end Reynolds's 'reign of terror' over the community" with the *Viereck* prosecutor's emotionally manipulative closing. (Doc. # 31 at 57). However, this comparison is not at all warranted after considering the context of *Viereck*.

In *Viereck,* the petitioner was charged, during World War II, for three counts of failing to register as a 'political agent' of a foreign principal—Germany. *Viereck*, 318 U.S. at 238-41. Although the defendant's conviction was later overturned by the Supreme Court due to a statutory deficiency, the Court warned the federal prosecutor as to his future choice of words in closing arguments. *Id.* at 247-48. The court cautioned, "[a]t a time when passion and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury were highly prejudicial" in response to the following argument:

> "In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

> "This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of crime, just as much as they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

> "As a representative of your Government I am calling upon every one of you to do your duty."

*Viereck*, 318 U.S. at 247 & n.3.

The material facts of *Viereck* are distinguishable from the prosecutor's argument at Reynolds's trial. (*See* Doc. # 31 at 57). The prosecutor in Reynolds's trial did not say anything like "as a representative of your Government I am calling upon every one of you to do your duty." And the prosecutor in Reynolds's trial did not compare the jurors' role to soldiers actively fighting common enemy overseas. So, in addition to the point that *Viereck* is not a case that pronounced a holding about prosecutorial statements, the magnitude of disparity between the prosecutor's conduct in *Viereck* and the prosecutor's remarks at Reynolds's trial supports the conclusion that the ACCA's decision was not contrary to any warning in *Viereck*, in any event.

### (b)   *Bruton v. United States*

Reynolds relies on *Bruton* for the sole proposition that curative instructions cannot correct prejudicial effects at trial in every case. (*See* Doc. # 31 at 58) (citing *Bruton*, 391 U.S. at 129). That is no doubt true. But, the ACCA did not predicate its ruling on this claim on any curative instruction by the trial court. *See Reynolds I*, 114 So. 3d at 143. Additionally, as explained in more detail below, the fact that a curative instruction was not enough to cure the error in *Bruton* -- which involved the trial court allowing an inculpatory statement to be made by a codefendant in a joint trial -- does not equate to a reminder by the trial court to base any verdict on the evidence at Reynolds's trial.   As a result, the ACCA's decision was not contrary to, or an unreasonable application of, *Bruton*.

### (c)   *Berger v. United States*

Reynolds also contends that the ACCA's decision was contrary to, and an unreasonable application of, *Berger*. (*See* Doc. # 31 at 55-58) (citing *Berger*, 295 U.S. at 88-89). *Reynolds I*, 114 So. 3d at 143. However, the prosecutorial conduct at issue in *Berger* is readily distinguishable

from the commentary that Reynolds argues improperly inflamed the passions of the jury at his trial. (*See id.*) (citing Vol. 7 at 177-78, 80; Vol. 11 at 166-67; Vol. 12 at 28).

In *Berger*, the Supreme Court reversed the defendant's conspiracy conviction because the record "clearly show[ed]" that the prosecuting attorney:

> was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner. *Berger*, 295 U.S. at 84.[28] The court continued by classifying the prosecutor's argument to the jury as "undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury."[29]

---

[28] One example provided by the *Berger* court is the following exchange, which took place during the defendant's cross-examination:

> Q. Now Mr. Berger, do you remember yesterday when the court recessed for a few minutes and you saw me out in the hall; do you remember that? A. I do, Mr. Singer.
> Q. You talked to me out in the hall? A. I talked to you?
> Q. Yes. A. No.
> Q. You say you didn't say to me out in the hall yesterday, 'You wait until I take the stand and I will take care of you'? You didn't say that yesterday? A. No; I didn't, Mr. Singer; you are lying.
> Q. I am lying, you are right. You didn't say that at all? A. No.
> Q. You didn't speak to me out in the hall? A. I never did speak to you outside since this case started except the day I was in your office when you questioned me. "Q. I said yesterday. A. No, Mr. Singer.
> Q. Do you mean that seriously? A. I said no.
> Q. That never happened? A. No, Mr. Singer, it did not.
> Q. You did not say that to me? A. I did not.
> Q. Of course, I have just made that up? A. What do you want me to answer you?
> Q. I want you to tell me I am lying, is that so? . . .

> (No effort was later made to prove that any such statement had ever been made).

*Berger*, 295 U.S. at 84 n.*.

[29] Another example that the *Berger* court provided was an exchange where the prosecutor accused the witness of lying on the stand when she testified that she could not identify the defendant:

> Mrs. Goldie Goldstein takes the stand. She says she knows Jones, and you can bet your bottom dollar she knew Berger. She stood right where I am now and looked at him and was afraid to go over there, and when I waved my arm everybody started to holler, 'Don't point at him.' . . . I was examining a woman that I knew knew Berger and could identify him, she was standing right here looking at him, and I couldn't say, 'Isn't that the man?' Now, imagine that!

*Berger*, 295 U.S. at 86-87.

*Id.* at 85 (footnote added). The Court held that under "these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence." *Id.* at 89. The Court reached this conclusion because the prosecution's misconduct was not "slight or confined to a single instance, but … pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Id.* at 89.

The prosecutor's conduct in Reynolds's trial is not even distantly comparable to the impropriety found in *Berger*. For example, the prosecutor at Reynolds's trial did not tell the jury to rely on the prosecutor's personal knowledge rather than the admitted evidence. Nor did the prosecutor at Reynolds's trial fabricate a conversation between himself and the defendant while cross-examining Reynolds. In the end, Reynolds has utterly failed to demonstrate that the prosecutor in his case "conduct[ed] himself in a thoroughly indecorous and improper manner." Therefore, the ACCA's decision is not contrary to, or an unreasonable application of, *Berger*.

### (4)    Conclusion

Other than making wholly conclusory allegations of prejudice, Reynolds has not offered any developed argument that the ACCA's decision was contrary to, or an unreasonable application of, clearly established federal law. Further, as explained elsewhere in the opinion, there is overwhelming evidence of Reynolds's guilt. Nothing in the record suggests that the outcome of Reynolds's trial was altered by the prosecutor's comments in opening or closing arguments. When considered with the weight of the evidence, the arguments made by defense counsel, Reynolds's testimony, and the trial court's instructions to the jury, the prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Therefore, this claim is due to be denied.

####                    d.          Alleged Prosecutorial Misconduct: Misstatement of Law to Jury

Reynolds next claims that the prosecutor misstated the law to the jury throughout trial regarding (1) reasonable doubt, (2) mitigating circumstances, (3) voluntary intoxication as a defense, and (4) limited consideration of mitigation evidence. (Docs. # 1 at 61-63; 31 at 51-55). Reynolds argues that the ACCA's "holding that the [prosecution's] misstatements of law did not result in reversible error was contrary to the Supreme Court's holdings in *Berger*, *Cage* [*v. Louisiana*, 498 U.S. 39 (1990)], *Sullivan* [*v. Louisiana*, 508 U.S. 275 (1993)], and *Bruton*."[30] (Doc. # 31 at 55) (internal citations omitted).

When evaluating a prosecutor's alleged improper remark, the relevant standard on habeas review to is whether "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction [and sentence] a denial of due process.'" *Darden*, 477 U.S. at 181, quoting *Donnelly*, 416 U.S. 637 (1974). The Eleventh Circuit has cautioned that "[i]mproper prosecutorial arguments, especially misstatements of law, must be considered carefully, because 'while wrapped in the cloak of state authority [they] have a heightened impact on the jury.'" *Spivey*, 207 F.3d at 1263 (11th Cir. 2000), *cert. denied*, 531 U.S. 1053 (2000), quoting *Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985) (alterations in *Spivey*). The Eleventh Circuit further provided:

> When assessing this type of claim, this Court examines the entire context of the judicial proceeding to determine if it was fundamentally unfair. Not every improper prosecutorial remark, therefore, renders the trial unfair. Improper arguments do, however, render the capital sentencing hearing fundamentally unfair and require reversal when there is a reasonable probability that they changed the outcome of the case. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair.

---

[30] The court notes that the Supreme Court disapproved of its decision in *Cage v. Louisiana* when it re-established the appropriate standard of review for jury instructions as "reasonable likelihood" from *Boyde v. California*, 494 U.S. 370 (1990). *See Estelle v. McGuire*, 502 U.S. 62, 72 n.3 (1991).

*Id.* at 1275-76 (internal citations omitted). Moreover, "improper statements during argument can be cured by clear and accurate jury instructions." *Johnson*, 256 F.3d at 1185.

For the reasons explained below, the court concludes that the ACCA's decision was not contrary to, or an unreasonable application of, clearly established federal law.

### (1)     Reasonable Doubt

Reynolds asserted that the prosecution violated the principles in *Cage* when the prosecutor allegedly told prospective jurors the incorrect definition of reasonable doubt, describing it as "a doubt to which you have a reason, . . . a fair doubt, a substantial doubt." (Doc. # 1 at 61, quoting Vol. 6 at 42).

Reynolds raised this same claim before the ACCA on direct appeal. After noting that Reynolds "did not object on this basis at trial," the ACCA found no plain error. *Reynolds I*, 114 So. 3d at 143. The ACCA reasoned that "[t]he use of the terms 'substantial doubt,' 'fair doubt,' and 'doubt for which you have a reason,' to explain the concept of reasonable doubt is not improper." *Id.* (citing *Greenhill v. State*, 746 So. 2d 1064, 1069-71 (Ala. Crim. App. 1999); *Lee v. State*, 898 So. 2d 790, 841-42 (Ala. Crim. App. 2003), *cert. denied*, 898 So. 2d 874 (Ala.), *cert. denied*, 543 U.S. 924 (2004)). The ACCA further explained:

> "Our review of the state's voir dire examination leads us to conclude that the prosecutor provided his 'definition' of reasonable doubt to assist him in learning the venire members' opinions on the state's burden of proof. We do not find any plain error in this situation. Moreover, the trial court repeatedly instructed the jury that the comments and arguments of counsel were not the law and that they should follow only his instructions on the law. Thus, we find no plain error."

*Reynolds I*, 114 So. 3d at 144, quoting *Broadnax*, 825 So. 2d at 180.

Reynolds's federal habeas argument relies primarily on *Cage* and similar Supreme Court precedent concerning a *trial* court's jury instructions on the reasonable doubt standard. But, the ACCA's decision was not contrary to, or an unreasonable application of, *Cage* (or any other

151

Supreme Court precedent). In *Cage*, the Supreme Court reversed the defendant's conviction because the *trial court instructed* the jury to equate reasonable doubt with "grave uncertainty" and "an actual substantial doubt" and stated that the jurors needed to have a "moral certainty" that the defendant was guilty. *Cage*, 498 U.S. at 41.

*Cage* does not apply to Reynolds's case. The error in *Cage* was that the trial court improperly instructed the jury. But, here, Reynolds contends that the prosecution's misstatement of the law was improper. Reynolds's comparison to *Cage* is without merit because the prosecutor in Reynolds's case was not "instructing" the jury or acting as the "trial court."[31]

Reynolds nevertheless argues that *Cage*'s reasoning applies regardless of whether his claim involves a court's jury instruction or a misstatement of law by a prosecutor. In making this argument he relies on the Eleventh Circuit's decision in *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1198-99 (11th Cir. 2000). (Doc. # 31 at 53). But his reliance is misplaced.

In *Cordoba-Mosquera*, the court decided that the prosecution's closing argument did not amount to misconduct, reasoning that "[p]rosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused." 212 F.3d

---

[31] Reynolds also cites to a long list of cases involving jury instructions and misstatements of law, but the cases again involved instructions by a trial court.

> *See, e.g.*, *Yates v. Evatt*, 500 U.S. 391, 411 (1991) (holding unconstitutional *instructions* on burden-shifting could not be excused as harmless error); *Francis v. Franklin*, 471 U.S. 307, 325-26, 333 (1985) (finding constitutional infirmity in *jury instructions* [that shifted] burden of proof on element of the crime, notwithstanding curative instruction, was not harmless error); *Sandstrom v. State of Mont[ana]*, 442 U.S. 510, 525-27 (1979) (finding *jury instruction* on presumption of ordinary consequences of voluntary actions unconstitutional[ly] shifted burden from the state to prove every element of offense beyond a reasonable doubt).

(Doc. # 31 at 52-53) (emphasis added). Again, each of these cases concern the trial court's jury instructions rather than comments by a prosecutor.

at 1198, quoting *United States v. Reed*, 887 F.2d 1398, 1402 (11th Cir. 1989). Here, even if the prosecutor's comments were improper (they were not), in the context of the entire trial, they simply did not prejudice Reynolds's substantial rights. And, regardless, Reynolds has failed to reference any Supreme Court precedent for his assertion.

Alternatively, there is not a reasonable likelihood that the jurors understood the prosecution's explanation of "reasonable doubt" during voir dire in a manner that would allow a conviction based on a lower burden of proof than required by the Constitution. *See Icenhour v. Medlin*, 567 F. App'x 733, 737 (11th Cir. 2014) ("When reviewing the correctness of reasonable-doubt charges, the inquiry is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' a lower burden of proof than that required by the Constitution"), quoting *Johnson*, 256 F.3d at 1191. Here, the temporal disparity between the prosecution's comments during jury selection and the jury's verdict (after receiving final instructions from the trial court) would make a court's finding that such "a reasonable likelihood" would exist even more questionable. During the guilt phase of Reynolds's trial, the court charged the jury, in part, as follows:

> [S]tatements of lawyers – the lawyers are permitted to argue the case. They are permit[ted] to draw reasonable inferences about the facts of the case. However, you are not governed by what the lawyers say. It is your responsibility to remember the evidence as *it came from the witness stand and base your verdict solely on the evidence*. Likewise, I've permitted the lawyers in large measure to say whatever they thought appropriate about the law. But if what the lawyers have said about the law differ in any respect to what I'm telling you about the law or what I have told you about the law, then you are to be governed by what I tell you about the law and not what the lawyers say.

(Vol. 12 at 85-86) (emphasis added). These instructions clearly stated that the court has the sole authority to charge the jury with the law, that statements made by the attorneys are only to be treated as argument, and that evidence should come from the witness stand. Moreover, the trial

court's instructions correctly conveyed the concept of reasonable doubt to the jury at the guilt phase of trial.

Reynolds failed to show that the ACCA's decision was contrary to, or an unreasonable application of, *Cage* (or any other Supreme Court precedent). Accordingly, Reynolds's claim is due to be denied.

## (2)   Mitigating Circumstances

Reynolds maintains that the prosecutor "improperly told the jury that in order to vote for life [imprisonment], the mitigating factors would have to outweigh the aggravating factors." (Doc. # 1 at 62 (citing Vol. 6 at 37; Vol. 7 at 89; Vol. 13 at 116). Reynolds points to two of the prosecutor's statements made during the individual panels of voir dire and one statement made during the State's closing argument at the penalty-phase of trial. (*See id.*). In the first statement, the prosecution explained to the venire panel the nature of Alabama's bifurcated trials before asking if anyone was unable to sentence someone to the death penalty.

> [I]f you find him guilty beyond a reasonable doubt of capital murder, we will move into the second phase, which is the penalty phase. And in that phase you will be asked to weigh what we call the aggravating circumstances and the mitigating circumstances. And it's not a numerical way. . . .
>
> Now you may have two or three aggravating circumstances and one mitigating circumstance. If that one fact in your mind could outweigh those aggravating circumstances, even though there may be three – you're going to be asked to go into a weighing of three factors. . . .
>
> What I'm asking now is regardless of the aggravating circumstances, regardless of the facts, because of your personal beliefs and your personal philosophy, can you never sentence someone to the death penalty? That's what I'm asking for.

(Vol. 6 at 37-38). In the second statement, the prosecution explained the nature of Alabama's bifurcated trial and what the jury members should expect. The prosecution followed the explanation with the qualifying question – whether "any of [the individual jurors] unalterably dead

set against the imposition of the death penalty in any case?" (Vol. 7 at 89-90). The challenged

commentary is as follows:

> And if you do find beyond a reasonable doubt that Michael Reynolds is guilty of capital murder, the case will then move into a second phase, and you will once again hear evidence of what we call aggravated circumstances. The state would present aggravated circumstances, circumstances that we feel justify and call for the death penalty in the case. And the defense will present evidence of what is called mitigating circumstances, circumstances that they feel – than can support as opposed to the death penalty a life without parole sentence, which means he would serve life in prison without the possibility of parole. They will present the mitigating circumstances. We will present what we call aggravating circumstances. It is not a numerical comparison, like if there are three aggravating circumstances and one mitigating. If you feel like mitigating circumstance is strong enough, that one could outweigh the three. Do all of you understand that?

(*Id.* at 88-89). The prosecutor's comment at issue from his closing argument during the penalty

phase of trial is as follows:

> But what you have to do, ladies and gentlemen, I submit to you with all due respect, is decide whether those mitigating circumstances and factors that you heard in this case are such that they outweigh what you have already decided over here.

(Vol. 13 at 116). At trial, Reynolds made no objection to any of these comments.

### (a)        The ACCA's Decision

Reynolds presented this claim on direct appeal. The ACCA found "no plain error occurred,

and [that] no basis for reversal exists regarding this claim," concluding that "[w]hatever

misstatements the prosecutor made regarding the weighing of aggravating and mitigating

circumstances did not so infect[] the trial with unfairness as to make the resulting conviction a

denial of due process." *Reynolds I*, 114 So. 3d at 144, quoting *Vanpelt*, 74 So. 3d at 90 (internal

quotations omitted). In support, the ACCA added, "[j]urors are presumed to follow the trial court's

instructions." *Id.* The ACCA recognized that the trial court "charged the jury at the penalty phase

that what the attorneys said was not evidence" and determined that the trial court "correctly

charged the jury on the weighing of the aggravating circumstances and mitigating circumstances." *Id.* (citing Vol. 13 at 131-32, 135-39, 145-46).

>    **(b)     Reynolds Failed to Properly Raise This Claim for Federal Habeas Review**

In his petition, Reynolds argues that relief on this claim is appropriate because the prosecutor's explanation at voir dire and closing argument on the weight of mitigating and aggravating circumstances were "the exact opposite of Alabama law." (*See* Doc. # 1 at 62). In support, Reynolds notes, "Alabama law . . . specifies that the death penalty can only be applied when the aggravating circumstances outweigh the mitigating circumstances." (*Id.* (citing Ala. Code § 13A-5-46(e); *Ex parte Bryant*, 91 So. 2d 724, 726 (Ala. 2002)). But, as Respondent has answered, Reynolds "offers nothing to show how [the ACCA's] decision was objectively unreasonable." (Doc. # 21 at 47). The court concludes that Reynolds has not pointed to any controlling precedent that shows the ACCA's decision was contrary to, or an unreasonable application of, clearly established federal law. (*See* Docs. # 1 at 62; 31 at 51-52).

In his reply brief, Reynolds misinterprets Respondent's position, and presents a number of non-sequiturs and conclusory allegations that actually weaken rather than strengthen his argument. (*Compare* Doc. # 31 at 51-52, *with* Doc. # 21 at 47). Respondent has not argued that habeas relief is unavailable because Reynolds's counsel failed to object to any purported misstatements. Rather, Respondent has merely explained that, without objection from defense counsel at trial, the ACCA reviewed this claim for plain error. (*See id.*) (citing *Reynolds I*, 114 So. 3d at 144).[32]

---

[32] Reynolds attempted to rebut Respondent's argument by asserting a novel ineffective assistance of counsel claim. (*See* Doc. # 31 at 51-52). But Reynolds did not properly raise this ineffective assistance of counsel issue for purposes of federal habeas review. (*See* Doc. # 10 at 5, ¶ B(b) (notifying Reynolds that any argument not initially raised in his federal habeas petition, or with leave from the court for amendment, is waived); (*see also* Doc. # 11 at 2) (certifying that Reynolds raised every claim for federal habeas review in his federal habeas petition, (Doc. # 1), as initially filed with this court); *see United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012) ("Parties cannot raise new issues in reply briefs.") (citing *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008)).  Accordingly, Reynolds has waived or abandoned any *Strickland* claim related to his counsel not objecting on this issue.

Regarding the underlying prosecutorial misconduct claim, "[a] party abandons all issues on appeal that he or she does not 'plainly and prominently' raise in his or her initial brief." *United States v. Krasnow*, 484 F. App'x 427, 429 (11th Cir. 2012), quoting *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (concluding an argument on appeal was abandoned when an appellant provided no argument on the issue, but instead conclusively alleges error of the lower court and finding that such argument is not properly raised in a reply brief absent discussion in any greater depth). This court need not address any "perfunctory and underdeveloped argument" that lacks legal authority or elaboration." *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007).

Reynolds has failed to meaningfully develop this claim in his petition and reply brief, which by rule results in the abandonment of the claim. In his petition, Reynolds asserted "[t]he prosecutor improperly told the jury … to vote for life, the mitigating factors would have to outweigh the aggravating factors." (Doc. # 1 at 62). However, Reynolds has not pointed to any grounds for federal relief; instead, he only cites an Alabama statute and state court case in support of the alleged error. (*Id.*) And, on reply, Reynolds failed to properly supplement this claim. (*See* Doc. # 31 at 50-72). Therefore, Reynolds waived or abandoned this claim.

        **(c)**      **Alternatively, the ACCA's Decision Was Not Contrary to, or an Unreasonable Application of, Clearly Established Federal Law**

Assuming without concluding that Reynolds provided the missing argument and precedent in support of this claim by generally averring that "misstatements of law" were not remedied by the trial court's curative instructions or jury instructions, Reynolds's argument still fails. (*See* Doc. # 31 at 54). In reply, Reynolds contends under the subheading "Misstatement of Reasonable Doubt Standard" that the "curative instructions given by the trial court did not alleviate the substantial

prejudice to Reynolds." (Doc. # 31 at 52, 54). To support this claim, Reynolds references *Bruton* and *Berger*. (*See* Doc. # 31 at 54-55). But, these cases do not support his argument under § 2254(d)(1).

### (i)       *Bruton v. United States*

In *Bruton*, the Supreme Court addressed whether "the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining [that defendant's] guilt or innocence." 391 U.S. at 123-24. The *Bruton* Court held that the trial court's curative instructions were insufficient. The Court provided "[d]espite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence *inculpating petitioner*, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for the petitioner's constitutional right of cross-examination." *Id.* at 137 (emphasis added).

Unlike the situation in *Bruton*, Reynolds was not tried in the context of a joint trial where the court improperly admitted hearsay of a codefendant. *Bruton* is not instructive on Reynolds's claim that the prosecutor misstated the law on mitigating and aggravating circumstances during voir dire and during the penalty-phase closing arguments. Although the *Bruton* Court found in that case that the curative instructions were insufficient to remedy the deprivation of defendant's right to confront the accusing codefendant, the inadequacy of curative instructions in *Bruton* simply cannot be equated with the trial court instructions Reynolds challenges here. Reynolds has not acknowledged the multiple other corrective measures taken by the trial court. For example, the trial court drew attention to the prosecution's misstatement, instructed the sentencing jury multiple times regarding the jury's task of weighing aggravating and mitigating circumstances, and

described how an appropriate sentence would relate to each of the possible outcomes under Alabama law.

For these reasons, the ACCA's decision was not contrary to, or an unreasonable application of, *Bruton*. *See* 28 U.S.C. § 2254(d)(1); *see also Reynolds I*, 114 So. 3d at 114.

### (ii)   *Berger v. United States*

Reynolds's *Berger* argument fares no better. He argues that "similar to the defendant in *Berger*, the evidence of [his] guilt was not strong or overwhelming but rather rested [on] the credibility of witnesses and evidence equally opposed." (Doc. # 31 at 55) (citing *Berger*, 295 U.S. at 89). But, that is simply not a correct characterization of the evidence presented at Reynolds's trial.

In *Berger*, the Supreme Court found that the prosecutor misstated facts, falsified the prior statements of witnesses, suggested having personal knowledge of out-of-court conversations without any evidentiary offerings, badgered a witness on cross-examination regarding the fabricated statements, assumed prejudicial facts not in evidence, and generally "conduct[ed] himself in a thoroughly indecorous and improper manner." *Berger*, 295 U.S. at 84. The prosecutor's egregious conduct in *Berger* is not remotely comparable to the prosecution's purported misstatement in Reynolds's case about the proper procedure for the jury should use in weighing mitigating and aggravating circumstances. Another distinguishing characteristic here is that, unlike what occurred in *Berger*, during the sentencing phase, Reynolds's trial judge correctly charged the jury regarding mitigating circumstances and the weighing process numerous times and also alerted the jury to the fact that one of the attorneys had stated the incorrect legal standard. (*See* Vol. 13 at 131-35, 138-39, 143-48). The ACCA's decision is not contrary to *Berger*.

### (d)    Conclusion

Reynolds has not shown that the ACCA's decision concluding that "[w]hatever misstatements the prosecutor made regarding the weighing of aggravating and mitigating circumstances did not so infect[] the trial with unfairness as to make the resulting conviction [and sentence] a denial of due process" was contrary to, or an unreasonable application of, clearly established law.[33] *See Reynolds I*, 114 So. 3d at 144. Accordingly, Reynolds's claim is due to be denied.

### (3)    Voluntary Intoxication as a Defense

Reynolds next accuses the prosecution of "blatantly" lying to the jury when the prosecutor stated that "voluntary intoxication is never a defense." (Doc. # 1 at 62, quoting Vol. 12 at 19-20). The prosecutor's contested comment is as follows:

> Now another thing the Judge is going to charge you as far as the law is concerned is that – they are going to try to argue that maybe he was intoxicated, too intoxicated to know what he was doing. The Judge is going to tell you, we believe, that voluntary intoxication is never a defense. You can get yourself all drugged up and drunk and go out and kill somebody and get away with it or try to get off on manslaughter because of that. Voluntary. Now, if I force you down and force some drugs into you it's a different thing. But if you do it voluntarily, it[']s not a defense. So please listen for that.

(Vol. 12 at 19-20).

### (a)    The ACCA's Decision

Reynolds presented this claim on direct appeal. *See Reynolds I*, 114 So. 3d at 144-145. After recognizing that the trial court charged the jury as to the limited role of attorneys' statements at trial, the ACCA determined that "the circuit court correctly charged the jury that '[w]hile voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent that

---

[33] Again, Reynolds has the burden to establish his right to federal habeas relief by proving all the facts required to show a constitutional violation. *See Romine*, 253 F.3d at 1357. But he has failed to provide this court with any facts that show the evidence of his guilt was not overwhelming.

is essential to an intentional killing and reduce it to other charges.'" *Id.*, quoting Vol. 12 at 63. "After reviewing the prosecutor's comment in the context of the entire trial," the ACCA determined that no plain error occurred and "no basis for reversal exist[ed]." *Id.* at 144-45. The court was "unpersuaded that the comment 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.*, quoting *Vanpelt*, 74 So. 3d at 81.

### (b)     Analysis

To the extent Reynolds argues this claim provides an independent cause for federal habeas relief, he has failed to sufficiently develop this argument using clearly established Supreme Court case law to support his argument. Reynolds makes this conclusory statement: "[a]llowing the jury to hear these misstatements was contrary to, and an unreasonable application of, clearly established Supreme Court law." But this conclusion, wholly unmoored to any supporting case law, is not enough to satisfy Reynolds's burden under § 2254. (*See* Doc. # 1 at 63).

Rather, Reynolds appears to rely on an alleged conflict between Alabama common law and statutory law. (*See* Doc. # 1 at 62) (citing Ala. Code § 13A-3-2(a); *Philley v. State*, 930 So. 2d 550, 562 (Ala. Crim. App. 2005)). But alleged conflict in a state court's interpretation of its law is not a proper theory for habeas relief under § 2254. *See Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997); *see also id.* (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Hays v. Alabama*, 85 F.3d 1492, 1500 (11th Cir. 1996), *cert. denied*, 520 U.S. 1123 (1997) ("Petitioner is due no relief on the grounds that Alabama has misinterpreted its own law."). Reynolds has not identified any other law in support of this claim to rebut the ACCA's decision that no plain error occurred. *Reynolds I*, 114 So. 3d at 144-45.

Alternatively, the ACCA's decision was clearly supported by the record that was before it at the time of its decision. Although Reynolds has accused the prosecutor of "lying" to the jury, the record does not reflect any intentional deception. Instead, a plain reading of the record shows the prosecutor gave an ambiguous explanation of voluntary intoxication. (*See* Vol. 12 at 19-20). *See also Donnelly*, 416 U.S. at 647 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.")

### (c)     Conclusion

The ACCA's decision was not based on an unreasonable determination of the facts. Nor was the ACCA's decision contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Thus, Reynolds's claim is due to be denied because it is underdeveloped and, in the alternative, without merit.

### (4)     Improper Limitation of Mitigation Evidence

Reynolds argues that the prosecution implied that Reynolds's "upbringing was not mitigating because it did not directly cause him to commit the crime." (Doc. # 1 at 62) (citing Vol. 13 at 9). Reynolds contends that "this was an erroneous statement on a crucial aspect of the law in [his] trial."[34] (*Id.*).

---

[34] The context surrounding the statement at issue -- made during the prosecutor's cross-examination of Reynolds's father at the penalty phase of trial -- is as follows:

> [PROSECUTOR]: Mr. Reynolds, you understand that this is the sentencing phase of this trial?
> [H. REYNOLDS]: Yeah.
> [PROSECUTOR]: The other issues have been determined. And one of the circumstances that they have offered – or will offer to the jury as to why this crime happened was the way [Reynolds] was raised. And you raised him; is that correct?
> [H. REYNOLDS]: Yeah.
> . . .
> [PROSECUTOR]: Do you feel like – you know, what – do you feel like that Michael had a bad life growing up?

### (a)  The ACCA's Decision

Reynolds raised this claim on direct appeal, and the ACCA rejected it. *See Reynolds I*, 114 So. 3d at 145.

> [D]efense counsel objected before the question was answered, and the circuit court sustained defense counsel's objection. Even so, as addressed above, the circuit court correctly charged the jury on the concept of aggravating and mitigating circumstances. In the context of the entire argument, we do not believe the prosecutor's question "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

*Id.*, quoting *Vanpelt*, 74 So. 3d at 47.

### (b)  Section 2254(d)(1)

Reynolds has failed to develop any argument that suggests that the ACCA's decision was contrary to clearly established federal law. Rather, Reynolds merely cites "generally" *Smith v. Texas*, 550 U.S. 297 (2007), and *Lockett v. Ohio*, 438 U.S. 586 (1978). As a result, Reynolds has likely waived this argument. However, even if Reynolds has properly presented this claim, he has not shown that the ACCA's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or that the decision was based on unreasonable factual findings. *See* 28 U.S.C. § 2254(d).

---

[H. REYNOLDS]: Well not that bad. I mean, . . . I wasn't the best father in the world. I done the best I could with no more education than I had. I always made sure he rode the bus and went to Sunday school and everything until they moved out of the house.
. . .
[PROSECUTOR]: As far as you having to tell this jury this morning that if this crime got committed by him, that it was because of the way you raised him, you don't feel that way, do you?
[DEFENSE COUNSEL]: Your Honor, I object to that question. Excuse me, Mr. Reynolds. We are not saying because of the way he was raised he committed this crime. We are offering it for mitigation to weigh the punishment. There is a distinction.
THE COURT: Sustained. Move along.
[PROSECUTOR]: That's all.

(Vol. 13 at 7-10).

**(i)**       *Smith v. Texas*

In *Smith,* the court decided an issue of Texas criminal procedure. Under Texas law, "the jury verdict form provides special-issue questions to guide the jury in determining whether the death penalty should be imposed." *Smith*, 550 U.S. at 300. Before *Penry v. Lynaugh*, 492 U.S. 302 (1989), there were only three special-issue questions that concerned deliberateness, future dangerousness, and provocation. *Id.* at 300-01. The *Penry* Court concluded these three questions were not broad enough, so the Texas legislature eventually added a catchall special issue. *Id.* at 301. However, in the short time between *Penry* and legislature's actions, trial judge attempted to cure *Penry* error using a nullification charge. *Id.* The nullification charge instructed each juror that despite the correct answer to the special questions, if the mitigation evidence as a whole showed that the defendant did not deserve death, then the jury must answer one of the special-issue questions in the negative. *Id.* The trial at issue in *Smith* occurred during this interim period.

During his state collateral review, the defendant in *Smith* argued that the trial court's nullification charge did not sufficiently cure an issue he raised pretrial. *Id.* at 299-300. The Texas state appellate court denied the defendant relief, holding that he did not properly preserve the claim in his first state habeas petition. *Id.* at 300. The state appellate court explained that reversal on an instructional error required the defendant to show "egregious harm." *Id.*

In *Smith*, there were two issues presented to the Supreme Court of the United States. The first issue was whether the defendant properly preserved his objections to the special-issue questions. *Id.* at 312-15. The second issue was whether the defendant had to show egregious harm or only "some harm" to warrant relief from the instructional error. *Id.* at 315-16.

As this explanation shows, Reynolds has not provided any comparison of his case to *Smith*. Nor can he. Rather, he has merely cited the case. This court fails to see how an issue of Texas

criminal appellate procedure on reviewing a verdict form applies to alleged prosecutorial misconduct in an Alabama criminal trial. Therefore, the ACCA's decision is not contrary to *Smith*.

(ii)      ***Lockett v. Ohio***

In *Lockett,* the defendant challenged the constitutionality of a death penalty statute that "did not permit the sentencing judge to consider, as mitigating factors, [the defendant's] character, prior record, age, lack of specific intent to cause death, and [the defendant's] relatively minor part in the crime." *Lockett*, 438 U.S. at 597. The court held that the statute was unconstitutional because it did not "permit the type of individualized consideration of mitigating factors" as required by the Eighth and Fourteenth Amendments. *Id.* at 606.

The issue in *Lockett* bears no resemblance to Reynolds's claim of prosecutorial misconduct here. That is, even if the prosecutor's statement purported to limit what mitigating factors apply to sentencing, the trial court cured any error in its jury instructions given in Reynolds's trial. Therefore, the ACCA's decision that the prosecutor's comments did not so infect the trial as to deprive Reynolds of due process is not in any way contrary to *Lockett*.

(c)      **Conclusion**

The court concludes that the ACCA's decision was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. The court further concludes that Reynolds waived this argument, and, in the alternative, the argument is without merit. For these reasons, the claim is due to be denied.

(5)      **Cumulative Impact of Misstatements of Law**

Reynolds contends that "allowing the jury to hear these misstatements was contrary to, and an unreasonable application of, clearly established Supreme Court law, [as they] rendered the trial

165

fundamentally unfair, and, thus violated [Reynolds's] constitutional due process rights." (Doc. # 1 at 63). The court disagrees.

Ultimately, a cumulative claim fails where individual claims of error or prejudice are without merit because there is nothing to accumulate. *See Morris*, 677 F.3d 117, 1132 (11th Cir. 2012). Here, the court concludes that Reynolds is not entitled to habeas relief on any of the individual prosecutorial misconduct claims. For similar reasons, he is not entitled to relief on his so-called cumulative claim.

### e.      Alleged Prosecutorial Misconduct: Victim Impact Evidence

Reynolds argues that the prosecutor introduced improper victim impact evidence during the trial's guilt-phase. (Docs. # 1 at 63-64; 31 at 58-62). Reynolds contends that the alleged improper victim impact evidence included: (1) implying "to the jury that the victims' families were parties" to the case; (2) discussing how the victims' families were affected by the murders; (3) commenting on "how old Savannah would have been at the time of trial"; (4) using "emotionally charged closing arguments" to obtain a guilty verdict based on juror sympathies; and (5) introducing fifty-three, autopsy photos with "close-range images" and crime-scene photos. (Doc. # 1 at 63).

Reynolds cites to several portions of the record in support of this argument, including the prosecution's comments during voir dire, opening statements, the prosecution's case-in-chief, and closing argument. (*Id.*); (Vol. 6 at 103-05, 122-23, 132, 195; Vol. 7 at 12, 20, 79, 176-77; Vol. 8 at 48; Vol. 9 at 165-66, 195-202; Vol. 10 at 3-53; Vol. 11 at 162-63, 166, 172; Vol. 12 at 16).

Reynolds claims that the ACCA's decision rejecting this claim involved an unreasonable application of Supreme Court precedent under *Viereck*, *Donnelly*, and *Darden*. (*See id.* at 64; Doc.

166

# 31 at 62). He also claims that the ACCA's decision was based on an unreasonable determination of the facts. (*Id.*).

### (1)    ACCA's Decision

Reynolds raised these claims individually on direct appeal, but the ACCA rejected them. *See Reynolds I*, 114 So. 3d at 146-48. The ACCA rejected Reynolds's argument that the "prosecution false[ly] indicated to the jury that the victims' families were parties to the case." *Id.* at 147. The ACCA concluded that "the prosecutor was explaining . . . the importance of the trial proceedings to Reynolds, the victims' family and the State." *Id.* at 147 (explaining that in *Henderson v. State*, 583 So. 2d 276, 278 (Ala. 1991), *aff'd*, *Ex parte Henderson*, 583 So. 2d 305 (Ala. 1991), *cert. denied*, 503 U.S. 908 (1992), the ACCA similarly found no plain error in the prosecutor's comments about "the importance of the case to the victim's family, the suffering of the family, [and] that he represented the family").

Next, the ACCA found no plain error occurred regarding Reynolds's allegation that during voir dire, opening statements, and in questioning a State's witness, "the prosecutor errantly focused the jury's attention . . . on how the crime affected the victims' families." *Id.* at 147, quoting Vol. 19 at 120 (citing in turn Vol. 6 at 194; Vol. 7 at 177; Vol. 8 at 48) (internal quotations omitted). After reviewing the allegedly improper comments in context, the ACCA determined that the comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 147-48, quoting *Vanpelt*, 74 So. 3d at 81 (quoting *Darden*, 477 U.S. at 181).

The ACCA also rejected Reynolds's argument that the "prosecutor's reference[s] in voir dire and closing argument regarding how old the victim Savannah Martin would have been at the time of trial were improper." *Id.* at 148 (citing Vol. 19 at 120) (citing in turn Vol. 7 at 177; Vol. 8 at 48). Finding that defense counsel "did not object to these alleged references on this basis at

trial." the ACCA held there was no plain error, particularly in light of "[t]he fact that Savannah would have been a teenager at the time of trial was an obvious fact to the jury." *Id.*

When addressing Reynolds's argument that the prosecutor "solicited a guilty verdict based on sympathy, not the evidence," the ACCA noted that on appeal that Reynolds "merely refer[red] . . . to various portions of the closing argument" without "specify[ing] which comments were egregious." *Id.* (citing Vol. 19 at 120 (citing in turn Vol. 11 at 162-63, 166, 172)). Nonetheless, the ACCA reviewed the comments "in context of the entire closing argument" and determined that, contrary to Reynolds's assertions, the prosecution's argument was not improperly designed to inflame the passions of the jury. *Id.*, quoting *Floyd v. State*, 190 So. 3d 940, 957 (Ala. Crim. App. 2007), *rev'd on other grounds by Ex parte Floyd*, 190 So. 3d 972 (Ala. 2012) (finding no basis for reversal exists where the record "is clear that the prosecutor's remarks at the guilt phase of [a defendant's] trial were made in the heat of debate, were proper comments on facts in evidence, were in reply to various remarks made during defense counsel's closing argument, and were not improperly designed to inflame the passions of the jury").

The ACCA also rejected Reynolds's argument that "autopsy photos of the victims" and other crime scene evidence "constituted improper impact evidence." *Id.* at 148 (citing Vol. 19 at 121-22). The ACCA held that there was "no abuse of discretion in the circuit court's admission of the evidence." *Id.* The ACCA determined that the autopsy and crime scene photos "did not constitute victim-impact evidence[,]" "[were] relevant to depict [both] the nature and extent of the injuries . . . suffered[,]" and "[were] neither unduly prejudicial nor inflammatory." *Id.* (internal quotations omitted), quoting *Billups v. State*, 86 So. 3d 1032 (Ala. Crim. App. 2009) (citing *Stallworth v. State*, 868 So. 2d 1128, 1151-52 (Ala. Crim. App. 2001)).

### (2)   Section 2254(d)(2)

After a thorough evaluation of the record, the court concludes that Reynolds's arguments miss the mark: the ACCA's decision is not contrary to *Donnelly*, *Darden*, or *Viereck*.

### (a)   *Donnelly v. DeChristoforo*

In *Donnelly v. DeChristoforo*, 416 U.S. 637 (1874), the Supreme Court held that an improper prosecutorial argument could reach the level of a federal constitutional violation if the remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. But, in *Donnelly*, the Court determined that the prosecution's remark did not meet this standard. *Id.* Instead, the prosecutor's comment was "one moment in an extended trial," and was, in any event, ambiguous. *Id.* And, as the Court noted, the trial judge had clearly cautioned the jury to disregard the remark when it gave a curative jury instruction. *Id.* at 644-46.

To the extent Reynolds relies on *Donnelly*, his argument is without merit. *Donnelly* involved an improper prosecutorial closing argument, but the *Donnelly* Court determined that, in light of the entire trial, the remark did not infect the trial to such a degree as to deprive the defendant of due process. Similarly, here, to whatever extent the ACCA decided that the prosecutor's comments were improper, the ACCA evaluated the remarks in light of the entire trial and determined that the comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Therefore, the ACCA's decision was not contrary to *Donnelly*.

### (b)   *Darden v. Wainwright*

In *Darden v. Wainwright*, the Supreme Court rejected a claim that the prosecutor's closing argument denied the defendant a fair trial. 477 U.S. at 178-84. The prosecutor's closing argument contained numerous improper remarks that reflected the prosecutor's highly emotional reaction to both the defendant and the gruesome homicide at issue. *See id.* at 179-81, 179-80 nn.9-12. But the

169

court held that there was no constitutional violation. *Id.* at 181. Although the Supreme Court characterized the prosecutor's closing argument as "fully deserving the condemnation it received from every court to review it," it held that the misconduct did not deprive the defendant of a fair trial. *See id.* at 179, 183.

The *Darden* Court concluded that the trial "was not perfect – few are – but neither was it fundamentally unfair." *Id.* (internal quotations omitted). The Court noted that the prosecutor's argument "did not misstate or manipulate the evidence"; "did not implicate other specific rights of the accused"; and, "was invited by or [in] response[] to defense counsel's opening argument." *Id.* at 181-82. The trial judge instructed the jurors several times that counsel's arguments were not evidence and their decision was to be based only on the evidence. *Id.* And, the Court noted the "weight of the evidence [presented at trial] against petitioner was heavy." *Id.*

Reynolds has not shown that the ACCA's decision was contrary to *Darden*. Instead, *Darden* actually supports the ACCA's decision rejecting Reynolds's claims. In the context of Reynolds's entire trial, the alleged improper remarks "did not misstate or manipulate the evidence"; "did not implicate other specific rights of the accused"; "[m]uch of [the prosecutor's] objectionable content was invited by or [in] response[] to defense counsel's opening argument"; the trial judge instructed the jurors several times that their decision was to be based only on the evidence and that arguments of counsel were not evidence; and, the "weight of the evidence against [Reynolds] was heavy." *Darden* at 181-82; *Reynolds I*, 114 So. 3d at 146-48. Thus, the ACCA's decision was not contrary to *Darden*.

### (c)     *Viereck v. United States*

To the extent Reynolds relies on *Viereck* to demonstrate the ACCA's decision was objectively unreasonable, the court has already discussed why *Viereck* does not support such a

finding. *See* Part IV(B)(iii), *supra*. For these same reasons, the court concludes that the ACCA's decision rejecting Reynolds's "improper introduction of victim-impact evidence" claims is not objectively unreasonable. Thus, Reynolds's claim is due to be denied.

### (3)    Section 2254(d)(2)

To the extent Reynolds contends that the ACCA's decision was based on an unreasonable determination of facts in the record (*see* Doc. # 31 at 62), the court disagrees. Reynolds's sporadic references to the record within his petition (along with his failure to identify which specific factual findings he contends the ACCA unreasonably determined) do not satisfy AEDPA's requirements.[35] *Ward*, 592 F.3d 1144, 1177 (11th Cir. 2010); *see, e.g.*, *Lee v. GDCP Warden*, 987 F.3d 1007, 1018 n.2 (11th Cir. 2021) (explaining that unless a petitioner "can[] show that the state court's decision 'was based on' the challenged findings, they provide no basis for federal habeas relief whether or not those findings were unreasonable"), quoting 28 U.S.C. § 2254(d)(2). Reynolds has not demonstrated that the ACCA unreasonably determined the facts in light of the evidence presented to the state court. Therefore, Reynolds's claim under § 2254(d)(2) fails.[36]

### (4)    Conclusion

Reynolds has failed to show he is entitled to relief under 28 U.S.C. § 2254(d). The court concludes that the ACCA's decision did not involve and unreasonable application of *Donnelly*, *Darden*, or *Viereck* (or any other Supreme Court decision for that matter). And the court concludes that the ACCA's decision was not based on an unreasonable determination of the facts of record

---

[35] (*See* Doc. # 31 at 59-62) (replying to the Respondent's complaint that Reynolds failed to point to specific facts within the record by editorializing and partially quoting from the record). The court notes that in reply, Reynolds has, for the first time, identified *specific* facts, beyond mere citations to the record. (*See id.*). However, upon the court's contextual review of the cited portions, the record does not demonstrate that the ACCA's decision relied on unreasonable determinations of the facts of record before the state court.

[36] Additionally, Reynolds did not seek to expand the habeas record or proffer evidence in an effort to meet § 2254(e)(1)'s clear and convincing standard on any state court factual determinations applicable to these prosecutorial misconduct allegations which he contends are unreasonable.

before the state court at the time of its decision. *See* 28 U.S.C. § 2254(d). Accordingly, this claim is due to be denied.

### f.      Alleged Prosecutorial Misconduct: Introduction of Hearsay

Reynolds argues that the prosecutor introduced hearsay statements made by "key" witnesses in violation of *Crawford v. Washington*, 541 U.S. 36 (2004). (*See* Doc. # 1 at 64). Reynolds alleges that the prosecution used West's testimony "in an attempt to bolster her testimony and excuse her involvement in the crime."[37] (*Id.*) Reynolds also contends that Chad Martin offered hearsay statements from Sergeant Mulkey, "an investigating officer at the crime scene." (*See id.*). Reynolds argues that the prosecution injected these statements "in an attempt to explain away [Chad Martin's] confession," and Reynolds asserts that the statements were "particularly prejudicial" as Mulkey had already testified but the State "had not elicited this information from [Mulkey] himself." (*Id.* at 65) (citing Vol. 9 at 95).

### (1)      Reynolds Failed to Exhaust This Claim

Before presenting a claim in a federal habeas proceeding, a petitioner must first present the claim to the appropriate state court and provide the state court "a meaningful opportunity to consider [the] allegations of legal error." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986). A petitioner

---

[37] Reynolds points to two portions of West's testimony:

Q. Tell the Jury what happened?

A. [Dino Harvey] pulled up, and I went back there. And he saw I was upset. And he asked if [Reynolds] had anything to do with what happened to [Charles Martin]. And I nodded yes. And he said for me to get the stuff. And I got the stuff, and we went and got rid of it.

. . .

A.   [ . . . ] I went next door. And the police came back. And then Dino came back. And Dino told me that Michael was going to be getting out of jail.

(Vol. 8 at 91).

satisfies the exhaustion requirement when "the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation to be the same as it was presented in state court." *Kelley v. Sec. for Dept. of Corrections*, 377 F.3d 1317, 1344-45 (11th Cir. 2004).

On direct appeal, Reynolds argued "[t]he *trial court* erroneously allowed hearsay statements by key witnesses." (Vol 19 at 125) (emphasis added). But, in his habeas petition, Reynolds has materially changed his argument. He now contends that "[t]he *prosecutor* also introduced hearsay statements by key witnesses." (Doc. # 1 at 64) (emphasis added). While these two claims have the same factual foundation -- the admission of hearsay -- they are separate and distinct legal arguments. A reasonable reader would not understand that the *legal* basis for each claim would be the same. Therefore, Reynolds failed to exhaust this argument related to the prosecution, and for that reason alone the claim is due to be denied.

### (2)      Section 2254(d)(2)

But, even assuming that Reynolds properly presented this claim to the ACCA, in assessing the underlying hearsay issue, the state court did not unreasonably apply clearly established federal law or base its decision on an unreasonable determination of the facts. *See Reynolds I*, 114 So. 3d at 108. The ACCA determined that the contested statements were not hearsay. *Id.* As the ACCA explained, the out-of-court statements were elicited "to explain the declarant's subsequent conduct" rather than proving the truth of the matter asserted. *Reynolds I*, 114 So. 3d at 108.

The ACCA's decision was supported by evidence in the record before it. Specifically, West's testimony provided context for how and why she disposed of some of the items taken from the crime scene. (*See* Vol. 8 at 91). Similarly, Martin's testimony offered background information that explained his emotional response and his knowledge of the locations of the bodies. (*See* Vol. 9 at 95). Reynolds has not demonstrated that the ACCA's decision was based on an unreasonable

determination of the factual record before the state court. Accordingly, Reynolds failed to meet his burden of proof. *See* 28 U.S.C. § 2254(d)(2).

### (3)      Section 2254(d)(1)

The ACCA's decision was not contrary to, or an unreasonable application of, *Crawford v. Washington*. In *Crawford*, the Supreme Court held that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant [has] had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54. The contested statements were not "testimonial" nor were they hearsay; instead, the statements were offered to show the effect on the listener. As a result, the ACCA's determination was not contrary to, or an unreasonable application of, *Crawford*. Moreover, the ACCA's decision was not contrary to *Darden*, 477 U.S. 168 (1986), or *Donnelly*, 416 U.S. 637 (1974). As the court has previously explained, *proper arguments* -- regardless of their impact on the outcome of the case -- do not render a trial unfair. *Spivey*, 207 F.3d at 1275-76 (internal citations omitted); *see also Romine*, 253 F.3d at 1366 ("[N]o matter how outcome-determinative it is a proper argument cannot render the proceedings fundamentally unfair and therefore cannot be the basis for a constitutional violation.")

### (4)      Conclusion

Reynolds did not exhaust this claim in state court. Alternatively, Reynolds has failed to demonstrate that the ACCA's decision was based on an unreasonable determination of the facts before the state court or that the ACCA's decision was contrary to clearly established federal law. For these reasons, this claim is denied.

### g.      Alleged Prosecutorial Misconduct: Evidence of Other Crime

Reynolds next argues that "the prosecutor inquired about [Dr. Craig's medical] examination of Melinda Martin for evidence of sexual assault or rape." (Doc. # 1 at 65-66).

Reynolds contends that it was improper for the prosecution to present nude autopsy photos of Melinda and Savannah Martin when they were clothed at the scene of the murders. (Doc. # 1 at 66). The ACCA held that neither the prosecution nor any State's witness suggested that the victims were raped or sexually assaulted. *Reynolds I*, 114 So. 3d at 92.

Reynolds argues that the ACCA's decision was based on an unreasonable determination of the facts. But the record reflects that Dr. Craig's testimony addressed the standardized procedures by which autopsies are performed rather than implying that Reynolds engaged in a sexual act with the female victims. *See Reynolds I*, 114 So. 3d at 91-92; (*See* Vol. 16 at 87, 89-90, 142). Additionally, Reynolds's argument that the prosecution insinuated sexual misconduct when introducing the *autopsy photos* of the two female victims defies common sense. An autopsy performed to determine the cause of death evaluates patent and latent injuries and requires the removal of soiled clothing. Reynolds has utterly failed to demonstrate that the ACCA's decision was based on any unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2). Rather, as the ACCA decided, the prosecution at no point submitted evidence of an offense other than one charged in the indictment. *Reynolds I*, 114 So. 3d at 92.

Reynolds also argues that the ACCA's decision was contrary to *Berger v. United States*. (Doc. # 1 at 66). In *Berger*, the court held that the prosecutor "was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in

general, of conducting himself in a thoroughly indecorous and improper manner." *Berger*, 295 U.S. at 84. Any such impropriety was wholly absent from Reynolds's trial. The ACCA's decision is clearly distinguishable from *Berger*. And, at a minimum, a fair-minded jurist could distinguish the cases. As a result, Reynolds fails to show that the ACCA's decision was contrary to clearly established federal law as determined by the Supreme Court of the United States.

The ACCA's decision was not based on an unreasonable determination of the facts before the state court. And the ACCA's decision was not contrary to clearly established federal law. Accordingly, this claim is due to be denied.

### h.    Claim:    Cumulative-Impact    of    Alleged    Prosecutorial Misconduct

Reynolds contends that the cumulative impact of the prosecutor's alleged errors denied him a fair trial. (Docs. # 1 at 66-67; 31 at 50-51). But a cumulative claim fails where each individual claim of error is without merit because there is nothing to accumulate. *See Morris*, 677 F.3d 117, 1132 (11th Cir. 2012). As the court explained above, Reynolds is not entitled to habeas relief on any of his individual allegations of prosecutorial misconduct. Thus, the court concludes that Reynolds's cumulative claim is due to be denied.

### C.    *Crawford*

Reynolds claims that the admission of deposition testimony of Dr. Adam Craig, the State's forensic pathologist, violated his right under *Crawford* to confront the witness. (Doc. # 1 at 140). Reynolds further contends that the trial court allowed the deposition into evidence over the defense's objection despite the State's refusal to turn over material evidence prior to the deposition. (Doc. # 31 at 112).

### 1.      The ACCA's Decision

This argument was made by Reynolds on direct appeal, but the ACCA found it was without

merit. *See Reynolds I*, 114 So. 3d at 89-91.

> Before trial, the parties agreed to depose Dr. Craig regarding the autopsy results
> and to use that deposition testimony at trial to introduce the autopsy results instead
> of presenting Dr. Craig as a witness at trial. *See*, Rule 16.6, Ala. R. Crim. P.; *see
> also* § 12-21-264, Ala. Code 1975. The deposition took place as scheduled at the
> Etowah County courthouse, and Reynolds was permitted to thoroughly examine
> Dr. Craig.
>
> Nevertheless, at a pretrial hearing when Reynolds informed the court that he had
> not been able to examine Dr. Craig regarding discovery material he purportedly did
> not have at the time of Dr. Craig's deposition, the court offered, at the State's
> expense, to allow Reynolds to supplement the deposition and/or to subpoena Dr.
> Craig for trial in order to address the discovery material. *See* § 12-21-283, Ala.
> Code 1975, "Uniform Act to Secure the Attendance of Witnesses from Without a
> State in Criminal Proceeding." Despite many subsequent opportunities, Reynolds
> did not pursue either option offered by the court.
>
> When the State sought to introduce the autopsy results through Dr. Craig's
> deposition testimony, Reynolds's only objection was that the State had not
> demonstrated that Dr. Craig was unavailable for trial.

*Reynolds I*, 114 So. 3d at 90-91.[38]

The ACCA applied the invited-error doctrine and harmless-error analysis in the alternative.

*Id*. at 90-91. Regarding invited error, the ACCA acknowledged the general rule that "[a party] will

not be permitted to allege an error in the trial court proceedings which was invited by him or was

a natural consequence of his own actions." *Id.* at 90. The ACCA noted that the doctrine applies in

capital cases. *Id.* Under the invited-error doctrine, an appellate court reviews for plain error. *Id.*

The ACCA assumed (but did not decide) that the trial court erred by allowing the deposition into

---

[38] The state court record before the ACCA shows that defense counsel *did*, in fact, possess the discovery information at the time of cross-examination, which supports the ACCA's federally reviewable conclusion. *See Harrington*, 562 U.S. at 98-100 (holding that to be entitled to AEDPA deference, a state court decision need not address every argument, nor even explain its reasoning as to its ruling on a federal constitutional claim).

evidence. *Id.* at 91. However, the ACCA concluded that "any error was the natural consequence of Reynolds's actions" and did "not rise to the level of plain error." *Id.*

Further, even to the extent that Reynolds was not responsible for the error, the ACCA recognized that "violations of the Confrontation Clause are subject [only] to harmless-error analysis" *Id.*, quoting *Smith v. State*, 898 So. 2d 907, 917 (Ala. Crim. App. 2004) (citing in turn *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The ACCA explained that West testified that Reynolds handed her two knives after she found him stabbing one of the victims. *Id.*  Therefore, the ACCA held that any error was harmless because "it is equally possible if Reynolds had confronted Dr. Craig and Dr. Craig had agreed that two different knives were used to stab the victims, that that testimony could have strengthened the State's case." *Id.*

### 2.        Section 2254(d)(1)

Reynolds claims that the ACCA's decision is contrary to, or an unreasonable application of, *Crawford* — along with *Mattox v. United States*, 156 U.S. 237 (1895), *Barber v. Page*, 390 U.S. 719 (1968), and *Coy v. Iowa*, 487 U.S. 1012 (1988).[39] (Doc. # 31 at 115). The court disagrees.

In *Crawford*, the Court reversed and remanded the petitioner's conviction because the trial court admitted an out-of-court statement without giving the petitioner an opportunity to cross-examine the declarant. 541 U.S. at 38. The Court held that the state court violated the petitioner's Sixth Amendment right to confront the witnesses against him and reasoned that the Framers of the Constitution "would not have allowed admission of testimonial statements of a witness who did

---

[39] In addition to explicitly arguing that the ACCA's decision was contrary to these four cases, Reynolds cites several other Supreme Court cases. *See Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006); *Davis v. Alaska*, 415 U.S. 308 (1974); *Brookhart v. Janis*, 384 U.S. 1 (1966); *Glasser v. United States*, 315 U.S. 60 (1942); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Mattox v. United States*, 156 U.S. 237 (1895). The court has reviewed each case and concludes that the ACCA's decision is not contrary to their holdings.

not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54.

The Supreme Court explained how these two necessary conditions -- unavailability and opportunity to cross-examine -- were consistent with its prior decisions in *Mattox* and *Barber*.  In *Mattox*, the Court admitted a deceased witness's prior trial testimony because the defendant had a prior opportunity to cross-examine the witness. *Id.* at 57 (citing *Mattox*, 156 U.S. at 244). Relatedly, in *Barber*, the Court held that the witness's unavailability must be established in addition to a prior opportunity for cross-examination for the out-of-court testimony to be admissible. *Id.* (citing *Barber,* 390 U.S. at 722-725).

In *Coy*, the Court held that the statutorily sanctioned use of a large screen between the defendant and the testifying accusers violated the Confrontation Clause because this practice was not "firmly rooted," and no individualized findings had been made indicating that "these . . . witnesses needed special protection." 487 U.S. at 1014-15, 1021. The Court reasoned that "[t]he Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Id.* at 1017, quoting *Ritchie*, 480 U.S. 39, 51 (1987) (plurality opinion).

*Crawford*, *Mattox*, *Barber*, and *Coy* do not support Reynolds's claims.[40] Unlike those defendants, Reynolds stipulated to the admission of the out-of-court testimony. And, during the deposition, Reynolds actually faced and cross-examined the witness.[41]

The ACCA also assumed (without deciding) the existence of *Crawford* error and correctly observed that "[v]iolations of the Confrontation Clause are subject to harmless-error analysis."

---

[40] Although it goes unmentioned by Reynolds, the Supreme Court's decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) is notable. In that case, the court applied *Crawford* to forensic evidence, and concluded that "[a] witness's testimony against a defendant is . . . inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Id.* at 309, quoting *Crawford*, 541 U.S. at 54. But the court also recognized that the rule would have little practical impact because defense counsel would often stipulate to the use of the out-of-court testimony. *See id.* at 328; *see also id.* at 325 n.10.

Such is the case here. As previously explained, both parties agreed that Dr. Craig was no longer living in or employed by the State of Alabama. (*See* Docs. # 1 at 140; 21 at 84-86; 31 at 113) (citing Vol. 1 at 105). So, to preserve Dr. Craig's testimony at trial, the State and Reynolds stipulated to a video deposition with the understanding that Dr. Craig's testimony would be used as substantive evidence during Reynolds's trial. (Vol. 1 at 105).

[41] Additionally, a review of the record before the state court supports the ACCA's conclusion that, if any error occurred, that error was self-inflicted. Not only did the trial court give Reynolds numerous opportunities to supplement the deposition and/or subpoena Dr. Craig, *see Reynolds I*, 114 So. 3d at 91, the record indicates Reynolds had knowledge of the two knives prior to Dr. Craig's September 7, 2006 deposition. In a pre-trial motion hearing on May 4, 2007, defense counsel confirmed it received West's statement on July 25, 2005. (Vol. 4 at 44). West's statement includes five references to "knives," implying multiple knives were used in the Martins' murders. (*See* Vol. 3 at 99-101). Specifically, West's statement provided:

> We awoke around 9 or 9:30 Sunday morning 5-25-03 and Michael was acting normal and was watching TV. Harold had gone to church and Michael and I were alone . . . . Michael had told me that the *knives* were under the truck, the clothes and purse were in a white bag . . . . Sometime later the police came and picked up Michael. After the police left I went to a neighbors to use the phone but I saw Dino pull into the back alley. I walked over to him and got into the car. . . . He asked me if Michael had anything to do with what happened at Chucks. I nodded and he told me to get the *knives* and clothes. [After burning the clothes and disposing of the phone base,] [w]e then rode to Noccalula Falls to get rid of the *knives* but there were people up there so we went to the junior college boat docks. Dino told me to put the *knives* up my sleeve and we walked out onto the dock. Dino stopped and talked to a black guy then came and threw the *knives* into the river.

(*Id.* at 100) (indicating the first reference to "knives" in the record was circled). In short, defense counsel had information suggesting multiple knives were used in the murders nearly a year and a half prior to the deposition of Dr. Craig on September 7, 2006. Accordingly, the record supports the ACCA's decision that *if* any error did occur, such error was invited and did not rise to the level which would substantially and injuriously effect Reynolds's substantive rights.

Additionally, to the extent Reynolds raised a claim alleging ineffective assistance of counsel in regard to this oversight in state habeas court, Reynolds has not raised this claim before the federal court. Accordingly, it is waived. (*See generally* Docs. # 10 at 4-5;11).

180

*Reynolds I*, 114 So. 3d at 91 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). In *Van Arsdall*, the Supreme Court held that:

> the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684.

The ACCA evaluated Reynolds's assertion "that had he been allowed to confront Dr. Craig at trial, he could have challenged Dr. Craig's conclusion that all victims were stabbed with the same or a similar weapon and at around the same time, and that this would have allowed him to undermine the State's theory that there was only one assailant." *Reynolds I*, 114 So. 3d at 91. However, utilizing the factors described in *Van Arsdall*, the ACCA "assumed that the damaging potential of the cross examination [was] fully realized" and concluded that the error was harmless. *Id.*

The ACCA's decision that there was no plain error under the invited-error doctrine -- and, in the alternative, that any assumed error was harmless -- was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, Reynolds is due no relief on this claim.

### D.     Double-Counting

Reynolds argues that "double counting" aggravating circumstances at the guilt-phase and the sentencing-phase of his trial operated in a manner that failed to narrow the class of cases eligible for the death penalty in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment

rights. (Doc. # 1 at 147-49).[42] This claim is without merit as there is simply no Supreme Court precedent establishing this principle against double counting.

During the guilt-phase of his trial, the jury found Reynolds guilty on all five counts of capital murder, including murder of two or more persons under § 13A-5-40(a)(10) within count one and murder during robbery in the first degree under § 13A-5-40(a)(2) within counts two, three, and five. (Vol. 12 at 163-64). The parties agreed that the verdict necessarily implied two aggravating factors had been proven beyond a reasonable doubt: (1) the capital offense was committed while Reynolds was engaged in a robbery pursuant to Ala. Code. § 13A-5-49(4) and (2) Reynolds intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct pursuant to Ala. Code. § 13A-5-49(9). (*See id.* at 167; Doc. # 1 at 148); *see also Reynolds I*, 114 So. 3d at 150-51.

Reynolds raised this claim on direct appeal. The ACCA noted that Reynolds failed to raise this objection at trial and rejected Reynolds's claim under plain-error review.[43] *Reynolds I*, 114 So. 3d at 157. The ACCA explained that it had previously rejected the same arguments in *Morris v. State*, 60 So. 3d 326 (Ala. Crim. App. 2010). *Id.*

In *Morris v. State*, the petitioner argued that Alabama's "capital-sentencing statute fail[ed] to narrow the universe of defendants eligible for the death penalty" and that "the death penalty is arbitrarily imposed because Alabama law allows the factor making certain offenses capital to also

---

[42] Although Reynolds cites only to the jury verdict and portions of the jury instructions during the guilt phase, this court may take judicial notice of its own records and the state record before it. *See United States v. Glover*, 179 F.3d 1300, 1302 n.5 (11th Cir. 1999); *Keith v. DeKalb County, Georgia*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014); *see also Grider v. Cook*, 522 F. App'x 544, 546 n.2 (11th Cir. 2013).

[43] "[W]hen a state appellate court applies plain-error review and in the course of doing so, reaches the merits of a federal claim and concludes there is no plain error, that decision is an adjudication 'on the merits' for purposes of § 2254(d) and thus AEDPA deference applies to it." *Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1210 (11th Cir. 2013).

serve as an aggravating circumstance in the case." 60 So. 3d at 380. The court observed that despite several appellants raising the same issue, Alabama's aggravating circumstances scheme "has consistently been upheld by Alabama appellate courts." *Id.*

The *Morris* court further explained that the United States Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988), had previously addressed "[t]his precise ground of error, that this double-counting fails to narrow the class of death-eligible murderers," and found no constitutional violation. *Morris*, 60 So. 3d at 380. In *Lowenfield*, a Louisiana defendant was convicted of capital murder and found eligible for the death penalty because he had the specific intent to kill or inflict great bodily harm upon more than one person. *Lowenfield*, 484 U.S. at 243. The only aggravating factor found by the jury was also an element of the capital offense. *Id.* The *Lowenfield* Court reasoned that "the Louisiana scheme narrows the class of death-eligible murderers [at the guilt phase] and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion." *Id.* at 246. As the Court held, "[t]he Constitution requires no more." *Id.*

While Reynolds refers in passing to numerous Supreme Court decisions in support of his argument,[44] he fails to cite to any Supreme Court case that demonstrates that the ACCA's decision

---

[44] *Kansas v. Marsh*, 548 U.S. 163 (2006) (holding that the Eighth Amendment did not prohibit states from imposing the death penalty when mitigating and aggravating sentencing factors were found to be of equal weight); *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth Amendment forbids the execution of the intellectually disabled); *Ring v. Arizona*, 536 U.S. 584 (2002) (holding that the Sixth Amendment requires a jury to find the aggravating factors necessary for imposing the death penalty); *Zant v. Stephens*, 462 U.S. 862 (1983) (holding that the subsequent invalidation of one of several statutory aggravating circumstances does not automatically require reversal of the death penalty where the State assures that a death sentence will be set aside if the invalidation of an aggravating circumstance makes the penalty arbitrary or capricious); *Gregg v. Georgia*, 428 U.S. 153 (1976) (holding that the imposition of the death penalty does not, under all circumstances, violate the Eighth and Fourteenth Amendments); *Jurek v. Texas* 428 U.S. 262 (1976) (holding that the sentencer's consideration of whether "the defendant would be a continuing threat to society" does not render the imposition of the death penalty arbitrary); *Furman v. Georgia*, 408 U.S. 238 (1972) (holding that carrying out the death penalty in three particular cases would constitute cruel and unusual punishment); *North Carolina v. Pearce*, 395 U.S. 711 (1969) (holding that neither the Double Jeopardy Clause nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction). (*See* Docs. # 1 at 147-49; 31 at 125-28).

was contrary to, or an unreasonable application of, clearly established federal law. In fact, conspicuously omitted from his briefing is *Jones v. United States*, 527 U.S. 373 (1999), in which the Supreme Court mentioned that it had "never before held that aggravating circumstances could be duplicative so as to render them constitutionally invalid." 527 U.S. at 398.

The ACCA's decision was not contrary to, or an unreasonable application, of federal law as determined by the Supreme Court of the United States – specifically the *Lowenfield* Court. At Reynolds's trial, the guilt-phase jury found him guilty of offenses that implied two aggravating factors beyond a reasonable doubt: (1) the capital offense was committed while Reynolds was engaged in a robbery pursuant to § 13A-5-49(4) and (2) Reynolds intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct pursuant to § 13A-5-49(9). Then, at the penalty phase, the jury weighed the mitigating circumstances against the aggravating circumstances, which allowed for the exercise of the jury's discretion based on the evidence presented. (*See* Vol. 13 at 140-45). As in *Lowenfield*, the Constitution requires no more here. Accordingly, this claim is due to be denied.[45]

### E.    Advisory Opinion

Reynolds next claims that the circuit court and the prosecutor diminished the jurors' sense of responsibility for their sentencing determination by referring to the jury's verdict during the penalty phase as an "advisory verdict" in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. # 1 at 149-50). Reynolds argues that these "repeated, incorrect directions to the jury . . . misled the jury as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should [have] for the sentencing decision." (Doc. # 1 at 149)

---

[45] To the extent Reynolds argues a *Ring v. Arizona*, 536 U.S. 584 (2002) violation occurred, (Doc. # 31 at 127-28); (*see also* Docs. # 1 at 145-47; 31 at 139-43) (Reynold's federal habeas *Ring* claim), the court addresses this claim in Part IV(H), *infra*. For the reasons provided there, Reynolds is due no relief on this claim.

(internal quotation marks omitted). According to Reynolds, these statements clearly violated *Darden v. Wainright*, 477 U.S. 168, 183 n.15 (1986). (Doc. # 1 at 150).

The ACCA noted that Reynolds did not object to these comments at trial, and, thus, it reviewed this claim for plain error. *Reynolds I*, 114 So. 3d at 153. As the ACCA explained, "We have repeatedly stated that a trial court does not diminish the jury's role by stating that its verdict in the penalty phase is a recommendation or an advisory verdict." *Reynolds I*, 114 So. 3d at 153 (citing *Doster v. State*, 72 So. 3d 50, 104 (Ala. Crim. App. 2010) (citations omitted)). Thus, the ACCA denied Reynolds relief on this claim.

This court concludes that the ACCA's decision was not contrary to, or an unreasonable application of, clearly established federal law as determined in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), *Darden*,[46] or any other Supreme Court case.

In *Caldwell*, the Supreme Court held that a judge during a trial's penalty phase may not impermissibly "minimize the jury's sense of responsibility for determining the appropriateness of death." 472 U.S. at 341. And, as explained a year later in *Darden*, "*Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." 477 U.S. at 185 n.15. In *Romano v. Oklahoma*, 512 U.S. 1 (1994), a case not cited by Reynolds, the Supreme Court added that to succeed on this type of claim, the petitioner must show that the comment was improper at the time it was made. *See* 512 U.S. at 9.

At the time of Reynolds's conviction and death sentence in 2007, Alabama law permitted trial courts to override a jury's recommendation of life imprisonment and impose the death penalty.

---

[46] While it is unclear whether the footnote cited from *Darden* amounts to clearly established federal law under § 2254(d)(1), for the sake of argument, the court treats it as doing so.

*See* Ala. Code § 13A-5-46 (2007). The language of the statute expressly provided that the jury's decision was "advisory." *Id.* Therefore, Reynolds's jury was never misled.[47] *See Darden*, 477 at U.S. at 185 n.15. Thus, neither the trial court's instructions nor the prosecution's remarks violated the *Caldwell* standard. To the contrary, the comments accurately described the role of the jury and judge during the penalty phase of trial as defined by Alabama law at the time of Reynolds's sentencing. *See Romano*, 512 U.S. at 9; *Davis*, 119 F.3d at 1482.

Accordingly, the court concludes that the ACCA's decision on this claim was not contrary to, or an unreasonable application of, clearly established Federal law. This claim is due to be denied.

## F.    Jury Instructions

Reynolds next contends that the trial court improperly instructed the jury, depriving him of due process, a fair trial, and reliable sentencing under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. # 1 at 150-52). Reynolds argues that the trial court gave erroneous instructions (1) when it defined "reasonable doubt" during the guilt phase of his trial; (2) when it charged the jury on mitigating and aggravating circumstances during the penalty phase, and (3) when it failed to provide a mercy instruction during the penalty phase. (Doc. # 1 at 150-51).

Reynolds raised these claims on direct appeal, and the ACCA rejected them. *Reynolds I*, 114 So. 3d at 148-53. Because Reynolds failed to object at trial, pursuant to Alabama Rule of Appellate Procedure 45A, the ACCA reviewed these claims for plain error. *Reynolds I*, 114 So. 3d

---

[47] The statute was amended years after Reynold's sentencing. *See* S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017) (permitting a trial court to impose the death sentence only when a jury returned a verdict of death, and otherwise obligating the trial court to sentence the defendant to life imprisonment without parole); Ala. Code § 13A-5-47(a) (2017). And the Act directed that this change "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act [April 11, 2017]." S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017).

at 149-50. Reynolds argues that the ACCA's decision was contrary to and an unreasonable application of clearly established Supreme Court precedent in *California v. Brown*, 479 U.S. 538 (1987), *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), as well as *Cage v. Louisiana*, 498 U.S. 39, 41 (1990), and *Sullivan v. Louisiana*, 508 U.S. 275 (1993) on reply. (Docs. # 1 at 151-52; 31 at 139).[48]

## 1. The Instruction on Reasonable Doubt During the Guilt Phase of Reynolds's Trial

Reynolds alleges that during the guilt-phase of his trial the trial court improperly defined reasonable doubt as "a doubt to which you can assign a reason." (Doc. # 1 at 151). Reynolds contends that there exists a "reasonable likelihood" that the court's improper instruction permitted a conviction based on insufficient proof. (*Id.*).

In addressing this claim on direct appeal, the ACCA began by discussing the relevant standards of review and overarching principles relevant to its evaluation of Reynolds's claims of improper jury instructions at both phases of Reynolds's trial. *See Reynolds I*, 114 So. 3d at 148-49, 151. In doing so, the ACCA noted that Reynolds did not object to any of the alleged improper jury instructions at trial and explained that as a result the ACCA could only review these claims for plain error,[49] as provided by Rule 45A. *Reynolds I*, 114 So. 3d at 148, 150.

---

[48] Reynolds also contends that the "conclusions of the state court flowed from unreasonable determinations of the facts in light of the evidence that it had before it." (Doc. # 1 at 152). However, Reynolds does not direct the court to any unreasonable determinations of fact. To set aside any doubt, the court notes that the ACCA's decision was not based on an unreasonable determination of the facts.

[49] For purposes of this court's federal habeas review, the Eleventh Circuit has held:

> [W]hen a state appellate court applies plain-error review and in the course of doing so, reaches the merits of a federal claim and concludes there is no plain error, that decision is an adjudication "on the merits" for purposes of [Section] 2254(d) and thus AEDPA deference applies to it. As the Sixth Circuit pointed out in *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009)], it would contravene the comity and federalism principles that underlie AEDPA if we were to ignore the state appellate court's work and review [an appellant's] *Batson* claim *de novo*. [*Fleming*, 556 F.3d] at 532. We decline to do so. The Alabama

> When reviewing a trial court's jury instructions, we must view them as a whole, not just in bits and pieces, and as a reasonable juror would have interpreted them. A trial court has broad discretion when formulating its jury instructions. When reviewing a trial court's instructions, the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.

*Reynolds I*, 114 So. 3d at 149, quoting *Vanpelt v. State*, 74 So. 3d 32, 92 (Ala. Crim. App. 2009).

With these principles in mind, the ACCA evaluated the trial court's jury instruction. *See id.* Specifically, the ACCA provided:

> Reynolds maintains that the circuit court "improperly told the jury that a reasonable doubt that would entitle the defendant to an acquittal is a 'doubt to which you can assign a reason.'" Reynolds asserts that this instruction improperly permitted a conviction based upon insufficient proof. As we held in *Lee v. State*, 898 So. 2d [at] 842:

>> "Taken as a whole, the trial court's instructions in this case properly conveyed the concept of reasonable doubt to the jury and did not lessen the State's burden of proof. There is not a reasonable likelihood that the jury applied the instructions in a manner that would violate the appellant's constitutional rights. Therefore, we do not find that there was any plain error in this regard."

*Reynolds I*, 114 So. 3d at 149.

Reynolds contends that the ACCA's "decision allowing the circuit court to improperly instruct the jury as to the reasonable doubt standard directly contravenes the Supreme Court's mandates in *Cage*."[50] (Doc. # 31 at 139). He argues "a doubt to which you can assign a reason" implies a higher degree of doubt than reasonable doubt. (*Id.* at 138-39). After careful consideration,

---

appellate court's "substantive reasoning does not simply vanish" just because it applied plain-error review. *Id.* "Nor does AEDPA." *Id.*

*Lee*, 726 F.3d at 1210 (footnote omitted).

[50] For the first time, in his reply brief, Reynolds also contends that the ACCA's decision "directly contravenes the Supreme Court's mandates in . . . *Sullivan [v. Louisiana*, 508 U.S. 275 (1993)]." (Doc. # 31 at 139). In *Sullivan*, the Supreme Court held that a trial court's unconstitutional reasonable doubt instruction was a structural defect that required automatic reversal. *Sullivan* 508 U.S. at 277-80. *Sullivan* is about the appropriate remedy to be imposed when there is an error, not whether an error occurred in the first place. So, *Sullivan* is immaterial to the question of whether there was an error here.

and for the reasons discussed below, the court concludes that Reynolds's argument is without

merit.

In *Cage*, the Supreme Court held that the trial court's instruction impermissibly suggested

a higher degree of doubt than is required for acquittal under the reasonable doubt standard of *In re*

*Winship*, 397 U.S. 358, 364 (1970). *Cage*, 498 U.S. at 39-40. The Supreme Court condemned the

jury instructions for equating reasonable doubt with "such doubt as would give rise to a grave

uncertainty," an "actual substantial doubt," and a doubt believed to a "moral certainty." *Id.* at 40

(emphasis removed).

> It is plain to us that the words "substantial" and "grave," as they are commonly
> understood, suggest a higher degree of doubt than is required for acquittal under
> the reasonable doubt standard. When those statements are then considered with the
> reference to "moral certainty," rather than evidentiary certainty, it becomes clear
> that a reasonable juror could have interpreted the instruction to allow a finding of
> guilt based on a degree of proof below that required by the Due Process Clause.

*Id.* at 41.

In this case, the ACCA referred to its decision in *Lee*. *See Reynolds I*, 114 So. 3d at 149

(citing *Lee*, 898 So. 2d at 842). In *Lee*, the court evaluated a similar claim of improper jury

instructions, in which the trial court defined reasonable doubt as "a doubt for which you can assign

a reason. It does not mean a doubt which arises from some mere whim or surmise or guess." 898

So. 2d at 841. After referencing *Cage*, the *Lee* court applied the proper standards for reviewing the

constitutionality of such an instruction. *See id.* at 841-42.

The ACCA's review of the record from Reynolds's trial shows it assessed whether the trial

court "conveyed the concept of reasonable doubt to the jury."[51] *See Lee*, 898 So. 2d at 842. And,

---

[51] The relevant portion of the court's instructions to the jury are as follows:

Now, . . . [t]he burden of proof in this case as in all criminal cases is upon the State of Alabama. It
is the duty of the State of Alabama to show the defendant's guilt beyond a reasonable doubt and to
the exclusion of every other reasonable hypothesis. And unless the State of Alabama has done that

as the ACCA concluded, the trial court properly instructed the jury on the nature of reasonable

doubt by stating that a conviction would require "an abiding conviction of the truth of the charge"

---

in this case, it is your duty to find the defendant, Michael Wayne Reynolds, not guilty. . . . The
defendant cannot be convicted unless the evidence is inconsistent with any reasonable theory of his
innocence.

I charge you, members of the jury, that if you have a reasonable doubt of the defendant's guilt
growing out of the evidence or any part of it, you must acquit him. The defendant is presumed
innocent and you must consider this presumption of innocence as evidence in the case just like the
testimony that you hear and the physical evidence that you see or touch.

When a defendant is placed on trial, charged with a crime, the law says that he is presumed to be
innocent of the offense. The defendant enters into this Court with a presumption of innocence in his
favor. And it is a fact which is to be considered as evidence and should not be disregarded. And this
presumption of innocence remains with the defendant unless and until overcome by evidence which
convinces the jury of the defendant's guilt beyond a reasonable doubt.

Before the defendant can be convicted, the state must satisfy each and every member of the jury of
his guilt. Unless also the state satisfies you of the defendant's guilt beyond a reasonable doubt and
to a moral certainty, then the defendant is entitled to an acquittal.

If after considering all of the evidence in this case you have abiding conviction of the truth of the
charge, then you are convinced beyond a reasonable doubt and it would be your duty to find the
defendant guilty.

On the other hand, if after considering all of the evidence in this case your minds are left in such a
condition that you cannot say that you have an abiding conviction to a moral certainty of the
defendant's guilt, then you're not convinced beyond a reasonable doubt and the defendant would be
entitled to acquittal.

As to reasonable doubt, the burden of proof that is on the state is to prove the guilt of the defendant
beyond a reasonable doubt.  The phrase beyond a reasonable doubt is a somewhat subjective term
. . . . Most people know intuitively what the law means when it says that the state has to prove the
guilt of the defendant beyond a reasonable doubt. Is there a doubt either arising from evidence or
from the lack of evidence as to any element of the offense that the state is charged? If there is, then
the defendant is entitled to the benefit of that doubt. A reasonable doubt is not a forced or capricious
doubt, and it is not necessary that the state prove the guilt of the defendant beyond all doubt but that
it prove the guilt of the defendant beyond all reasonable doubt and to a moral certainty.

A reasonable doubt is a doubt to which you can assign a reason. It's a doubt which reasonable and
fair-minded persons would entertain after hearing all of the evidence or lack of evidence that you
hear.

If you find from the evidence that the state has proven any of the offenses that they have charged
beyond a reasonable doubt, then it would be your duty to convict.

If you find that they have not proven each element of the offense charged, then you should not
convict but should return a verdict of not guilty.

(Vol. 12 at 73-77).

and "an abiding conviction to a moral certainty of the defendant's guilt" whereas an acquittal could be sustained if "reasonable and fair-minded persons [would entertain doubts of the defendant's guilt]." (Vol. 12 at 73-77); (*see also* Vol. 12, at 100, 103, 110, 119, 124-25, 127, 130, 1333, 137-39, 142) (instructions for each count of Reynolds's indictment). Under *Cage*, that is sufficient. In "[e]mphasizing the state's burden and the jury's obligation to focus on the evidence presented, the entire instruction establishes that it was not reasonably likely the jury applied the instruction in an unconstitutional manner." *Icenhour v. Medlin*, 567 F. App'x at 737 (11th Cir. 2014) (citing *Victor*, 511 U.S. at 5 and *Johnson*, 256 F.3d at 1190-94).

A fair-minded jurist could agree with the ACCA's decision that, "[t]aken as a whole, the trial court's instructions . . . properly conveyed the concept of reasonable doubt . . . [so that] [t]here is not a reasonable likelihood that the jury applied the instructions in a[n unconstitutional] manner." *Reynolds I*, 114 So. 3d at 149, quoting *Lee*, 898 So. 2d at 842. Thus, the ACCA's decision is not an unreasonable application of *Cage* nor is it contrary to clearly established federal law. Accordingly, this claim is due to be denied.

### 2.    Instruction on Mitigating Circumstances During the Penalty Phase

Reynolds next alleges that the trial court was required to instruct the jurors that they could consider mitigating circumstances whether or not they all agreed on the existence of those particular circumstances. (Docs. # 1 at 150-51; 31 at 132-35).[52] Reynolds contends that in referring

---

[52] Reynolds provides no citations to support his claim that "[t]he Circuit Court limited the jury's consideration of relevant mitigating circumstances when it repeatedly referred to the jury as a single unit for consideration of aggravating and mitigating circumstances and then failed to provide an instruction that unanimity was not required for consideration of a mitigating circumstance." (Doc. # 31 at 132). However, the court can take judicial notice of its own records and the trial record before it. *Grider*, 522 F. App'x at 545 n.2 (11th Cir. 2013). The court notes that Reynolds provided citations to the trial court's allegedly offending conduct in his brief to the ACCA on direct appeal. (*See* Vol. 19 at 111) (citing Vol. 13 at 140-45).

to the jury as one unit — by saying "you" and "your" — the judge left the jurors with the mistaken impression that unanimity was required. (Docs. # 1 at 150-51; 31 at 134).

The ACCA rejected this claim on direct appeal. *Reynolds I*, 114 So. 3d at 151-52. Because Reynolds failed to object to the penalty phase jury instructions, the ACCA reviewed for plain error only under Rule 45A, Ala. R. App. P. *Id.* at 150. (*See, e.g.*, Vol. 13, Tab 32, TR. 2004).

> Reynolds contends that the circuit court's use of the words "you" and "your" during its jury charge in the penalty phase of the trial implied to the jury that the jury's findings as to the existence of any mitigating evidence had to be unanimous before the mitigating evidence could be considered. [(Vol. 19, Tab 40], at 90-91). This court addressed and rejected an identical argument in *Hall v. State*, 979 So. 2d 125, 165-67 (Ala. Crim. App. 2007) [*Hall II*]. Further we have reviewed the Court's entire charge in light of the principles addressed [in] *Hall* [*II*] and find "nothing in the instructions that would have suggested to the jurors, or given them the impression, that their findings concerning the existence of mitigating circumstances had to be unanimous" before those mitigating circumstances could be considered. *Hall* [*II*] at 165, quoting other cases. Accordingly, we find no error, plain or otherwise, in this regard.

*Id*. at 151-52 (some internal quotation marks omitted).

In rejecting this claim, the ACCA relied on its previous decision in *Hall II*. In that case, the ACCA denied the petitioner's claim that the trial court's use of the collective "you" during its penalty phase instructions violated *Mills* by "im[plying] to the jury that its findings as to mitigating evidence had to be unanimous." *Hall II*, 979 So. 2d at 165, quoting *Hall v. State*, 820 So. 2d 113, 144 (Ala. Crim. App. 1999) (*Hall I*). Like Reynolds, Hall failed to object to the challenged instruction at trial, so the ACCA reviewed this claim for plain error. *Id.*; *see Reynolds I*, 114 So. 3d at 150. The ACCA noted several decisions rejecting similar arguments "that the court erred by failing to instruct the jury that its findings as to mitigating circumstances did not have to be unanimous." *Hall II*, 979 So. 2d at 165-67.

The *Hall II* court specifically recognized that the Supreme Court in *Mills* "held that a sentence of death must be vacated where 'there is a substantial probability that reasonable jurors,

upon receiving the judge's instructions . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.'" *See id*. at 165, quoting *Williams v. State*, 710 So. 2d 1276, 1307 (Ala. Crim. App. 1996), *aff'd*, 710 So. 2d 1350 (Ala. 1997), *cert. denied*, 524 U.S. 929 (1998), quoting in turn *Mills*, 486 U.S. at 384. The *Hall II* court, however, concluded that *Mills* was factually distinguishable. Unlike *Mills*, the jury was properly instructed that once a mitigating circumstance was offered:

> the State had the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. No portion of the trial court's instructions suggested to the jury that its findings concerning mitigating circumstances had to be unanimous. Moreover, the trial court's instructions were in accordance with the *Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried under Act. No. 81-178*. After reviewing the trial court's instructions, we find that there was "no reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstance." *Williams*, 710 So. 2d at 1307.

*Hall II*, 979 So. 2d at 166-67, quoting *Hall I*, 820 So. 2d at 144-46. Additionally, as the ACCA explained, the "[u]se of the word 'you,' without more, in relationship to a jury charge on mitigating evidence does not imply that the finding of a mitigating circumstance must be unanimous." *Id.* at 167, quoting *Kuenzel v. State*, 577 So. 2d 474 (Ala. Crim. App. 1990), *aff'd* 577 So. 3d 531 (Ala.), *cert. denied*, 502 U.S. 886 (1991).

With respect to this "without more" language, Reynolds contends that "the 'more' cautioned [about in *Hall II*] was present in the instructions to Reynolds's jury." (Doc. # 31 at 133). Moreover, Reynolds contends that the ACCA's decision was contrary to and an unreasonable application of *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990).[53] (Docs. # 1 at 150-51; 31 at 135). This court disagrees.

---

[53] In addition to his multiple references to *Mills* and *McKoy* in support of this claim, Reynolds cites to a litany of other Supreme Court cases for the first time in his federal habeas reply brief. (*See* Doc. # 31 at 141-44). But, none

In *Mills*, the Supreme Court vacated a death penalty imposed by a jury due to a misleading jury form and accompanying instruction. 486 U.S. at 278, 384. One section of the form included instructions for finding an aggravating circumstance. *Id.* at 378. After reading the instructions on the form, the trial judge stressed the unanimity requirement for finding an aggravating circumstance. *Id.* The trial court then moved on to discuss another section of the form, which concerned mitigating circumstances and included similar language to the first section. *Id.* However, the trial court did not instruct the jury that there was no unanimity requirement for considering mitigating circumstances. *Id.* The court concluded that "there [was] a substantial probability that reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at 384.

In *McKoy*, the Supreme Court held that North Carolina's statutory unanimity requirement was contrary to its decision in *Mills*. 494 U.S. at 444. The Court explained that an unanimity requirement impermissibly limited the jury's consideration of mitigation evidence by allowing one holdout juror to prevent the others from mulling over evidence that might have dictated a lesser sentence. *Id*. at 438 (citing *Mills*, 486 U.S. at 384, and *Lockett*, 438 U.S. 586).

Unlike in *Mills* or *McKoy*, the subject of unanimity was not mentioned in Reynolds's trial instructions. The trial court never gave an indication that unanimity was required with respect to either aggravating or mitigating circumstances. (*See* Vol. 13 at 131-52). As to aggravating circumstances, the trial judge explained, "So the three aggravating circumstances that the state says apply in this case, I'm telling you from a legal standpoint that you don't have to make that

---

of these cases hold that a death sentence must be set aside as unconstitutional if the trial judge does not explicitly instruct the jury that mitigating circumstances are not required to be found unanimously. (*See id.*) (citing *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Lockett v. Ohio*, 438 U.S. 586 (1978); *House v. Tennessee*, 498 U.S. 912 (1990); *Boyde v. California*, 494 U.S. 370, 381 (1990)).

decision. I'm making it for you by telling you that those three aggravating circumstances exist." (*See id.* at 138). Suffice it to say that the jurors in Reynolds's case were never given the opportunity to draw an inference that because unanimity was required for aggravating circumstances, it also must be required for mitigating circumstances. Unanimity was never mentioned during the mitigating instructions. In short, the trial court never gave the jurors any impression that findings of a mitigating circumstance must be unanimous.

The trial court's instructions here were materially the same as those found constitutional in *Hall II* and other decisions. Reynolds has failed to establish that the ACCA's decision was contrary to, or an unreasonable application, of clearly established federal law. Thus, this claim is due to be denied.

### 3. Instruction Regarding Mercy During the Penalty Phase of Reynolds's Trial

Reynolds next argues that the trial court's penalty-phase charge "erroneously informed the jurors that they could not consider mercy in their sentencing verdict." (Doc. # 1 at 151) (citing *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Conner, J., concurring); *Drake v. Kemp*, 762 F.2d 1449, 1460 (11th Cir. 1985)). (*See also* Doc. # 31 at 135-37).

Reynolds's argument is not supported by the actual charge given by the trial court.

Now, in your deliberation, ladies and gentlemen, do not let personal opinions outweigh the law. Weigh the aggravating and mitigating circumstances carefully and dispassionately. Do not be swayed by anger, sympathy, or prejudice or any type of passion or emotion. The weighing and comparing of aggravating and mitigating circumstances requires the exercise of sound judgment on your part. It is not a matter of unbridled discretion. A human life hangs in the [balance]. It is a matter of calm reflection, not for the indulgence of emotion.

You are to weigh the aggravating and mitigating circumstances and honestly and rationally evaluate the two options before you in light of those circumstances.

You are to use your common sense in the evaluation. Your verdict, as always, is based on the evidence.

(Vol. 13 at 147-48). The trial court never said that mercy could not be considered.

The ACCA rejected this claim on direct appeal. *See Reynolds I*, 114 So. 3d at 152-53. The ACCA's discussion focused on the overarching principles quoted above from *Vanpelt*, 74 So. 3d at 92, along with the court's holding in *Brown v. State*, 11 So. 3d 866, 921 (Ala. Crim. App. 2007), *aff'd*, 11 So. 3d 933 (Ala. 2008), *cert. denied*, 557 U.S. 938 (2009). *See Reynolds I*, 114 So. 3d at 152-53.

The ACCA observed that in *Brown v. State*, "the appellant . . . argued that 'the circuit court's instruction allowed the jury to believe that it could not consider mercy in determining its penalty-phase verdict.'" *Id*. at 152, quoting *Brown*, 11 So. 3d at 921. The ACCA recognized that under "well-settled" Alabama law, "[a] capital defendant is not automatically entitled to a mercy instruction," adding that "[t]he Alabama provisions for the imposition of capital punishment nowhere mentions mercy." *Id.*, quoting *Brown*, 11 So. 3d at 921 (internal quotation marks omitted). The ACCA also recognized that under *California v. Brown*, 479 U.S. 538, 539 (1987), "the United States Supreme Court held that 'an instruction informing jurors that they 'must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling' during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.'" *Reynolds I*, 114 So. 3d at 152-53, quoting *Brown v. State*, 11 So. 3d at 921.

Reynolds contends that the trial court had a "constitutional obligation to instruct the jury specifically that mercy can form the basis for a life sentence" and that the trial court's failure to give that instruction violated clearly established Supreme Court precedent. (Doc. # 31 at 135). In support, Reynolds cites multiple cases;[54] however, these cases do not hold that a death sentence

---

[54] *McKoy v. North Carolina*, 494 U.S. 433 (1990); *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Mills v. Maryland*, 486 U.S. 367 (1988); *McClesky v. Kemp*, 481 U.S. 279 (1987); *California v. Brown*, 479 U.S. 538 (1987); *Caldwell*

must be set aside as unconstitutional if the trial judge does not explicitly instruct the sentencing jury that it may consider mercy in determining the appropriate sentence. Indeed, the Supreme Court's decision in *California v. Brown* makes clear no such instruction is necessary.

> In *California v. Brown*, the Court noted two prerequisites to a valid death sentence:

> First, sentencers may not be given unbridled discretion in determining the fates of those charged with capital offenses. The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion. Second, even though the sentencer's discretion must be restricted, the capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense.

*California v. Brown*, 479 U.S. at 541 (internal citations and quotations omitted). The Court held that a charge instructing the jury "not [to] be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" was constitutional. *Id.* at 543.

A trial judge is only required by the Eighth and Fourteenth Amendments to "clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death." *Moore*, 809 F.2d at 731 (internal quotation marks omitted) (collecting cases). And, the trial judge in Reynolds's case clearly complied with this requirement.

> the defendant is allowed to offer mitigating circumstances as reasons why he should not be put to death. The law defines certain circumstances that it holds to be mitigating circumstances. . . . In this case the one I'm giving you from the statute states that the defendant has no significant history of prior criminal activity and in addition to any other relevant mitigating circumstances which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

> Unlike aggravating circumstance, where you are limited to those in the statute, you may consider any circumstance which you reasonably believe to reflect favorable on the defendant as a reason why the defendant should not be put to death.

---

*v. Mississippi*, 472 U.S. 320 (1985); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Kennedy v. Herring*, 54 F.3d 678 (11th Cir. 1995); *Nelson v. Nagle*, 995 F.2d 1549 (11th Cir. 1993); *Moore v. Kemp*, 809 F.2d 702 (11th Cir. 1987); *Peek v. Kemp*, 784 F.2d 1479 (11th Cir. 1986); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985). (*See* Docs. # 1 at 150-52; 31 at 131-32, 135-36).

> The defendant has the burden of injecting the issue if the factual existence of a mitigating circumstance is in question. This merely means that the defendant must show at least the possibility that the mitigating circumstance exists. Then the burden of proof is on the state to disprove the existence of a mitigating circumstance by a preponderance of the evidence. This means that unless the state shows that more likely than not the mitigating circumstance does not exist, you should consider the mitigating circumstance as established.

Vol. 13 at 143-45). Moreover, the trial court did not prevent defense counsel or defense mitigation witnesses from asking for mercy on Reynolds's behalf. To the contrary, mitigation witnesses and defense counsel pleaded for mercy before the sentencing jury. (*See generally* Vol. 12 at 197-98; Vol. 13 at 23, 32, 36, 41, 54-55, 123-27).

The ACCA's decision upholding the trial court's instruction was not contrary to clearly established federal law, nor was it an unreasonable application of clearly established federal law. This claim is due to be denied.

### G.   *Batson*

Reynolds claims that the trial court erred by failing to find, *sua sponte*, a *prima facie* case of a *Batson* violation (Doc. # 1 at 152-55). Reynolds argues that "the prosecutor's illegal removal of [African American] jurors from [his] jury violated his rights to a fair trial, equal protection, and reliable sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States." (*Id.* at 155).

Reynolds presented his *Batson* claim to the ACCA on direct review. (*See* Vol. 19 at 127-29). The ACCA rejected the claim. That is, the ACCA held that the circuit court's failure to raise a *Batson* challenge *sua sponte* did not result in plain error. *Reynolds I*, 114 So. 2d at 86.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Court created a three-part test to guide a trial court's review of peremptory strikes. "First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory

purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State

to explain adequately the racial exclusion by offering permissible race-neutral justifications for the

strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide whether

the opponent of the strike has proved purposeful racial discrimination." *Johnson v. California*, 545

U.S. 162, 168 (2005) (internal citations and quotations omitted).

The ACCA began by acknowledging the trial court's finding that "[a] jury was struck and

sworn in this case, consisting of seven females, and five males. One of the male jurors was black,

and all of the remaining jurors were white. There were no *Batson* challenges made by either side

and no *Batson* violations occurred in the selection of the jury." *Reynolds I*, 114 So. 2d at 85,

quoting Vol. II, C. 320, 327, 334, 341, 348. Because Reynolds failed to make a *Batson* objection

at trial, the ACCA reviewed his claim for plain error. *Id.* Reynolds did not specify to the ACCA

what he claimed was "unquestionable evidence of discrimination," and the ACCA noted that any

so-called unquestionable evidence was not evident in the record. *Id.* at 85-86.

The ACCA next explained that, under plain error review of a *Batson*, "the record must raise

an inference that the state . . . engaged in 'purposeful discrimination' in the exercise of its

peremptory challenges." *Id.* at 86, quoting *Ex parte Walker*, 972 So. 3d 737, 742 (Ala. 2007), *cert.*

*denied*, 552 U.S. 1088 (2007). However, Reynolds's only factual basis supporting this claim was

that the State used peremptory strikes to remove nine of fourteen qualified African American

venire members. *Id.* The ACCA concluded that this argument was unavailing because "Alabama

courts have repeatedly held that numbers alone are not sufficient to establish a prima facie case of

discrimination." *Id.*, quoting *Vanpelt*, 74 So. 3d at 53. Further, the ACCA "thoroughly reviewed

the record and f[ound] no inference of purposeful discrimination by the State." [55] *Id.*

---

[55] The record before the ACCA indicates that the prosecution and defense each had thirty-six peremptory
strikes. (Vol. 18 at 76). Each party's final strike served as an alternate juror. (*Id.*). The prosecution's final strike was

### 1.    Reynolds Waived His *Batson* Claim

Reynolds waived this claim by not making a timely *Batson* objection and not "fairly presenting" this claim to the state courts. (Vol. 2 at 122, 129, 136, 143, 150). Evidence and arguments not presented to the trial court cannot later be relied on to prove that the trial court violated *Batson* and its progeny. *See United States v. Houston*, 456 F.3d 1328, 1338 (11th Cir. 2006) (refusing to consider defendant's *Batson* argument because it was not presented to the trial court); *see United States v. Rodriguez*, 917 F.2d 1286, 1288 n.4 (11th Cir. 1990), *vacated in part on reh'g*, 935 F.2d 294 (11th Cir. 1991) ("An inquiry into the government's exercise of its peremptory challenges is initiated by a . . . timely objection.").

 "The failure to make a timely *Batson* objection results in the waiver of the claim." *United States v. Cashwell*, 950 F.2d 699 (11th Cir. 1992). In *Cashwell*, the Eleventh Circuit rejected the defendant's *Batson* claim after finding that the "record establish[d] that Cashwell's trial lawyer made no objections of any kind during *voir dire*." *Id.*; *see also United States. v. Tate*, 586 F.3d 936, 943 (11th Cir. 2009) ("[A] defendant forfeits a *Batson* claim if he or she fails to object on this ground in the district court."). Following these cases, Alabama courts have held *Batson* challenges waived when not raised at trial. *See, e.g.*, *White v. State*, 179 So. 3d 170, 198 (Ala. Crim. App. 2013); *Russell v. State*, 272 So. 3d 1134, 1152-53 (Ala. Crim. App. 2017); *Gaston v. State*, 265

---

African American. (*Id.* at 73, 76, 78). Reynolds misleadingly omits the alternate jurors from his calculations. In fact, two of the fourteen potential jurors, or 14.3%, were African American. Given Reynolds's contention that, at the time of trial, African Americans comprised 14.5% of Etowah County and the ACCA's independent calculation that the "qualified" venire was 15.5% African American, (*see id.* at 73-76; *but cf.* Doc. # 1 at 153) (petitioner claiming, without substantiation, that the venire was 17.5% African American), Reynolds has failed to show that the ACCA's finding was objectively unreasonable.

The ACCA also noted that it was unable to review the jury questionnaires completed by the venire members. When the ACCA requested the production of those questionnaires, "pursuant to Rule 18.2(b), Ala. R. Crim. P., [the ACCA] was informed by the Etowah circuit clerk that the questionnaires had not been retained." *Reynolds I*, 114 So. 3d at 86 n. 6.

So. 3d 387, 414-15 (Ala. Crim. App. 2018); *see also, e.g.*, *Sheuing v. State*, 161 So. 3d 245, 298-305 (Ala. Crim. App. 2013) (Windom, P.J., concurring specially with opinion, joined by Joiner, J). Accordingly, the court concludes that Reynolds waived his *Batson* claim by failing to make an objection at trial.

### 2.    In Any Event, Reynolds Cannot Succeed on His *Batson* Claim

Even if Reynolds has not waived his claim, he has failed to show that the ACCA's decision was contrary to, or an unreasonable application of, *Batson* and its progeny.[56] *See* 28 U.S.C. § 2254(d)(1). "A petitioner has the burden of establishing his right to federal habeas relief and of proving all facts necessary to show a constitutional violation." *Romine*, 253 F.3d at 1357 (internal citations omitted). Notably, the Supreme Court has emphasized the deference federal district courts must afford state court decisions on federal habeas review, particularly *Batson* claims:

> The trial court's determination is entitled to "great deference," . . . and "must be sustained unless it is clearly erroneous," *Snyder v. Louisiana*, 522 U.S. 472, 477 (2008).
>
> That is the standard on direct review. On federal habeas review, AEDPA, "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decision be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

*Felkner v. Jackson*, 562 U.S. 594, 598 (2011).

Reynolds relies on *Batson*, *Johnson v. California*, 545 U.S. 162 (2005), *Miller-El v. Dretke*, 545 U.S. 231 (2005), *Powers v. Ohio*, 499 U.S. 400 (1991), and *Edmonson v. Leesville Concrete*

---

[56] Reynolds does not specify which provision of § 2254 he uses to challenge the ACCA's determination. (*See generally* Docs. # 1 at 152-55; 31 at 143-47). The court infers from Reynolds's reply brief's heading — "Contrary to Supreme Court Precedent, the Circuit Court Failed to Find That the State Improperly Exercised its Peremptory Strikes in a Discriminatory Manner," (Doc. # 31 at 143 ) — and his failure to point to any specific facts which the ACCA unreasonably determined that Reynolds alleges error only under 28 U.S.C. § 2254(d)(1). Thus, Reynolds has abandoned any grounds available for relief under § 2254(d)(2). *See Romine*, 253 F.3d at 1357.

*Co.*, 500 U.S. 614 (1991). (Docs. # 1 at 155; 31 at 146-47).[57] However, the ACCA's decision is not contrary to any of those decisions.

In *Batson*, the Supreme Court established the rule that a juror may not be struck due to race. In that case, the prosecution removed every African American venire member, to which the defense timely objected. 476 U.S. at 100. *Johnson*, decided after *Batson*, clarifies the level of scrutiny to be applied by the trial court during the first step of a *Batson* inquiry. *Johnson*, 545 U.S. at 168. In *Dretke*, the defense objected to the discriminatory strikes (the prosecution had excluded 91% of the eligible African American venire members). *Dretke*, 545 U.S. at 236, 241. The *Powers* court held that a criminal defendant has standing to raise the equal protection rights of a juror excluded from service in violation of *Batson*. 499 U.S. at 410. In *Powers*, the defendant objected during voir dire to the discriminatory peremptory strikes. *Id.* at 403. Finally, *Edmonson* extends the holdings in *Batson* and *Powers* to civil trials. *Edmondson*, 500 U.S. at 631.

Reynolds did not make a *Batson* objection at trial; therefore, his claim is materially distinguishable from the above cases that he relies upon. The ACCA's holding -- that Reynolds's reliance on numbers alone fails to satisfy *Batson*'s *prima facie* requirement -- is not contrary to, or an unreasonable application of, clearly established federal law. No Supreme Court case clearly calls that holding into question. Thus, Reynolds's *Batson* claim is due to be denied.

## H.   *Ring*

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that the Sixth Amendment's jury-trial guarantee requires that a jury, not a judge, find every fact that makes a defendant death-eligible beyond a reasonable doubt. 536 U.S. at 609. Reynolds contends that his

---

[57] Reynolds also cites *Miller El v. Cockrell*, 537 U.S. 322 (2003), *Snyder v. Louisiana*, 552 U.S. 472 (2008), *Rose v. Mitchell*, 443 U.S. 545 (1979), and *Coleman v. Thompson*, 501 U.S. 722 (1991). The court has reviewed these cases and concludes that the ACCA's decision is not contrary to their holdings. Reynolds also cites to several Alabama cases, but those cases do not speak to whether the ACCA's decision is contrary to clearly established federal law.

sentence "runs afoul of *Ring* because a jury never made the factual findings necessary to support the imposition of the death penalty" and that "[t]here is no basis for concluding that the aggravating circumstances in this case were found by a unanimous jury to exist beyond a reasonable doubt." (Doc. # 1 at 145).

> The ACCA rejected this claim on direct appeal, providing:

> Initially, we note that two of the three aggravating circumstances – *i.e.,* that the murders were committed during a first-degree robbery, and that two or more people were killed pursuant to a common scheme or plan – were found to exist beyond a reasonable doubt based on the jury's unanimous verdicts in the guilt phase finding Reynolds guilty of five counts of capital murder. The third aggravating circumstance – that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses – was stipulated to by the parties. Moreover, Reynolds did not object to the imposition of his sentence on these grounds. Accordingly, we review his allegations for plain error only. These same arguments have been addressed and decided adversely to Reynolds. *See Doster v. State*, 72 So. 3d 50 (Ala. Crim. App. 2010); *Sharifi v. State*, 993 So. 2d 907, 940-41 (Ala. Crim. App. 2008), *cert. denied*, 555 U.S. 1010 (2008); *Lewis v. State*, 24 So. 3d 480, 533-36 (Ala. Crim. App. 2006), *aff'd*, 24 So. 3d 540 (Ala. 2009), cert. denied, 558 U.S. 1078 (2009). Because the existence of the aggravating circumstances was found either by the jury's guilt-phase verdicts or by stipulation of the parties, Reynolds is due no relief on [this] claim.

*Reynolds I*, 114 So. 3d at 156-57 (parallel citations omitted).

Alabama law makes the death penalty available in a capital case whenever "at least one aggravating circumstance" exists. Ala. Code §13A-5-45(f). That a murder occurred during a robbery is an aggravating circumstance. *Id.*; § 13A-5-49(4). The jury convicted Reynolds of murder during a first-degree robbery at the guilt phase of his trial. Thus, every fact that made Reynolds eligible for the death penalty was found by a jury beyond a reasonable doubt at the conclusion of the guilt phase of his trial. That is exactly what *Ring* requires. Therefore, the ACCA's decision was not contrary to, or an unreasonable application of, clearly established federal law as provided by the *Ring* court. *See Lee v. Comm'r, Ala. Dep't Corr.*, 726 F.3d 1172 (11th Cir. 2013) ("the holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the

finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury. That occurred in [the petitioner's] case by virtue of the jury's capital robbery-murder verdict. *Ring* goes no further."). Accordingly, this claim is due to be denied.

I.      **Alabama's Capital Sentencing Process**

In relation to his *Ring* claim, Reynolds also argues that Alabama's capital sentencing process, as defined in *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002), is unconstitutional. (Doc. # 1 at 146-47). In *Waldrop,* the Alabama Supreme Court held that a judge was able to constitutionally impose the death penalty when a guilt-phase jury found that a statutory aggravating circumstance existed by virtue of their unanimous verdict. 859 So. 2d at 1187-90. In that case, an Alabama jury convicted the defendant of (1) two counts of murder made capital because the murders were committed during a first-degree robbery and (2) one count of murder made capital because two or more persons were murdered during a single course of conduct. *Id.* at 1185. The jury recommended a sentence of life imprisonment without parole by a vote of ten to two. *Id.* Notwithstanding the jury's recommendation, the trial judge sentenced the defendant in *Waldrop* to death. *Id.*

The *Waldrop* court held that the defendant's death sentence did not violate *Ring* or *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because he became death eligible upon the jury's guilt-phase finding that he committed murder during a first-degree robbery. *Waldrop*, 859 So. 2d at 188. The Alabama Supreme Court explained that "the findings reflected in the jury's [guilt-phase] verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty[,]" and reasoned that, once exposed to the punishment of death by the jury's guilt-phase verdict, there was no constitutional problem with a judge choosing to impose the maximum penalty

authorized -- death -- notwithstanding a jury's penalty-phase recommendation to the contrary.[58]
*Id.*

Reynolds argues that the ACCA's reliance on *Waldrop* "renders defendants convicted of some capital offenses automatically subject to the death penalty at the end of the first phase, while defendants convicted of other capital offenses cannot be sentenced to death without further jury fact-findings at the penalty phase." (Doc. # 1 at 146). Reynolds claims this "arbitrary distinction violates the requirements of the Due Process Clause and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution," as well as the integrity of the jury's judgment. (*Id.* at 146-47). More specifically, Reynolds's habeas petition can be understood to assert that the state court's reliance on *Waldrop* was contrary to, and an unreasonable application of, *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (plurality opinion), and *Adams v. Texas*, 448 U.S. 38, 46-47 (1980). (*Id.*). This argument is unpersuasive.[59]

First, Reynolds claims that, under *Simmons*, "due process entitles the defendant to inform the jury about the nature and consequences of that decision." (*Id.* at 146). Although Reynolds does not elaborate on this claim, the court infers that he contends that, under *Simmons,* he was entitled to inform the guilt-phase jury that a conviction for murder during a robbery, or two or more

---

[58] The court recognizes that Alabama amended its capital sentencing statute in 2017. *See* S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017). The 2017 amendment binds a court to a jury's life-sentence recommendation. *See* § 13-A-5-47(a) (2017) ("Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole.").

[59] Reynolds's habeas petition cites briefly to *Caldwell v. Mississippi*, 472 U.S. 320, 328-329 (1985). To the extent Reynolds contends the decision in *Caldwell* supports the proposition set forth in *Simmons* (Doc. # 1 at 146-47), Reynolds is misguided. *Caldwell* does no such thing. Notably, Reynolds provides the court with only a bare quotation, without any analysis or explanation, and does not apply (nor attempts to apply) *Caldwell* in support of his argument here. (*See id.* at 145-47).

Moreover, even assuming *Caldwell* stated and/or supported the proposition determined in *Simmons*, Reynolds's argument is still unsuccessful. As discussed below, the ACCA's decision did not contravene *Simmons*, and, thus, would not have contravened *Caldwell* either. The court notes that Reynolds raised a *Caldwell* claim in its proper context -- alleging the court's improper reduction of jury responsibility in sentencing -- which the court addressed above and found lacked merit. *See* Part IV(E), *supra*.

murders during a single course of conduct, would result in the availability of the death penalty. *Simmons* requires nothing of the sort.

*Simmons* held that where a defendant's future dangerousness is at issue in the penalty phase of a capital trial and the defendant is ineligible for parole under state law, "due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156. A plurality of the court reached that conclusion based on the principle that due process "does not allow the execution of a person on the basis of information which he had no opportunity to deny or explain." *Id.* at 161 (internal quotation marks omitted). During the penalty phase of Simmons's capital trial, the state argued for the death penalty, in part, on the basis that the defendant "would pose a future danger to society if he was not executed" — despite the fact that the defendant was precluded from informing the jury that he was, in fact, ineligible for parole by nature of his capital conviction. *Id.* at 162. The plurality concluded that the defendant was denied due process because the state "succeeded in securing a death sentence on the ground, at least in part, of [Simmons's] future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole." *Id.*

*Simmons* did not address the issue Reynolds raises in this case, namely whether due process entitled him to inform the jury at the *guilt* phase of his trial that a conviction for murder during a robbery would expose him to a maximum sentence of death. (*See* Doc. # 1 at 146-47). *Simmons* spoke to a defendant's right to inform the jury at the *penalty* phase of his trial that, by virtue of his capital conviction, he was not parole-eligible if sentenced to life imprisonment. This right was implicated by the prosecution's decision to argue that death was the *only* appropriate sentence because of the defendant's "potential" risk to the community. Both the court's plurality opinion

and Justice O'Connor's concurring opinion in *Simmons* recognized that the court's holding represented a narrow exception to the "broad proposition" espoused in other Supreme Court decisions: "that [federal courts] generally will defer to a State's determination as to what a jury should and should not be told about sentencing." *Id.* at 168; *see also id.* at 177 (O'Connor, J., concurring in the judgment).

Reynolds has not identified any clearly established Supreme Court precedent holding that a defendant has a constitutional right to inform a guilt-phase jury that a conviction for a particular offense will result in the defendant being death-eligible. Accordingly, Reynolds has failed to establish that the ACCA's decision was contrary to, or an unreasonable application of, *Simmons* or any other Supreme Court precedent.

Next, Reynolds argues that "the *Waldrop* decision undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty" in violation of *Adams v. Texas*, 448 U.S. 38 (1980). (Doc. # 1 at 147). Without any analysis, Reynolds conclusively states that "[s]uch proceedings are fundamentally incompatible with the requirements of the Due Process Clause and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in capital cases, and in conflict with Supreme Court precedent in *Ring*." (*Id.*).

In *Adams*, the Supreme Court held that Texas violated the Constitution, "when it excluded members of the venire from jury service because they were unable to take an oath that the mandatory penalty of death or imprisonment for life would not affect their deliberations on any issue of fact." 448 U.S. at 40 (internal quotation marks and alteration omitted). No jury-service oath is at issue in the present case, and Reynolds has completely failed to demonstrate how the ACCA's decision is either contrary to, or an unreasonable application of, *Adams, Ring,* or any other Supreme Court holding. Therefore, Reynolds is due no habeas relief on this claim.

J.        **Alabama's Method of Execution**

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor *cruel and unusual punishment inflicted*." U.S. Const. amend. VIII. In Alabama, as of June 1, 2018, "a death sentence shall be imposed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution and or nitrogen hypoxia." Ala. Code § 15-18-82.1 (2018). Reynolds argues that "Alabama's execution protocol poses a substantial risk of inflicting unnecessary pain" and that, under "evolving standards of decency," Alabama's method of execution "constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments." (Doc. # 1 at 157).

Reynolds's method-of-execution claim is inappropriate in a federal habeas petition. The appropriate vehicle for him to challenge method would be in a separate action under 42 U.S.C. § 1983. "Issues sounding in habeas are mutually exclusive from those sounding in a § 1983 action." *McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013). This issue has been addressed by courts on multiple occasions.

For example, in *Hutcherson v. Riley*, 468 F.3d 750 (11th Cir. 2006), the Eleventh Circuit found that "[a]n inmate convicted and sentenced under state law may seek federal relief under two primary avenues": a petition for habeas corpus under § 2254 or a complaint under 42 U.S.C. §1983. *Hutcherson*, 468 F.3d at 75; *see also McNabb*, 727 F.3d at 1344. In *Hutcherson*, the Eleventh Circuit explained that, "[t]he line of demarcation between a § 1983 civil rights action and a § 2254 habeas claim is based on the effect of the claim on the inmate's conviction and/or sentence." *Hutcherson*, 468 F.3d at 754.

As further explained by the Eleventh Circuit:

A claim is properly raised under § 1983 when "an inmate challenges the circumstances of his confinement but not the validity of his conviction and/or

208

sentence." *Id.* (internal quotation marks omitted). By contrast, "habeas corpus law exists to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release." *Valle v. Sec'y, Fla. Dep't of Corr.*, 654 F.3d 1266, 1267 (11th Cir. 2001), *cert. denied*, [564] U.S. [1069] (2011).

Usually, an inmate who challenges a state's method of execution is attacking *the means by which the State intends to execute [the inmate]*, which is a circumstance of his confinement. It *is not an attack on the validity of his conviction and/or sentence*. For that reason, '[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures." *Tompkins v. Sec'y, Dep't of Corr.*, 577 F.3d 1257, 1261 (11th Cir. 2009).

*McNabb*, 727 F.3d at 1344 (parallel citations omitted) (emphasis added). *See also Rivera v. Humphrey*, 2017 WL 6035017, at *3 (S.D. Ga. Dec. 6, 2017) ("Petitioner's claim challenges lethal-injection procedure, not the constitutionality of his conviction. Thus, it is not a cognizable habeas claim."); *James v. Culliver*, 2014 WL 4926718, at *149 (N.D. Ala. Sept. 30, 2014) ("[C]laims challenging lethal injection protocols as cruel and unusual punishments proscribed by the Eighth Amendment to the United States Constitution are properly brought in actions bottomed upon 42 U.S.C. § 1983, rather than as an independent claim within a *habeas* petition"), *aff'd sub nom. James v. Warden*, 957 F.3d 1184 (11th Cir. 2020); *King v. Chatman*, 2014 WL 1365415, at *3 (S.D. Ga. Apr. 7, 2014) ("By challenging the state's method of execution, Petitioner is challenging a circumstance of his confinement rather than attacking the validity of his conviction or sentence – thereby making his [§ 2254] claim non-cognizable."). Here, Reynolds plainly challenges the method of execution. This claim does not entitle Reynolds to habeas relief under § 2254.

Alternatively, as the ACCA recognized, such an attack is foreclosed by cases upholding the constitutionality of lethal injection. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35, 54-55 (2008)*; DeYoung v. Owens,* 646 F.3d 1319, 1326-27 (11th Cir. 2011); *Reynolds I*, 114 So. 3d at 157-58. In *Baze,* the Supreme Court affirmed the denial of an action brought by a death row inmate claiming that Kentucky's use of a three-drug lethal injection execution protocol posed an

unacceptable risk of significant pain and, therefore, constituted cruel and unusual punishment proscribed by the Eighth Amendment. 553 U.S. at 63. The Court reasoned that, "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50.

In *Baze*, the Supreme Court also decided that an Eighth Amendment violation cannot be established by a showing of a marginally safer alternative to a method of execution, because such an approach would "transform courts into boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Id.* at 51. *See also Glossip v. Gross*, 576 U.S. 863, 867 (2015) (making clear that the standard set forth in *Baze*, governs "all Eighth Amendment method-of-execution claims");[60] *id.* at 877-78 (finding that, under *Baze* (in a §1983 claim), a prisoner must show a "feasible, readily implemented" alternative that "in fact significantly reduce[s] a substantial risk of severe pain.").

Together, *Baze and Glossip* confirm the Supreme Court's recognition that the Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions." *Baze*, 553 U.S. at 47. *Baze* provides instead that the Constitution affords a "measure of deference to a State's choice of execution procedures" and does not authorize courts to serve as "boards of inquiry charged with determining 'best practices' for executions." *Id.* at 51 & n.2. The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is "substantial

---

[60] The court recognizes that the ACCA's challenged decision on direct appeal pre-dates the *Glossip* decision. The court refers to *Glossip* not for any precedential purpose but rather to provide further insight into the Supreme Court's decision in *Baze*, on which the ACCA relied.

when compared to a known and available alternative." *Glossip*, 576 U.S. at 878 (citing *Baze*, 553 U.S. at 61).

Additionally, as the ACCA recognized in its decision, the Alabama Supreme Court has held that Alabama's method of performing lethal injection does not constitute cruel and unusual punishment. *Ex parte Belisle*, 11 So. 3d 323, 338-39 (Ala. 2008). In *Belisle*, the death-row inmate argued that the State of Alabama, which uses the same three-drug protocol as a majority of the states, lacked the procedures to guard against the "risk of unnecessary pain and suffering" that could result from the administration of these drugs. *Id.* at 338. The Alabama Supreme Court rejected the contention that the Alabama's lethal injection scheme violated the Eighth Amendment. *Id.* at 339. "'Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of "objectively intolerable risk of harm" that qualifies as cruel and unusual.'" *Id.*, quoting *Baze,* 553 U.S. at 50.

Even assuming for the sake of argument that Reynolds's cruel and unusual punishment claim was properly before the court in his *habeas* petition (and it is not), for the reasons discussed above, Reynolds has not shown that the ACCA's rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law as established by the Supreme Court precedent. Therefore, Reynolds is due no federal habeas relief on this claim.

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

Reynolds argues that his trial counsel rendered ineffective legal representation during both the guilt and penalty phase of his capital murder trial. (*See* Doc. # 1 at 67; *see also* Vol. 24 at 146). *See Strickland v. Washington*, 466 U.S. 668 (1984). More specifically, Reynolds's *Strickland* claim is divided into the four segments of this capital litigation during which he alleges he was denied effective assistance of counsel: (1) at the guilt-phase of trial; (2) at the penalty phase of

trial; (3) at his sentencing hearing; and (4) in connection with his motion for a new trial. Reynolds's guilt-phase claim under *Strickland* is comprised of ten individual sub-claims, and Reynolds's penalty-phase *Strickland* claim is comprised of four subclaims.

Reynolds presented his *Strickland* claims for the first time to the Circuit Court of Etowah County in his amended Rule 32 petition. (*See generally* Vol. 24 at 146, 201; Vol. 25 at 3-17). The Rule 32 court dismissed Reynolds's *Strickland* claims on the pleadings, and Reynolds appealed that dismissal to the ACCA. (*See* Vol. 31 at 2-111; *see also* Vol. 25 at 162-202; Vol. 26 at 3-22). Upon review, the ACCA upheld the Rule 32 trial court's dismissal of Reynolds's *Strickland* claims, concluding these claims were "insufficiently pleaded under Rules 32.3 and 32.6(b), Ala. R. Crim. P., [or] without merit." (Vol. 33 at 175).

Reynolds contends that the ACCA's adjudication of his ineffective assistance claims was based on "an unreasonable determination of the facts and resulted in a decision that was both contrary to and an unreasonable application of clearly established Supreme Court precedent." (Doc. # 1 at 69-70).[61] After careful review, the court concludes Reynolds's ineffective assistance of counsel claims are individually and collectively without merit and are due to be denied.

A.    **Guilt Phase Claims of Ineffective Assistance**

Reynolds contends that his trial counsel provided ineffective guilt-phase assistance in violation of *Strickland*. (Doc. # 1 at 70). He asserts that his appointed trial counsel provided constitutionally ineffective assistance of counsel because they failed to (1) take necessary steps to ensure Reynolds's participation in his own defense; (2) adequately investigate the case against him; (3) investigate decomposition evidence; (4) move for a change in venue; (5) conduct adequate

---

[61] In his introduction, Reynolds cites without any elaboration the following cases: *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 538 U.S. 30 (2009); *Sears v. Upton*, 561 U.S. 945 (2010). (*See* Doc. # 1 at 70). The court will discuss these cases in its connection with Reynolds's *Strickland* subclaims.

voir dire; (6) object to racial discrimination in jury selection; (7) introduce a third-party's confession; (8) object to improper prosecutorial commentary and other improprieties; (9) examine a "key witness;" and (10) object to heightened security measures.

The court will address each of Reynolds's guilt-phase subclaims. However, before analyzing his individual claims, the court makes this observation: Reynolds continuously fails to specify which provisions of § 2254(d) that his petition -- and the discrete claims he presents within his petition -- rely on. Nevertheless, as explained below, the court concludes that Reynolds has failed to demonstrate that the ACCA's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Nor has Reynolds demonstrated that the ACCA's decision rested on an unreasonable determination of the facts presented. *See* 28 U.S.C. § 2254(d)(2). The court addresses each of his sub-claims in detail below.

### 1.        Meaningful Participation in His Own Defense

Reynolds contends that his trial counsel failed to develop an effective relationship with him. Reynolds contends that his attorneys were ineffective because they did not meet with him until six weeks after he was charged, failed to procure eyeglasses for him (despite knowing he had poor vision), and failed to properly advise him regarding his decision to testify in his own defense.

The ACCA affirmed the summary dismissal of this claim, explaining Reynolds "has not pleaded how he was prejudiced by counsel's actions." *Reynolds v. State*, Mem. Op. at 36 (Ala. Crim. App. Apr. 22, 2016). The ACCA concluded that Reynolds "failed to plead what evidence trial counsel were unable to uncover, what actions trial counsel were unable to take, or how the course of the investigation was altered to Reynolds's detriment based on their alleged ineffectiveness." *Id*. The ACCA also determined that Reynolds failed to plead how his allegedly

limited vision prejudiced him at trial. *Id.* Finally, the court held that Reynolds's allegation that his trial counsel failed to adequately advise him regarding his decision to testify was facially meritless. *Id.* He failed to plead "what advice should have been given to him or even whether he would have chosen not to testify had he been adequately advised by trial counsel," or "how trial counsel should have prepared him to testify or how his testimony would have been different had trial counsel adequately prepared him." *Id.*

To warrant federal habeas relief on this claim, Reynolds must demonstrate that the ACCA's decision that he failed to plead specific facts establishing prejudice under *Strickland* was objectively unreasonable or contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d). He has not met this requirement.

As the Eleventh Circuit has instructed, when faced with a Rule 32 adjudication rejecting a particular claim due to insufficient pleading, a district court must "examine the reasonableness of the Court of Criminal Appeals' adjudication of the claims based upon the allegations contained in his" Rule 32 petition. *Borden v. Allen*, 646 F.3d 785, 816-17 (11th Cir. 2011); *see also Cullen,* 563 U.S. at 181-82 (2011) (holding "that review under [section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Accordingly, the court addresses Reynolds's arguments as presented in his Rule 32 Amended petition.

The ACCA concluded that Reynolds had failed to demonstrate *Strickland* prejudice resulting from his trial counsel's purported failures to communicate with him. That conclusion was neither objectively unreasonable nor contrary to clearly established Supreme Court precedent. (*See* Vol. 33 at 135). The ACCA determined that Reynolds failed to plead "what evidence trial counsel were unable to uncover, what actions trial counsel were unable to take, or how the course of the

investigation was altered to Reynolds's detriment based on [counsel's] alleged ineffectiveness." (*Id.*).

Reynolds also failed to provide any specific facts in the Rule 32 court record concerning how he was prejudiced by this alleged lack of communication.[62] Reynolds argues that he did plead specific facts concerning his counsel's inaction or failure to advise him. (Doc. # 31 at 74). He did not. Reynolds failed to allege any facts concerning the information his counsel was unable to procure due to any alleged deficient communication, tardy communications, and/or breakdown in rapport. Nor has he explained what information was left undiscovered due to counsel's failure to meet with him more frequently.

Alternatively, Reynolds's claim fails because he has not pleaded or shown any prejudice. Reynolds is required to plead that, but for his counsel's deficiencies, there exists a reasonable probability he would not have been convicted of five counts of capital murder nor been sentenced to death. *See Ward*, 592 F.3d at 1177. Reynolds's claims are based on speculation and conjecture. He has not indicated that, but for his counsel's purportedly insufficient communications and their

---

[62] Reynolds made a *pro se* motion requesting substitution of counsel on the day opening statements were set to begin, but the trial court denied that motion after hearing Reynolds's reasons on the record. (*Id.*).

Specifically, Reynolds's handwritten *pro se* "Motion to Remove Mr. Hart as [his] Attorney" states:

1. Mr. Hart has made it clear to me he doe's [sic] not believe me "inncent [sic]." So haw [sic] can he put on a fair defence? [sic]
2. Mr. Hart has heeled [sic] information from me that he had in his position [sic].
3. I have ask [sic] Mr. Hart to put in a motion and [he] has yet to do so.
4. A motion was filed by Mrs. Granger afther [sic] the court ask that she remove herself from this case. She agreed to do so. Mrs. Granger filed this motion while my attorney Mr. hart was on vacation he never objected to this even though I ask this motion not be filed.
5. I feel Mr. Hart has reveiled [sic] information to the state about my case.
6. I ask that Mr. Hart be removed from this case and that he be replaced and that my Attorney's be giving [sic] adequate time to preapir [sic] for my Defence [sic].

(Vol. 2 at 119). At most, Reynolds's motion indicates a lack of rapport and trust in his defense counsel. *See Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) ("[R]ejecting the claim that the Sixth Amendment guarantees 'a meaningful relationship between an accused and his counsel[,]'" as "[n]o court could possibly guarantee that a defendant will develop . . . rapport with his attorney – privately retained or provided by the public."). Further, the last-minute nature of the motion suggests intentional delay rather than an honest belief his counsel was ineffective.

supposedly lackluster relationship, some admissible (and reliable) exculpatory evidence would have been discovered and presented to the jury, and, on that basis, there is a reasonable probability of a different outcome.

Reynolds's argument that his counsel was ineffective for failing to procure him a pair of eyeglasses is equally unavailing. Reynolds alleged that defense counsel failed to provide him with a new pair of prescription eyeglasses, despite counsel's awareness of Reynolds's visual impairment and knowledge that Reynolds's prescription eyeglasses were broken and taken into the State's custody to be presented as evidence at Reynolds's trial. (Doc. # 31 at 74) (citing Vol. 11 at 98-99, 108); (Doc. # 1 at 71). Reynolds contends that, as a result, he suffered prejudice because he was unable to see exhibits and, more generally, participate meaningfully in his own defense at trial. (Doc. # 1 at 74) (citing Vol. 24 at 162-63) (citing in turn Vol. 11 at 98-99, 108).

As discussed above, the ACCA noted that Reynolds failed to plead "how his alleged limited vision prejudiced him at trial" and failed to demonstrate *Strickland* prejudice when relying on "a bare assertion that he was prejudiced and that there was a reasonable probability that the outcome would have been different." (Vol. 33 at 135) (citing *Hyde*, 950 So. 2d at 356). Moreover, Reynolds does not provide any precedential support for his argument. In any event, this claim is without merit as Reynolds has not shown (and the record does not support) that Reynolds's nearsightedness resulted in a denial of his ability to assist his counsel and meaningfully participate in his defense. (*See* Vol. 11 at 108-09) (explaining that while nearsighted, Reynolds "can see anything up close").

Similarly, Reynolds's contentions regarding his counsel's purported failure to discuss Reynolds's decision to testify and to prepare for such testimony are unavailing. He cannot show that the ACCA's holding that these claims were insufficiently pleaded was objectively unreasonable or contrary to Supreme Court precedent. (*Id.*). Reynolds did not plead what advice

should have been given to him, whether he would have chosen not to testify had he had been adequately advised, how trial counsel should have prepared him to testify, or how his testimony would have been different if he were adequately prepared. (Vol. 33 at 135) (citing *Hyde*, 950 So. 2d at 356). But, even if properly pleaded, Reynolds's claim would still fail for an alternative reason: he does not indicate how he was in any way prejudiced.

### 2.     Investigation of the State's Case

Reynolds contends that trial counsel was ineffective for failing to adequately investigate the State's case. (Doc. # 1 at 74-75) (citing Vol. 24 at 166-68). In support, Reynolds points to counsel's alleged inability to procure potential impeachment evidence for trial by failing to hire a replacement investigator, failing to interview multiple State's witnesses, and failing to identify and interview the Martins' neighbors and other witnesses (including persons mentioned in witness statements to police). (*See id.*) (citing Vol. 24 at 166-68).

The ACCA determined that Reynolds's claim that trial counsel "failed to adequately investigate the State's case" was insufficiently pleaded and properly dismissed because (1) "most of the individuals Reynolds alleged "could have been interviewed by trial counsel" were "unnamed" and (2) even when an individual was named Reynolds did not specifically "plead what counsel would have learned from a majority of the individuals had [they] been interviewed." (Vol. 33 at 140) (citing *Daniel v. State*, 86 So. 3d 405, 416-17 (Ala. Crim. App. 2011)) (holding that a petitioner insufficiently pleaded a *Strickland* claim regarding counsel's alleged failure to investigate where the petitioner did not plead the information to be uncovered or the names of witnesses to be interviewed). The ACCA similarly held that Reynolds's claim that "trial counsel failed to locate witnesses to corroborate" an allegedly threatening note written by Chad Martin to

Charles Martin was insufficiently pleaded because Reynolds "failed to plead the name of anyone who could, in fact, corroborate the existence of the note." (*Id.*).

With respect to Reynolds's claim that counsel failed to hire a replacement investigator, the ACCA determined that "Reynolds failed to plead how much of the investigation had been completed and what remained, and, more importantly, what a second investigator could have uncovered." (*Id.*). Further, to the extent Reynolds pleaded that his trial counsel should have investigated West's activities before and after the crime and the individuals named in her statement to police, the ACCA concluded that Reynolds "failed to plead what trial counsel would have learned had [such an] investigation taken place." (*Id.* at 140-41). Indeed, as the ACCA put it, "it is entirely possible that investigation into those lines of inquiry would have corroborated West's account." (*Id.* at 141). The ACCA also found similar pleading deficiencies with regard to Reynolds's claim that "trial counsel should have investigated the amount of drugs consumed by West and Reynolds prior to the crime and the effect that quantify of drugs would have had on them" because Reynolds "failed to plead the actual amount of drugs consumed or their effect." (*Id.*) (citing *Connally v. State*, 33 So. 3d 618, 622-23 (Ala. Crim. App. 2007)).

The ACCA recognized that "[i]n some limited instances . . . Reynolds pleaded what information could have been learned had a particular interview been conducted." (*Id.*). For instance, the ACCA acknowledged that Reynolds "pleaded that had trial counsel interviewed 'neighbors who lived near the scene of the crime,' trial counsel would have learned evidence that was [allegedly] inconsistent with West's testimony." (*Id.*, quoting Vol. 24 at 168-69). However, as the ACCA noted, Reynolds "failed to identify the neighbors by name." (*Id.*) (citing *Lee v. State*, 44 So. 3d 1145, 1158 (Ala. Crim. App. 2009)) (rejecting an ineffective assistance of counsel claim as insufficiently pleaded when petitioner failed to identify by name one of the state witnesses

counsel allegedly failed to investigate). The ACCA also recognized that Reynolds pleaded that "had counsel interviewed Reynolds's employer, they 'could have confirmed [his] assertion that he was paid the morning before the crime and did not need money.'" (*Id.*). However, as the ACCA observed, Reynolds "failed to identify Reynolds's employer[,]" and further observed that Reynolds couched the pleading in rank speculation. (*Id.*) (noting only that counsel may have determined Reynolds was paid before the murders) (citing *Lee*, 44 So. 3d at 1158).

The ACCA also discussed Reynolds's allegation that "counsel should have interviewed Mark Hopwood to learn that blood was not found on the floorboard of Sandra Roberts's car, which [is] where West testified[] she placed the knives." (*Id.*) The ACCA determined that Reynolds pleaded "[i]n conclusory fashion" that such an interview "would have undermined West's testimony" and "failed to plead how he was prejudiced by this failure to interview Hopwood." (*Id.*). In particular, the ACCA emphasized that Reynolds's generalized argument was insufficient because the record demonstrated that the "jury was made aware of the results of Hopwood's test." (*Id.*) (citing *Reynolds I*, 114 So. 3d at 114). That is correct. (*Id.*) ("During defense counsel's cross-examination of Hopwood, Hopwood testified that he had performed a chemical-screening test for the presence of blood in various places of the interior of the automobile that Reynolds and West used on the night of the murders, but that the test did not detect the presence of blood.").

None of Reynolds's failure-to-investigate claims were properly plead. Reynolds fails to articulate or cite to any "defect" in the ACCA's decision within his federal habeas petition. Reynolds has wholly failed to articulate how the ACCA's explanation was objectively unreasonable. More specifically, Reynolds has not articulated or cited to any "defect" in the ACCA's decision. Although Reynolds cites *Gregg v. Georgia*, 428 U.S. 153, 187 (1976), and *Rompilla v. Beard*, 545 U.S. at 374, 387 (2005), arguing the general propositions that counsel has

a duty to investigate. (*See* Doc. # 1 at 74-75), he has not provided any analysis as to why the ACCA's determination on this issue is contrary to *Gregg* or *Rompilla*. (*Id.*).

Reynolds has failed to properly plead this *Strickland* claim. *See* 28 U.S.C. § 2254 Rule 2(c) ("[h]abeas petitions must meet heightened pleading requirements."); *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citing 28 U.S.C. § 2254 Rule 2(c)). He has failed to meet the heightened requirements of habeas pleading. His petition did not provide specific facts explaining why his counsel's pretrial investigation was inadequate (*i.e.*, what specific information counsel would have found had they made what Reynolds contends would have been an adequate investigation). Nor has Reynolds adequately pleaded *Strickland* prejudice. He has not sufficiently alleged that but for his counsel's failure to have found such information, there exists a reasonable probability that introduction of the information would have changed the result of the trial. Further, Reynolds has not stated any specific facts identifying and detailing who the witnesses were that trial counsel failed to investigate, what specific mitigating evidence they would have provided, or how, absent that evidence Reynolds suffered actual prejudice at trial or in sentencing. Thus, Reynolds has failed to "state specific, particularized facts which entitle [him] habeas corpus relief" on this claim. *See Adams*, 897 F.2d at 334.

Finally, even if Reynolds had pleaded sufficient facts, his claim would still be unavailing. The cases Reynolds cites are not relevant. *Gregg* held that imposition of the death penalty was not necessarily cruel and unusual punishment. 428 U.S. 153. And *Rompilla* held that trial counsel was ineffective for failing to obtain materials that counsel had known the prosecution would probably use at the trial's sentencing phase. 545 U.S. at 389. Neither holding would be relevant here. This claim is due to be denied.

### 3.    Investigation of Decomposition Evidence

Reynolds next argues that his trial counsel was constitutionally ineffective in failing to investigate and obtain additional analysis of decomposition evidence, which was identified by the State's expert witness, Dr. Craig. (Doc. # 1 at 75) (citing Vol. 17 at 192-94). In support, Reynolds argues that Dr. Craig's testimony -- recorded before trial -- revealed that "Savannah Martin had more advanced decomposition than her parents." (*See id.*) (citing Vol. 24 at 176-78). Reynolds claims that this indicates the possibility of Savannah's murder occurring first, and Reynolds argues that if this fact were proven true it would have been in direct conflict with West's testimony and timeline of events. (*Id.*). Reynolds further asserts that his trial counsel was aware of this discrepancy in decomposition evidence but did not investigate further or "search for a countervailing expert." (*Id.*) (citing Vol. 24 at 176-78).

Reynolds also alleges that "forensic evidence around West's timeline of events is untenable and developing this could have been a valuable tool for impeachment at trial" and for undermining the State's timeline of events. (*Id.*). Reynolds suggests that "[t]his evidence . . . *could have* refuted West's testimony that Savannah Martin was killed after her parents in order to eliminate a potential eyewitness." (*Id.* at 50) (emphasis added).

Reynolds initially raised this claim before the Rule 32 court, which dismissed it as insufficiently pleaded under Rules 32.3 and 32.6(b), Ala. R. Crim. P. (Vol. 33 at 149). The ACCA affirmed the Rule 32 court's dismissal of this claim because Reynolds failed to sufficiently plead this claim in his amended Rule 32 petition. The ACCA began its review of this claim by summarizing the actual content of Reynolds's pleadings. (*Id.* at 148-49). As the ACCA recognized, "Reynolds pleaded Dr. Craig testified that Savanah Martin's body showed early decompositional changes, . . . indicat[ing] that her body had progressed further into decomposition than her parents'

bodies." (*Id.*). But, this evidence does not make the point that Reynolds suggests. Dr. Craig clarified "that it was possible that their deaths had occurred at the same time, and that the discrepancy in decomposition was due to environmental factors[.]" (*Id.* at 149 n.8).

As the ACCA explained, Reynolds's claim was insufficiently pleaded because he failed to allege with specificity the following facts: "the name of any expert available to investigate and to testify on this issue," "what additional investigation the unnamed expert should have conducted," "what information trial counsel would have learned from the unspecified investigation," and "how trial counsel's failure to learn [this] information prejudiced him at trial." (*Id.* at 149) (citing *Daniel*, 86 So. 3d at 437-38). For these reasons, the ACCA determined that Reynolds's claim that his trial counsel was ineffective for failing to investigate or seek further expert testimony regarding West's timeline of event was insufficiently pleaded and properly denied by the Rule 32 court. (*Id.*).

After careful review, it is clear that this claim is based on speculation and conclusory arguments. Specifically, Reynolds has failed to describe how "additional analysis of [the] decomposition evidence" would have created a reasonable probability that his sentence would have been something less than death. But, even putting aside this defect, Reynolds also failed to show that the ACCA's adjudication of this claim was contrary to clearly established federal law or based on unreasonable facts.

Reynolds's habeas petition does not offer any rebuttal to the ACCA's catalog of pleading deficiencies, much less make an argument showing that the ACCA's factual determinations were objectively unreasonable. Further, Reynolds does not challenge the ACCA's decision on any other meritorious grounds.

To the extent Reynolds argues that the ACCA's decision was contrary to or involved an objectively unreasonable application of *Strickland*, he simply has not satisfied AEDPA's burden

of proof. Reynolds argues that "[i]n light of the particular forensic evidence in this case, and the fact that the case turned on the credibility of dueling eyewitness accounts," his "counsel's conduct fell below professional norms." (Doc. # 1 at 75-76). But he has not provided any specifics (or citation to the record) regarding what particular forensic evidence he is referencing. Consequently, Reynolds has not presented any argument sufficient to overcome AEDPA's doubly deferential treatment of the ACCA's adjudication and dismissal for insufficient pleading of Reynolds's *Strickland* claim.

Moreover, upon the court's independent review of Reynolds's Rule 32 pleadings and habeas petition, and in light of the record before the ACCA as a whole, the court concludes that Reynolds failed to plead with specificity a number of key points: who would provide expert testimony at his trial; what that testimony would be; what forensic tests should be performed to obtain this expert evidence; how that testimony would undermine West's testimony, along with the State's case; and how that testimony would have refuted, or even differed from, Dr. Craig's explanation that environmental factors can alter the speed of decomposition. *Reynolds v. State*, Mem. Op. at 49-50 (Ala. Crim. App. Apr. 22, 2016).

Reynolds also failed to specifically plead how this unknown, unspecified, potential expert-testimony, if introduced, would result in a reasonable probability that he would not have been sentenced to death in light of the overwhelming evidence against him. And, he failed to address what effect this unspecified "forensic expert" evidence would have had on the three statutory aggravating circumstances, the one statutory mitigating circumstance, and/or defense counsel's mitigation case that was presented at trial.

Reynolds did not properly allege cause or prejudice. This claim is due to be denied.

### 4.      No Motion for Change in Venue

Reynolds claims that his trial counsel's failure to move for a change of venue amounted to ineffective assistance under *Strickland*. (Doc. # 1 at 76-78). In support, Reynolds contends that his counsel had a demonstrated awareness of the potential for prejudice and jury contamination due to "extensive" news coverage, "community outreach," and publicity that continued after the murders. (*See id*. at 76-77) (citing Vol. 24 at 170-71). Reynolds alleges that this publicity included information such as Reynolds's prior criminal activity and statements from the chief investigator that discussed the emotional difficulties innate in investigating the Martin family's murders. (*See id.* at 76) (citing Vol. 24 at 170-71). Reynolds also asserts that at the time of trial "Remember Savannah" signs were displayed on "several businesses near the courthouse." (*Id.* at 76, 78) (citing Vol. 24 at 170).

According to Reynolds, the news media publicized his criminal history to the jury pool "even though the State stipulated that Mr. Reynolds's criminal history was not significant and would not be introduced to the jury." (*Id.* at 78) (citing Vol. 24 at 170-71; Vol. 12 at 178). Reynolds alleges that, despite expressly requesting and receiving assurances from Ms. Granger that counsel would move for a change in trial venue, his trial counsel neglected to do so. (*See id.* at 76) (citing Vol. 24 at 170-71). Reynolds points to his trial counsel's motion to sequester the jury, which noted that the "case's notoriety" and the risk of exposure to prejudicial publicity. (*Id.*) (citing Vol. 24 at 170; Vol. 1 at 191). Based on this, Reynolds deduces that his counsel believed "that the publicity would negatively impact [his] trial" and claims that counsel's deficient actions in failing to move for a change of venue resulted in either actual or presumed prejudice. (*Id.*).

Reynolds raised this claim for the first time in his Rule 32 proceedings. The Rule 32 court

rejected his claim because it was insufficiently pleaded under Rules 32.3, 32.6(b) and 32.7(d).[63]

(Vol. 33 at 142-44). The ACCA affirmed the Rule 32 court's dismissal of Reynolds's claim,

agreeing the claim was insufficiently pleaded. (*Id.* at 142, 146) (citing Ala. R. Crim. P. 32.3,

32.6(b), 32.7(d)). In explaining when a change of venue is appropriate, the ACCA noted:

> [A] change of venue must be granted only when it can be shown that the pretrial
> publicity has so 'pervasively saturated' the community as to make the 'court
> proceedings nothing more than a "hollow formality,"' *Hart v. State*, 612 So. 2d
> 520, 526-27 (Ala. Crim. App.), *aff'd*, 612 So. 2d 536 (Ala. 1992), *cert. denied*, 508
> U.S. 953 (1993), citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963), or when
> actual prejudice can be demonstrated. The burden of showing this saturation of the
> community or actual prejudice lies with . . . [Reynolds]. *Sheppard v. Maxwell*, 384
> U.S. 333 (1966). [. . .] [T]o show community saturation, . . . [Reynolds] must show
> more than the fact 'that a case generates even widespread publicity.' *Thompson v.
> State,* 581 So. 2d 1216, 1233 (Ala. Crim. App. 1991), *cert. denied*, 502 U.S. 1030
> (1992). '"Newspaper articles alone would not necessitate the change of a venue
> unless it was shown that the articles so affected the general citizenry through the
> insertion of such sensational, accusational or denunciatory statements, that a fair
> and impartial trial was impossible. *Patton v. State*, 21 So. 2d 844 (Ala. 1945).'"
> *Thompson v. State*, [581 So. 2d at 1233], quoting *McLaren v. State*, 353 So. 2d 24,
> 31 (Ala. Crim. App.), *cert. denied*, 353 So. 2d 35 (Ala. 1977). Furthermore, . . . for
> [Reynolds] to show prejudice, the '"proper manner for ascertaining whether
> adverse publicity may have biased the prospective jurors is through the voir dire

---

[63] As the Rule 32 court explained, "even assuming his allegations as true, Reynolds has failed to plead any
facts that would show there was actual prejudice or presumed prejudice based on community saturation." (Vol. 25 at
185). Notably, in holding that Reynolds insufficiently pleaded presumed prejudice that only applies to rare,
exceptional cases as the result of prejudicial publicity saturating the entire community as a whole, where Reynolds
failed to plead "how . . . the news coverage was extreme" and did not provide any "reference[s] to sensational,
inflammatory, slanted news coverage" within the articles referenced. (*See id.* at 185-86) (finding that with regard to
Reynolds's complaint that the Gadsden Times article published his guilty-pleas to unrelated drug charges on May 31,
2004 – "three years before his trial" – Reynolds failed to plead how "this article [was] prejudicial, inflammatory, or
slanted[,]" or what "information in this article was [not] a factual account of a public record") (citing Vol. 24 at 33).
The Rule 32 court provided that "Reynolds . . . failed to plead facts that if true, would show how any of the four
*Skilling* factors supported the existence of presumed prejudice[;]" adding that Reynolds never mentioned these "factors
in his petition." (*Id.* at 84) (citing *Luong v. State*, No. 1121097, 2014 WL 983299, at *4 (Ala. March 14, 2014), citing
in turn *Skilling v. United States*, 561 U.S. 358 (2010)).

The court recognizes that the ACCA's adjudication on the merits, affirming the Rule 32 court's summary
dismissal of Reynolds's change of venue *Strickland* claim, is the controlling state court decision for purposes of this
court's federal habeas review. However, to the extent Reynolds challenges the Rule 32 court's reference to *Skilling*
factors in his brief and reply (*see* Docs. # 1 at 77-79; 31 at 82-83), the court will address that argument below.

examination." *Anderson v. State*, 362 So. 2d 1296, 1299 (Ala. Crim. App. 1978).'
*Ex parte Grayson*, 479 So. 3d 76, 80 (Ala. 1985), *cert. denied* 474 U.S. 865 (1985).

(Vol. 33 at 143, quoting *Oryang v. State*, 642 So. 2d 979, 983 (Ala. Crim. App. 1993)). The ACCA recognized that Reynolds pleaded the titles of several published newspaper articles that reported on the case, the victims, or Reynolds's criminal history. (*Id.* at 44). But, the ACCA reasoned that Reynolds failed to allege that "the articles were sensational, accusational, or denunciatory." (*Id.*) (citing *Oryang*, 642 So. 2d at 983).

Similarly, the ACCA explained that Reynolds's allegation that "dozens of potential jurors had knowledge of the murders" was insufficiently pleaded where Reynolds failed to "identify the jurors." (*Id.*) (citing *Washington v. State*, 95 So. 3d 26, 62-63 (Ala. Crim. App. 2012)). Recognizing that Reynolds properly pleaded the identity of three jurors, the ACCA nonetheless concluded that this claim still failed because Reynolds had not pleaded that those jurors were unable to be impartial due to the media coverage. (Vol. 33 at 144; Vol. 25 at 185).

Next, the ACCA held that Reynolds insufficiently pleaded his claim that "prejudice may be presumed[.]" (*Id.*). The ACCA explained that "'[p]rejudice is presumed from pretrial publicity when *pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community* where the trials were held.'" (Vol. 33 at 144, quoting *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir. 1985)) (emphasis in original). However, as the ACCA correctly cautioned, "[p]rejudice is rarely presumed" and such a presumption is "reserved for only 'extreme situations.'" (*Id.*, quoting *Hunt*, 642 So. 3d at 1043, quoting in turn *Coleman*, 778 F.2d at 1537). The ACCA concluded that Reynolds's claim, as pleaded, did not demonstrate such an exceptional circumstance. Rather, the ACCA held that the handful of articles pleaded by Reynolds failed to show that prejudicial pretrial publicity saturated the community, even those that

publicized Reynolds's' past criminal conduct. (*Id.*) (citing *Hunt v. State*, 642 So. 2d 999, 1043 (Ala. Crim. App. 1993), quoting in turn *Coleman*, 778 F.2d at 1537).

Finally, the ACCA determined that Reynolds failed to plead sufficient facts showing that such a motion for new venue would have been meritorious. (*Id.*). As "[t]rial counsel cannot be held ineffective for failing to raise a meritless motion," the ACCA held that Reynolds failed to sufficiently plead facts that, if true, would satisfy *Strickland* deficiency or prejudice. (*Id.*) (citing *McNabb v. State*, 991 So. 3d 313, 327 (Ala. Crim. App. 2007); *Bearden v. State*, 825 So. 3d 868, 872 (Ala. Crim. App. 2001). So, the ACCA affirmed the Rule 32 court's dismissal. (*Id.*) (citing Ala. R. Crim. P. 32.7(d)).

Reynolds contends that habeas relief is appropriate under § 2254(d)(2) because the ACCA's decision relies on unreasonable factual determinations. (*See* Doc. # 31 at 74). The court disagrees.  At best, Reynolds has made sporadic references to the record that fail to identify the specific factual findings he alleges were unreasonably determined. Therefore, to succeed on the merits, Reynolds must show that the ACCA's decision violated § 2254(d)(1). In his petition, Reynolds references *Irvin v. Dowd*, 366 U.S. 717 (1961); *Rideau v. Louisiana*, 373 U.S. 723 (1963); and *Skilling v. United States*, 561 U.S. 358 (2010).[64] (Doc. # 1 at 76-78). But, as the court explains below, the ACCA's decision is not contrary to these cases.

---

[64] Reynolds also cites *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985), and *Coleman v. Zant*, 708 F.2d 541 (11th Cir. 1983). (Doc. # 1 at 76). Again, section 2254(d)(1) requires that the ACCA's decision be contrary to the holding of a case from the Supreme Court of the United States. Nonetheless, the court notes that the Eleventh Circuit cases that Reynolds cites here do not adequately support his claim. *See Kemp*, 778 F.2d 1487, 1539 (holding that the petitioner made a sufficient *showing* of prejudicial publicity); *Zant*, 708 F.2d 541 (relying on *Irvin v Dowd* and *Rideau* for the legal framework and holding that an evidentiary hearing was needed)

Here, as the ACCA appropriately determined, in order to satisfy the prejudice prong of *Strickland*, Reynolds must establish that there is a reasonable probability that, but for his counsel's failure to move the court for a change of venue, the result of the proceeding would have been different. At minimum (and as discussed above), Reynolds was required to plead specific facts demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if Reynolds's counsel had presented such a motion to the court. Reynolds utterly failed that burden. Accordingly, the ACCA properly determined that Reynolds did not plead

In *Irvin*, the court noted an extensive list of prejudicial publicity:

[P]etitioner's first motion for a change of venue from Gibson County alleged that the awaited trial of petitioner had become the cause ce le bre of this small community—so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the State of Kentucky, where petitioner is alleged to have committed one of the six murders, if Indiana failed to do so. Another characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories petitioner was described as the 'confessed slayer of six,' a parole violator and fraudulent-check artist. Petitioner's court-appointed counsel was quoted as having received 'much criticism over being Irvin's counsel' and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin. On the day before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case) as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.'

---

facts showing that his counsel's purported failure to move for a change in venue resulted in prejudice because Reynolds has not shown this motion would have had merit.

366 U.S. 717, 725-26. And, the Court noted that of the 430 venire members, the court excused 268 "for cause as having fixed opinions as to the guilt of petitioner." *Id.* at 727. In fact, eight of the selected jurors in *Irvin* revealed in voir dire that they thought the petitioner was guilty. *Id.* Here, as the ACCA explained, Reynolds did not plead facts (as to the amount of publicity or to the level of prejudice) comparable to those in *Irvin*.

In *Skilling*, the Supreme Court determined that a lower court appropriately denied a motion to change venue despite hundreds of publications about Enron's financial collapse that referred to the named defendant. *See Skilling,* 561 U.S. at 367-77. Moreover, the motion to change venue was denied despite the fact that the *Skilling* defendant offered *specific* evidence including not only copies of the "named" articles but also the statistical analyses of the composition of and "prejudicial permeation" of this reporting into the community's beliefs along with comparative analyses of other potential available venues. *See Skilling*, 561 U.S. at 369-71.

The *Skilling* Court noted that a change in venue was only necessary when the "conviction [was] obtained in a trial atmosphere that [was] utterly corrupted by press coverage." 561 U.S. at 380, quoting *Murphy v. Florida,* 421 U.S. 794, 798-799 (1975). Further, "[j]uror exposure to . . . news accounts of the crime . . . alone [does not] presumptively deprive[] the defendant of due process." *Id*. Here, Reynolds has not pleaded anything even remotely close to a "carnival atmosphere" or that his conviction was obtained in a trial atmosphere utterly corrupted by press coverage." Accordingly, Reynolds has not shown that the ACCA's decision was contrary to *Skilling*.[65]

---

[65] Reynolds also argues that the presence of signs on buildings near the courthouse in memory of Savannah tends to show media influence on the verdict as contemplated in *Skilling*. 561 U.S. at 383. But, in light of the overwhelming evidence presented against Reynolds, the signs near the courthouse had no prejudicial effect. Thus, the ACCA's decision is not contrary to *Skilling*.

In *Rideau*, the Supreme Court overturned a conviction due to manifest prejudice where the evidence demonstrated that three jurors likely watched a broadcast of the petitioner's confession to committing murder, kidnapping, and robbery. 373 U.S. at 725-727 (1963). Reynolds did not plead facts near that level of prejudice. Thus, a fair-minded jurist could conclude that the ACCA's decision is not contrary to *Rideau*. Accordingly, this claim is due to be denied, as Reynolds fails to prove that the ACCA's decision is contrary to, or an unreasonable application of, clearly established federal law.

### 5.   Failure to Adequately Conduct *Voir Dire*

Reynolds claims that his counsel was ineffective for failing to conduct an adequate *voir dire*, which deprived him of a fair trial and impartial jury. (*See* Docs. # 1 at 79; 31 at 83-85). Reynolds asserts that "[c]ounsel's failure . . . was not a matter of strategy and [that it] fell below prevailing professional norms." (Doc. # 1 at 79) (citing *Strickland*, 466 U.S. at 690). Reynolds also contends that "where counsel failed to inquire if certain jurors could be impartial, ensure they understood mitigation, and life-qualify the panels, there is a reasonable probability that a different jury would have been selected and the result of the proceeding would have been different." (*Id.* at 79-80) (citing *Strickland*, 466 U.S. at 694).

Reynolds first raised this claim before the Rule 32 court, which summarily dismissed this claim under Alabama Rules of Criminal Procedure 32.3, 32.6(b), and 32.7(d) as insufficiently plead and, alternatively, "facially meritless."[66] (Vol. 25 at 186-88); (*see also*, Vol. 33 at 145). The ACCA affirmed the Rule 32 court's dismissal.

---

[66] In support of its alternative holding -- that Reynolds's claim was due to be dismissed under Rule 32.7(d), as this claim "[was] facially meritless and fail[ed] to state a material issue" (Vol. 25 at 188) -- the Circuit Court explained:

Even accepting [Reynolds's] allegations as true, Reynolds has failed to plead a facially meritorious claim that, if true, would show trial counsel was deficient. "Generally, an attorney's actions during

> Reynolds pleaded that trial counsel failed to ask three of the four panels of prospective jurors "whether the fact that they, a close family member, or friend had been the victim of a crime would affect their ability to be impartial," and failed to ask any of the panels "whether the fact that they had a family member in law enforcement would affect their ability to be impartial." Reynolds also pleaded that trial counsel failed to adequately life-qualify the prospective jurors, relied on jury questionnaires without asking an adequate amount of follow-up questions, and failed to explain mitigation or the penalty phase.

(Vol. 33 at 145, quoting Vol. 24 at 172-73) (internal citation omitted).

The ACCA explained that "[b]eyond a bare allegation of prejudice, Reynolds failed to plead any facts to indicate that he was, in fact, prejudiced by trial counsel's failures to address the aforementioned issues in *voir dire*." (*Id.*). Further, "Reynolds failed to identify any jurors who were biased against him or that did not understand the penalty phase." (*Id.*) (citing *Washington v. State*, 95 So. 3d 26, 63-64 (Ala. Crim. App. 2012)).

Reynolds has failed to show that the ACCA's determination was objectively unreasonable. Moreover, Reynolds has not attempted to (nor could he) show that the ACCA's decision was based on any unreasonable determination of the facts. Accordingly, Reynolds is not due relief under § 2254(d)(2).

Nor was the ACCA's determination contrary to clearly established Supreme Court precedent. Reynolds references *Strickland* and *Morgan v. Illinois*, 504 U.S. 719 (1992), to support this claim. However, the ACCA's decision is not contrary to the decision in either case. *Strickland* involved penalty-phase evidence (not a *voir dire* challenge), and the *Strickland* Court reversed the lower court's determination that the petitioner received ineffective assistance of counsel. *See*

---

*voir dire* are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is . . . so ill chosen that it permeates the entire trial with obvious unfairness."

(*Id.*, quoting *Washington*, 95 So. 3d at 63-64 (Ala. Crim. App. 2012)).

*generally Strickland*, 466 U.S. 688. Accordingly, even if Reynolds's *voir dire* claim was substantively reviewed under *Strickland*, he could not demonstrate that the ACCA's decision was contrary to *Strickland*.

In *Morgan*, the trial court asked the questions during *voir dire*. 504 U.S. at 722-23. While the trial court asked the death-qualifying questions that the prosecution requested, it refused to ask venire members the life-qualifying question requested by the defense. *Id.* The Court recognized its previous holdings (1) that a juror must be removed for cause if he would not vote for capital punishment in any case and (2) that a juror who would automatically vote for the death penalty without weighing the aggravating and mitigating circumstances as instructed must also be removed for cause. *Id.* at 728-29. "If even one such juror [who would automatically vote for the death penalty] is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*at 729. The *Morgan* Court reasoned "[w]ere *voir dire* not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so. *Id.* at 733-34 (emphasis in original).

The facts surrounding the *voir dire* in Reynolds's case are much different than those in *Morgan*. Reynolds claims, without pointing to any record evidence, that a venire member selected for the petit jury indicated on a questionnaire "that death was the only just punishment if a defendant was found guilty of murder." (Doc. # 1 at 79).[67] First, as pleaded, that indication is not enough to disqualify the contested juror: the contested juror did not indicate that he could not put

---

[67] While Reynolds does not specify which juror in his federal habeas petition, Reynolds indicated that it was juror B.T. in his Rule 32 petition. (*Compare* Doc. # 1 at 79 *with* Vol. 24 at 173).

his personal feelings aside and, instead, follow the law regarding aggravating and mitigating circumstances as instructed. (Vol. 7 at 88-90, 92-93). Second, unlike *Morgan*, the trial court in Reynolds's case did not refuse him the ability to ask life-qualifying questions. In fact, after the process of weighing aggravating and mitigating circumstances at the penalty phase was explained to the venire-panel on which the contested juror participated, the venire-panel was asked life qualifying questions. (*Id.*). Therefore, Reynolds did not sufficiently plead, and, further, has not substantively shown that the ACCA's decision is contrary to *Morgan*.[68]

In sum (and as previously recognized), the ACCA concluded that "[b]eyond a bare allegation of prejudice, Reynolds failed to plead any facts to indicate that he was, in fact, *prejudiced* by trial counsel's failures to address the aforementioned issues in voir dire." (Vol. 33 at 145) (emphasis added). Similarly, here Reynolds fails to plead any facts to indicate that he suffered actual prejudice resulting from his trial counsel's alleged deficiencies during *voir dire*. (Doc. # 31 at 83-85). Merely asserting that prejudice has occurred is not adequate to plead a *Strickland* prejudice claim and does not satisfy the federal habeas fact-based pleading requirements under AEDPA. *See McFarland*, 512 U.S. at 856 (citing 28 U.S.C. § 2254 Rule 2(c)). Further, Reynolds has not shown that the ACCA's decision was based on an unreasonable determination of the facts or was contrary to clearly established federal law such that no fair-minded jurist could agree. Accordingly, this claim is due to be denied.

---

[68] Another distinguishing factor between Reynolds's case and *Morgan* is that the statutory framework in *Morgan* required a unanimous vote for the death penalty while in Reynolds's case only a ten-to-two vote was required. Reynolds fails to plead that a second (or third) juror was improperly disinclined from a death sentence. Moreover, Reynolds does not plead that the contested juror infected the petit jury's deliberations at the penalty phase.

### 6.        Failure to Make a *Batson* Objection

Reynolds also claims that his trial counsel was constitutionally ineffective for failing to make a *Batson* objection in response to the State's alleged racially discriminatory peremptory strikes. (Doc. # 1 at 80-81). Reynolds contends that his counsel's failure was "objectively unreasonable" and resulted in "presume[ed] prejudice[]." (Docs. # 1 at 80; 31 at 85) (citing *Batson*, 476 U.S. at 79, 96-97).

The Rule 32 court dismissed the claim because it was insufficiently pleaded in violation of Rules 32.2 and 32.6(b). (*See* Vol. 33 at 147; Vol. 25 at 188-90). The ACCA affirmed the Rule 32 court's dismissal. (Vol. 33 at 147). The ACCA explained the three-step analysis a court must apply to decide whether a *Batson* violation occurred. (Vol. 33 at 146). The ACCA then noted:

> In the first step of the process, the step at issue here, "[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination." *Ex parte Brooks*, 695 So. 2d 184, 190 (Ala. 1997). "In addition to showing that the State used peremptory challenges to remove members of a cognizable group . . . and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner." *Madison v. State*, 718 So. 2d 90, 101 (Ala. Crim. App. 1997). "The facts and circumstances necessary to establish a prima facie case of purposeful discrimination in the jury selection process will, of course, vary from case to case, depending on the particular facts and circumstances involved." *Kidd v. State*, 649 So. 2d 1304, 1311 (Ala. Crim. App. 1994). While it is true the striking of one person for a racial reason is a violation of the principles of *Batson* and grounds for reversal, *see Williams v. State*, 548 So. 2d 501, 507 (Ala. Crim. App. 1988), it is equally true that "[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case." *Edwards v. State*, 628 So. 2d 1021, 1024 (Ala. Crim. App. 1993).

(*Id.* at 147, quoting *Carruth v. State*, 165 So. 3d 627, 638 (Ala. Crim. App. 2014), quoting in turn, *Lightfoot State*, 152 So. 3d 434, 438 (Ala. Crim. App. 2012), *rev'd on other grounds Ex parte Lightfoot*, 152 So. 3d 445, 438 (Ala. 2013)). The ACCA applied these principles.

Reynolds argues that trial counsel were ineffective for failing to make a *Batson* motion. Reynolds pleaded that the State used its peremptory challenges to strike 9

of the 14 eligible black prospective jurors and these prospective jurors were a heterogeneous group whose only shared characteristic was their race. In support of that assertion, Reynolds pleaded that four of the black prospective jurors who were struck provided little to no information during voir dire, while three white women who provided no information during voir dire served on the jury.

(*Id.*).

The ACCA held that Reynolds insufficiently pleaded his *Strickland/Batson* claim because he only "made a bare allegation that the eligible black prospective jurors who were struck by the State were a heterogenous group who shared only the characteristic of their race," and that Reynolds "failed to identify any of the jurors by name." (*Id.*) (citing *Carruth*, 165 So. 3d at 638). The ACCA also recognized that on direct appeal it had "thoroughly reviewed the record before [it] and f[ou]nd no inference of purposeful discrimination by the State." (*Id.* at 47 n.7, quoting *Reynolds*, 114 So. 3d at 86).

After careful review, the court concludes that the ACCA's decision did not involve an unreasonable application of *Strickland* or *Batson* and did not rely on an unreasonable determination of the facts before the Rule 32 court. *See* 28 U.S.C. § 2254(d). As explained in the substantive *Batson* section above, Reynolds has not shown that the State violated *Batson*. It follows that Reynolds has not shown that his counsel performed deficiently by not raising a *Batson* objection.

Further, as the ACCA held, Reynolds did not sufficiently plead this claim. The question framed within this *Strickland* claim is whether Reynolds's "petition contained sufficient facts that, if true, established an inference of racially discriminatory jury selection . . . [and], if true, established that counsel were deficient for failing to bring that to the attention of the trial court by raising a *Batson* challenge." (*See* Vol. 33 at 147, 174-75; Vol. 25 at 188-90). Notably, Reynolds's amended Rule 32 Petition made no mention of the ultimate composition of the jury selected, the

composition of the venire, or the number of peremptory strikes provided to the parties. As the ACCA points out, Reynolds also failed to disclose the identities of the venire-members allegedly struck by the State in a racially discriminatory manner. Aside from Reynolds's conclusory allegation that the African-American venire-members struck by the State were a heterogenous group, Reynolds pleaded no facts that support his claim. Reynolds also failed to identify the three white women who did not speak during *voir dire* and has not provided any additional factual comparison on which the court could reasonably rely when determining the reason for their selection, or otherwise.

The court concludes that the ACCA's decision did not violate either provision of § 2254(d). As explained above, there was no *Batson* violation and, thus, the accompanying *Strickland* claim is without merit.  Accordingly, this claim is due to be denied.

### 7.    Failure to Introduce Report of Chad Martin's Confession

Reynolds claims he received constitutionally ineffective assistance of counsel when his trial counsel failed to introduce Chad Martin's purportedly inculpatory statement into evidence. (*See* Doc. # 1 at 81) (citing Vol. 24 at 147-57). Reynolds asserts that his trial counsels' failure to introduce this statement into evidence amounted to constitutionally deficient performance and prejudiced his defense such that the outcome of his trial is unsound. (*Id.*) (citing *Strickland*, 466 U.S. at 688).

Reynolds alleges that his counsel were ineffective for failing to call at least one of five potential witnesses to testify about Chad Martin's May 25, 2003 statement to police. Reynolds complains that as a result of his counsel's failure to adequately investigate and prepare, counsel was unable to introduce allegedly confessionary statements offered to police investigators by Chad Martin, after Chad Martin testified that he could not remember the content of this statement and

after Captain Harbin was unable to authenticate the May 29, 2003 police report containing Chad Martin's purportedly inculpatory statements. (Doc. # 1 at 82).

Reynolds contends that counsel should have more thoroughly investigated and interviewed the "[f]ive people" who he claims were present for Chad Martin's confession and who could have potentially testified. (Doc. # 1 at 81) (citing Vol. 24 at 148). Reynolds asserts that "any one of [the five individuals] could have been approached [by counsel] to authenticate the typed statement provided by police." (*Id.*) (citing Vol. 24 at 148)). Reynolds argues that were this evidence introduced, his trial counsel would have been able to impeach Chad Martin's testimony that he had no involvement in the Martin family's murders or would have been able to use the statement as substantive evidence of third-party guilt. (*Id.*) (citing Vol. 24 at 147-57).

Reynolds contends that he suffered actual prejudice resulting from his counsel's failure to introduce this evidence because the jury was unable to hear Chad Martin's alleged inculpatory statements first hand. (*See id.* at 85). Reynolds asserts that "[e]vidence of a confession by a third party, either as impeachment or substantive evidence, would have cast substantial doubt on . . . Reynolds's guilt" because the evidence "directly contradicted . . . West's testimony and the State's theory of the case." (*Id.*) (citing *Strickland* 466 U.S. at 695).

The Rule 32 court summarily dismissed this claim as insufficiently pleaded under Rules 32.3 and 32.6(b). (Vol. 33 at 128; Vol. 25 at 166-70). The ACCA affirmed the Rule 32 court's dismissal, holding that Reynolds failed to plead facts sufficient to make a showing of *Strickland* error. (*See* Vol. 33 at 132). The ACCA summarized Reynolds's pleadings and provided a synopsis of the ACCA's findings of facts regarding Chad Martin on direct appeal before turning its analysis to this guilt-phase *Strickland* claim. (*See id.* at 126-27, quoting *Reynolds I*, 114 So. 3d at 92; *see also id.* at 128).

Next, the ACCA observed that while Reynolds alleged that five other people *could have* authenticated the report, Reynolds failed to plead facts "that would indicate that they could, in fact, do so." (*Id.* at 128-29) (citing *Hyde*, 950 So. 2d at 356). The ACCA explained that "Reynolds failed to plead what the testimony would be of any of the five named individuals that could authenticate the report." (*Id.*); (*see also* Vol. 25 at 167).

"More importantly," the ACCA held, "Reynolds failed to plead how Chad Martin's confession was consistent with the defense's theory of the case," given that Reynolds's strategy at trial suggested West's involvement in the murders and generally limited his own involvement to helping West "clean up" after the murders occurred. (*Id.*). The ACCA provided an example of such an inconsistency, recognizing that while "Chad Martin named several individuals that had allegedly participated in the murders, West was not mentioned during the statement." (*Id.*)  (citing Vol. 18 at 9-11.  The ACCA also noted that Captain Harbin's report of Chad Martin's statement actually implicated Reynolds in the murders and was *not exculpatory*.  (*Id.* at 129-30; *see* Vol. 18 at 11).  The ACCA further explained that Reynolds's testimony at trial about attempting to destroy evidence "[was] inconsistent with Chad Martin's statement," where Chad Martin "[s]pecifically . . . stated that it was he who had poured gasoline through the Martins' house, and that it was he who had retrieved the gas can from the trunk of Langley's vehicle." (*Id.*).

In short, the ACCA held that Reynolds "failed to plead sufficient facts to indicate that the five individuals could authenticate the report for impeachment purposes and failed to plead how Chad Martin's statement would have been consistent with his theory of the case." (*Id.* at 130); (*see id.* at 130-31) (citing *McWhorter v. State*, 142 So. 3d 1195, 1237 (Ala. Crim. App. 2011); *see Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will be so, that course should be followed")).

238

"[L]ikewise," the ACCA determined, "Reynolds's claim regarding trial counsel's failure to admit the confession as substantive evidence of third-party guilt must . . . fail[.]" (Vol. 33 at 131). For support, the ACCA looked to its decision on direct appeal, which concluded that Chad Martin's confession was not admissible because the report, which was hearsay, "did not have 'sufficient indica of reliability' to overcome the prohibition against providing third party's guilt by use of hearsay evidence." (*Id.*, quoting *Reynolds I*, 114 So. 3d at 102-03). The ACCA held that Reynolds failed to meet his heightened pleading burden under Rules 32.3 and 32.6(b) because Reynolds did not "plead specific facts indicating what the testimony would be of any of the five named individuals regarding the report." (*Id.*). The ACCA reasoned that Reynolds failed to provide documents indicating the identity of the "five people" who he alleges his counsel failed to call at trial, the degree of personal knowledge each of these five people possess, or what testimony each of these five individuals were able to offer. (*Id.*).

Reynolds is not due federal habeas relief on this claim because he has not shown that the ACCA's decision that Reynolds failed to demonstrate prejudice violated § 2254(d).[69] As Reynolds concedes, the jury heard Chad Martin's inculpatory statements through the testimony of Lieutenant Gary. At trial, Lieutenant Gary testified that Chad Martin made comments at the crime that referenced the location of the bodies of his deceased relatives and stated that he could smell gas on his hands, that he lost his sunglasses, and that he did not know where the cuts on his hands came from. (*See* Vol. 11 at 53-59). Also, the ACCA acknowledged the inconsistencies between

---

[69] For the first time, in his reply, Reynolds cites to *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) to support his argument that he "was prejudiced by the inability to use the confession or police report as substantive evidence of a third-party's guilt." (Doc. # 31 at 88). Even assuming this argument was not abandoned for failure to raise in his habeas petition, it is without merit. As discussed below, Chad Martin's purported "confession," if introduced into evidence, would not have resulted in the reasonable probability of a different result in Reynolds's trial, as this reported "confession" also contains information that directly conflicts with Reynolds's version of events on the night of the murders. Thus, Reynolds has not met his burden to sufficiently establish *Strickland* prejudice.

Chad Martin's confession and Reynolds's testimony at trial: to explain why his eyeglasses were found at the scene, Reynolds testified that he threw gas around the house to destroy evidence of West's purported involvement in the crime, but in the "confession," it was Martin who said that he spread the gasoline. In other words, the introduction of Chad Martin's "confession" would have negatively impacted the defense's theory of the case.

Strickland requires that Reynolds show his counsel's deficient performance and prejudice. And, section 2254(d)(1) review requires that Reynolds show that no fair-minded jurist could agree with the ACCA's decision that Reynolds insufficiently pleaded *Strickland* prejudice. As explained above, Reynolds has failed to make either showing. This claim is due to be denied.

### 8. Failure to Object to "Prejudicial" Bolstering

Reynolds claims that his trial counsel was constitutionally ineffective by failing to object to the State's allegedly "prejudicial" bolstering of state witnesses, Chad Martin and Langley. (Docs. # 1 at 85; 31 at 89). According to Reynolds, Langley was called by the State "as an alibi witness for Chad Martin." (Doc. # 1 at 85). During Langley's testimony, Reynolds alleges that the prosecutor improperly elicited testimony regarding Langley's initial status as a suspect and how the officers' suspicions were dispelled after "20-22 hours" of questioning and a polygraph test. (*Id.*). Similarly, Reynolds alleges that the prosecutor improperly "elicited testimony from [Chad] Martin that he offered to take a polygraph test" and that the prosecution prompted Chad Martin to testify directly to his mother in the crowd, "Momma. I didn't kill him." (*Id.*, quoting Vol. 9 at 107-09).

Reynolds contends that his trial counsel's failure to object "allowed the State to reinforce the jury's impression of Chad Martin's and . . . Langley's innocence." (*Id.*). Reynolds argues this was grossly inadequate "considering that counsel's defense depended on implicating Chad Martin

as the perpetrator of the crime[.]" (*Id.*). Reynolds further contends that the failure to object "cannot be considered 'strategy' and constituted an objectively unreasonable performance." (*Id.*, quoting *Strickland*, 466 U.S. at 690).

Reynolds also pleaded that counsel's failure to object here -- "in combination with counsel's failure to introduce Chad Martin's confession" -- created a "'probability sufficient to undermine confidence in the outcome of [his] trial.'" (Doc. # 1 at 86, quoting *Strickland*, 466 U.S. at 691). Thus, Reynolds asserts that "had the jury heard direct evidence of Chad Martin's confession, and in the absence of improperly bolstered testimony professing [Chad] Martin's and . . . Langley's innocence, 'there is a reasonable probability that [, but for counsel's errors,] the result of the proceeding would have been different.'" (*Id.*, quoting *Strickland*, 466 U.S. at 691).

The Rule 32 court summarily dismissed this claim as insufficiently pleaded under Alabama Rules of Criminal Procedure 32.3 and 32.6(b). (Vol. 33 at 131; *see* Vol. 25 at 171-73). The ACCA affirmed the Rule 32 court's dismissal, holding that Reynolds failed to specifically plead facts that, if true, would demonstrate *Strickland* prejudice. (Vol. 33 at 131, 173-74).

Reynolds has not shown that the ACCA's decision was based on an objectively unreasonable determination of facts or that the ACCA's decision was contrary to clearly established federal law. 28 U.S.C. §§ 2254(d). Further, Reynolds has not proffered a reason to call into question the ACCA's decision.  He has not referenced any unreasonably determined fact on which the ACCA relied and failed to even cite any Supreme Court precedent demonstrating that the ACCA's determination was objectively unreasonable to the extent that no other fair-minded jurist could agree.

The court concludes that Reynolds conclusory allegations of prejudice within his federal habeas petition are insufficient to meet the heightened pleading requirements of 28 U.S.C. § 2254

Rule 2(c). *See* Rule 2(c) of the *Rules Governing Section 2254 Cases in the U.S. District Courts*.

*See also* Advisory Committee Note to Rule 4 of the *Rules Governing 2254 Cases in the U.S. District Courts* ("Notice pleading is not sufficient [in habeas proceedings], for the petition is expected to state facts that point to a real possibility of constitutional error"), quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970) (internal quotation marks omitted). And, in any event, there is overwhelming evidence of Reynolds's guilt, even if this were improper bolstering. In other words, there is simply nothing to suggest that absent this purported bolstering the outcome of Reynolds' trial would have been different. This claim is due to be denied.

### 9.     Failure to Cross-Examine a "Key Witness" at Trial

Reynolds claims that his trial counsel was ineffective for "failing to ask any questions of prosecution witness Roger Dale." (Doc. # 1 at 87). According to Reynolds, Detective "Dale had been involved in multiple factors of the investigation … all of which, were open to cross-examination after his self-identification as the lead investigator." (*Id.*). Reynolds argues that his "[c]ounsel's failure to examine Dale was therefore unreasonable 'under prevailing professional norms' and not the result of any strategic consideration." (*Id.*, quoting *Strickland*, 466 U.S. at 688). Moreover, Reynolds argues that the failure to cross-examine Dale "on his investigation of Chad Martin abandoned any opportunity to create reasonable doubt as to . . . Reynolds's guilt and likely affected the outcome of Reynolds's case." (*Id.*, quoting *Strickland*, 466. U.S. at 695).

The Rule 32 court summarily dismissed this claim due to insufficient pleading under Alabama Rules of Criminal Procedure 32.3, 32.6(b). (*See* Vol. 33 at 149; Vol. 25 at 194-95). The ACCA affirmed the Rule 32 court's dismissal.

> Although Reynolds pleaded that trial counsel could have cross-examined Detective Dale on a number of issues, [Reynolds] specifically offered *only that he could have been cross-examined* about his investigation of Chad Martin as an alternative suspect. Reynolds *failed to plead specific questions* that trial counsel should have

asked Detective Dale *and failed to plead any facts to indicate what Detective Dale's responses to those questions would have been*. Also, Reynolds failed to plead how he was prejudiced by trial counsel's failure to elicit from Detective Dale that Chad Martin was a suspect in light of the fact that this information was already before the jury.

(Vol. 33 at 149-50) (emphasis added).

Although it is unclear on which provision of § 2254(d) Reynolds now relies, he has not satisfied his burden under either provision. Reynolds has not shown that the ACCA's decision was based on an objectively unreasonable determination of facts or that the ACCA's decision was contrary to clearly established federal law. 28 U.S.C. §§ 2254(d). Further, Reynolds has failed to offer any reason to call into question the ACCA's decision. He has utterly failed to reference any unreasonably determined fact on which the ACCA relied and also failed to cite any Supreme Court precedent demonstrating that the ACCA's determination was objectively unreasonable to the extent that no other fair-minded jurist could agree.

Reynolds's argument is a bare allegation, which is wholly insufficient to show grounds for relief under *Strickland*, especially in light of AEDPA's heightened pleading requirements. And, in any event, there is overwhelming evidence of Reynolds's guilt. Even if Dale had been cross-examined, there is no indication that the outcome of the trial would have been different.

This claim is due to be denied.

### 10. Failure to Object to Courtroom Security Measures

Reynolds next argues that his counsel was ineffective for failing to object to heightened security measures in the courtroom. (*See* Doc. # 1 at 87) (citing Vol. 24 at 165). Reynolds contends that "no state interest" existed prior to the trial court's decision to implement heightened security, and that, regardless of the State's intent, his counsel failed to object to the use of the stun-belt and additional guards. (*Id.* at 88) (citing Vol. 24 at 165). As a result, Reynolds surmises that his

counsel's failure to object fell below an objective standard of reasonableness under *Strickland*. (*Id.*) (citing *Strickland*, 466 U.S. at 690).

Reynolds also asserts that the "inherently prejudicial" restraints created a chilling effect on Reynolds's ability "to participate in his own defense due to the presence of the belt restricting his movement and the 'interference' based on the positioning of the two uniformed officers flanking him for the duration of the trial." (*Id.* at 88-89) (citing *Deck v. Missouri*, 544 U.S. 622, 635 (2005). Thus, Reynolds concludes that he demonstrated that "there is a reasonable probability that counsel's failure to object to the stun-belt affected the outcome of his case and thus prejudiced the defense." (*Id.* at 89) (citing *Strickland*, 466 U.S. at 691).

The Rule 32 court dismissed this claim as insufficiently pleaded under Alabama Rules of Criminal Procedure 32.3 and 32.6(b) and found it was without merit. (Vol. 25 at 179-80; Vol. 33 at 136). The ACCA affirmed the Rule 32 court's dismissal, holding that Reynolds insufficiently pleaded that he had suffered *Strickland* prejudice because of his trial counsel's purported failure "to object to the heightened security in the courtroom." (Vol. 33 at 139, 174-75).

In particular, the ACCA criticized Reynolds's brief for failing to sufficiently plead whether the "stun-belt was visible [to the jurors]" or whether the jurors were otherwise "aware of [the belt's] existence." (*Id.* at 137). Similarly, the ACCA reasoned that Reynolds insufficiently pleaded *Strickland* prejudice because Reynolds did not plead whether "any jurors were aware that the officers [beside and behind him at trial] constituted extra security personnel[,]" or whether any of the "jurors drew any prejudicial inference from the officers' presence." (*Id.*). Further, the ACCA found conclusory Reynolds's argument that he suffered *Strickland* prejudice due to the alleged "chilling effect" these "additional security measures" had on Reynolds's ability to participate at

244

trial because he failed to specifically plead any actions he was prevented from taking or precisely how his ability to participate in his own defense was "hampered." (*Id.*).

Reynolds argues that habeas relief is proper under § 2254(d)(2) because the ACCA's decision allegedly contains unreasonable factual determinations. However, the court's review of Reynolds's Rule 32 pleadings before the ACCA and his federal petition show that Reynolds did does not substantiate this claim. Reynolds's sporadic references to the record within his petition (many of which circularly refer to his Rule 32 conclusory allegations) and his failure to identify which specific factual findings he contends the ACCA unreasonably determined (much less explain the significance of such a finding) fail to elevate this *Strickland* subclaim to a "highly probable" one. *Ward*, 592 F.3d at 1177; *see also Lee v. GDCP*, 987 F.3d at 1018 n.2 (explaining that unless a petitioner "can[] show that the state court's decision 'was based on' the challenged findings, they provide no basis for federal habeas relief whether or not those findings were unreasonable") Accordingly, Reynolds is not due relief under § 2254(d)(2).

Nor is Reynolds entitled to relief under § 2254(d)(1). Reynolds cites to multiple authorities within his federal habeas petition. *Deck v. Missouri*, 544 U.S. 622 (2005); *Estelle v. Williams*, 425 U.S. 501 (1976); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Illinois v. Allen*, 397 U.S. 337 (1970); and *Strickland*.[70] (*See* Doc. # 1 at 88-89). For the most part, Reynolds cites these cases for general

---

[70] As an initial matter, the court notes that Reynolds's reliance on *United States v. Durham,* 287 F.3d 1297 (11th Cir. 2002), and *United States v. Wilson*, 634 F. App'x 718, 732 (2015), is misplaced. The relevant inquiry in a § 2254 proceeding is whether the state's decision violated clearly established Supreme Court case law. *See* 28 U.S.C. § 2254(d)(1); *Lockyer*, 538 U.S. at 71-72. (*See* Doc. # 31 at 93).

*Durham* involved the direct appeal of a district court's denial of a motion to prohibit the use of a stun belt. *See Durham,* 287 F.3d at 1300. Thus, the legal principles announced in that case do not apply here. Furthermore, because *Durham* did not arise in the § 2254 context, the Eleventh Circuit did not address whether the defendant in *Durham* was prejudiced by the use of the stun-belt. In *Wilson*, like in *Durham*, there was a direct appeal from trial where the district court ordered additional security measures at trial including the use of leg shackles and stun-belts. *Wilson*, 634 F. App'x at 729. While not dispositive as *Wilson* arose in the § 2254 context (though not under AEDPA), the Eleventh Circuit did evaluate prejudice and determined that even if "the district court abused its discretion in instituting physical restraints such error would not be sufficiently prejudicial as to warrant a reversal of the . . . convictions[,] . . . because the clothing and table skirts covered the shackles and tasers, and . . . the jury could neither

propositions and provides little if any context or analysis relating them to his circumstances. (*See generally* Docs. # 1 at 88-89; 31 at 91-94). Nonetheless, the court will discuss each case.

In *Deck* the Supreme Court "h[e]ld that the Constitution forbids the use of *visible* shackles during the penalty phase, [just] as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest' -- such as courtroom security -- specific to the defendant on trial." 544 U.S. at 624 (emphasis added) (citing *Holbrook*, 475 U.S. at 568-69; *Allen*, 397 U.S. at 343-344). The Court observed that the defendant in *Deck* "was shackled with leg irons, handcuffs, and a belly chain." The Court also observed that, despite multiple objections by defense counsel, the shackling continued through the penalty phase where (upon renewed objection) he continued to remain before the jury in leg irons and a belly chain. *Id*. at 625. The Court explained that, because of the importance of the penalty phase and "[g]iven the presence of similarly weighty considerations" to those decided in the guilt phase, such as life and death, "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding." *Id.* at 632. The Court reasoned that "[t]he appearance of the offender during the penalty phase in shackles . . . almost inevitably affects adversely the jury's perception of the character of the defendant," which "inevitably undermines the jury's ability to weigh accurately all relevant considerations." *Id.* at 633.

Reynolds's reliance on *Estelle v. Williams* is also unavailing. In *Estelle*, the Supreme Court held that "the State cannot, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury *while dressed in identifiable prison clothes*." *Estelle*, 425 U.S. at 512-13

---

see nor hear the restraints." *Id.* at 734. Moreover, the Eleventh Circuit concluded that "[a]bsent any indication that the presence of the shackles and tasers contributed in any way to the verdict obtained, any error on the part of the district court in ordering these restraints as a security measure would be harmless beyond a reasonable doubt." *Id.* at 734. Reynolds is required to point to a Supreme Court case to support his claim. He has not. Indeed, he has not demonstrated that the ACCA's decision is even contrary to Eleventh Circuit case law.

(emphasis added). Reynolds's trial clothes are not at issue. Rather, to the extent Reynolds cites to *Estelle* in support of a claim of appearance before the jury, the ACCA recognized that Reynolds failed to plead that his stun-belt was visible to the jury and further failed to plead that any juror was aware that he was wearing a stun-belt.

Unlike the visible shackling discussed at length by the *Deck* Court or the practice of requiring a defendant to appear before a jury in prison-wear like in *Estelle*, Reynolds did not plead that his stun-belt was visible to the jury or that any juror at any time was even aware of its existence. Thus, Reynolds has not met his burden to show that the ACCA's decision was contrary to, or an unreasonable application of, *Deck* and *Estelle* such that no fair-minded jurist could agree with the ACCA.[71]

Reynolds's reliance on *Holbrook* is also misplaced. (Docs. # 1 at 89; 31 at 93). In *Holbrook*, the petitioner argued that the supplementation of the customary courtroom security force with four uniformed state troopers seated in the first row of the spectator section violated his right to a fair trial. *See* 475 U.S. at 567. The Court reasoned that "[w]hile shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable" because "[j]urors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence[.]" The Court also recognized that the "jurors will not infer

---

[71] To the extent Reynolds cites to *Illinois v. Allen,* his reliance is misplaced. In *Allen*, the trial court removed the defendant from the courtroom after several outbursts that interrupted the trial. 397 U.S. at 339-41. The *Allen* Court recognized that there is not a single "formula for maintaining the appropriate courtroom atmosphere . . . [fitting for] all situations." *Id.* However, the Court also recognized "a number of constitutionally permissible ways for a trial judge to handle" an "obstreperous defendant." Here, Reynolds makes no showing that the trial court's actions fell outside of any of the acceptable methods noted in *Allen*. Therefore, Reynolds has not shown that the ACCA's determination was contrary to *Allen*.

anything at all from the presence of the guards." *Id.* at 569. The *Holbrook* court held that "[i]n view of the variety of ways in which such guards can be deployed," a case-by-case approach to prejudice (rather than presumption) is appropriate. *Id.*

Here, as the ACCA recognized, Reynolds failed to plead with any specificity whether the jury drew any prejudicial inference from the guards or even if the jury was aware of the two guard's presence at trial. For this reason, the ACCA determined that Reynolds failed to demonstrate *Strickland* prejudice as a result of his counsel's alleged failure to object, with respect to this claim. Reynolds has not shown that the ACCA's decision was contrary to, or an unreasonable application of, *Holbrook*.

In his reply brief, Reynolds also argues that the ACCA unreasonably applied *Strickland* by "arbitrarily enhancing" his burden of proof. He contends that, under *Strickland*, "[t]he test is whether counsel acted unreasonably and whether the failure to act prejudiced the defendant." 466 U.S. at 687; (Doc. # 31 at 91). Reynolds failed to present this argument in his federal habeas petition; as such, it has been waived and is not properly presented for the court's review. (*See* Docs. # 10 at 1, 5; 11 at 2). *See Al-Amin*, 2016 WL 10718765, at *17 ("Nor may parties . . . raise new issues in reply briefs. The same principles apply at the district court level.") (internal quotation marks and citation omitted).

But even putting aside his waiver of the claim, Reynolds's *Strickland* argument in his reply brief is without merit. Reynolds mistakenly equates his Rule 32 pleading burden with *Strickland*'s burden of proof. Nothing in the Rule 32 state court record indicates that the court required Reynolds to *prove* that, but for the acts constituting alleged ineffective assistance of counsel, there existed a reasonable probability that the result of his trial (or sentencing) would have been different. Rather, the Rule 32 court concluded that Reynolds had not met his heightened *pleading*

requirement. That is, even assuming every pleaded *specific, non-conclusory fact* to be true, Reynolds could not demonstrate that *Strickland* prejudice existed. *See, e.g.*, Ala. R. Crim. P. 32.3, 32.6(b), 32.7(d). Moreover, Reynolds failed to point to any evidence in support of this claim. Accordingly, this argument is without merit.

Based on what was before the ACCA at the time it ruled, the court concludes that its decision that Reynolds insufficiently pleaded *Strickland* prejudice was not based on an unreasonable determination of the facts or contrary to clearly established federal law. Reynolds's claim is due to be denied.

### B.       Penalty Phase Claims of Ineffective Assistance

Reynolds also contends that his trial counsel provided ineffective assistance during the penalty phase of the proceedings. (*See generally* Docs. # 1 at 89-133; 31 at 94-105). Reynolds divides this claim into four *Strickland* subclaims alleging that defense counsel: (1) "failed to conduct a reasonable mitigation investigation" (*see* Docs. # 1 at 90-113; 31 at 94-98); (2) "failed to present powerful and available mitigation evidence" (*see* Docs. # 1 at 113-28; 31 at 98-103); (3) "failed to prepare the penalty phase witnesses to testify" (*see* Docs. # 1 at 128-31; 31 at 103-04); and (4) "failed to introduce a confession to create residual doubt." (*See* Docs. # 1 at 131-33; 31 at 104-05).

After reviewing each subclaim, the court concludes that Reynolds is not entitled to relief under § 2254(d) for a number of reasons (*e.g.*, failure to adequately plead, failure to prove that the state court's decision was contrary to clearly established Federal law, and failure to prove that the state court's decision was based on an unreasonable determination of the facts presented).[72] The

---

[72] The court has addressed why Reynolds is not entitled to an evidentiary hearing on any *Strickland* claim. *See* Part III(B), *supra*.

court addresses the subclaims below and for the reasons provided below, concludes that each of Reynolds's penalty-phase *Strickland* claims are due to be denied.

### 1.     Failure to Conduct a Reasonable Mitigation Investigation

Reynolds further divides this claim into two separate subparts: (1) "failure to obtain a mitigation expert and locate key records" (Doc. # 1 at 93-97) and (2) "failure to investigate organic brain damage, low IQ, mental health issues, substance abuse issues, and numerous witnesses who would have testified on his behalf." (Doc. # 1 at 97-113).

The Rule 32 court dismissed Reynolds's allegations of unreasonable mitigation investigation as insufficiently pleaded under Alabama Criminal Procedure Rules 32.3 and 32.6(b) and without merit under Rule 32.7(d).[73] (Vol. 25 at 198, 202). The Rule 32 court acknowledged the lengthy nature of this subclaim, but despite its "length," determined that Reynolds's allegations were "bare" and lacking in the "basic facts necessary" to state either the performance or prejudice prong of a sufficient *Strickland* claim. (*Id.* at 198-202).

The ACCA addressed each of Reynolds's arguments together, and affirmed the Rule 32 court's decision to dismiss "Reynolds's claim that [his] trial counsel were ineffective for failing to conduct an adequate mitigation investigation." (Vol. 33 at 152-55). The ACCA focused on Reynolds's failure "to specifically address the prejudice he suffered as a result of trial counsel's alleged failures." (Vol. 33 at 153-54) (citing *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice … that course should be followed.")).

As the ACCA explained, "while Reynolds pleaded that trial counsel failed to investigate whether he suffered from a mental illness or organic brain damage, [Reynolds] failed to plead that

---

[73] The court described the pleading requirements of Rules 23.3 and 32.6(b) as well as the standard for summary dismissal under Rule 32.7(d) in the Standard of Review section above. *See* Part II(C), *supra*.

he actually suffered from a specific mental illness or organic brain damage." (*Id.*). The ACCA also listed the extensive number of mitigating circumstances found by the trial court; noted the existence of three aggravating factors; and explained that Reynolds's trial counsel presented "ample mitigation evidence … during the penalty phase." (*Id.* at 153-54, 153 n. 9). Also, the ACCA stated that "[m]uch of what Reynolds argue[d] should have been investigated would have been cumulative to what trial counsel actually presented." (*Id.* at 153). The ACCA concluded that Reynolds's "bare allegations of prejudice" were insufficient to establish prejudice under the *Strickland* standard. (*Id.* at 153-55). For the reasons explained below, the court concludes that Reynolds is not due relief on this claim.

### a.       Reynolds Did Not Properly Plead This Claim

Reynolds's claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and is due to be denied because Reynolds has not articulated a sufficient claim under § 2254(d). "Habeas corpus petitions must meet heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). Further, a habeas petitioner must include in his statement of each claim sufficient supporting facts to justify a decision for the petitioner if the alleged facts are proven true. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that a habeas petition must "state facts that point to a 'real possibility of constitutional error,'" quoting Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts*). Here, Reynolds does nothing more than sporadically argue the facts of his case, mention the holdings of several cases, and make the bare assertion that the ACCA's holding is contrary to several Supreme Court cases. He has not explained how he was prejudiced at his trial or how any Supreme Court cases support his arguments. Thus, Reynolds did not sufficiently plead this claim.

### b.      Section 2254(d)(1)

Even if Reynolds had sufficiently pleaded this claim, he has failed to show that the ACCA's decision is contrary to clearly established federal law. Reynolds asserts that the ACCA's decision was contrary to, or involved an unreasonable application of, clearly established law as set forth in *Porter, Ake, McWilliams, Wiggins,* and *Rompilla*.[74] But, his assertions are off the mark. Each of these cases are materially distinguishable from Reynolds's case, at least to the point where a fair-minded jurist could agree with the ACCA's decision.

#### (1)      *Ake v. Oklahoma*, 470 U.S. 68 (1985); *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017)

Reynolds invokes *Ake* for the proposition that "when a criminal defendant demonstrates that his mental state will be a significant issue at trial, an expert in psychiatry is one of the 'raw materials integral to the building of an effective defense.'" (Doc. # 1 at 98, quoting *Ake*, 470 U.S. at 77). Reynolds next states "[e]vidence that [he] suffers from brain damage is highly relevant to

---

[74] Reynolds cites several other Alabama and federal cases in support of this claim: *Porter v. Singletary*, 14 F.3d 554 (11th Cir. 1994); *Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002); *Dubose v. State*, 662 So. 3d 1189 (Ala. 1995); *Stevens v. Zant*, 968 F.2d 1076 (11th Cir. 1992); *Bolender v. Singletary*, 16 F.3d 1547 (11th Cir. 1994); *Hyde v. State*, 950 So. 2d 344 (Ala. Crim. App. 2006); ); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011); *Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988); *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541 (11th Cir. 2015); *Kirpatrick v. Whitley*, 992 F.3d 491 (5th Cir. 1993); and *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008), *opinion reinstated sub. nom. Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009). However, these cases do not support Reynolds's burden under AEDPA. *See* § 2254(d)(1) (limiting habeas relief to decisions that are "contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*") (emphasis added); *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010) ("AEDPA limits our review to whether the state court's determination that [petitioner] failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of *Supreme Court precedent*.") (emphasis added). Regardless, the court has reviewed these cases and concludes that the ACCA's decision is not contrary to them.

Reynolds also relies on the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "ABA Guidelines") in support of his *Strickland* claims. (Docs. # 1 at 90-91; 31 at 95-96). The Supreme Court has referred to the ABA Guidelines as appropriate standards for attorney conduct. *See, e.g.*, *Wiggins*, 539 U.S. at 524. However, the practitioner-focused advice and commentary are not examples of clearly established federal law under AEDPA. *See* § 2254(d)(1) (limiting habeas relief to decisions that are "contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*") (emphasis added).

the mitigating factor of his capacity 'to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.'" (*Id.*, quoting Ala. Code § 13A-5-51(6)). Later, Reynolds correctly cites *McWilliams* for the assertion that "*Ake* clearly established a right to 'a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.'" (*Id.* at 103, quoting *McWilliams*, 137 S. Ct. at 1791).

While *Ake* and *McWilliams* may help a petitioner prove the performance prong of a *Strickland* claim, they in no way support Reynolds's argument that the ACCA's decision -- that Reynolds failed to sufficiently plead prejudice in his state habeas complaint -- was contrary to clearly established Federal law. The *Ake* Court held "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. And *McWilliams* reiterates *Ake*'s holding. 137 S. Ct. at 1794. However, neither case supports an assertion that the ACCA's dismissal of Reynolds's claim for a lack of prejudice under *Strickland* was contrary to clearly established federal law.[75]

### (2)     *Williams v. Taylor*, 529 U.S. 362 (2000)[76]

Reynolds cites *Williams* in conjunction with the ABA guidelines and asserts that his counsel were ineffective because they "failed to conduct an investigation that would have

---

[75] Similarly, Reynolds's reliance on *Tennard v. Dretke*, 542 U.S. 274 (2004) fails. *Tennard* concerns a *Penry* violation. In *Penry,* the court held that "the sentencing body must be allowed to consider mental retardation as a mitigating circumstance in making the individualized determination whether death is the appropriate punishment in a particular case." *Penry v. Lynaugh*, 492 U.S. 302, 337-38, *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). Again, while this holding may help a petitioner establish the performance prong of a *Strickland* violation, it does not indicate that Reynolds was prejudiced by the mitigation investigation.

[76] The opinion of the Court was delivered by Justice Stevens and Justice O'Connor. In Justice Stevens's opinion, he wrote for the Court as to parts I, III, and IV of his opinion (but parts II and V of his opinion did not garner a majority.).

uncovered extensive records graphically describing [petitioner's] nightmarish childhood" (Doc. # 1 at 91, quoting *Williams*, 529 U.S. at 395). But again, this statement goes to the performance portion of *Strickland*. Nevertheless, the court will recount the prejudice analysis in *Williams* to show that the ACCA's decision is not contrary to the Supreme Court's holding.

In *Williams*, a jury convicted the petitioner of robbery and capital murder after being presented with several pretrial confessions. *Williams*, 529 U.S. at 367-68. After considering the defendant's record of prior convictions and confessional statements, "the jury found a probability of future dangerousness and unanimously fixed [the petitioner's] punishment at death." *Id.* at 368, 370. The Supreme Court reasoned that the state supreme court's decision that there was no prejudice was unreasonable because "it failed to evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation. *Id.* at 397-98 (citing *Clemons v. Mississippi*, 494 U.S. 738, 751-52 (1990)). The Supreme Court noted that the state court did not mention the mitigating evidence advanced at trial (petitioner turned himself in, expressed remorse, and cooperated with police). *Id.* at 398. The Supreme Court held that the state supreme court erred in its prejudice analysis when it did not combine the mitigating evidence at trial with the additional mitigating evidence in the petitioner's collateral habeas brief (petitioner's abusive childhood characterized by privation and the fact that petitioner was "borderline mentally retarded") against the aggravating factors.[77] *Id.* at 398.

---

[77] In part V of his opinion, Justice Stevens wrote:

In our judgment, the state trial judge was correct both in his recognition of the established legal standard for determining counsel's effectiveness, and in his conclusion that the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised "a reasonable probability that the result of the sentencing proceeding would have been different" if competent counsel had presented and explained the significance of all the available evidence. It follows that the Virginia Supreme Court rendered a "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." Williams' constitutional right to the

Unlike the facts involved in *Williams*, Reynolds's allegations of missing mitigating evidence (which mentioned only a *potential* for mental illness or organic brain damage) simply do not meaningfully counter the three aggravating factors that the trial court found the State had proven beyond a reasonable doubt in support of Reynolds's death sentence. Moreover, the aggravating factors in *Williams* were much less compelling than those found here. Reynolds murdered three victims as part of a robbery; inflicted upon them multiple stab wounds that prolonged their pain and suffering; and killed a defenseless child in an effort to prevent her from identifying him as her parents' killer. Consequently, the sentencing circumstances that supported a prejudice finding in *Williams* are substantially different from those here. The ACCA's decision was not  contrary to clearly established federal law.

### (3)  *Wiggins v. Smith*, 539 U.S. 510 (2003)

Reynolds cites *Wiggins* for the principle that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." (Doc. # 1 at 90, quoting *Wiggins*, 539 U.S. at 521). Reynolds also asserts that "*Strickland* requires that reasonable performance by capital defense counsel includes the thorough investigation into the client's background, life history, and mental health for 'all reasonably available mitigating evidence.'" (*Id.* at 113) (citing *Wiggins*, 529 U.S. at 524, 546; *Rompilla*, 545 U.S. at 374; *Porter*, 130 S. Ct. 447). But again, these two assertions speak to the performance prong of *Strickland*, not prejudice. Nevertheless, for completeness, the court will analyze the *Wiggins* Court's discussion.

---

effective assistance of counsel as defined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was violated.

*Williams*, 529 U.S. 398-99. However, again, Justice Stevens did not write for the court in this portion of his opinion. Therefore, part V of Justice Steven's opinion does not constitute clearly established federal law, as determined by the Supreme Court.

In *Wiggins*, the Supreme Court reviewed prejudice without the benefit of a state court decision on the issue. *Wiggins*, 539 U.S. at 534. The Court noted that the petitioner's brief showed that he "experienced severe privation and abuse in the first six years of his life…suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care… [and that] the time [petitioner] spent homeless, along with his diminished mental capacities, further augment his mitigation case." *Id.* at 535. However, the only significant mitigating factor that the sentencing jury heard was that the petitioner had no prior convictions. *Id.* at 537. The court also noted that the petitioner "d[id] not have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative." *Id.* at 537.

The Court compared *Wiggins* with *Williams v. Taylor* (discussed above) in terms of the total mitigating evidence versus the aggravating evidence. "[T]he mitigating evidence in [*Wiggins*] is stronger, and the State's evidence in support of the death penalty far weaker, than in *Williams*, where we found prejudice as the result of counsel's failure to investigate and present mitigating evidence." *Id.* at 537-38. And the Court held that the totality of available mitigation evidence "might well have influenced the jury's appraisal." *Id.* at 538 (citing *Williams*, 529 U.S. at 398).

The evidence that Reynolds alleges was omitted only refers to the "potential" of organic brain injury or mental illness. His allegations do not approach the specificity or powerfulness of the "petitioner's excruciating life history" presented in *Wiggins*. 539 U.S. at 537. Additionally, Reynolds's trial counsel developed and presented evidence of numerous aspects of his troubled background, including experiencing severe childhood neglect and abuse, witnessing domestic violence, enduring a "disjointed family" without parental love or bonding, growing up impoverished and in a filthy home, quitting school, developing serious alcohol dependence and addiction to crystal methamphetamine and cocaine, losing custody of his child, and the loss of jobs

because of his addictions. (Vol. 33, Tab 68, at 54-55 n.9). Consequently, the Supreme Court's *de novo* discussion of prejudice in *Wiggins* does not demonstrate that, in rejecting Reynolds's ineffective investigation allegations for lack of actionable prejudice, the ACCA unreasonably applied *Strickland*.

### (4)  *Rompilla v. Beard*, 545 U.S. 374 (2005)

Reynolds cites *Rompilla* for the proposition that "counsel has the duty 'to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.'" (Doc. # 1 at 90) (citing *Rompilla*, 545 U.S. at 387). Reynolds contends that "there is a reasonable probability" the jury would not have sentenced him to death had his attorney presented a portion of the available mitigating evidence. (*Id.* at 93). The facts and legal principles set forth in *Rompilla* do not entitle Reynolds to relief under § 2254(d)(1).

In *Rompilla*, the Commonwealth proved three aggravating factors: "that the murder was committed in the course of another felony; that the murder was committed by torture; and that [the petitioner] had a significant history of felony convictions indicating the use or threat of violence." *Rompilla*, 545 U.S. at 378. On the mitigation side, the petitioner presented five family members as witnesses. They testified about residual doubt, mercy, and that the petitioner was a good man. The jury found two mitigating circumstances: "that [petitioner's] son had testified on his behalf and that rehabilitation was possible. *Id.* However, the jury found that the aggravating factors outweighed the mitigating factors, and it assigned death as the sentence. *Id.*

As in *Wiggins*, the state court on *Strickland* review did not address prejudice, so the Supreme Court reviewed the issue *de novo. Id.* at 390. The mitigating information that post-conviction counsel uncovered included:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

*Id.* at 391-92. Petitioner's post-conviction counsel also had him tested for mental deficiencies, and an expert found that petitioner "suffer[ed] from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions … likely caused by fetal alcohol syndrome." *Id.* at 392. Additionally, "[s]chool records showed [the petitioner's] IQ was in the mentally retarded range." *Id.* at 392. The court held that the totality of mitigation evidence undermined the confidence in the jury's sentence of death. *Id.* at 393.

The *Rompilla* Court concluded that the complete body of the undiscovered evidence "add[ed] up to a mitigation cause that b[ore] no relation to the few naked pleas for mercy actually put before the jury" and, as a result, undermined confidence in the death sentence. *Id.* at 393. The evidence presented during Reynolds's penalty phase is clearly distinguishable from *Rompilla*. Again, because Reynolds's allegations refer to only a few mitigating factors (all of which are minor) he cannot satisfy his burden under AEDPA to show that the ACCA's decision is contrary to *Rompilla* or an unreasonable application of *Strickland*.

### (5)    *Porter v. McCollum*, 558 U.S. 30 (2009)

Reynolds cites *Porter* for the proposition that (1) his counsel was ineffective for failing to present evidence of mental impairment (Doc. # 1 at 99, 101); (2) his "counsel was ineffective for

failing to uncover and present mental health evidence" (Doc. # 1 at 101); and (3) his counsel was ineffective for ignoring court-ordered psychiatrist evaluation (Doc. # 1 at 102-03).

In *Porter,* the petitioner "was convicted of two counts of first-degree murder for the shooting of his [ex-]girlfriend … and her boyfriend." 558 U.S. at 31. While the jury recommended the death sentence for both murders, the trial court concluded the death penalty was appropriate for the murder of his ex-girlfriend. *Id*. at 32. "The trial court found that the State had proved all four aggravating circumstances for the murder of [his ex-girlfriend]" and "no mitigating circumstances." *Id.* On direct appeal, the state supreme court upheld the death sentence, but it concluded that the prosecution only proved three aggravating circumstances. *Id.* at 33.

The petitioner sought post-conviction relief in state court, and one of his claims was that "his penalty-phase counsel failed to investigate and present mitigating evidence." *Id.* "Unlike the evidence presented during [the petitioner's] penalty hearing, which left the jury knowing hardly anything about him other than the facts of his crimes, the new evidence described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity." *Id.* The trial judge "held that [the petitioner] had not been prejudiced by the failure to introduce any of that evidence." *Id.* at 36. The state supreme court affirmed the decision, but two justices dissented, "reasoning that counsel's failure to investigate and present mitigating evidence was especially harmful because of the divided vote affirming the sentence on direct appeal—even without the substantial mitigation that we now know existed—and because of the reversal of the heinous, atrocious, and cruel aggravating factor." *Id.* at 37-38 (internal quotations omitted).

When analyzing *Strickland*'s prejudice prong, the Supreme Court of the United States noted that "the judge and jury at [the petitioner's] original sentencing heard almost nothing that

would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* at 41. Instead, the triers of fact "learned about [the petitioner's] turbulent relationship with [his ex-girlfriend], his crimes, and almost nothing else." *Id.* However, if the petitioner's trial counsel would have been effective, the trier of fact would have heard about the petitioner's:

> (1) . . . heroic military service in two of the most critical – and horrific – battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling.

*Id.* at 41.

The Court also reasoned that there was only one additional aggravating factor that stood through review. *Id.* at 41-42. The Court held that it was "unreasonable to discount to irrelevance the evidence of [the petitioner's] abusive childhood, especially when that kind of history may have particular salience for a jury evaluating [the petitioner's] behavior in his relationship with [his ex-girlfriend]." *Id.* at 43. The Court further concluded that it was "also unreasonable to conclude that [petitioner's] military service would be reduced to 'inconsequential proportions,' simply because the jury would also have learned that [the petitioner] went AWOL on more than one occasion," particularly in light of "[o]ur Nation['s] … long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as [the petitioner] did." *Id*.

Reynold's reliance on *Porter* is misplaced. Unlike the double murder in *Porter*, which the Florida Supreme Court found was more consistent with a "'crime of passion,'" *Porter*, 558 U.S. at 33, quoting *Porter*, 564 So. 2d at 1063, the three murders in this case -- like those in *Strickland* -- were carried out for "pecuniary gain" and "to hinder law enforcement." *Strickland*, 466 U.S. at 674. Further, the omitted mitigating factors in Reynolds's case do not approach the level of impact as those in *Porter* would have. Unlike the defendant's counsel in *Porter*, who presented only

limited mitigation evidence and "did not even take the first step of interviewing witnesses or requesting records," 558 U.S. at 40, Reynolds presented extensive mitigation evidence about his environment, education, life, background, family history, and school history. (Vol. 33 at 153-54). So, the level of culpability of the defendant in *Porter* (*i.e.*, the aggravating circumstances of his crimes) was substantially less than Reynolds's. And, the extent of the mitigation evidence not offered on behalf of the defendant in *Porter* was much more significant than in Reynolds's case. Reynolds has not shown that the ACCA's decision is contrary to *Porter* such that no fair-minded jurist could agree.

### (6)   *Sears v. Upton*, 661 U.S. 945 (2010)

In *Sears*, a jury convicted the petitioner of "armed robbery and kidnaping with bodily injury (which also resulted in death)." *Id.* at 947. "During the penalty phase of [petitioner's] capital trial, his counsel presented evidence describing his childhood as stable, loving, and essentially without incident. … Counsel's mitigation theory, it seems, was calculated to portray the adverse impact of Sears' execution on his family and loved ones." *Id.* However, the State flipped the evidence in its favor, describing petitioner as "a person, privileged in every way, who has rejected every opportunity that was afforded him." *Id.* at 947-48. Ultimately, the jury sentenced petitioner to death. *Id.* at 947 n. 2.

The court detailed the mitigation evidence from the state postconviction evidentiary hearings as follows:

> [The petitioner's] home life, while filled with material comfort, was anything but tranquil: His parents had a physically abusive relationship and divorced when Sears was young; he suffered sexual abuse at the hands of an adolescent male cousin; his mother's "favorite word for referring to her sons was 'little mother fuckers,'"; and his father was "verbally abusive" and disciplined [the petitioner with age-inappropriate military-style drills[.] [The petitioner] struggled in school, demonstrating substantial behavior problems from a very young age. For example, [the petitioner] repeated the second grade and was referred to a local health center

261

for evaluation at age nine[.] By the time [the petitioner] reached high school, he was "described as severely learning disabled and as severely behaviorally handicapped."

Environmental factors aside, and more significantly, … [the petitioner] suffered "significant frontal lobe abnormalities." Two different psychological experts testified that [the petitioner] had substantial deficits in mental cognition and reasoning—i.e., "problems with planning, sequencing and impulse control," — as a result of several serious head injuries he suffered as a child, as well as drug and alcohol abuse. Regardless of the cause of his brain damage, his scores on at least two standardized assessment tests placed him at or below the first percentile in several categories of cognitive function, "making him among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli." The assessment also revealed that [the petitioner's] "ability to organize his choices, assign them relative weight and select among them in a deliberate way is grossly impaired." From an etiological standpoint, one expert explained that [the petitioner's] "history is replete with multiple head trauma, substance abuse and traumatic experiences of the type expected" to lead to these significant impairments.

*Id.* at 948-49 (internal citations omitted).

The Supreme Court found the post-conviction court's assessment of *Strickland* prejudice

problematic and articulated two key reasons for its concern:

[T]he [state] court curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory. The court's determination that counsel had conducted a constitutionally deficient mitigation investigation should have, at the very least, called into question the reasonableness of this theory. And more to the point, that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears. The "reasonableness" of counsel's theory was, at this stage in the inquiry, beside the point: Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not. . . .

[M]ore fundamentally, the court failed to apply the proper prejudice inquiry. We have never limited the prejudice inquiry under *Strickland* to cases in which there was only "little or no mitigation evidence" presented. True, we have considered cases involving such circumstances, and we have explained that there is no prejudice when the new mitigating evidence "would barely have altered the sentencing profile presented" to the decisionmaker[.] But we also have found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase.

262

561 U.S. at 953-54 (internal citations and footnote omitted) (emphasis in original). Ultimately, the Court held that "[a] proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of [the petitioner's] 'significant' mental and psychological impairments, along with the mitigation evidence introduced during [petitioner's] penalty phase trial…." *Id.* at 956.

Unlike *Sears*, the allegedly "additional" mitigating information that Reynolds asserts does not differ dramatically from the information that was actually presented to the sentencing jury. Further, Reynolds's references to possible mental health problems have limited mitigating value (for the reasons already described above). And, the aggravating factors in Reynolds's case are much stronger than those present in *Sears*, which involved a single killing. Because of these key differences, the Supreme Court's *de novo* remand in *Sears* does not support a finding that the ACCA's decision was contrary to clearly established federal law such that no fair-minded jurist could agree.

### c.    Section 2254(d)(2)

Reynolds also asserts that habeas relief is appropriate under § 2254(d)(2). He argues that the ACCA's decision contains unreasonable factual determinations. But, he has made only sporadic references to the record within his petition, many of which circularly refer to his Rule 32 allegations, and failed to identify which specific factual findings he contends the ACCA unreasonably determined. For these reasons, he has failed to establish that his *Strickland* penalty-phase subclaim is a "highly probable" one. *Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010); *see also Lee v. GDCP*, 987 F.3d at 1007, 1018 n.2 (explaining that unless a petitioner "can[] show that the state court's decision 'was based on' the challenged findings, they provide no basis for

federal habeas relief whether or not those findings were unreasonable," quoting 28 U.S.C. § 2254(d)(2).

In sum, Reynolds is not entitled to relief on this claim because it was insufficiently pleaded and, alternatively, Reynolds has not established that the ACCA's decision was contrary to clearly established federal law or based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

### 2.    Counsel's Omission of "Powerful," "Readily-Available," and "Compelling" Mitigation Evidence

Reynolds further divides his second penalty-phase *Strickland* subclaim into three sub-subclaims: (1) "Counsel Presented an Incomplete and Misleading Depiction of Mr. Reynolds's Childhood" (Doc. # 1 at 114-23); (2) "Counsel Failed to Present the Impact of their Traumatic Childhood on Mr. Reynolds's Siblings" (Doc. # 1 at 124-25); and (3) "Counsel Failed to Present Evidence of Mr. Reynolds's Work Ethic, Good Character, And Love For Children." (Doc. # 1 at 125-28). Reynolds contends that his "counsel fail[ed] to present a wealth of readily available and compelling mitigating evidence" and instead only introduced "scattered fragments of [his] character and history" such that "the picture . . . presented to the jury and the judge was incomplete and misleading." (*Id.* at 114). Reynolds further posits that this failure amounted to an abdication of his counsel's duty to "'complet[e] the [jury's] picture of [his] . . . moral culpability'" and amounted to *Strickland* prejudice. (*Id.*, quoting *Wiggins*, 539 U.S. at 535; *Strickland*, 466 U.S. at 695).

### a.    The ACCA's Decision

The circuit court dismissed Reynolds's arguments related to this subclaim as inadequately pleaded under Rules 32.3 and 32.6(b) and without merit under Rule 32.7(d). (Vol. 33 at 156). The ACCA affirmed the circuit court. Regarding the first sub-subclaim, the ACCA reasoned that "what

Reynolds argues should have been presented would have been cumulative." (*Id*.). Further, the ACCA acknowledged that "[e]ven the evidence that Reynolds argues was not cumulative … does not, if true, entitle Reynolds to relief" because it would have had minimal mitigating value as none of the instances involved him being abused. (*Id.* at 156-57).

The ACCA distinguished Reynolds's arguments relating to the first sub-subclaim from *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008), for two reasons. (*Id.* at 157). First, in *Williams*, counsel only presented one mitigation witness, as opposed to the seven family members who presented evidence during the penalty phase of Reynolds's trial. (*Id.*). Second, the *Williams* court noted that "the case [before it] was 'not highly aggravated,'" while here "Reynolds's murders involved 'three strong aggravating circumstances." (*Id.*) Further, the ACCA pointed out that Reynolds's age (thirty-one) at the time of the triple homicide "lessened the probability of prejudice" attributable to his traumatic childhood to a minimal value. (*Id.*) (citing *Callahan v. Campbell*, 427 F.3d 897, 937 (11th Cir. 2005); *Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir. 1990). The ACCA also noted that Reynolds "ha[d] made [only] a bare allegation of prejudice without specifically pleading how he was prejudiced by trial counsel's failure to present this additional evidence." (Vol. 33 at 157). Thus, the ACCA concluded that this sub-subclaim was "insufficiently pleaded and without merit." (Vol. 33 at 158).

Regarding the second sub-subclaim, the ACCA concluded that Reynolds insufficiently pleaded this claim "because Reynolds failed to plead any facts to show how th[e] evidence would have been mitigating … or how he was prejudiced.". (Vol. 33 at 159). The ACCA reasoned that "whatever ill effects Reynolds's siblings have suffered as a result of their traumatic childhoods, only Reynolds has committed a heinous act of violence. (*Id.*) (citing *Grayson v. Thompson*, 257 F.3d 1194, 1227 (11th Cir. 2001).

As to the third sub-subclaim, the ACCA concluded that it was without merit. (*Id.* at 161). The ACCA reasoned that much of the testimony that Reynolds argues should have been presented would have been cumulative of the evidence that was actually presented during the penalty phase. (*Id.* at 160). The ACCA noted that "[m]ultiple witnesses testified that Reynolds was a good father and good with children, and Dr. Martin testified that Reynolds had done so well at work that he had been promoted to supervisor." (*Id.*). The ACCA rejected Reynolds's argument that this testimony would have been more compelling if it had come from non-family members because that assertion was not properly pleaded and because each individual that Reynolds contends would have presented this testimony were also susceptible to bias in favor of him. (*Id.*).

### b.  Section 2254(d)(1)-(2)

In his attempt to satisfy his AEDPA burden, Reynolds relies on several of the same cases that the court has already addressed, including *Wiggins* and *Strickland*.[78] (*See* Docs. # 1 at 114,

---

[78] Reynolds also references *Ferrell v. Hall* and *Kirpatrick v. Whitley*, as he did in relation to his first sub-subclaim, Again, these cases do not support Reynolds's arguments under AEDPA. *See* 28 U.S.C. § 2254(d)(1) (limiting habeas relief to decisions that are "contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*") (emphasis added); *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010) ("AEDPA limits our review to whether the state court's determination that [petitioner] failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of *Supreme Court precedent*.") (emphasis added). Regardless, and in any event, the court has reviewed these cases and concludes that the ACCA's decision is not contrary to them.

Reynolds also relies upon *Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999) (cited in his reply brief), and *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008). Once again, these are circuit court decisions so they do not support Reynolds's arguments under § 2254(d)(1). That is, they do not show that the ACCA's decision is contrary to clearly established federal law as determined by the Supreme Court of the United States. But, even if they did, Reynolds's reliance on *Collier* and *Williams* is off the mark.

As compared to *Collier*, Reynolds's trial counsel presented more than just "minimal" evidence of Reynolds's difficult upbringing. Reynolds's trial counsel also presented evidence of several positive aspects of his life, including that his son and other family members love him, his role as a good father and stepfather prior to his addiction, his efforts to "hold[] his disjoined family together," and his record of "no significant . . . prior criminal activity." (Vol. 33 at 154). Although Reynolds contends that his trial counsel critically omitted testimony from his ex-wife and former in-laws, *Collier* does not stand for the proposition that the penalty-phase jury must hear cumulative evidence. Additionally, a reasonable jurist could find that the aggravating factors in Reynolds's case were more severe than those in *Collier*, thus, substantially lessening the value of this cumulative mitigating evidence. The ACCA's decision is not contrary to the holding of *Collier*.

128; 31 at 99, 102). The court's prior analysis on why these decisions do not show that the ACCA unreasonably applied *Strickland*'s prejudice prong to Reynolds's ineffective investigation allegations applies with equal force to Reynolds's allegations that trial counsel unreasonably omitted powerful mitigating circumstances during the penalty phase. *See supra*, Section V(A)(2). So, there is no need for the court to repeat its analysis here. Thus, Reynolds fails to show that the ACCA's decision is contrary to clearly established federal law such that no fair-minded jurist could agree.

Also, for the same reasons as explained above, Reynolds has not established that the ACCA's decision was based on an unreasonable determination of the facts. Reynolds disagrees with the ACCA's ultimate decision, but he does not argue that the ACCA unreasonably determined any of the underlying facts. Accordingly, Reynolds is not due relief under § 2254(d) on this claim. Thus, this claim is due to be denied.

### 3. Counsels' Failure to Prepare the Penalty Phase Witnesses to Testify

In his third penalty-phase *Strickland* subclaim, Reynolds alleges that his trial counsel ineffectively prepared mitigation witnesses, including: his aunt Barbara Reynolds; his ex-wife's

---

Also, this court agrees with the ACCA's conclusion that the sentencing circumstances in *Williams* are "distinguishable" from those in Reynolds's record. (*Id.*). The ACCA explained the *Williams* decision is different from Reynolds's case for two reasons. (Vol. 33 at 157). First, the ACCA observed that in *Williams* there was only one witness who testified about his abuse, and she wrongfully implied that the abuse was "mild." *Id.* But, at Reynolds's trial, seven witnesses testified about multiple instances of serious parental abuse and neglect that Reynolds experienced as a child. (*Id.*). Second, the ACCA observed that the trial court in *Williams* only found a single aggravating circumstance, but during Reynolds's penalty-phase the State proved "three strong aggravating circumstances." (Vol. 33 at 157) (internal quotation marks omitted); s*ee Williams*, 542 F.3d at 1330 (finding one of eight aggravating circumstances available under Alabama law and three mitigating circumstances). There is also a significant difference in the defendants' ages at the time of the crimes: Reynolds was thirty-one at the time of the triple murder and therefore was much further removed from childhood traumas than was nineteen-year-old Williams when he murdered one person. Given these differences, *Williams* does not provide support for Reynolds's contention that the ACCA unreasonably rejected his allegations of *Strickland* prejudice.

son Chaz Tankersly; his sister Christy Prosser; his brother-in-law Alan Prosser; and his father Harold Reynolds. (Doc. # 1 at 128-29).

The Rule 32 court dismissed this subclaim as insufficiently pleaded under Rules 32.2 and 32.6(b) and without merit under Rule 32.7(d). (Vol. 33 at 155). The ACCA affirmed that dismissal, concluding that Reynolds's allegations were insufficiently pleaded and without merit. (*Id.*). The ACCA criticized Reynolds's brief for failing to include facts "indicat[ing] what trial counsel should have done to prepare the mitigation witnesses or how their testimony during the penalty phase would have been different had they received the unspecified preparation." (*Id.* at 155) (citing *Boyd v. State*, 913 So. 2d 1113, 1138-39 (Ala. Crim. App. 2003)). The ACCA noted that Reynolds's *Strickland* claim regarding his father's testimony was "facially meritless." (*Id.*). As it explained:

> First, Harold Reynolds provided testimony that directly supported trial counsel's strategy of presenting Reynolds's difficult childhood -- he testified to being an alcoholic, to moving frequently when Reynolds was young, to a period of homelessness, to the involvement in prostitution by Reynolds's mother, to slapping his wife on multiple occasions, to the possibility that he choked his wife, and to Reynolds's dropping out of school. Second, while Harold Reynolds denied certain testimony provided by other mitigation witnesses, it is clear from the trial court's findings of mitigating factors in its sentencing order that these self-serving denials were given little to no weight.

(*Id.* at 155-56).[79]

Reynolds cites *Holladay v. Haley*, 209 F.3d 1243 (11th Cir. 2011), *Boyde v. California*, 494 U.S. 370 (1990), and *Strickland* in support of this subclaim. (Docs. # 1 at 129, 131; 31 at 104).

---

[79] Although the ACCA did not specifically mention Reynolds's allegations of prejudice with respect to this subclaim, the Rule 32 court did. (*See* Vol. 26 at 407) (concluding that "Reynolds fail[ed] to specifically plead how he was prejudiced by the failure to more adequately prepare the penalty phase witnesses" and that Reynolds's allegations about his father's compromised testimony did not "show either deficient performance or prejudice"). Under the look-through presumption, a "federal [habeas] court should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale . . . [and] then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018). Consistent with this principle, the Rule 32 court's dismissal for insufficient pleading of prejudice becomes the merits-based decision to which AEDPA deference attaches with respect to *Strickland* prejudice.

And, he contends that the ACCA "unreasonabl[y] determined . . . facts in light of the record before it." (Doc. # 31 at 103). But, these arguments are each off the mark.

First, as the court has previously explained, Reynolds's reliance on *Strickland* does not adequately support his allegations of prejudice. Second, the Supreme Court's decision in *Boyde* addresses federal habeas claims unrelated to ineffective assistance of counsel. *See* 494 U.S. at 372 ("This case requires us to decide whether two California jury instructions used in the penalty phase of petitioner's capital murder trial and in other California capital cases before each was modified in 1983 and 1985, respectively, are consistent with the requirements of the Eighth Amendment."). Third, other than being a decision from the Eleventh Circuit, *see Carey v. Musladin*, 549 U.S. 70, 74 (2006), the *Holladay* court's opinion is inapposite to Reynolds's claims: *Holladay* does not speak to *Strickland* prejudice on the issue of witness preparation. *Holladay*, 209 F.3d at 1253-54. In *Holladay*, the Eleventh Circuit addressed several *Strickland* claims including one challenging the adequacy of counsel's preparation of the *defendant* to testify. But, the *Holladay* court did not factor *Strickland* prejudice into its decision on that claim, or even include a prejudice analysis in an alternative holding. *Holladay*, 209 F.3d at 1253-54. Fourth, for the reasons discussed above, Reynolds has not shown that the ACCA's decision was based on an unreasonable determination of the facts. Reynolds has failed to show that he is due relief under § 2254(d) and this claim is due to be denied.

### 4.    Counsels' Failure to Introduce a Confession to Create Residual Doubt

In his fourth penalty-phase *Strickland* subclaim, Reynolds faults trial counsel for failing to introduce the purported confession of Chad Martin to create residual doubt about Reynolds's guilt. (Doc. # 1 at 131; Vol. 33 at 126). The circuit court dismissed this subclaim as inadequate under

Rules 32.3 and 32.6(b) and without merit under Rule 32.7(d). (Vol. 33 at 128). The ACCA affirmed the Rule 32 court's dismissal.

> Reynolds argues that the confession could have created residual doubt in the minds of the jury and sentencer. First, although capital defendants are allowed to present any relevant mitigating circumstances during the penalty phase, residual doubt is not a relevant mitigation circumstance. Trial counsel cannot be held ineffective for failing to offer irrelevant evidence. Further, with respect to prejudice on this claim, Reynolds merely pleaded that, had counsel [attempted to introduce Chad Martin's confession], there is a reasonable probability that the results of the penalty phase would have been different and Mr. Reynolds would not have been sentenced to death. Again, Reynolds pleaded a conclusion that he was prejudiced while failing to support that conclusion with specific facts. Accordingly, this claim is insufficiently pleaded.

(*Id*. at 131-32) (citations and internal quotation marks omitted).

Reynolds would be hard-pressed to argue that the failure to introduce this residual doubt evidence in the penalty phase was deficient. As the ACCA recognized in its decision, "although capital defendants are allowed to present any relevant mitigating circumstance during the penalty phase" under Alabama Code § 13A-5-52 (1975), "residual doubt is not a 'relevant mitigating circumstance." (*Id*. at 131, quoting *Ex parte Lewis*, 24 So. 3d 540, 543 (Ala. 2009)); citing *Franklin v. Lynaugh*, 487 U.S. 164, 188 (1988) (O'Connor, J., concurring); *Melson* v. *State*, 775 So. 2d 857, 899 (Ala. Crim. App. 1999), *aff'd*, 775 So. 2d 904 (Ala. 2000)) (internal quotation marks omitted). To this end, the ACCA reasoned that "[t]rial counsel cannot be held ineffective for failing to offer irrelevant evidence." (*Id*. at 132).

In any event, Reynolds cites to a variety of state and federal sources in his attempt to show deficient performance and prejudice, including Ala. Code § 13A-5-45(d) (1975); *Roberts v. State*, 735 So. 2d 1244 (Ala. Crim. App. 1977); *Pierre v. Walls*, 297 F.3d 617 (7th Cir. 2020); *Parker v. Sec'y, Fla. Dep't of Corr.*, 331 F.3d 764 (11th Cir. 2003); *Smith v. Wainwright*, 741 F.2d 1248 (11th Cir. 1984); *Ex parte Lewis*, 24 So. 3d 540 (Ala. 2009); *Chandler v. United States*, 218 F.3d

1305 (11th Cir. 2000); *Tarver v. Hopper*, 169 F.3d 710 (11th Cir. 1999), and *Wiggins*. (Docs. # 1 at 132; 31 at 104-05). Notably, *Wiggins* is the only Supreme Court decision Reynolds references in connection with this subclaim. But, *Wiggins* focused on a failure to investigate moral culpability, not residual doubt. Thus, *Wiggins* does not demonstrate that the ACCA's decision is contrary to clearly established federal law. And, again, the other cases cited by Reynolds do not show that the ACCA's decision are contrary to a holding of the Supreme Court of the United States.[80] *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

   To obtain habeas relief, an AEDPA petitioner must do much more than simply raise (or, as in this instance, restate) allegations which he believes reflect a valid constitutional claim. Instead, he must establish that one of § 2254(d)'s provisions, which are expressly reserved for correcting

---

[80] Nevertheless, the court also notes that the ACCA's decision is not even contrary to these non-Supreme Court cases. For example, *Smith* is distinguishable for several reasons. First, in *Smith* the Eleventh Circuit reviewed the record *de novo* and without the constraints of AEDPA. Second, the Eleventh Circuit did not grant Smith habeas relief but rather ordered the district court to conduct an evidentiary hearing and then determine whether habeas relief was appropriate. Third, unlike *Smith*, in which trial counsel's sentencing strategy lacked clarity but seemed to seek a life sentence based on residual or whimsical doubt, the strategy during the penalty phase of Reynolds's capital case was to present his life history and argue his lack of moral culpability, consistent with evidence presented during the guilt-phase of trial. (Vol. 12 at 184-88; Vol. 13 at 120-27). Fourth, even assuming that Chad Martin's confession was admissible at the mitigation stage, Reynolds has not alleged how the introduction of that confession into evidence would support a residual doubt sentencing strategy in light of the ACCA's finding that "[Reynolds's] testimony [was] inconsistent with Chad Martin's statement," (Vol. 33 at 130), that the report documenting the retracted confession "appeared to implicate Reynolds" (*Id.* at 129), and where the circuit court found that "the heart of trial counsel's [guilt-phase] strategy . . . focused on questioning Marcie West's version of events and suggesting that West and some other *unidentified* individual committed the murders," (Vol. 25 at 170-71) (emphasis added). Fifth, the record belies Reynolds's allegations that trial counsel unreasonably failed to use Chad Martin's confession to support a residual doubt theory during the penalty phase.

   Also, the Eleventh Circuit in *Parker* held that, considering "the limited value of the mitigating evidence" and the inconsistencies it could lead to (including with the petitioner's alibi defense), "[counsel] was not deficient in focusing their time and energy on acquittal at trial and focusing their arguments at sentencing on residual doubt (instead of other forms of mitigation)." 331 F.3d at 788. In the alternative, the *Parker* court held that the petitioner could not prove prejudice where the aggravating factors were substantial and "the mitigating evidence [the petitioner] argue[d] should have been presented" was "relative[ly] weak. *Id.* at 788-89. These holdings support the ACCA's decision. They do not help Reynolds's position.

   Finally, the Eleventh Circuit in *Chandler* recognized that a residual doubt strategy is oftentimes a reasonable approach when "the evidence of guilt [is] not overwhelming." 218 F.3d at 1320. But, in Reynolds's case (as the ACCA acknowledged), there was powerful evidence of Reynolds's guilt (and Chad Martin's confession would have contradicted Reynolds's theory of the case). The ACCA's decision is not contrary to *Chandler*.

egregious state court constitutional error, applies. Reynolds has not satisfied his burden of showing that the ACCA resolved his residual doubt subclaim contrary to clearly established federal law as determined by the Supreme Court of the United States under § 2254(d)(1) or that the ACCA's decision was based on an unreasonable determination of the facts in light of the State court record under § 2254(d)(2). This claim is due to be denied.[81]

### C.  Sentencing Hearing

Reynolds asserts that his trial counsel were ineffective during the sentencing hearing by "focus[ing] [] their efforts [on] withdraw[ing] from the case" instead of "conduct[ing] any additional investigation . . . or present[ing] any testimony." (Doc. # 1 at 133). Reynolds contends that "the same failures that occurred during the penalty phase occurred again at . . . sentencing, where . . . counsel made no presentation at all." (*Id.*).

The Rule 32 court dismissed this *Strickland* claim as inadequate under Rules 32.3 and 32.6(b). (Vol. 33 at 161). Likewise, the ACCA reasoned that "Reynolds did not plead any specific evidence trial counsel should have presented at the sentencing hearing" and merely incorporated his deficiently pleaded penalty-phase errors. (*Id.*). Thus, the ACCA concluded that "the circuit court did not err in dismissing this claim." (*Id.*) (citing Rule 32.7(d)).

---

[81] The court notes that Reynolds incorrectly contends in his reply that because, under Alabama law, "non-unanimity on a death verdict results in a life sentence, the prejudice inquiry is whether there is 'a reasonable probability that at least one juror would have struck a different balance.'" (Doc. # 31 at 105, quoting *Wiggins*, 539 U.S. at 537). The death penalty case that the Supreme Court reviewed in *Wiggins* was from Maryland, not Alabama. 539 U.S. at 514-15. *See* Ala. Code § 13A-5-46(f) (1975) ("The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors."). Moreover, at the time of Reynolds's sentencing hearing the penalty-phase jury verdict was only a recommendation and, at that time, state law permitted the trial court judge to "override" an advisory jury recommending life without the possibility of parole in favor of the death penalty. As previously noted, this practice does not reflect Alabama's current law, but the new law is not retroactive.

To satisfy his burden under § 2254(d)(1),[82] Reynolds cites several of the same cases that he raised in support of his penalty-phase *Strickland* claims. (*See* Docs. #1 at 133-34; 31 at 196). Because the court has already explained why those authorities (the Supreme Court's decision in *Wiggins*, *Williams*, and *Rompilla*, and the Eleventh Circuit's decision in *Williams*) do not show that Reynolds is entitled to habeas relief, there is no reason to revisit them here. The only remaining decision cited by Reynolds from the Supreme Court is *Gardener v. Florida*, 430 U.S. 349 (1977).[83]

---

[82] Reynolds contends that the ACCA's "resolution of this claim was contrary to, . . . an unreasonable application of, clearly established Supreme Court precedent[,] . . . [and] . . . flowed from unreasonable determinations of the facts in light of the evidence that it had before it." (Doc. # 1 at 135). But, as this court explained previously, the only conceivable way for Reynolds to obtain habeas relief on his penalty-phase *Strickland* allegations was by satisfying § 2254(d)(1). Consistent with that analysis, and in the absence of citations to the record that substantiate an unreasonable factual determination under § 2254(d)(2), the court similarly considers whether Reynolds has shown that the ACCA's decision is contrary to, or an unreasonable application of, federal law.

[83] Reynolds also cites *DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263 (11th Cir. 2014), *Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003), and *McDonald v. State*, 668 So. 2d 89 (Ala. Crim. App. 1995). Again, the court notes that it is Reynolds's burden to show that the ACCA's decision was contrary to federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C.§ 2254(d)(1). Nonetheless, even putting that defect aside, the three additional cases that Reynolds cites to for this claim do not provide sufficient support under § 2254(d)(1).

*DeBruce* is unavailing for Reynolds. In *DeBruce*, the Eleventh Circuit decided that the defendant's counsel committed ineffective assistance of counsel regarding an inadequate mitigation investigation and concluded that sufficient prejudice could be presumed. 758 F.3d at 1265, 1279. The Eleventh Circuit reasoned in *DeBruce* that the state court unreasonably applied *Strickland* "[b]ecause no lawyer could reasonably have made a strategic decision to forego the pursuit of mitigation evidence based on the results of the pre-trial report governing competency to stand trial" or reasonably have chosen not "to question DeBruce and his mother about the[] overt contradictions" between the report and "his mother's account of DeBruce's childhood." *Id*. at 1274-75. However, the sentencing circumstances contemplated in *DeBruce* are substantially different from those at Reynolds sentencing hearing.

Therefore, *DeBruce* does not establish that the ACCA's decision in Reynolds's case was contrary to federal law as determined by the Supreme Court. As the ACCA explained, Reynolds's counsel provided extensive mitigation. (*See* Vol. 26 at 12). In sum, *DeBruce* does not bolster Reynolds's claim under § 2254(d)(1) because the evidence Reynolds now contends should have been presented would have been needlessly cumulative.

Nor does Reynolds's reliance on *Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) support his § 2254(d)(1) argument. In *Hardwick*, the Eleventh Circuit framed the *Strickland* inquiry as "whether an attorney who provided *no defense at the guilt or penalty phase* was ineffective in defending a young drug dealer, who was an alcoholic and drug abuser." 320 F.3d at 1130 (emphasis added). While the court denied the ineffective assistance of counsel claim at the guilt phase, the court granted relief based on the sentencing phase. *Id.*

Reynolds's reliance on *Hardwick* is also unfruitful. In contrast to the petitioner in *Hardwick*, Reynolds's lawyers *did* present mitigating evidence. Furthermore, *Hardwick* does not speak to Reynolds's allegation that his trial counsel was deficient for focusing on withdrawing from the case instead of presenting evidence of mitigation at the sentencing hearing. The ACCA's decision is not contrary to *Hardwick*.

Reynolds cites *Gardener* for the proposition that "sentencing is a critical stage of the criminal proceeding at which [the defendant] is entitled to the effective assistance of counsel." (Doc. #1 at 134, quoting *Gardener*, 430 U.S. at 358). While this statement is of course true, *Gardener* is a case about a defendant being sentenced to death on the basis of a presentence report that was not disclosed to his counsel. 430 U.S. at 361. Without access the to the presentence report, defendant's counsel could not help but be ineffective at sentencing. *See id.* at 359-61.[84] This fact situation is far afield from Reynolds's claim that his counsel did not prepare enough at the sentencing phase. (Doc. # 1 at 134). Therefore, *Gardener* does not establish that the ACCA's decision related to Reynolds's claims of ineffective assistance of counsel at the sentencing hearing is contrary to federal law such that no fair-minded jurist could agree with the ACCA's decision.

Reynolds has not shown that the ACCA's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Further, Reynolds has not shown that the ACCA's decision on this claim was contrary to the Supreme Court's decisions in *Gardener* *Wiggins*, *Williams*, and *Rompilla*. Accordingly, the court concludes that Reynolds's ineffective assistance of counsel claim at the sentencing hearing is due to be denied.

---

*McDonald v. State*, 668 So. 2d 89 (Ala. Crim. App. 1995) is also unhelpful to Reynolds. Although that decision reviewed a *Strickland* sentencing hearing, the facts are significantly different from Reynolds's allegations. In *McDonald*, the defendant's counsel did not attend the defendant's sentencing hearing. *Id.* at 89, 93. Applying *Golden v. Newsome*, 755 F.2d 1478 (11th Cir. 1985), the ACCA found that counsel's complete absence from the sentencing hearing without a waiver from the defendant violated the Sixth Amendment. 668 So. 2d at 91. The constitutional violation recognized by *McDonald* and *Golden* is the *complete* absence of counsel at sentencing. Reynolds has not alleged that trial counsel failed to appear at his sentencing. The ACCA's decision is not contrary to *McDonald* or *Golden*.

[84] Actually, the *Gardner* decision speaks more to constitutional waiver rather than ineffective assistance of counsel. 430 U.S. at 61-62.

### D.       Motion for a New Trial

Reynolds also claims that the counsel appointed for his new trial motion were ineffective. (Doc. # 1 at 135-36). He contends that "[counsel] were appointed more than four months before filing an amended motion for a new trial yet they did not conduct an investigation, seek an evidentiary hearing, or even cite the record or applicable case law in support of this motion." (*Id*. at 135). In his petition, Reynolds refers to portions of the hearing transcript in which appointed counsel reported to the trial court that "they did not have a full and final transcript of the trial." (*Id.*). Reynolds also points out that "the trial transcript was not certified until March 31, 2008, more than six weeks after counsel argued the motion for new trial." (*Id.*). According to Reynolds, "[w]ithout such basic information, counsel could not have adequately moved for a new trial." (Doc. # 31 at 107).

The Rule 32 court dismissed this *Strickland* claim as inadequate under Rules 32.3 and 32.6(b). (Vol. 33 at 161-62). The ACCA determined that Reynolds had not pleaded "any specific claims that trial counsel could have raised in the motion for new trial, much less any that would have been meritorious." (Vol. 33 at 162) (citing *Daniel v. State*, 86 So. 3d 405, 440 (Ala. Crim. App. 2011) ("[Petitioner] failed to plead what argument counsel could have made that would have resulted in a different sentencing recommendation in this case or how he was prejudiced; thus, he failed to comply with Rule 32.6.")). Thus, the ACCA held that the "circuit court did not err in dismissing this claim." (*Id.*) (citing Rule 32.7(d)).

275

In an attempt to satisfy § 2254(d)(1),[85] Reynolds points to *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011). (Docs. # 1 at 135-36; 31 at 107).[86] In *Ferrell*, the court held that the petitioner had a meritorious *Strickland* claim -- under both the performance and prejudice prong -- based on appellate counsel's mishandling of his motion for a new trial. 640 F.3d at 1236-40. The *Ferrell* court noted that the mitigating evidence presented at the hearing was "limited" and summarized the gaps left out by petitioner's counsel. *Id.* at 1239-40. As a result, the *Ferrell* court concluded that counsel's "fail[ure] to present significant mitigating evidence about the petitioner[s] upbringing and mental health'" made "the totality of mitigating evidence … very significant, when compared to the aggravators." *Id.* at 1240

However, the circumstances surrounding Reynolds's motion for a new trial are distinguishable from *Ferrell*. First, the alleged "neglect" by Reynolds's counsel does not compare to the magnitude of evidence that was readily available and potentially impactful in *Ferrell*. *See also Fugate v. Head*, 261 F.3d 1206, 1217 (11th Cir. 2001) ("Th[e Eleventh Circuit] and the Supreme Court have held repeatedly that the performance of counsel who fails to present any mitigating evidence whatsoever—even when such evidence was available—may nonetheless pass constitutional muster."). Even if the court assumed that counsel's performance was deficient (and to be clear the court does not make any such conclusion) unlike the petitioner in *Ferrell*, Reynolds

---

[85] Consistent with the court's prior discussion above, Reynolds's only conceivable avenue of AEDPA relief is § 2254(d)(1).

[86] Again, § 2254(d)(1) requires a state court's decision to be contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Petitioner's lack of argument in support of this claim based on Supreme Court decisions (and lack of any explanation as to how Eleventh Circuit cases show the ACCA's decision is contrary to Supreme Court precedent) is reason enough to deny this claim. Nonetheless, the court details how *Ferrell* does not otherwise support Reynolds's argument under § 2254(d)(1). Additionally, Reynolds also cites to *Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002). But, it appears that Reynolds uses this case merely to note the standard required for counsel's performance to be found unreasonable: "no competent counsel would have taken the action." *Crawford v. Head*, 311 F.3d at 1297. As *Crawford v. Head* does not address a motion for new trial, the court declines to analyze that case further.

cannot show that there was a reasonable probability that the outcome of his motion for new trial would have been different. At a minimum, fair-minded jurists could disagree on whether the aggravating factors outweighed the mitigating evidence.

A successful AEDPA petitioner must show "the sort of 'extreme malfunction[s] in the state criminal justice syste[m]' that would permit federal court intervention" to remedy a serious constitutional violation. *Shinn*, 141 S. Ct. at 526, quoting *Richter*, 562 U.S. at 102. Reynolds's allegations and authorities do not establish such an error. Because Reynolds cannot show that the ACCA's decision on this claim was contrary to clearly established federal law as determined by the Supreme Court of the United States, this clam is due to be denied.

### E.    "Actual Conflict of Interest" Claim

Reynolds next claims that Ms. Patricia Granger who represented Reynolds during his pretrial preparations and plea negotiations, had an "actual conflict of interest." (*See* Docs. # 1 at 136-40; 31 at 108-12). Reynolds contends that this alleged "actual conflict of interest" rendered his representation "constitutionally ineffective under the Sixth Amendment."[87] (*See* Docs. # 1 at 136-38; 31 at 108-12).

---

[87] In his federal habeas petition, Reynolds contends that in addition to violating his Sixth Amendment right to effective counsel, the alleged "actual conflict of interest" violated his rights under the Eighth and Fourteenth Amendments. (*See* Doc. # 1 at 126). The court presumes Reynolds's reference to the Fourteenth Amendment is for the purpose of incorporation. To the extent Reynolds intended to seek habeas relief under the Fourteenth Amendment's Due Process Clause or under the Eighth Amendment, those arguments are procedurally barred from the court's review as Reynolds failed to make these claims in state court. *Medellin*, 544 U.S. at 666 (holding that a petitioner "can seek federal habeas relief only on claims that have been exhausted in state court"). In the alternative, these claims have been waived. "[M]ere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments—hence litigate—on a petitioner's behalf. Federal judges cannot litigate on behalf of the parties before them, and it is for this reason that any claims in [Reynolds's] petition that were not argued in his brief are abandoned." *Blankenship*, 2007 WL 4404972, at *40 (citing *Burkhalter*, 966 F. Supp. at 1225 n.4; *GJR Investments, Inc.*, 132 F.3d at 1369). And further, this claim is more appropriately evaluated under the Sixth Amendment's right to effective counsel rather than the Fourteenth Amendment's due process right or the Eighth Amendment right against cruel and unusual punishment.

The ACCA concluded that the claim was insufficiently pleaded under Rules 32.2 and 32.6(b). (*See* Vol. 33 at 134).[88] The ACCA noted that "Reynolds pleaded that Granger was appointed to represent him on June 3, 2003, and that Granger had an actual conflict of interest from February 1, 2007—the day she accepted a position as a part-time prosecutor for the City of Gadsden—until April 26, 2007— when she withdrew from his representation." (*Id.* at 132). Next, the ACCA acknowledged that Reynolds pleaded that "'[d]uring key months of preparation . . . [Granger] should have been interviewing City of Gadsden police officers, either to secure their presence as defense witnesses or to prepare to cross[-]examine them at trial, as the State had already furnished its witness list.'" (*Id.*, quoting Vol. 24 at 158). The ACCA also found that "Reynolds pleaded that Granger and her co-counsel did not interview officers involved in the investigation and that Granger engaged in attorney-client communications with Gadsden police officers that, according to Granger, 'require[d] the exchange of confidential information.'" (*Id.* at 33, quoting Vol. 24 at 158-59). The ACCA acknowledged that Reynolds had pleaded that he suffered prejudice "because Granger withdrew from representation less than six months prior to trial, which left replacement trial counsel an insufficient amount of time to prepare." (*Id.*).

After recognizing that the controlling authority for the purpose of analysis was *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), the ACCA held that "Reynolds's claim that trial counsel were ineffective because [Granger] had a conflict of interest was insufficiently pleaded." (Vol. 33 at 133-34). In doing so, both the ACCA and the Rule 32 court recognized that "to demonstrate an

---

[88] "An Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim in a Rule 32 petition necessarily entails a determination of the merits of the underlying claim." *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011). It is not "a state procedural bar that [] preclude[s] [federal court] review." *Id*. A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

actual conflict of interest, a defendant must be able to point to specific instances in the record which suggest an impairment or compromise of [Reynolds's] interests for the benefit of another party." (Vol. 25 at 174, quoting *Burden v. Zant*, 24 F.3d 1298, 1305 (11th Cir. 1994)) (internal quotation marks and citation omitted); *see Mers*, 701 F.2d at 1328 (explaining that the court "will not find an actual conflict unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests[,]" that "appellants must make [a] factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one but harmful together[,]" and that "[i]f [counsel] does not make such a choice, the conflict remain[s] hypothetical").

Upon analyzing Reynolds's pleadings under this framework, the ACCA reasoned that Reynolds had "broadly asserted that Granger had a conflict that adversely affected her representation," but "failed to plead any specific facts supporting that conclusion." (Vol. 33 at 134). Further, the ACCA found that "Reynolds failed to plead with specificity any evidence he was unable to obtain or any interviews that replacement counsel was unable to perform." (*Id.*). The ACCA also found Reynolds's allegation that "Granger's alleged conflict prevented her from offering [him] candid advice" insufficiently pleaded, as Reynolds "failed to plead with specificity what advice should have been offered." (*Id.*). "In sum," the ACCA found that Reynolds failed to plead sufficient facts showing that "Granger 'was actively representing conflicting interests' or that [she] 'made a choice between possible alternative courses of action' in her representation of Reynolds." (*Id.*, quoting *M.S.*, 822 So. 2d at 453).

Here, Reynolds asserts that habeas relief is appropriate under § 2254(d)(2) because the ACCA made unreasonable factual determinations. His sporadic references to the record fail to

identify the specific factual findings he contends the ACCA unreasonably determined (much less explain the significance of any such finding). Therefore, Reynolds's "actual conflict of interest" claim is not "highly probable." *Ward*, 592 F.3d at 1177; *see also Lee*, 987 F.3d at 1018 n.2 (explaining that unless a petitioner "can[] show that the state court's decision 'was based on' the challenged findings, they provide no basis for federal habeas relief whether or not those findings were unreasonable," quoting 28 U.S.C. § 2254(d)(2). Thus, to overcome AEDPA's deferential standard, Reynolds must show that the ACCA unreasonably applied Supreme Court precedent under § 2254(d)(1). *See, e.g.*, *Shinn*, 141 S. Ct. at 523. Reynolds has not met this exacting standard.

Reynolds relies on several federal and Alabama cases in support of his actual conflict of interest claim, including *Strickland*, *Sullivan*, *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978), *Burden*, *United States v. Khoury*, 901 F.2d 948 (11th Cir. 1990), and *LoConte v. Duggar*, 847 F.2d 745 (11th Cir. 1988). (*See* Doc. # 1 at 137-40). In his reply brief, Reynolds also cites *Wood v. Georgia*, 450 U.S. 261 (1981); *McConico v. State of Ala.*, 919 F.2d 1543 (11th Cir. 1990); and *M.S.* (*See* Doc. # 31 at 108-11). For the most part, Reynolds uses these decisions to highlight general propositions instead of applying their "actual conflict of interest" analyses to his claim.[89]

Nevertheless, the court turns to review of the relevant Supreme Court precedent, including *Strickland*, *Sullivan*, *Holloway*, and *Wood*, as well as the Eleventh Circuit's treatment of the *Sullivan* exception *at the time of Reynolds's trial*. As explained above, a petitioner claiming a Sixth Amendment violation based upon the ineffective assistance of counsel must allege that, but for his

---

[89] As explained numerous times, § 2254(d)(1) requires that the ACCA's decision be contrary to the holding of a case decided by the Supreme Court of the United States. Putting aside this critical defect, the court further notes that even the Eleventh Circuit cases that Reynolds cites do not adequately support his claim. *See Burden v. Zant*, 24 F.3d 1298 (11th Cir. 1994) (concerning a joint representation where the attorney reached a deal with the prosecution that one client would not be prosecuted in exchange for testimony against the other client); *McConico v. State of Alabama*, 919 F.2d 1543 (11th Cir. 1990) (finding an actual conflict where an attorney had to cross-examine one of his other clients); *United States v. Khoury*, 901 F.2d 948 (11th Cir. 1990) (regarding the joint representation of coindictees); *LoConte v. Duggar*, 847 F.2d 745 (11th Cir. 1988) (reasoning that, despite the joint representation, the conflict did not impact the appellant's decision to plead guilty).

counsel's conduct, he suffered actual prejudice. Thus, to warrant relief under *Strickland*, a defendant is usually required to show "a reasonable probability that but for counsel's unprofessional errors, the *result* of the proceeding would have been different." *Strickland*, 46 U.S. at 694 (emphasis added). However, where counsel's ineffectiveness stems from a conflict of interest, the Supreme Court has carved out a few exceptions "to assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens v. Taylor*, 535 U.S. 162, 176 (2002); *see Dallas v. Warden*, 964 F.3d 1285, 1303 (11th Cir. 2020).

In *Holloway v. Arkansas*, a defendant's trial counsel made a timely request to the trial court, requesting to withdraw as defendant's counsel. 435 U.S. at 478-80. The attorney felt that he could not adequately represent the divergent interests of three codefendants. *Id.* Defense counsel's motions for the appointment of separate counsel, however, were denied without inquiry by the trial court. *Id.*

As the *Mickens* Court explained, "*Holloway* presumed . . . that the conflict, 'which [the defendant] and his counsel tried to avoid by timely objections to the joint representation,' undermined the adversarial process." *Mickens*, 535 U.S. at 168, quoting *Holloway*, 435 U.S. at 490. The *Mickens* Court further reasoned that this "presumption was justified because joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants 'effectively sea[ls] [the] lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors." *Id.*, quoting *Holloway*, 435 U.S. at 489-90. Thus, the decision in *Holloway* "creates an automatic reversal rule *only* where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." *Id.* (emphasis added) (citing *Holloway*, 435 U.S. at 488). Reynolds does not plead (and the record does not reflect) that Granger was "forced [by the trial

court] to represent codefendants [at trial] over her timely objection," as required for *Holloway* error. The *Holloway* decision lends no help to Reynolds.

In *Cuyler v. Sullivan*, the Court held that *Holloway*'s automatic reversal rule does not apply when counsel fails to make a timely objection. The Court reasoned that absent a timely objection to an alleged conflict of joint representation, "a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel." 446 U.S. at 348-49; *see also Mickens*, 535 U.S. at 168-69 (summarizing *Sullivan*). Instead, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Sullivan,* 446 U.S. at 348; *see also Mickens*, 535 U.S. at 168-69 (explaining that *Sullivan* declined to extend the *Holloway* rule). *Sullivan* does not demonstrate that the ACCA's determination rejecting the claim that Granger's three-month-long *pretrial-representation* of Reynolds "adversely affected" his trial counsel's ability to interview those same officers (during the six-month period between Granger's withdrawal and the start of trial) is in any way contrary to clearly established federal law. In fact, before Reynolds's trial, the judge *sua sponte* questioned Granger's dual representation (*see* Vol. 3 at 202; Vol. 4 at 3-4), and she withdrew. Reynolds has not alleged any specific facts in the record demonstrating that Granger somehow prevented Reynolds's actual trial counsel from conducting these interviews.

The Supreme Court's rationale in *Wood v. Georgia*, 450 U.S. 261 (1981) further examines the "actual conflict of interest" standard. Here, the employer's attorney represented the employee defendants. *Id.* at 266. As summarized by the *Mickens* Court, "the employer's interest in establishing a favorable [] precedent . . . diverged from the [employees'] interest in obtaining leniency or paying lesser fines to avoid imprisonment." 535 U.S. at 169. This conflict "was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire

further." *Wood*, 450 U.S. at 272. Moreover, the Court clarified that, as referenced in *Wood*, "'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171 (emphasis in original).

*Wood* does not support Reynolds's claim that Granger's three-month, pre-trial, dual representation amounted to an "actual conflict of interest." Although the *Wood* Court did remand for further inquiry, it did so because of "the *possibility* of a conflict of interest was sufficiently apparent . . . to impose upon the court a duty to inquire further." *Wood*, 450 U.S. at 272 (emphasis in original). In contrast, Reynolds's trial court actually inquired about Granger's *possible* conflict of interest. Reynolds has not pointed to any specific fact in the record, much less a fact pattern even remotely analogous to *Wood*, to show that the ACCA's decision was objectively unreasonable. Nor has he even suggested now Granger's dual-representation for a period of approximately three months "actually [affected] the adequacy of [Reynolds's] representation" at trial, particularly where Granger withdrew as counsel six months prior to trial. (*See* Vol. 33 at 134). Thus, *Wood* does not help Reynolds here.

"An actual conflict for Sixth Amendment purposes is a conflict of interest that adversely affects counsel's performance." *Mickens*, 535 U.S. 162 at 172 n.5. As instructed by the Eleventh Circuit, and as recognized by both the ACCA and the Rule 32 court, a federal habeas petitioner claiming that a conflict of interest adversely affected his representation, is required to satisfy each of the following elements in a multi-part test. *First*, a petitioner "'must make a factual showing of inconsistent interests' or point to 'specific instances in the record' to suggest an actual impairment of his or her interests." *Quince v. Crosby*, 360 F.3d 1259, 1264 (11th Cir. 2004), quoting *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987). *Second*, in order "[t]o prove adverse effect, a

defendant needs to demonstrate: (a) that the defense attorney could have pursued a plausible alternative strategy, (b) that this alternative strategy was reasonable, and (c) that the alternative strategy was not followed because it conflicted with the attorney's external loyalties." *Quince*, 360 F.3d at 1264-65 (11th Cir. 2004), quoting *Reynolds v. Chapman*, 253 F.3d 1337, 1343 (11th Cir. 2001).

Reynolds failed to show that the ACCA's decision concluding that Reynolds did not adequately plead an actual conflict of interest that affected counsel's representation was unreasonable or contrary to clearly established federal law, particularly as determined in *Holloway*, *Sullivan*, and *Wood*.[90] Granger, upon timely inquiry by the trial court, withdrew as Reynolds's counsel six-months before his trial started. And, as the state courts recognized, Reynolds has not pleaded specific instances in the record showing any adverse effects on him due to Granger's three-month stint of representation.

Thus, Reynolds has not met his burden under § 2254(d)(1) or § 2254(d)(2), and his claim is due to be denied.

### F. Reynolds's Cumulative-Effect *Strickland* Claim

Reynolds argues that he is due federal habeas relief because of the cumulative effect of his counsel's errors, which he claims fundamentally impaired the fairness of his trial, sentencing, and motion for a new trial. (*See generally* Doc. # 1 at 67-70, 136).

The Eleventh Circuit's adjudication of a similar claim in *Hunt v. Commissioner, Alabama Department of Corrections*, 666 F.3d 708 (11th Cir. 2012) is instructive. In *Hunt*, a habeas petitioner complained that the ACCA "refused to consider whether the cumulative effect of counsel's alleged errors amounted to ineffective assistance of counsel, and in doing so,

---

[90] The ACCA's decision certainly is not contrary to *Burger v. Kemp*, which involved coindictees being represented by different attorneys in the same firm. *See* 483 U.S. at 783-88.

unreasonably applied clearly established federal law." *Id.* at 731. The Eleventh Circuit rejected the claim, saying that "[e]ven if [it] were to determine that clearly established federal law mandates a cumulative effect analysis of ineffective-assistance claims, Hunt would not be entitled to relief: he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective assistance."[91] *Id.* at 731-32. The same is true here. Reynolds has failed to demonstrate that the actions or omissions of his trial counsel, regardless of whether they are considered individually or cumulatively, prejudiced him under *Strickland*. It is incumbent upon him to do so because,

> [u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." [*Strickland* , 466 U.S.] at 689; *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Premo v. Moore*, 562 U.S. 115, 131 (2011).

The fact that Reynolds's present habeas counsel may have tried this case differently in some way is not sufficient to satisfy *Strickland*. *See* 466 U.S. at 687. After careful review, the court concludes that Reynolds's "cumulative effect" claim does not satisfy the prejudice prong of *Strickland*, and that claim is due to be denied.

---

[91] Similarly, in *Borden v. Allen*, 646 F.3d 785 (11th Cir. 2011), the Eleventh Circuit addressed the question of whether "a claim of ineffective assistance of counsel may be based on the 'cumulative effect' of multiple non-prejudicial errors by counsel when no individual error standing alone would warrant a finding of prejudice under *Strickland*." *Id.* at 823. Because the petitioner in *Borden*, like Reynolds, had not sufficiently pleaded facts that would establish prejudice, regardless of whether the actions of the petitioner's attorneys were considered cumulatively, the circuit declined "to elaborate further on the concept of 'cumulative effect' for fear of issuing an advisory opinion on a hypothetical issue." *Id.*

## VI.    REYNOLDS'S CUMULATIVE-EFFECT "OF ALL ERRORS" CLAIM

Finally, Reynolds claims that the cumulative effect of the alleged errors he has claimed violated his federal constitutional rights (Doc. # 1 at 157-58). But, Reynolds has not satisfied his burden to show that the ACCA's decision rejecting that claim was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. §2254(d). Nor has he shown that the ACCA's ruling is based on an unreasonable finding of fact in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(2).

The ACCA rejected a portion of this claim on direct appeal, holding "the cumulative effect of the individually nonreversible errors did not affect Reynolds's substantial rights." *Reynolds I*, 114 So. 2d at 81, quoting *Sharifi v. State*, 993 So. 2d 907, 946-47 (Ala. Crim. App. 2008). For the reasons below, the court concludes that Reynolds is not due relief on this claim.

First, Reynolds's claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and is due to be denied because Reynolds has not articulated a claim under 28 § U.S.C. 2254(d). "Habeas corpus petitions must meet heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citing 28 § 2254 Rule 2(c)). Reynolds failed to plead with any specificity why he is due relief under a cumulative effect theory. As the Supreme Court has explained:

> In ordinary civil proceedings, the governing Rule, Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 2(c) of the Rules Governing Habeas Corpus Cases [however] requires a more detailed statement. The habeas rule instructs [a] petitioner to "specify all the grounds for relief available to [him]" and to "state the facts supporting each ground."

*Mayle v. Felix*, 545 U.S. 644, 649 (2005). Thus, to comply with Rule 2(c)'s pleading requirement, Reynolds must identify the relevant Supreme Court case, identify a ground for relief under § 2254(d), and allege facts supporting his § 2254(d) claim. *See, e.g.*, *Washington v. Crosby*, 324 F.3d

1263, 1265 (11th Cir. 2003) (affirming the denial of habeas relief because the petitioner failed to identify a relevant Supreme Court case).

Here, Reynolds has not specified a ground for relief under 28 U.S.C. § 2254(d).[92] Reynolds alleges the cumulative impact of all his alleged claims of error entitles him to a new trial, but this is not a valid ground for relief under § 2254(d). Moreover, Reynolds does not cite to either AEDPA provision within this claim or identify the relevant state courts' adjudication of these claims. Because Reynolds's claim is insufficiently pleaded, it is due to be summarily denied.

Alternatively, even if a cumulative error claim is cognizable (and even assuming that Reynolds sufficiently pleaded such a claim), no cumulative error occurred here. "None of the [petitioner's] individual claims of error or prejudice have any merit, and therefore [the court has] nothing to accumulate." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012); *see Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003) ("the sum of various zeroes remains zero"). Because Reynolds has failed to establish that the ACCA's decision is not in violation of § 2254(d)(1) or § 2254(d)(2), his petition is due to be denied.

---

[92] In support of this claim, Reynolds cites *Ford v. Schofield*, 488 F. Supp. 2d 1258, 1368-69 (N.D. Ga. 2007) and *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004). (*See* Doc. # 1 at 157-58). The court notes that, just as *Ford* recognized, there is no clearly established Supreme Court precedent requiring states to consider the cumulative effect of alleged constitutional errors to determine whether a defendant has received due process. 488 F. Supp. at 1368 (citing *Jenkins v. Byrd*, 103 F. Supp. 2d 1350, 1382 (S.D. Ga. 2000)). In *Conklin*, however, the Eleventh Circuit did quote a pre-AEDPA decision explaining that "[a] piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." 366 F.3d at 1210, quoting *United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir. 1983); *see also Parle v. Runnels*, 505 F.3d 922, 928-29 (9th Cir.2007) (recognizing claim of cumulative error in federal habeas). *But see Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998) (holding no cumulative error claims on federal habeas); *Moore v. Parker*, 425 F.3d 250 (6th Cir. 2005) (same); *Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996) (same). As these diverging opinions indicate, it is an open question as to whether Reynolds's cumulative error claim is even cognizable.

**VII.    CONCLUSION**

For all these reasons, and after careful review, the court concludes that Reynolds's petition (Doc. # 1) and Motion Requesting Discovery and an Evidentiary Hearing (Doc. # 32) are due to be denied.

A separate order will be entered.

**DONE** and **ORDERED** this March 25, 2022.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE